**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

DEREK WASKUL, by his guardian, Cynthia Waskul; CORY SCHNEIDER,
by his guardians, Martha and Wendy Schneider; KEVIN WIESNER,
by his guardian, Kerry Kafafian; and WASHTENAW
ASSOCIATION FOR COMMUNITY ADVOCACY,

     Plaintiffs,                               Case No. 2:16-cv-10936

v.                                               Hon.

TRISH CORTES, in her official capacity as
Director of Washtenaw County Community
Mental Health; WASHTENAW COUNTY COMMUNITY
MENTAL HEALTH; NICK LYON in his official
capacity as Director of Michigan Department of
Health and Human Services; JANE TERWILLIGER
in her official capacity as director of Community
Mental Health Partnership of Southeast Michigan; and
COMMUNITY MENTAL HEALTH PARTNERSHIP OF
SOUTHEAST MICHIGAN,

     Defendants.

_____/

| | |
|---|---|
| LEGAL SERVICES OF SOUTH | MICHIGAN POVERTY LAW PROGRAM |
| CENTRAL MICHIGAN | Lisa Ruby (P46322) |
| Nicholas A. Gable (P79069) | Attorney for Plaintiffs |
| Attorney for Plaintiffs | 220 E. Huron #600A |
| 420 N. Fourth Ave. | Ann Arbor, MI 48104 |
| Ann Arbor, MI 48104 | (734) 998-6100 ext. 117 |
| (734) 665-6181 ext. 127 | lruby@mplp.org |
| ngable@lsscm.org | |

MICHIGAN PROTECTION AND
ADVOCACY SERVICE, INC.
Mark A. Cody (P42695)
Attorney for Plaintiffs
4095 Legacy Pkwy Ste. 500
Lansing, MI 48911-4264
(517) 487-1755
mcody@mpas.org

_____/

**COMPLAINT**

    Plaintiffs, through their attorneys, state as follows:

**PRELIMINARY STATEMENT**

    1. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 based on

        violations of their rights expressly conferred by the Social

1

Security Act and United States Constitution. Plaintiffs bring additional state claims pursuant to Michigan's Mental Health Code.

2. Plaintiffs are three severely developmentally-disabled adults receiving medically-necessary Community Living and Support (CLS) Services through Washtenaw County Community Mental Health (WCCMH), which allow them to avoid institutionalization.

3. Plaintiffs filed this action after their medically-necessary CLS services were reduced.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over Plaintiffs' federal and constitutional claims under 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

4. Venue in the Eastern District is proper because Plaintiffs reside in Washtenaw County, Michigan, and because all the events complained of herein occurred in Washtenaw County, Michigan.

**PARTIES**

5. Individual plaintiffs, Derek Waskul (guardian Cynthia Waskul), Cory Schneider (guardians Martha Schneider and Wendy Schneider), and Kevin Wiesner (guardian Kerry Kafafian) are residents of Washtenaw County, Michigan. At all relevant times, they have been participants in the Community Living and Support (CLS) services program offered under Michigan's Habilitation Supports Waiver (HSW) and administered by Washtenaw County Community Mental Health.

6. Guardians for the individual Plaintiffs are suing on Plaintiffs' behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

2

7.   Washtenaw Association for Community Advocacy brings this action on its own behalf and on behalf of its members who have been directly affected by Defendants' unlawful policies and practices.

8.   Defendant Washtenaw County Community Mental Health (WCCMH) was established by Public Act 258. It provides mental health services to Washtenaw County adults with a severe and persistent mental illness, children with a severe emotional disturbance, and individuals with a developmental disability.

9.   Trish Cortes is the Director of WCCMH and is being sued in her official capacity.

10.  Nick Lyon is the Director of Michigan's Department of Health and Human Services (MDHHS, or The Department) and is being sued in his official capacity.

11.  The Department is the single state agency responsible for administering Medicaid. 42 U.S.C. § 1396a(a)(5).

12.  Jane Terwilliger is the Executive Director of the Community Mental Health Partnership of Southeast Michigan (CMHPSM) and is being sued in her official capacity.

13.  The CMHPSM is a specialty prepaid health plan considered a Medicaid managed care organization under MCL 400.109f.

14.  Medicaid managed care organizations are responsible for making medical assistance available and accessible to Medicaid beneficiaries within their region. 42 U.S.C. § 1396b(m).

**FACTS**

**A. Medicaid Program and Habilitation Supports Waiver**

15.  The Medicaid program is jointly funded and administered by the state and federal governments under Title XIX of the Social Security Act.

16.  The Medicaid program provides medical assistance for certain low income children, families, pregnant women, disabled adults, and elderly people.

17.  Michigan must operate its Medicaid program in compliance with federal Medicaid statutes and regulations.

18.  MDHHS contracts with CMHPSM, a Medicaid managed care organization, to provide or arrange for services for enrollees in its region. 42 U.S.C. § 1396u-2(a)1(B); MCL 400.109f.

19.  CMHPSM contracts with WCCMH, an organization statutorily required to provide and arrange for mental health services to individuals with developmental disabilities in Washtenaw County, to provide or arrange services for Medicaid enrollees.

20.  CMHPSM, as a Medicaid managed care organization, is responsible for "providing defined inpatient services, outpatient hospital services, physician services, other specified Medicaid state plan services, and additional services approved by the centers for Medicare and Medicaid services under section 1915(b)(3) of title XIX of the social security act, 42 U.S.C. § 1396n." MCL 400.109f.

21.  The relationship between MDHHS, CMHPSM, and WCCMH is represented in the following graphic published by the University of Michigan and Blue Cross Blue Shield of Michigan's Center for Healthcare Research & Transformation:

4



PIHP = Prepaid Inpatient Health Plans
CMH = Community Mental Health Services Programs
CA = Substance Abuse Coordinating Agencies

22.  States submit a plan to Centers for Medicare and Medicaid Services (CMS) for how the Medicaid program will be administered. This is called the State Plan. 42 U.S.C. § 1396a(a).

23.  The State Plan contains and describes the nature and scope of the State's Medicaid program. 42 C.F.R. § 430.10.

24.  Michigan's State Plan includes the provision of home and community based services to approved Medicaid beneficiaries under a waiver, "granted under 42 C.F.R. Part 441, subpart G," who would otherwise require services in a facility. Attachment 2.2-A to the Michigan State Plan. This waiver is called the Habilitation Supports Waiver (HSW) in Michigan.

25.   CMS grants waivers to "permit states to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to avoid institutionalization." 42 C.F.R. § 441.300.

26.   Michigan elected, applied, and was approved to receive funding to furnish waiver services under 42 U.S.C. § 1396n to assist individuals with developmental disabilities with activities of daily living necessary to permit them to live in their own home or rental unit in a community supported living arrangement setting.

27.   Federal law lists the type of community living arrangement services which must be offered under the waiver. 42 U.S.C. § 1396u and 42 C.F.R. § 440.180.

28.   Michigan elected to make all Medicaid home and community-based living arrangement services under 42 U.S.C. § 1396u and 42 C.F.R. § 440.180 available to individuals on the HSW. MCL 400.109c.[1]

29.   Community supported living arrangement services is defined as approved services that assist a developmentally disabled individual in activities of daily living necessary to permit them to live in their own apartment in a community supported living arrangement setting. 42 U.S.C. § 1396u. It also includes personal assistance and "support services necessary to aid an individual to participate in community activities." 42 U.S.C. § 1396u(a)(7).

---

[1] "The department of community health shall include, as part of its program of medical services under this act, home- or community-based services to eligible persons whom the department of community health determines would otherwise require nursing home services or similar institutional care services under section 109. MCL 400.109(c)(1). The minimum list of required services includes home delivered meals, chore services, homemaker services, respite care, personal care, adult day care, private duty nursing, mental health counseling, caregiver training,

30.  "Community Living Supports facilitate an individual's independence, productivity, and promote inclusion and participation." Michigan Medicaid Provider Manual (MPM) § 15.1.

31.  Plaintiffs receive services under the HSW when, "if not for the availability of the home and community-based services, [he or she would] require the level of care provided in an intermediate care facility for the mentally retarded (ICF/MR)." HSW Eligibility Certification.

32.  The Social Security Act and federal regulations make clear that, for state waiver plans like the HSW, "lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan." 42 U.S.C. § 1396a(a)(2); 42 C.F.R. § 433.53.

33.  Michigan has a long history of authorizing CLS services under the HSW (the provision authorizing the HSW was first added to the Social Security Act in 1981), which are seen as a more humane and cost-effective alternative to institutionalization.

**B. Right to Self-Determination Under the Habilitation Supports Waiver**

34.  The core of the Community Living Supports program is the participant's right to self-determination. Exhibit A, HSW, Appendix E-2. This means that the participant structures his or her own plan of service according to medical need.

35.  States decide whether to allow participant-directed services. If so, the state must complete Appendix E of the HSW and specify which aspects of the services are participant-directed. See CMS

---

emergency response systems, home modification, transportation, and medical equipment and supply services." MCL 400.109(c)(2).

Instructions, Technical Guide, and Review Criteria, page 213 *et seq*.

36. Medical necessity criteria is defined in Michigan's Medicaid Provider Manual as supports, services, and treatment "intended to treat, ameliorate, diminish or stabilize the symptoms of mental illness, developmental disability, or substance use disorder." MPM § 2.5.A.

37. Medical necessity criteria also includes supports, services, and treatment "designed to assist the beneficiary to attain or maintain a sufficient level of functioning in order to achieve his goals of community inclusion and participation, independence, recovery, or productivity." *Id*.

38. The determination of a medically-necessary support, service, or treatment must be based on 1) information provided by the beneficiary and/or his family, 2) clinical information from the beneficiary's primary care physician or other qualified health care professionals who have evaluated the beneficiary, and 3) person centered planning. MPM § 2.5.B.

39. In accordance with 42 C.F.R. § 441.301(b)(1)(i), a participant-centered service plan (of care) is developed for each participant employing the procedures specified in Appendix D of the HSW.

40. In accordance with 42 CFR § 431.51, a participant may select any willing and qualified provider to furnish waiver services included in the service plan.

41. In the HSW application, the state has the option to check this box: "There is a limit on the maximum dollar amount of waiver services authorized for each specific participant."

8

42. Michigan's application provides: "Not applicable- The State does not impose a limit on the amount of waiver services…" Exhibit B, HSW Appendix C-4(a).

43. This is in accordance with state policy, which prohibits services from being denied "solely on preset limits of the cost, amount, scope, and duration of services." MPM § 2.5.C., pg. 14.

44. Only after the participant's medical needs have been determined can the plan be budgeted. Exhibit A, HSW Appendix E-2(b)(ii).

45. "An individual budget includes the expected or estimated costs of a concrete approach of obtaining the mental health services and supports included in the [Individual Plan of Service (IPOS)] (SD Guideline II.C.). Both the IPOS and the individual budget are developed in conjunction with one another through the person-centered planning process (PCP) (SD Guideline II)." Exhibit A, HSW Appendix E-2(b)(ii).

46. "*The amount of the individual budget is determined by costing out the services and supports in the IPOS, after a IPOS that meets the participant's needs and goals has been developed*. In the IPOS, each service or support is identified in amount, scope and duration (such as hours per week or month). The individual budget should be developed for a reasonable period of time that allows the participant to exercise flexibility (usually one year)." *Id.* (emphasis added).

47. The participant can hire and fire staff, schedule staff, and "determine staff wages and benefits subject to State limits." Exhibit A, HSW, Appendix E-2(a)(ii).

48. There are no State limits for staff wages under the HSW.

9

49. Michigan specifically gives participants the right to reallocate funds among services included in the budget, as well as to determine the amount paid for services. Exhibit A, HSW, Appendix E-2(b)(i).

50. "*Both the participant and the PIHP must agree to the amounts in the individual budget before it is authorized for use by the participant.* This agreement is based not only on the amount, scope and duration of the services and supports in the IPOS, but also on the type of arrangements that the participant is using to obtain the services and supports. Those arrangements are also determined primarily through the PCP process. Michigan uses a retrospective zero-based method for developing an individual budget." Exhibit A, SW Appendix E-2(b)(ii) (emphasis added). See also 42 C.F.R. § 441.301(c)(2)(ix).

51. "The mental health agency (PIHP or designee) must provide the participant with information on how to request a Medicaid Fair Hearing when the participant's Medicaid-funded services are changed, reduced or terminated as a result of a reduction in the individual budget or denial of the budget adjustment." Exhibit A, HSW Appendix E-2(b)(iv).

C. **Defendant WCCMH and the WCHO: Reformation and Budget Crisis**

52. Until January 2014, the Washtenaw County Health Organization (WCHO) was the PIHP for Washtenaw County.

53. The WCHO was dissolved around October 2015.

54. WCCMH, when it operated as the WCHO, contracted with Community Support and Treatment Services (CSTS) to provide services.

55. CSTS oversaw the development of participants' IPOS, and the plan of service's budget was managed by a fiscal intermediary.

56. The fiscal intermediary allows participants to employ their own staff directly without managing administrative details such as payroll, taxes, and W2s.

57. Plaintiffs' fiscal intermediary is the Community Living Network (CLN), which operates under the d/b/a of Community Alliance of Southeastern Michigan.

58. In summer 2014, the WCHO informed Washtenaw County that it was facing a shortfall of several million dollars. Exhibit C – Behavioral Health Task Force, Final Report.

59. A Behavioral Health Task Force issued a recommendation in February 2015, in which it recommended dissolving the WCHO and creating a new Community Mental Health Agency.

60. The Behavioral Health Task Force also specifically recommended targeting Community Living Support services in order to reduce the deficit. Exhibit C.

61. In October 2015, CSTS and the WCHO merged to create Defendant WCCMH.

62. Due to the budget crisis, an outside consultant, Health Management Associates (HMA), was brought in around the time of the merger to review WCCMH's budget.

63. In a draft report dated December 17, 2015, HMA wrote: "The Community Living Supports program area is another with cost metrics that bear scrutiny. WCCMH leadership has indicated to HMA that they already have made changes that will reduce costs in this area and that they will continue to evaluate and explore

options for improved cost effectiveness while maintaining quality. We encourage these continuing efforts." HMA Draft Report, page 12. Exhibit D.

64. In a letter sent to PIHP executive directors on October 22, 2015, MDHHS had notified Defendants CMHPSM and WCCMH that the "changes that will reduce costs" mentioned in the HMA letter were illegal. Exhibit E, Letter from Thomas Renwick to PIHP Executive Directors.

65. Specifically, MDHHS condemned "PIHPs and/or their provider networks [implementing] a practice of using assessments or screening tools to determine, limit or restrict the amount, scope, or duration of a service." *Id*.

66. The letter states that "it is the person-centered planning process and medical necessity criteria that determine the amount, scope and duration of services." *Id*.

67. Moreover, MDHHS stated: "it also bears reminding that the PIHP is obligated to ensure that medically necessary supports, services or treatments or treatment are sufficient in amount, scope and duration to reasonably achieve their purpose." *Id*.

68. The "changes that will reduce costs," criticized by MDHHS in the letter and affecting the named Plaintiffs' CLS services, went into effect in May 2015, and have not been reversed despite several individual administrative law decisions reversing the reductions.

D. **The May 2015 Cuts**

69. Prior to May 15, 2015, the IPOS budget for CLS services participants was calculated as follows: an hourly pay rate for

the paid CLS providers was established, and additional line items were then added to the budget.

70.   For example, a participant's CLS providers might be paid $13.88 an hour, and then additional costs for transportation, community activities, worker's compensation, and training were added to the budget.

71.   After a fiscal intermediary fee (billed to Medicaid separately) was subtracted from this total budget amount, the total budget was then divided by the annual number of CLS hours, and then divided by four to arrive at the quarterly-hour CLS billing rate (billed as H2015).

72.   For example, Plaintiff Waskul's CLS providers made $13.88 per hour in March 2015, but the CLS billing rate per hour was $16.56 ($4.14 X 4).

73.   This method of calculating the budget created a CLS provider pay rate that took into account additional medically-necessary budget line items, but did not cap the participant's overall CLS services budget.

74.   All budget items were based on the medically-necessary services established in the participants' IPOS.

75.   A letter dated April 9, 2015 was sent to all participants receiving CLS services, notifying them that the CLS rate would be set at $13.88 for all participants effective May 15, 2015. Exhibit F, Letter to CLS Participants from Sally Amos O-Neal.

76.   Sally Amos O'Neal, Interim Executive Director of the WCHO, claimed in the letter that the rate change was not a reduction in services.

13

77.   Specifically, Ms. Amos O'Neal wrote, "The new rate will be $13.88 an hour, which includes worker's compensation, transportation, community participation, taxes, and training. While this is not a reduction in your current level of services, it may reduce the amount you can pay your staff." *Id.*

78.   The rate reduction was not simply a new set rate for CLS providers. Rather, participants' IPOS budgets were reduced and entirely recalculated.

79.   Instead of adding separate budget line items for transportation and community activities in addition to the CLS providers' pay rate, the WCHO began subtracting those items from the providers' annual pay.

80.   The WCHO also began subtracting budget line items for training and "unbillable expenses" from the CLS providers' hourly rate.

81.   Moreover, the WCHO also began including respite hours in the CLS provider pay rate calculation.

82.   Respite is a type of support available to families of children with developmental disabilities or serious emotional disturbance, and is designed to temporarily relieve the unpaid primary caregiver.

83.   Respite services are billed separately from CLS services under the HSW, and therefore should not be included with CLS hours in determining a CLS budget.

84.   Defendant WCCMH also reduced the hourly rate participants could pay their CLS providers for training.

85.   The result of the new budget calculation was that, effective May 15, 2015, CLS participants' budgets were significantly reduced,

14

upon information and belief often by around $10,000 per participant annually.

86. The paid CLS providers' hourly rate was consequently reduced.

87. Moreover, participants' budgets were effectively capped because budgeting for additional medically-necessary services would further reduce the CLS providers' pay, making it impossible to find and maintain paid CLS providers at such a low rate.

88. For example, Plaintiff Waskul's budget dated February 12, 2015 was calculated as follows:

1. The total number of annual authorized hours (32.5 per week at the time) was multiplied by the agreed upon CLS hourly provider rate of $13.88 to create a starting budget amount of $23,457.20.

2. From there, $1,027.12 was added for the annual cost of training (74 annual hours X the training rate of $13.88).

3. An additional $2,100 was then added for annual transportation expenses.

4. $199.08 per CLS provider was then budgeted for worker's compensation, for a total of $398.26.

5. $720 was then added for annual community participation.

6. $280.08 was added for an annual recreation pass.

7. An annual fiscal intermediary fee of $1,200 was added to the total costs but billed separately to Medicaid under the code T2025.

8. The total costs of $29,182.56, minus the fiscal intermediary fee of $1,200, created a total budget of $27,982.56.

       9. The total budget of $27,982.56 was then divided again by the annual number of authorized CLS hours to create an hourly CLS rate of $16.56.

      10.  This rate was then divided by four to create the fifteen minute CLS variable rate of $4.14, billed to Medicaid as H2015.

89. After the May 15, 2015 reduction, with the same number of CLS hours per week, Plaintiff Waskul's total budget amount was only $18,672.55, nearly $10,000 less than before May 15, 2015.

90. Plaintiff Waskul's budget created May 18, 2015 was calculated as follows:

      1. The weekly number of authorized CLS hours was multiplied by four to get a "unit" of 130, which was then multiplied by the new quarterly hour rate of $3.47 ($13.88 per hour).

      2. This was multiplied by fifty-two weeks to create a total starting CLS budget of $23,457.20.

      3. A similar calculation was done for respite hours, and a total respite annual starting budget of $3,500 was then improperly added to the CLS starting budget to create a universal "beginning budget amount" of $26,957.20.

      4. From here, $3,369.65 in taxes was subtracted.

      5. $905 for worker's compensation was then subtracted.

      6. An estimated training cost of $270 was subtracted.

      7. "Unbillable expenses" of $1,200 were subtracted.

      8. Transportation costs of $2,100 were subtracted.

      9. Community activity expenses of $720 were subtracted.

      10.     Finally, a recreational center pass expense of $280 was subtracted.

      11.     The "total left after expenses" was $18,672.55.[2]

      12.     This total was then divided by the number of CLS and respite hours (improperly) to get $9.63, the "max rate for employee wage."

91.     This budget reduction affected all CLS participants in Washtenaw County.

92.     Upon information and belief, as of November 30, 2015, there were 169 participants receiving CLS services under the HSW in Washtenaw County.

93.     The April 2015 letter from Ms. Amos O'Neal failed to give notice to participants of their right to request a Medicaid fair hearing. *Id.*

94.     The April 2015 letter did not give any reason for the intended action or cite any specific regulation supporting the action. *Id.*

95.     The April 2015 letter did not provide an explanation of the participant's right to request a hearing. *Id.*

96.     The April 2015 letter was not based on medical necessity criteria, and did not provide an explanation of the circumstances under which benefits would be maintained should a hearing be requested. *Id.*

97.     In a January 2016 administrative pleading, Defendant WCCMH admitted that it did not provide CLS participants adequate notice of hearing rights in the April 2015 letter. Exhibit G, WCCMH's

---

[2] The numbers in the budget appear to be calculated incorrectly: the "total left after expenses" is really $18,112.55.

17

Response to Appellant Waskul's Motion for Summary Disposition, page 2.

**E. <u>Post-June 4, 2015 Notice of Hearing Rights</u>**

98. MDHHS sent notice to Defendant WCCMH on June 4, 2015, warning Defendant WCCMH that its decision to reduce CLS participants' provider rate did not conform to the approved budget authority process in the Habilitation Supports Waiver application. Exhibit H, Letter from Jeffrey Wieferich to Sally Amos O'Neal.

99. MDHHS noted that "Medicaid-funded services are changed, reduced, or terminated as a result of a reduction in the individual budget…" *Id*.

100. In response to MDHHS's letter, Defendant WCCMH claimed that it was "collaborating with the individual and/or guardian to review the Individual Plan of Service (IPOS) and the Self Determination budget. Upon review with all parties, the IPOS will be reviewed and signed off on by the individual and/or guardian and the CMHSP…..Through the completion and signature on the updated IPOS, each individual and/or guardian will be provided Adequate Notice of Rights." Exhibit I, WCCMH Response to MDHHS.

101. Starting in late June, Defendant WCCMH began reopening participants' IPOS to incorporate the budget reductions.

102. Upon information and belief, contrary to MDHHS's demand that Defendant WCCMH comply with the person centered planning process when reopening the IPOS, Defendant WCCMH often simply had clinical staff telephone participants and notify them that their IPOS would be redone.

18

103. Upon information and belief, Defendant WCCMH's clinical staff usually showed up at participants' homes with an IPOS reflecting the reduction already incorporated, and asked them to sign it.

104. When Defendant WCCMH incorporated the CLS budget reduction into participants' IPOS, it provided a notice of hearing rights with the new IPOS.

105. These later notices of hearing rights described the action taken as "adequate," and were not negative advance action notices. Exhibit J, Post-June 4, 2015 Notice of Hearing Rights (for Plaintiff Schneider).

106. These later notices did not cite any statute or policy authorizing the reduction in services.

107. These notices did not state what was reduced or why.

108. Because these later notices did not acknowledge the reduction in services, no reason for the reduction was given in the notices.

109. Upon information and belief, Defendant WCCMH told participants at the time the hearing notice was provided that the CLS budget reduction was not appealable.

110. At two local dispute meetings held in late summer and early fall 2015, Defendant WCCMH continued to argue that the budget reduction was not an appealable issue, and argued that the Michigan Administrative Hearing System (MAHS) did not have jurisdiction to hear the named Plaintiffs' cases.

111. Defendant WCCMH continued to assert that MAHS did not have jurisdiction to hear CLS budget reduction appeals through February 2016.

112. Upon information and belief, only about 10 of around 170 CLS participants in Washtenaw County reached administrative hearings by an appeal based on this later notice of hearing rights.

113. Although Defendant WCCMH also assured MDHHS that it had "reversed the CLS rate retroactive to May 15, 2015 pending results of the Medicaid Fair Hearings Process scheduled for July 1, 2015," it did not do so for every individual. Exhibit I.

114. Upon information and belief, Plaintiff Waskul is the only CLS participant whose CLS provider rate (only the provider hourly rate and not the overall CLS budget calculation) was eventually reversed to the pre-May 15, 2015 amount.

115. For the few CLS participants who requested a hearing, Defendant WCCMH, instead of reversing the rate to the pre-May 15, 2015 amount, instead attempted to impose a "negotiated" rate of $14.48, which it borrowed from Michigan's Children's Waiver.

116. Upon information and belief, this rate was never "negotiated"; rather, participants were told they could have the $14.48 rate or the $13.88 rate.

117. Both the $14.48 rate and $13.88 rate were calculated according to the post-May 15, 2015 method, which reduces and caps participants' CLS budgets.

118. The harm to Plaintiffs is irreparable. Plaintiffs have no adequate remedy at law to prevent the continuing wrong and irreparable injury caused by Defendants' acts.

## PLAINTIFFS' FACTS

### DEREK WASKUL

119.  Plaintiffs incorporate all paragraphs above.

**A. Mr. Waskul's Disabilities; Effect of the May 15, 2015 Cuts.**

120.  Plaintiff Derek Waskul (Mr. Waskul) suffers from a developmental disability and severe autism.

121.  He is in his mid-thirties but cannot function independently.

122.  Cynthia Waskul, his mother and legal guardian, provides unpaid natural support on weekends and evenings, but Mr. Waskul depends on two paid CLS providers seven and a half hours a day, Monday through Friday.

123.  Mr. Waskul receives CLS services under the HSW.

124.  Through his guardian, Mr. Waskul participates in the CLS self-determination process.

125.  Prior to May 15, 2015 Mr. Waskul's CLS providers were paid $13.88 an hour.

126.  Mr. Waskul's budget included separate items for training, transportation, community activities, and worker's compensation.

127.  Mr. Waskul's pre-May 15, 2015 IPOS budget was developed based on the medically-necessary services authorized by his IPOS.

128.  Mr. Waskul received the April 9, 2015 letter from Sally Amos O'Neal, described above and attached as Exhibit F.

129.  The April 9, 2015 letter did not notify Mr. Waskul of his right to request a Medicaid fair hearing.

130.  As explained above at paragraphs 88-90, Mr. Waskul's budget was reduced and entirely recalculated effective May 15, 2015.

21

131. As discussed above, MDHHS sent notice to Defendant WCCMH on June 4, 2015, warning Defendant WCCMH that its decision to reduce CLS participants' provider rate did not conform to the approved budget authority process in the Habilitation Supports Waiver application. Exhibit H, Letter from Jeffrey Wieferich to Sally Amos O'Neal.

132. Katie Snay, Fair Hearings Officer for Defendant WCCMH, confirmed that the rate was reversed around June 30, 2015.

133. With that assurance, Mr. Waskul withdrew his pending request for a Medicaid fair hearing, a hearing he had requested when his hours were illegally reduced by Defendant WCCMH before the May 15, 2015 budget reduction.

134. Mr. Waskul's CLS provider rate had been reduced between May 15, 2015 and the June 12, 2015 meeting, at which time Defendant WCCMH temporarily reversed the budget reduction and convinced Mr. Waskul to withdraw his hearing request.

135. Despite Defendant WCCMH's assurance that it had reversed the budget reduction and would comply with person centered planning, Defendant WCCMH subsequently reduced Mr. Waskul's budget again by a notice dated July 20, 2015, despite the fact that Michigan policy allows the IPOS and budget to be developed only through the person-centered planning process. MPM, § 15, page 975.

136. The notice of action sent to Mr. Waskul stated that the reduction would be imposed, even explicitly acknowledging that Mr. Waskul did not agree. Exhibit K, Notice of Hearing Rights, July 20, 2015.

137. This time, the WCHO admitted that the change was a "reduction in services" and sent a negative advance action notice. *Id.*

138. Defendant WCCMH claimed at the subsequent administrative law hearing that this notice was a mistake, and that no notice with hearing rights (or an adequate action notice) should have been given on the basis that there was no reduction in services.

139. Upon information and belief, this was the only negative advance action notice subsequently sent to CLS participants who had received the April letter.

140. The only justification provided in the July notice was that the new imposed rate of $14.48 was the maximum state rate allowed under the Children's Waiver. *Id.*

141. The Children's Waiver is a separate waiver program that is not relevant to Mr. Waskul.

142. Although there is a maximum rate set by the state under the Children's Waiver, there is no such rate under the HSW.

143. Mr. Waskul requested a local dispute hearing and a Medicaid fair hearing after receiving the notice of reduction dated July 20, 2015.

144. After a local dispute resolution meeting, Defendant WCCMH issued a decision affirming the reduction in services, citing its need "to be good stewards of Medicaid dollars." Exhibit L, August 24, 2015 Local Dispute Resolution Committee Report of Findings.

145. This new notice unilaterally set Mr. Waskul's CLS providers' pay rate at $14.48 with additional budget line items subtracted.

146. As discussed above, instead of adding additional budget line items for transportation and community activities to the CLS

providers' pay rate, Defendant WCCMH continued subtracting those budget items from the providers' annual pay.

147. Defendant WCCMH continued subtracting training costs, worker's compensation, and "unbillable expenses" from the budget.

148. Additionally, the WCHO continued to include respite hours with CLS hours in determining the CLS caregivers' pay rate.

149. The result of the WCHO's unilateral interference with Mr. Waskul's budget was that Mr. Waskul's providers' hourly rate was lowered from $13.88 per hour to around $9.50 per hour.

150. As explained above in paragraphs 88-90, during the period when Mr. Waskul's hours were improperly reduced from 37.5 to 32.5 per week, his total yearly budget amount was $29,182.56. Exhibit M – Budget Created February 12, 2015.

151. After the May 15, 2015 reduction, Mr. Waskul's total budget amount was only $18,672.55. Exhibit N – Budget Created May 18, 2015.

152. Defendant WCCMH has never offered any justification based on medical need for the reduction of Mr. Waskul's budget.

153. Although Mr. Waskul's primary care provider wrote a letter stating that "a lowering of Derek's self-determination budget would be devastating to Derek," Defendant WCCMH did not take this into account. Exhibit O, Letter from Maria Heck, DO.

154. Doctor Heck also wrote, "As a young man with severe cognitive impairment and autism, Derek needs stability, consistency and dependability. With the proposed changes, which would lower the staff wage, Derek will lose his current staff whom he has developed relationships with. Derek's current staff have

facilitated and helped Derek to develop meaningful relationships in the community. Social interaction with others is a very important piece in the purpose of the self-determination arrangement." *Id.*

155. "Without constancy, Derek will inevitably have increased anxiety, increased behavior problems, and increased autism symptoms. Autism is a disorder that requires a need for sameness. As his doctor, I ask that you consider Derek's specific medical needs when making this decision." *Id.*

156. Despite Doctor Heck's clear direction, Defendant WCCMH nevertheless ignored Mr. Waskul's medical needs and reduced his CLS budget.

**B. Administrative Law Hearing and Subsequent Developments.**

157. Mr. Waskul requested a Medicaid Fair Hearing shortly after receiving the July 20, 2015 notice of hearing rights.

158. When Mr. Waskul requested the Medicaid hearing, his CLS provider hourly rate (but not the overall method of calculating the budget) was reinstated to the full pre-May 15, 2015 amount.

159. A Medicaid Fair Hearing was held by the Michigan Administrative Hearing System (MAHS) on October 14, 2015.

160. Mr. Waskul's two paid CLS providers both testified under oath that they could not continue to work at the reduced rate.

161. Medical evidence was admitted stating that losing any of his current CLS providers would be detrimental to Mr. Waskul's health.

162. Despite Mr. Waskul's evidence that the rate reduction would force his CLS staff to quit and lead to harm, at the urging of

25

Defendant WCCMH ALJ Steven Kibit issued a dismissal order claiming that he had no jurisdiction on the basis that there had been no reduction in the amount, scope, and duration of Mr. Waskul's services. Exhibit P, Order of Dismissal.

163. For unknown reasons, Mr. Waskul's hourly provider rate was not reduced again after the dismissal, but stayed at the pre-May 15, 2015, where it remains today.

164. On November 25, 2015, ALJ Kibit *sua sponte* issued an Order Vacating Dismissal, ruling that MAHS did in fact have jurisdiction to hear the case. Exhibit Q.

165. Specifically, ALJ Kibit ruled that MAHS had jurisdiction because the reduction in Mr. Waskul's CLS budget did confer the right to a Medicaid Fair Hearing, and ordered a new hearing.

166. After ALJ Kibit dismissed the case for lack of jurisdiction, Mr. Waskul's provider Christina Pulcifer quit, and Mr. Waskul currently does not have enough staff to provide the medically-necessary services required by his IPOS.

167. It will take significant time to find a suitable replacement for Ms. Pulcifer, because Mr. Waskul must be familiar with the provider and have established a certain level of trust.

168. Mr. Waskul is at risk of losing his other paid CLS provider as well because of the uncertainty surrounding her job.

169. On February 18, 2016, ALJ Kibit granted Mr. Waskul's Motion for Summary Disposition and ordered Defendant WCCMH to reverse the budget reduction.

170. On February 29, 2016, Defendant WCCMH sent Mr. Waskul an Order Certification, certifying that ALJ Kibit's Order had been implemented.

171. Despite its representations in the Order Certification, Defendant WCCMH notified Mr. Waskul's counsel on March 10, 2016 that it intended to appeal ALJ Kibit's decision.

172. Counsel for Plaintiffs received Defendant WCCMH's Claim of Appeal on March 14, 2016.

173. Upon information and belief, Defendant WCCMH has not reversed Mr. Waskul's budget reduction, despite its representations in the Order Certification.

174. Defendant WCCMH has also refused to reverse the CLS reductions for all recipients in Washtenaw County.

### CORY SCHNEIDER

175. Plaintiffs incorporate all paragraphs above.

**A. Mr. Schneider's Disabilities and Staffing; Before the May 15, 2015 Cuts.**

176. Plaintiff Cory Schneider (Mr. Schneider) has been diagnosed with autism and a developmental disability, and he suffers from an undiagnosed behavior disorder.

177. He is twenty years old but cannot function independently.

178. Mr. Schneider has received CLS services under the HSW since he turned eighteen.

179. Due to his extremely limited speech and the likelihood of self-inflicted harm, Mr. Schneider requires 24/7 care.

180. Mr. Schneider's CLS providers are necessary to help Mr. Schneider lead as normal a life as possible and avoid institutionalization.

181. Among other things, the CLS providers help Mr. Schneider to cross the street, engage in basic social interactions, remind him to use the bathroom, and monitor his aggression.

182. Because of Mr. Schneider's behavioral disorder, the CLS providers must also prevent Mr. Schneider from hurting others or himself; when angry, Mr. Schneider has been known to become aggressive toward others and bang his head against the wall.

183. Caring for Mr. Schneider is a strenuous job involving constant monitoring. Mr. Schneider is over six feet tall and has aggressive tendencies resulting from his behavioral disorder, which CLS staff need to control.

184. Mr. Schneider's IPOS provides for 93 hours of CLS services per week, and Mr. Schneider's grandmother provides unpaid natural support for any of Mr. Schneider's unmet needs.

185. Prior to May 15, 2015, Mr. Schneider's IPOS budget was calculated as follows: an hourly pay rate for his paid CLS providers was established, and additional line items were then added to the budget.

186. Mr. Schneider had around four paid CLS providers prior to May 15, 2015.

187. Before May 15, 2015, Mr. Schneider's lead CLS provider, Stacey Rozsa, who has been with Mr. Schneider for at least six years, was paid around $13.50 per hour.

188. Mr. Schneider's other three CLS providers were paid around $10.00 per hour.

28

**B. Effect of the May 15, 2015 Cuts.**

189. Mr. Schneider received the April 9, 2015 letter stating that his community living support provider rate would be set at $13.88 per hour effective May 15. Exhibit F.

190. The letter did not give notice to Mr. Schneider of his right to a Medicaid fair hearing.

191. Only after receiving a notice of hearing rights (which was not an advance notice and stated that the action taken was "adequate") following an IPOS "progress review" was Mr. Schneider able to request an administrative hearing.

192. This notice, dated November 18, 2015, was given well after the budget reduction was implemented in Mr. Schneider's IPOS.

193. The notice stated that it was "given to Marti Schneider on 11/18/2015." Exhibit G.

194. The notice stated that the action taken was effective on October 19, 2015, the effective date of the new IPOS, nearly a month before the date of the notice of hearing rights. *Id.*

195. Because the notice described the action taken as "adequate," the notice on its face did not provide Mr. Schneider an opportunity to request a timely hearing and receive benefits pending, because pending benefits require "a termination, reduction, or suspension of a service that was previously authorized." *Id.*

196. The specific regulation cited in the notice simply stated that the amount, scope, and duration of an IPOS must be sufficient, and that the Medicaid agency "may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§

440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." *Id.*

197. For the reasons outlined above, the rate reduction was not simply a new set rate for paid CLS providers. Rather, the budget was reduced and entirely recalculated.

198. Instead of adding the additional budget line items to the CLS providers' pay rate, Defendant WCCMH began subtracting those items from the providers' annual pay.

199. Defendant WCCMH also began subtracting training costs and "unbillable expenses" from the budget.

200. Defendant WCCMH reduced Ms. Rozsa's pay rate, which then fluctuated for no apparent reason in subsequent months between $11.50 and $12.00 per hour.

201. Both Ms. Rozsa's and the other three CLS providers' take home pay was further reduced, because WCCMH began subtracting additional budget line items from the starting provider rate.

202. Besides reducing the overall budget, this recalculation capped Mr. Schneider's CLS budget.

203. After the May 15, 2015 budget recalculation, the pay rate for Mr. Schneider's CLS providers was frozen at around $10 per hour for new providers.

204. Because of the frozen budget imposed by Defendant WCCMH, Mr. Schneider is unable to maintain his current paid CLS providers or find suitable replacement providers, and consequently is not receiving the medically-necessary services required by his IPOS.

205. Since May 15, 2015, Mr. Schneider's grandmother has made numerous attempts to find replacement CLS providers, posting at Eastern Michigan University and on care.com.

206. Due to the low pay rate and the difficult nature of the work involved, Mr. Schneider has been unable to find suitable replacement CLS staff.

207. Mr. Schneider can only currently employ two paid CLS providers for about sixty-five of his ninety-three scheduled hours a week.

208. Although Mr. Schneider's IPOS specifically requires him to have five days out in the community, Mr. Schneider is now unable to budget for medically necessary items like transportation and community activities without further reducing his CLS providers' pay.

209. Mr. Schneider's grandmother, Martha Schneider, has been paying out of pocket for transportation and community activity expenses.

210. On December 4, 2015, Mr. Schneider requested $400 monthly for transportation and $200 monthly for community activities.

211. Mr. Schneider's amended IPOS from December 4, 2015 states that "these costs are above what the current self-determination budget covers."

212. Defendant WCCMH did not provide Mr. Schneider notice of his hearing rights when it denied this request for medically-necessary services.

213. Mr. Schneider's grandmother has been caring for Mr. Schneider the remaining 103 hours of the week.

214. Ms. Schneider is seventy-five years old and underwent heart surgery within the last year.

31

215. On February 18, 2016, ALJ Kibit granted Mr. Schneider's Motion for Summary Disposition and ordered Defendant WCCMH to reverse the budget reduction.

216. On March 4, 2016, Defendant WCCMH sent Mr. Schneider an Order Certification, certifying that ALJ Kibit's Order had been implemented.

217. Upon information and belief, Defendant WCCMH has not reversed Mr. Schneider's budget reduction, despite its representations in the Order Certification.

218. Defendant WCCMH has appealed ALJ Kibit's decision in Plaintiff Waskul's administrative law case.

219. Defendant WCCMH has also refused to reverse the CLS reductions for all recipients in Washtenaw County.

### KEVIN WIESNER

220. Plaintiffs incorporate all paragraphs above.

**A. Mr. Wiesner's Disabilities; Background.**

221. Plaintiff Kevin Wiesner (Mr. Wiesner) is an eighteen-year old with severe developmental delays who suffers from seizures.

222. Mr. Wiesner collapses during seizures and risks striking his head on objects while falling. In addition to preventing him from collapsing during seizures, his paid CLS providers must also pass a magnet over his Vagus Nerve Stimulator, which sends an electric charge to his brain. CLS staff must also ensure that Mr. Wiesner coughs up food to prevent blockage of his airways during seizures.

223. Mr. Wiesner receives about 85 hours of care a week in his IPOS.

224. Mr. Wiesner requires at least two CLS staff with him at all times in public.

225. Mr. Wiesner has been receiving CLS services under the HSW since he turned eighteen.

226. Mr. Wiesner's pre-May 15, 2015 hourly CLS provider rate of $12.00 per hour allowed for transportation and community activities to be budgeted outside of the caregiver rate, although he did not have a written budget between the time he transitioned from the Children's Waiver and the May 15, 2015 cuts.

**B. Effect of the May 15, 2015 Cuts.**

227. Mr. Wiesner's IPOS requires medically-necessary community activities.

228. Mr. Wiesner's guardian was prepared to ask that medically-necessary transportation and community activity expenses be budgeted when she received the April 9, 2015 letter from Sally Amos O'Neal.

229. The April 2015 letter and subsequent discussions with Defendant WCCMH convinced Mr. Wiesner's guardian that she could not budget for those medically-necessary services without reducing Mr. Wiesner's CLS providers' pay rate to an unlivable wage.

230. On May 15, 2015, Mr. Wiesner's CLS budget was reduced and recalculated.

231. The result was that the CLS providers' hourly rate was lowered to $11.50 per hour.

232. This reduction caused Mr. Wiesner to breach his employment contracts with his CLS staff.

233. Instead of adding additional budget line items to the CLS providers' pay rate, Defendant WCCMH began subtracting those items from the providers' annual pay.

234. Defendant WCCMH also began subtracting training costs and "unbillable expenses" from the budget.

235. Additionally, Defendant WCCMH began including respite hours with CLS hours in determining the CLS providers' pay rate.

236. The result was that Mr. Wiesner's overall CLS budget was reduced and effectively capped.

**C. Improper Notice of Hearing Rights and Lack of Benefits Pending.**

237. Mr. Wiesner received no notice of hearing rights either in April 2015, when the letter was sent, or on May 15, 2015, when the budget reduction was instituted.

238. Mr. Wiesner refused to sign an amended IPOS in July 2015, which would have implemented the reduced budget in his IPOS.

239. At that time, Mr. Wiesner received a notice of his hearing rights, dated July 7, 2015 (a notice of "adequate action"), and requested a hearing.

240. Defendant WCCMH reduced Mr. Wiesner's services before providing the July 7, 2015 notice, which was not a negative advance action notice.

241. Because the July 7 notice described the action taken as "adequate," the notice on its face did not provide Mr. Wiesner an opportunity to request a timely hearing and receive benefits pending, because pending benefits require "a termination, reduction, or suspension of a service that was previously authorized."

242. Mr. Wiesner was forced to pay his CLS providers reduced wages for two months.

243. When Mr. Wiesner requested the hearing in August 2015, Defendant WCCMH raised his CLS provider rate, but not to the full prior amount.

244. Instead, this was a "compromised" rate of $14.48, which WCCMH borrowed from the Children's Waiver.

245. Mr. Wiesner received no retroactive benefits for his CLS providers.

246. An administrative mix-up concerning Mr. Wiesner's guardian paperwork prevented his hearing request from being properly processed until December 2015.

247. Upon information and belief, it was only in December 2015 that Mr. Wiesner was told by Katie Snay, Fair Hearings Officer for WCCMH, that Defendant WCCMH had restored his CLS provider rate to the full $12.00.[3]

248. Moreover, the pre-May 15, 2015 method of calculating the budget was not reinstated pending the Medicaid fair hearing.

249. Mr. Wiesner's guardian has been paying out of pocket for community activity and transportation expenses.

250. When Mr. Wiesner's guardian has requested reimbursement for these expenses, she is told that additional line items would need to be added to his IPOS.

---

[3] Although under the HSW a self-determination participant has the right to hire staff, the fiscal intermediary handles all administrative work pertaining to the CLS providers' wages. The participant therefore would not know what the providers' rate is without looking at the providers' pay stubs or asking the fiscal intermediary directly.

251. Adding these additional budget line items would only continue to reduce Mr. Wiesner's CLS provider pay rate.

252. Since the budget reduction was imposed, Mr. Wiesner has lost one CLS provider.

253. Mr. Wiesner has suffered and continues to suffer harm as a result of the illegal reduction in his CLS budget, and as a result of WCCMH's refusal to budget for transportation and community activities.

254. Mr. Wiesner has not yet received a decision in his administrative law hearing.

255. Defendant WCCMH has appealed Plaintiff Waskul's favorable ALJ decision, and has refused to reverse the reductions for all CLS participants in Washtenaw County.

### WASHTENAW ASSOCIATION FOR COMMUNITY ADVOCACY

256. Plaintiffs incorporate all paragraphs above.

257. Washtenaw Association for Community Advocacy (WACA) is a non-profit organization, established in 1949.

258. Its mission and purpose include advocating for persons with developmental disabilities and their families.

259. Its service population is comprised mainly of persons with disabilities and their families.

260. Its members include recipients of Community Living Support services and their providers.

261. All 169 HSW CLS services recipients in Washtenaw County qualify for WACA's services.

262. Many of WACA's clients, including the named individual Plaintiffs in this case, have been directly harmed by Defendants' practices.

**COUNT I — FAILURE TO PROVIDE CONSTITUTIONALLY ADEQUATE NOTICE AND RIGHT TO BE HEARD (Defendants Cortes, Terwilliger, and Lyon)**

263. Plaintiffs incorporate all paragraphs above.

264. The right to procedural due process is secured by the 14th Amendment, and public benefits are a constitutionally-protected property interest. See *Goldberg v Kelly*, 397 U.S. 254, 262 (1970).

265. Medicaid participants' hearing and notice rights under *Goldberg* are codified at 42 C.F.R. § 431.205(d): "The hearing system must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart."

266. Under *Goldberg,* the state must provide "a meaningful notice stating the basis for the action and, when coverage is to be reduced or terminated, a pre-termination notice informing the claimant of the right to continue benefits pending a final administrative decision."

267. In this case, Defendant WCCMH simply sent the April 2015 letter to all CLS participants in the county notifying them that the reduced rate/budget would be unilaterally imposed effective May 15, 2015. Exhibit F.

268. Plaintiffs were not advised in the letter of their right to appeal the rate reduction and reduced budget, how to appeal, or how to obtain continued services pending the outcome of a hearing.

269. Defendant WCCMH failed to reinstate Plaintiffs' CLS budgets to the full pre-May 15, 2015 amount pending their Medicaid Fair Hearings.

270. Defendant WCCMH reduced Plaintiffs' services before providing the post-June 4, 2015 notices, which were not negative advance action notices.

271. Because the post-June 4 notices described the action taken as "adequate," the notices on their face did not provide participants an opportunity to request a timely hearing and receive benefits pending, because pending benefits require "a termination, reduction, or suspension of a service that was previously authorized."

272. The specific regulation cited in the post-June 4, 2015 notices states only that the amount, scope, and duration of an IPOS must be sufficient, and that the Medicaid agency "may not arbitrarily deny or reduce the amount, duration, or scope of a required service under [42 C.F.R.] §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition."

273. Defendants violated Plaintiffs' constitutional right to due process, rights secured by the 5th and 14th Amendments and enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983, when it did not allow Plaintiffs an opportunity to be heard and contest the reduction of their CLS services.

274. Defendants' actions, under color of state law, have harmed Plaintiffs by depriving them of medically necessary care, disrupting and diminishing their development and mental health.

**COUNT II – VIOLATION OF STATUTORY RIGHT TO NOTICE AND AN OPPORTUNITY TO BE HEARD (Defendants Cortes, Terwilliger, and Lyon)**

275. Plaintiffs incorporate all paragraphs above.

276. The Medicaid Act requires that "[a] State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

277. Subpart E of 42 C.F.R. 431 "[i]mplements section 1902(a)(3) [1396a(a)(3)] of the Act, which requires that a State plan provide an opportunity for a fair hearing to any person whose claim for assistance is denied or not acted upon promptly."

278. 42 C.F.R. § 431.206 provides that the state must provide notice of a beneficiary's right to a hearing and instructions on how to request it "[a]t the time of any action affecting his or her claim."

279. Notice given under 42 C.F.R § 431.210 must "contain (a) A statement of what action the State … intends to take; (b) The reasons for the intended action; (c) The specific regulations that support, or the change in Federal or State law that requires, the action; (d) An explanation of— (1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or (2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and (e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested."

280. If a beneficiary requests a hearing before the date of action, the State may not terminate or reduce services until a decision is rendered after the hearing, unless it is determined at the hearing that the sole issue is one of Federal or State law or policy, and the agency promptly informs the beneficiary in writing that services are to be terminated or reduced pending the hearing decision. 42 C.F.R § 431.230(a)(1) and (2).

281. The budget reductions imposed by Defendant WCCMH are a clear reduction of a previously authorized service.

282. Defendant WCCMH simply sent out a letter in April 2015 stating that participants' CLS rates would be reduced and additional budget items included in (i.e. subtracted from) that rate.

283. Defendant WCCMH did not provide HSW participants adequate notice of hearing rights when it reduced their budgets on May 15, 2015.

284. Plaintiffs were and are entitled to continued services under 42 C.F.R § 431.230 and 42 C.F.R § 431.21.

285. The post-June 4, 2015 notices did not provide HSW participants adequate notice of their hearing rights pursuant to 42 C.F.R § 431.210.

286. Defendant WCCMH reduced Plaintiffs' services before providing the post-June 4, 2015 notices, which were not negative advance action notices.

287. Because the post-June 4 notices described the action taken as "adequate," the notices on their face did not provide participants an opportunity to request a timely hearing and receive benefits pending, because pending benefits require "a

40

termination, reduction, or suspension of a service that was previously authorized."

288. The specific regulation cited in the post-June 4, 2015 notices simply states that the amount, scope, and duration of an IPOS must be sufficient, and that the Medicaid agency "may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition."

289. Defendant WCCMH also subsequently failed to reinstate Plaintiffs' CLS budgets to the full pre-May 15, 2015 amount pending their Medicaid Fair Hearings.

290. Defendant WCCMH violated Plaintiffs' right to statutory due process by failing to provide proper notice.

291. Defendants have violated Plaintiffs' clearly established rights under 42 U.S.C. § 1396a(a)(3), rights enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983. See *Gean v Hattaway*, 330 F.3d 758 (6th Cir. 2003).

292. Defendants' actions, under color of state law, have harmed Plaintiffs by depriving them of medically necessary care, disrupting and diminishing their development and mental health.

**COUNT III – VIOLATION OF SOCIAL SECURITY ACT – FAILURE TO AUTHORIZE SERVICES IN THE AMOUNT, SCOPE, OR DURATION TO REASONABLY ACHIEVE THEIR PURPOSE (Defendants Cortes, Terwilliger, and Lyon)**

293. Plaintiffs incorporate all paragraphs above.

294. Under 42 U.S.C. § 1396a(a)(10)(B), Plaintiffs have the right to services in the amount, scope, and duration akin to those of any other such individual under Medicaid.

295. Under 42 C.F.R. § 440.230(b), "each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose."

296. Plaintiffs receive home and community based services to assist them with participating in community activities and to prevent institutionalization.

297. CMS waived MDHHS's obligation to comply with the comparability requirements of § 1396a(a)(10)(B) in the HSW (implemented by 42 C.F.R. § 440.230(a)), but not the sufficiency requirements set forth in 42 C.F.R. § 440.230(b).

298. The service group specified in the State's HSW must still receive services sufficient in amount, duration, and scope to reasonably achieve their purpose.

299. Defendants' reduction of Plaintiffs' IPOS budgets has frustrated the purpose of the medically-necessary services set forth in Plaintiffs' IPOS.

300. Plaintiffs have not received services sufficient in scope to achieve the services' purpose, in violation of their established rights under 42 U.S.C. § 1396a(a)(10)(B) and 42 C.F.R. § 440.230(b), rights enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983.

301. Defendants' actions, under color of state law, have harmed Plaintiffs by depriving them of medically necessary care, disrupting their development and mental health.

**COUNT IV – VIOLATION OF SOCIAL SECURITY ACT – RIGHT TO RECEIVE SERVICES
WITH REASONABLE PROMPTNESS (Defendants Cortes, Terwilliger, and Lyon)**

302. Plaintiffs incorporate all paragraphs above.

303. The Social Security Act, 42 U.S.C. § 1396a(a)(8) and 42 U.S.C. §
1396a(a)(10), requires the State to furnish medical assistance
with reasonable promptness to all eligible individuals.

304. Medical assistance includes "community supported living
arrangement services" as defined in 42 U.S.C. § 1396u(a) and 42
U.S.C. § 1396d(a)(23).

305. Community Supported living arrangement services is defined as
approved services which assist a developmentally disabled
individual "in activities of daily living necessary to permit
such individual to live in the individual's own home, apartment,
family home, or rental unit furnished in a community supported
living arrangement setting." 42 U.S.C. § 1396u.

306. It also includes "support services necessary to aid an individual
to participate in community activities." 42 U.S.C. § 1396u(a)(7).

307. Plaintiffs' support services, which allowed them to participate
in the community, have been curtailed because their CLS budgets
have been reduced, and because paid CLS providers cannot be
readily found to work at such low rates.

308. Several of Plaintiffs' CLS providers have quit.

309. Defendants have failed to make services available to Plaintiffs
by imposing low reimbursement rates and refusing services based
on cost.

310. Defendants have failed to make services available to Plaintiffs by capping their budgets and not allowing them to budget for additional medically-necessary services.

311. This makes it impossible for participants to obtain adequate medically necessary services with reasonable promptness, in violation of 42 U.S.C. § 1396a(a)(8) and 42 U.S.C. § 1396 a(a)(10)(A).

312. Defendants have also violated state policy prohibiting services from being denied "solely on preset limits of the cost, amount, scope, and duration of services." Michigan Medicaid Provider Manual, § 2.5.C., pg. 14.

313. The post-May 15, 2015 budget calculation method and consequent inadequate provider reimbursement rates have effectively denied Plaintiffs the right to medical assistance in violation of 42 U.S.C. § 1396a(a)(8) and 42 U.S.C. § 1396a(a)(10)(A).

314. Defendants have violated Plaintiffs' clearly established rights under 42 U.S.C. § 1396a(a)(8) and 42 U.S.C. § 1396a(a)(10)(A), rights enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983.

315. Defendants' actions, under color of state law, have harmed Plaintiffs by depriving them of medically necessary care, disrupting and diminishing their development and mental health.

**COUNT V – VIOLATION OF MICHIGAN MENTAL HEALTH CODE – VIOLATION OF MCL 330.1722(1) (Defendants WCCMH and CMHPSM)**

316. Plaintiffs incorporate all paragraphs above.

317. The Michigan Mental Health Code provides that no "recipient of mental health services shall … be subjected to abuse or neglect." MCL 330.1722(1).

44

318. "Neglect" means "an act or failure to act" by, among others, a CMH agency, "that denies a recipient the standard of care or treatment to which he or she is entitled under this act." MCL 330.1100(b)(19).

319. A recipient is entitled to "mental health services … suited to his or her condition." MCL 330.1708(1).

320. Michigan's Mental Health Code also provides that the responsible mental health agency for each recipient shall provide a written individual plan of service addressing, "as either desired or required by the recipient, the recipient's need for … health care … transportation, and recreation." MCL 330.1712(1).

321. Defendants' failure to provide Plaintiffs with a written IPOS addressing their needs for health care, transportation, and recreation amounts to neglect.

322. Defendants' failure to provide Plaintiffs with mental health services suited to their condition amounts to neglect.

323. "A recipient of mental health services who is abused or neglected has a right to pursue injunctive and other appropriate civil relief." MCL 330.1722(3).

324. Defendants' actions, under color of state law, have harmed Plaintiffs by depriving them of medically necessary care, disrupting and diminishing their development and mental health.

### RELIEF REQUESTED

A. Assume jurisdiction in this case;

B. Declare unlawful the rate reduction and new budget calculation imposed by Defendant WCCMH;

C. Declare unlawful Defendant WCCMH's denial of participants' right to
   self-determination generally;

D. Preliminarily and permanently enjoin Defendant WCCMH from imposing
   the rate reduction, new budget calculation method, and unilateral
   hours reductions;

E. Preliminarily and permanently enjoin Defendant WCCMH from denying
   participants their right to procedural due process;

F. Enjoin Defendant WCCMH from refusing to reinstate the pre-May 15,
   2015 level of funding and services to Plaintiffs and to all other
   CLS service recipients until lawful IPOS meetings are conducted and
   CLS service recipients are offered notice of any proposed cuts and
   an opportunity to be heard regarding any objections they may have to
   the cuts;

G. Assume continuing jurisdiction as may be necessary to monitor and
   enforce any relief granted;

H. Award Plaintiffs costs and reasonable attorney fees under 42 U.S.C.
   § 1988; and

I. Grant such other relief as is just and proper.

/s/ Nicholas A. Gable (P79069)
LEGAL SERVICES OF SOUTH CENTRAL MICHIGAN
Attorney for Plaintiffs
420 N. Fourth Ave.
Ann Arbor, MI 48104
(734) 665-6181 ext. 127
ngable@lsscm.org


/s/ Lisa Ruby (P46322)
MICHIGAN POVERTY LAW PROGRAM
Attorney for Plaintiffs
220 E. Huron #600A
Ann Arbor, MI 48104
(734) 998-6100 ext. 117
lruby@mplp.org


March 15, 2016