**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

DEREK WASKUL, ET AL.,

     Plaintiffs,                        No. 2:16-cv-10936-AJT-APP

v.                                  Hon. Arthur J. Tarnow

WASHTENAW COUNTY COMMUNITY
MENTAL HEALTH, ET AL.,

     Defendants.
_____/
LEGAL SERVICES OF SOUTH          MICHIGAN POVERTY LAW PROGRAM
CENTRAL MICHIGAN                Lisa Ruby (P46322)
Nicholas A. Gable (P79069)        Attorney for Plaintiffs
Attorney for Plaintiffs          220 E. Huron #600A
420 N. Fourth Ave.            Ann Arbor, MI 48104
Ann Arbor, MI 48104          (734) 998-6100 ext. 117
(734) 665-6181 ext. 127       lruby@mplp.org
ngable@lsscm.org

MICHIGAN PROTECTION AND       MI DEPT. OF ATTORNEY GENERAL
ADVOCACY SERVICE, INC.        William R. Morris (P31957)
Mark A. Cody (P42695)         Katherine J. Bennett (P75913)
Attorneys for Plaintiffs       Attorneys for Defendant Lyon
4095 Legacy Pkwy Ste. 500       525 W Ottawa St. Ste. 338
Lansing, MI 48911-4264        Lansing, MI 48933-1067
(517) 487-1755               (517) 373-7700
mcody@mpas.org              morrisw@michigan.gov

STEFANI CARTER (P27489)
Attorney for Defendants WCCMH and Cortes
4007 Carpenter Road, #124
Ypsilanti, MI 48197
(734) 369-6250
stefaniacarterlaw@att.net
_____/

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH SUPPORTING BRIEF

On March 16, 2016, March 28 and 30, 2016, and March 29, 2016 (for Defendants Cortes/WCCMH, Lyon, and CMHPSM/Terwilliger, respectively) Plaintiffs' attorneys contacted Defendants' counsel, seeking their concurrence in this motion. Concurrence was not granted.

Plaintiffs move the Court for a preliminary injunction and temporary

1

restraining order pursuant to Fed. R. Civ. P. 65. Plaintiffs make this motion on the grounds that:

1. Plaintiffs are likely to prevail on the merits of their claim;

2. Plaintiffs will suffer irreparable harm if preliminary relief is not granted;

3. Defendants will not be harmed by the relief sought; and

4. The public interest will be served by granting the relief sought.

Plaintiffs specifically request that the Court issue a temporary restraining order and preliminary injunction to:

A. Enjoin Defendants from refusing to reinstate the pre-May 15, 2015 level of funding and services to Plaintiffs and to all other Community Living Support (CLS) service recipients until lawful individual plan of service meetings are conducted and CLS service recipients are offered notice of any proposed cuts and an opportunity to be heard regarding any objections they may have to the cuts;

B. Preliminarily and permanently enjoin Defendant Washtenaw County Community Mental Health (WCCMH) from imposing the rate reduction, new budget calculation method, and unilateral hours reductions;

C. Preliminarily and permanently enjoin Defendant WCCMH from denying participants their right to procedural due process;

D. Grant such other and further relief as may be just and proper.

### BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
### FOR PRELIMINARY INJUNCTION

**Questions Presented:**

1. Whether this court should enjoin Defendants from refusing to reinstate the pre-May 15, 2015 level of funding and services to Plaintiffs and to all other Community Living Support (CLS) service recipients until lawful individual plan of service meetings are conducted and CLS service recipients are offered notice of any proposed cuts and an opportunity to be heard regarding any objections they may have to the cuts.

2. Whether this court should preliminarily and permanently enjoin Defendant Washtenaw County Community Mental Health (WCCMH) from imposing the rate reduction, new budget calculation method, and unilateral hours reductions.

3. Whether this court should preliminarily and permanently enjoin Defendant WCCMH from denying participants their right to procedural due process.

**Controlling Authority:**

U.S. Const. Amend. 14, § 1

*Goldberg v. Kelly*, 397 U.S. 254 (1970)

42 U.S.C. § 1396a(a)(10)(B)

42 U.S.C. § 1396a(a)(8)

42 U.S.C. § 1396a(a)(10)

MCL 330.1708(1)

MCL 330.1712(1)

MCL 330.1722(3)

**Table of Contents**

| | | |
|---|---|---|
| **I.** | **Introduction** | **6** |
| **II.** | **Facts** | **7** |
| | a. Medicaid Program and Habilitation Supports Waiver (HSW) | |
| | b. Right to Self-Determination Under the HSW | |
| | c. Defendant WCCMH and the WCHO: Reformation and Budget Crisis | |
| | d. The May 2015 Cuts | |
| | e. Post-June 4, 2015 Notice of Hearing Rights | |
| **III.** | **Plaintiffs' Facts** | **15** |
| | a. Derek Waskul | |
| | b. Cory Schneider | |
| | c. Kevin Wiesner | |
| | d. Washtenaw Association for Community Advocacy | |
| **IV.** | **Argument** | **21** |
| | a. Standard | |
| | b. Plaintiffs have shown a likelihood of success on the merits | |
| | c. Plaintiffs will be irreparably harmed without a preliminary injunction | |
| | d. The public interest will be served by a preliminary injunction | |
| | e. A Preliminary Injunction Will Not Prejudice Defendants | |
| **V.** | **Conclusion** | **26** |

## I.  INTRODUCTION

Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 based on violations of their rights expressly conferred by the Social Security Act, US Constitution, and Michigan's Mental Health Code. Plaintiffs are the Washtenaw Association for Community Advocacy, a non-profit organization established in 1949 whose mission and purpose include advocating for persons with developmental disabilities and their families, and three severely developmentally-disabled adults receiving medically-necessary Community Living Support (CLS) services through Washtenaw County Community Mental Health (WCCMH). These CLS services allow Plaintiffs to avoid institutionalization. Plaintiffs filed this action after their medically-necessary CLS services were illegally reduced by Defendant WCCMH.

Plaintiffs will suffer irreparable harm as long as the illegal reductions in their CLS services are not reversed. Plaintiffs are not receiving the medically-necessary services set forth in their Individual Plans of Service (IPOS), and Plaintiffs' guardians are forced to provide unpaid services while paying out of pocket for expenses that are supposed to be covered by Defendant WCCMH. Lack of adequate services puts Plaintiffs at risk of institutionalization, the very risk that HSW CLS services are designed to avoid.

The public is also harmed by Defendants' refusal to provide medically-necessary CLS services. In addition to being more humane than institutionalization, CLS services are less expensive than institutionalization. The public has an interest in ensuring that individuals with disabilities receive the most humane and cost-effective treatment possible.

Finally, Defendants are required to comply with HSW policy and

federal Medicaid law, and there can be no harm to them by being required to do so.

Therefore, Plaintiffs ask this court to grant a preliminary injunction enjoining Defendants from refusing to reinstate the pre-May 15, 2015 level of funding and services to Plaintiffs and to all other CLS service recipients until lawful IPOS meetings are conducted and CLS service recipients are offered notice of any proposed cuts and an opportunity to be heard regarding any objections they may have to the cuts.

## II. FACTS

### A. Medicaid Program and Habilitation Supports Waiver.

The Medicaid program is jointly funded and administered by the state and federal governments under Title XIX of the Social Security Act. The Medicaid program provides medical assistance for certain low income children, families, pregnant women, individuals with disabilities, and the elderly. Michigan must operate its Medicaid program in compliance with federal Medicaid statutes and regulations. Defendant WCCMH is an organization statutorily required to provide and arrange for mental health services to individuals with developmental disabilities in Washtenaw County.

Michigan elected, applied, and was approved to receive funding to furnish waiver services under 42 U.S.C. § 1396n to assist individuals with developmental disabilities with activities of daily living necessary to permit them to live in their own home or rental unit in a community supported living arrangement setting. The Medicaid waiver under which these services are offered is called the Habilitation Supports Waiver (HSW).

7

Michigan elected to make all Medicaid home and community-based community living arrangement services under 42 U.S.C. § 1396u and 42 C.F.R. § 440.180 available to individuals on the HSW. MCL 400.109c.

Community supported living arrangement services is defined as approved services that assist a developmentally disabled individual in activities of daily living necessary to permit them to live in their own apartment in a community supported living arrangement setting. 42 U.S.C. § 1396u. It also includes personal assistance and "support services necessary to aid an individual to participate in community activities." 42 U.S.C. § 1396u(a)(7). "Community Living Supports (CLS) facilitate an individual's independence, productivity, and promote inclusion and participation." Michigan Medicaid Provider Manual (MPM) § 15.1.

Plaintiffs receive services under the HSW when, "if not for the availability of the home and community-based services, [he or she would] require the level of care provided in an intermediate care facility for the mentally retarded (ICF/MR)." HSW Eligibility Certification. Michigan has a long history of authorizing CLS services under the HSW, which are seen as a more humane and cost-effective alternative to institutionalization.

**B.** **Right to Self-Determination Under the HSW.**

The core of the CLS program is the participant's right to self-determination. Exhibit A, HSW, Appendix E-2. This means that the participant structures his or her own plan of service according to medical need.

Medical necessity criteria is defined in Michigan's Medicaid Provider Manual, and includes supports, services, and treatment "intended to treat, ameliorate, diminish or stabilize the symptoms of mental illness, developmental disability, or substance use disorder." MPM §

8

2.5.A. Medical  necessity criteria also includes supports, services, and treatment "designed to assist the beneficiary to attain or maintain a sufficient level of functioning in order to achieve his goals of community inclusion and participation, independence, recovery, or productivity." *Id*.

The determination of a medically-necessary support, service, or treatment must be based on 1) information provided by the beneficiary and/or his family, 2) clinical information from the beneficiary's primary care physician or other qualified health care professionals who have evaluated the beneficiary, and 3) person centered planning. MPM § 2.5.B.

Only after the participant's medical needs have been determined can the plan be budgeted. HSW Appendix E-2(b)(ii). Ex. A. "*The amount of the individual budget is determined by costing out the services and supports in the IPOS, after a IPOS that meets the participant's needs and goals has been developed*." *Id*. (emphasis added). "Both the participant and the [Prepaid Inpatient Health Plan (PIHP)] must agree to the amounts in the individual budget before it is authorized for use by the participant. This agreement is based not only on the amount, scope and duration of the services and supports in the IPOS, but also on the type of arrangements that the participant is using to obtain the services and supports." HSW Appendix E-2(b)(ii). Ex. A.

**C. Defendant WCCMH and the WCHO: Reformation and Budget Crisis**

Until January 2014, the Washtenaw County Health Organization (WCHO) was the PIHP for Washtenaw County. The WCHO was dissolved around October 1, 2015.

In summer 2014, the WCHO informed Washtenaw County that it was facing a shortfall of several million dollars. Ex. B, Behavioral Health Task Force, Final Report. A Behavioral Health Task Force issued a

recommendation in February 2015, in which it recommended dissolving the WCHO and creating a new Community Mental Health Agency. The Behavioral Health Task Force also specifically recommended targeting CLS services in order to reduce the deficit, an effort encouraged by an outside consultant in December 2015. The outside consultant, Health Management Associates (HMA), supported WCCMH's changes "that will reduce costs in [the CLS program]." Ex. C, HMA Draft Report, page 12.[1]

In a directive sent to PIHP executive directors on October 22, 2015, MDHHS had already notified CMHPSM and WCCMH that the "changes that will reduce costs" mentioned in the HMA letter were illegal. Ex. D – Directive from Thomas Renwick to PIHP Executive Directors. Specifically, MDHHS condemned "PIHPs and/or their provider networks [implementing] a practice of using assessments or screening tools to determine, limit or restrict the amount, scope, or duration of a service." *Id.*

The directive makes clear that "it is the person-centered planning process and medical necessity criteria that determine the amount, scope and duration of services." *Id.* Moreover, MDHHS stated: "it also bears reminding that the PIHP is obligated to ensure that medically necessary supports, services or treatments or treatment are sufficient in amount, scope and duration to reasonably achieve their purpose." *Id.*[2]

The "changes that will reduce costs," criticized by MDHHS in the directive and affecting the named Plaintiffs' CLS services, went into effect in May 2015, and have not been reversed despite MDHHS' clear

---

[1] It is worth noting that the HMA report was released about half a year after WCCMH implemented the budget reductions.

[2] MDHHS had also specifically notified WCCMH in June 2015 that the May 15, 2015 cuts were illegal, and had demanded that WCCMH reverse the reductions. See discussion below at Section E.

direction and several administrative law decisions reversing the reductions in individual cases (15-018842-CMH; 15-013180-CMH).

   D. **The May 2015 Cuts**

      Prior to May 15, 2015, the IPOS budget for CLS participants was calculated as follows: an hourly pay rate for the CLS providers was established, and then additional line items were added to the budget. After a fiscal intermediary fee was subtracted from this total budget amount, the total budget was then divided by the annual number of CLS hours.[3]

      This method of calculating the budget created a CLS provider pay rate that took into account additional budget line items, but did not cap the participant's overall CLS services budget. All budget items were based on the medically-necessary services established in CLS participants' IPOS.

      A letter dated April 9, 2015 was sent out to all participants receiving CLS services, notifying them that the CLS rate would be set at $13.88 for all participants effective May 15. Ex. E, Letter to CLS Participants from Sally Amos O-Neal. Ms. Amos O'Neal wrote, "The new rate

---

[3] For example, Plaintiff Waskul's budget dated February 12, 2015 was calculated as follows: the total number of annual authorized hours (32.5 per week at the time) was multiplied by the agreed upon CLS hourly provider rate of $13.88 to create a starting budget amount of $23,457.20. From there, $1,027.12 was added for the annual cost of training (74 annual hours X the training rate of $13.88).

An additional $2,100 was then added for annual transportation expenses. $199.08 per CLS provider was then budgeted for worker's compensation, for a total of $398.26 ($199.09 X 2). $720 was then added for annual community participation; $280.08 was added for an annual recreation pass; and an annual fiscal intermediary fee of $1,200 was added to the total costs but billed separately to Medicaid under the code T2025. The total costs of $29,182.56, minus the fiscal intermediary fee of $1,200, created a total budget of $27,982.56. The total budget of $27,982.56 was then divided again by the annual number of authorized CLS hours to create an hourly CLS rate of $16.56. This rate was then divided by four to create the fifteen minute CLS variable rate of $4.14, billed to Medicaid as H2015.

will be $13.88 an hour, which includes worker's compensation, transportation, community participation, taxes, and training. While this is not a reduction in your current level of services, it may reduce the amount you can pay your staff." *Id*.

However, the rate reduction was not simply a new set rate for CLS providers. Rather, participants' IPOS budgets were entirely recalculated. Instead of adding separate budget line items for transportation and community activities, WCCMH began subtracting those items from the CLS providers' annual pay. WCCMH also began subtracting budget line items for training and "unbillable expenses." Moreover, WCCMH began including respite hours in the CLS budget calculation, and it also reduced the hourly training rate for CLS providers.[4]

The result of these reductions was that participants' budgets were significantly cut, and their CLS providers' hourly rate was reduced. Moreover, participants' budgets were effectively capped because budgeting for additional medically-necessary services would further reduce the CLS

---

[4] After the May 15, 2015 reduction, with the same number of CLS hours per week, Plaintiff Waskul's total budget amount was only $18,672.55, nearly $10,000 less than before May 15, 2015. This new budget, created May 18, 2015, was calculated completely differently. The weekly number of authorized CLS hours was multiplied by four to get a "unit" of 130, which was then multiplied by the new quarterly hour rate of $3.47 ($13.88 per hour). This was multiplied by fifty-two weeks to create a total starting CLS budget of $23,457.20. A similar calculation was done for respite hours, and a total respite annual starting budget of $3,500 was then improperly added to the CLS starting budget to create a universal "beginning budget amount" of $26,957.20.

From there, $3,369.65 in taxes was subtracted, $905 for worker's compensation was subtracted, an estimate training cost of $270 was subtracted, "unbillable expenses" of $1,200 were subtracted, transportation costs of $2,100 were subtracted, community activity expenses of $720 were subtracted, and a recreational center pass expense of $280 was subtracted. The "total left after expenses" was $18,672.55 (although in fact this figure should be $18,112.55). This total was then divided by the number of CLS and respite hours (improperly) to get $9.63, the "max rate for employee wage."

providers' pay, making it impossible to find and maintain paid CLS providers at such a low rate.

This budget reduction affected all CLS participants in Washtenaw County. Upon information and belief, as of November 30, 2015, there were 169 participants receiving CLS services under the HSW in Washtenaw County.

The April 2015 letter from Ms. Amos O'Neal did not give notice to participants of their right to request a Medicaid fair hearing, nor did it give any reason for the intended action or cite any specific regulation supporting the action. *Id.* The April 2015 letter was not based on medical necessity criteria, and did not provide an explanation of the circumstances under which benefits would be maintained should a hearing be requested. *Id.*

**E. Post-June 4, 2015 Notice of Hearing Rights**

MDHHS sent notice to WCCMH on June 4, 2015, warning WCCMH that its decision to reduce CLS participants' provider rate did not conform to the approved budget authority process in the HSW application. Ex. F, Letter from Jeffrey Wieferich to Sally Amos O'Neal. MDHHS noted that "Medicaid-funded services are changed, reduced, or terminated as a result of a reduction in the individual budget," and demanded that WCCMH "reverse this decision immediately and retroactively to May 15, 2015 for all SD and choice voucher arrangements effected [sic] by this action." *Id.*

Starting in late June, WCCMH began reopening participants' IPOS to incorporate the budget reductions. Upon information and belief, contrary to MDHHS's demand that WCCMH comply with the person centered planning process when reopening the IPOSs, WCCMH often only had clinical staff telephone participants and notify them that their IPOS would be redone. Upon information and belief, WCCMH's clinical staff usually showed up at

participants' homes with an IPOS reflecting the reduction already incorporated, and asked them to sign it.

When WCCMH incorporated the CLS budget reduction into participants' IPOS, it provided a notice of hearing rights with the new IPOS. These later notices of hearing rights described the action taken as "adequate," and were not negative advance action notices. Ex. G, Post-June 4, 2015 Notice of Hearing Rights. These later notices did not cite any statute or policy authorizing the reduction in services. Because these later notices did not even acknowledge the reduction in services, no reason for the reduction was given in the notices. Upon information and belief, WCCMH told participants at the time the hearing notice was provided that the CLS budget reduction was not appealable.

Upon information and belief, only about 10 of around 170 CLS participants in Washtenaw County reached administrative hearings by an appeal based on this later notice of hearing rights.

Furthermore, although WCCMH assured MDHHS that it had reversed the CLS rate retroactive to May 15, 2015 pending Plaintiff Waskul's Medicaid hearing (it is not clear why all participants' services would be reinstated pending only one individual's Medicaid hearing), it did not do so. Upon information and belief, Plaintiff Waskul is the only CLS participant whose provider rate (but not overall budget reduction and recalculation) was eventually reversed to the pre-May 15, 2015 amount. Plaintiff Schneider's benefits have not been fully restored, despite the fact that WCCMH certified to MAHS that it had implemented the administrative law judge's order.

For the few CLS participants who requested a hearing, WCCMH, instead of reversing the rate to the pre-May 15, 2015 amount, instead attempted to

14

impose a "negotiated" rate of $14.48, which it arbitrarily borrowed from the Michigan Children's Waiver. This rate was never "negotiated"; rather, participants were told they could have the $14.48 rate or the $13.88 rate. Both the $14.48 rate and $13.88 rate were calculated according to the post-May 15, 2015 method, which reduces and caps participants' CLS budgets, as discussed above.

### III. PLAINTIFFS' FACTS

#### DEREK WASKUL

Plaintiff Derek Waskul (Mr. Waskul) has a developmental disability and has been diagnosed with severe autism; he is in his mid-thirties but cannot function independently. Cynthia Waskul, his mother and legal guardian, provides unpaid natural support on weekends and evenings, but Mr. Waskul depends on two paid CLS providers seven and a half hours a day, Monday through Friday.

The result of WCCMH's unilateral interference with Mr. Waskul's budget was that Mr. Waskul's caregivers' hourly rate was lowered from around $13.00 per hour to around $9.50 per hour, and his overall annual budget was reduced by about $10,500. During the period when WCCMH had illegally reduced Mr. Waskul's hours from 37.5 to 32.5 per week, his total yearly budget amount was $29,182.56. Ex. H, Budget Created February 12, 2015. After the May 15, 2015 reduction, Mr. Waskul's total budget amount was only $18,672.55. Ex. I, Budget Created May 18, 2015.

WCCMH has never offered any justification based on medical need for the May 15, 2015 reduction of Mr. Waskul's budget. Although Mr. Waskul's primary care provider wrote a letter stating that "a lowering of Derek's self-determination budget would be devastating to Derek," WCCMH continued with the cuts. Ex. J, Letter from Maria Heck, DO. Dr. Heck also wrote,

"As a young man with severe cognitive impairment and autism, Derek needs stability, consistency and dependability. With the proposed changes, which would lower the staff wage, Derek will lose his current staff whom he has developed relationships with. Derek's current staff have facilitated and helped Derek to develop meaningful relationships in the community. Social interaction with others is a very important piece in the purpose of the self-determination arrangement . . . As his doctor, I ask that you consider Derek's specific medical needs when making this decision." *Id.*

Despite Dr. Heck's clear statement of medical necessity, WCCMH nevertheless ignored Mr. Waskul's medical needs and reduced his CLS budget. At a Medicaid Fair Hearing in October 2015, Mr. Waskul's two paid CLS providers both testified under oath that they could not continue to work at the reduced rate. Additional medical evidence was admitted stating that losing any of his current CLS providers would be detrimental to Mr. Waskul's health.

After WCCMH reduced his budget, Mr. Waskul's caregiver Christina Pulcifer quit, and Mr. Waskul currently does not have enough staff to provide the medically-necessary services required by his IPOS. It will take significant time to find a suitable replacement for Ms. Pulcifer, because Mr. Waskul must be familiar with the provider and have established a certain level of trust.  Mr. Waskul is at risk of losing his other provider as well because of the uncertainty surrounding her job.

On February 18, 2016, ALJ Steven Kibit granted Mr. Waskul's Motion for Summary Disposition in his Medicaid Fair Hearing and ordered WCCMH to reverse the budget reduction (15-013180-CMH). However, WCCMH has appealed Judge Kibit's decision, and has refused to reverse its policy for all CLS participants affected by the cuts.

### CORY SCHNEIDER

Plaintiff Cory Schneider (Mr. Schneider) has been diagnosed with autism and mild retardation, and he suffers from an undiagnosed behavior

16

disorder. He is twenty years old but cannot function independently. He has received CLS services under the HSW since he turned eighteen. Due to his extremely limited speech and the likelihood of self-inflicted harm, he requires 24/7 care. Mr. Schneider's IPOS provides for 93 hours of CLS services per week, and his grandmother provides unpaid natural support for any of his unmet needs.

Mr. Schneider's CLS providers are necessary to help him avoid institutionalization. Among other things, the CLS providers help him to cross the street, engage in basic social interactions, remind him to use the bathroom, and monitor his aggression. The CLS providers must also prevent Mr. Schneider from hurting others or himself; when angry, he has been known to become aggressive toward others and bang his head against the wall. Caring for Mr. Schneider is a strenuous job involving constant monitoring.

Before May 15, 2015, Mr. Schneider's lead CLS provider, Stacey Rozsa, who has been with him for at least six years, was paid $13.50 per hour before tax deductions. His other three CLS providers were paid around $10.00 per hour.

Effective May 15, 2015, WCCMH cut Mr. Schneider's CLS budget, which reduced Ms. Rozsa's pay rate. Ms. Rozsa's pay rate then fluctuated for no apparent reason in subsequent months between $11.50 and $12.00 per hour.[5] Besides reducing the budget, this recalculation capped Mr. Schneider's CLS budget. After the May 15, 2015 budget recalculation, the pay rate for his CLS providers was frozen at around $10 per hour for new providers. Because of the frozen budget imposed by WCCMH, Mr. Schneider is unable to maintain

---

[5] The fiscal intermediary handles all administrative work pertaining to the CLS providers' wages, and payments are made directly by the fiscal intermediary.

his current paid CLS providers or find suitable replacement providers, and consequently is not receiving the medically-necessary services required by his IPOS.

The April 2015 letter did not give notice to Mr. Schneider of his right to a Medicaid fair hearing. Only after receiving a notice of hearing rights (which was not an advance notice and stated that the action taken was "adequate") following an IPOS "progress review" was he able to request an administrative hearing.

This notice, dated November 18, 2015, was given well after the budget reduction was implemented in May 2015. The notice stated that it was "given to Marti Schneider on 11/18/2015." Ex. G. The notice stated that the action taken was effective on October 19, 2015, the date of the new IPOS, nearly a month before the date of the notice of hearing rights. *Id.*

Because the notice described the action taken as "adequate," the notice on its face did not provide Mr. Schneider an opportunity to request a timely hearing and receive benefits pending the hearing, because pending benefits require "a termination, reduction, or suspension of a service that was previously authorized." *Id.* The specific regulation cited in the notice simply stated that the amount, scope, and duration of an IPOS must be sufficient, and that the Medicaid agency "may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." *Id.*

Since May 15, 2015, Mr. Schneider's grandmother has made numerous attempts to find replacement CLS providers. Due to the low provider pay

rate and the difficult nature of the work involved, she has been unable to find suitable replacement CLS staff.

Mr. Schneider can currently employ only two paid CLS providers for about 65 of the 93 weekly hours required by his IPOS. Although his IPOS specifically requires him to have five days out in the community, he is now unable to budget for medically necessary items like transportation and community activities without further reducing his CLS providers' pay.

Mr. Schneider's grandmother, Martha Schneider, has been paying out of pocket for transportation and community activity expenses. On December 4, 2015, Mr. Schneider requested $400 monthly for transportation and $200 monthly for community activities. His amended IPOS from December 4, 2015 simply states that "these costs are above what the current self-determination budget covers." WCCMH did not provide him notice of his hearing rights when it denied this request for medically-necessary services.

Mr. Schneider's grandmother has been caring for him the remaining 103 hours of the week. Ms. Schneider is seventy-five years old and underwent heart surgery within the last year.

On February 18, 2016, ALJ Kibit granted Mr. Schneider's Motion for Summary Disposition in the Medicaid Fair Hearing and ordered WCCMH to reverse the budget reduction (15-018842-CMH). However, WCCMH has failed to fully restore benefits to Mr. Schneider as ordered by ALJ Kibit, despite certifying to MAHS that it had implemented Judge Kibit's decision. Ex. K, Order Certification.

**KEVIN WIESNER**

Plaintiff Kevin Wiesner (Mr. Wiesner) is an eighteen-year-old with severe developmental delays who suffers from seizures. He receives about

85 hours of CLS services a week in his current IPOS but requires 24/7 care. He requires at least two CLS staff with him at all times in public. Mr. Wiesner collapses during seizures and risks striking his head on objects while falling. In addition to preventing him from collapsing during seizures, his paid CLS providers must also pass a magnet over his Vagus Nerve Stimulator, which sends an electric charge to his brain. CLS staff must also ensure that he coughs up food to prevent blockage of his airways during seizures.

Mr. Wiesner has been receiving CLS services under the HSW since he turned eighteen. His pre-May 15, 2015 hourly CLS provider rate was $12.00 per hour, and his CLS budget allowed for separate transportation and community activity line items to be budgeted.

Mr. Wiesner's IPOS requires medically-necessary community activities. Prior to completing a budget for his pre-May 15, 2015 IPOS, Mr. Wiesner's guardian was prepared to ask that medically-necessary transportation and community activity expenses be budgeted. However, the April 9, 2015 letter from Sally Amos O'Neal and subsequent discussions with WCCMH staff convinced Mr. Wiesner's guardian that she could not budget for those medically-necessary services without reducing Mr. Wiesner's CLS providers' pay rate to an unlivable wage.

On May 15, 2015, Mr. Wiesner's CLS provider rate was reduced and his budget was cut. The result was that the CLS providers' hourly rate was lowered from $12.00 to $11.50 per hour. This reduction caused Mr. Wiesner to breach his employment contracts with his CLS staff. His budget was entirely recalculated as well, as described above.

Mr. Wiesner received no notice of hearing rights either in April 2015, when the letter was sent, or on May 15, 2015 when the budget

reduction was instituted. He refused to sign an amended IPOS in July 2015, which would have implemented the reduced budget in his IPOS. At that time, he received notice of his hearing rights (a notice of "adequate action") and requested a hearing. He was forced to pay his CLS providers reduced wages for two months.

When Mr. Wiesner requested the hearing in August 2015, WCCMH raised his CLS provider rate, but not to the full prior amount. Instead, this was a "compromised" rate of $14.48, which WCCMH borrowed from the Children's Waiver (discussed above). He received no retroactive benefits for his CLS providers. Upon information and belief, it was only in December 2015 that he was told by Katie Snay, Fair Hearings Officer for WCCMH, that WCCMH had restored his CLS provider rate to the full rate of $12.00.

Mr. Wiesner has been paying out of pocket for community activity and transportation expenses. When Mr. Wiesner has requested reimbursement for these expenses, he is told that additional line items would need to be added to his IPOS. However, adding these additional budget line items would only continue to reduce his CLS providers' pay rate.

Since the budget reduction was imposed, Mr. Wiesner has lost one CLS provider. Mr. Wiesner has suffered and continues to suffer harm as a result of the illegal reduction in his CLS budget, and as a result of WCCMH's refusal to budget for transportation and community activities.

### WASHTENAW ASSOCIATION FOR COMMUNITY ADVOCACY

Washtenaw Association for Community Advocacy (WACA) is a non-profit organization whose mission and purpose include advocating for persons with developmental disabilities and their families. Its service population is comprised mainly of persons with disabilities and their families, and its

members include recipients of Community Living Support services and their providers. All 169 HSW CLS services recipients in Washtenaw County, including the named individual Plaintiffs in this case, qualify for WACA's services, and have been directly harmed by Defendants' practices.

## IV. ARGUMENT

### A. Standard

Plaintiffs seek a preliminary injunction pursuant to Fed. R. Civ. Pro. 65. In Michigan, four factors must be considered in determining whether a preliminary injunction should be issued:

(1) the likelihood that the party seeking the injunction will prevail on the merits;

(2) the danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued;

(3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief;

(4) the harm to the public interest if the injunction is issued.

*Campau v. McMath*, 185 Mich App 724, 728-9; 463 NW2d 186 (1990); citing *Michigan State Employees Assn v. Dept of Mental Health*, 421 Mich 152, 157-8; 365 NW2d 93 (1984). "Other considerations . . . are whether it will preserve the status quo so that a final hearing can be held without either party having been injured and whether it will grant one of the parties final relief prior to a hearing the merits." *Campau*, supra, 185 Mich App at 729.

In the present case, the factors all clearly weigh in favor of granting preliminary relief to allow Plaintiffs' continued receipt of their medically necessary CLS services, which are essential to their ability to avoid institutionalization.

**B. Plaintiffs have shown a likelihood of success on the merits**

To date, an administrative law judge has issued three individual decisions reversing the budget reductions at issue in this case. MDHHS has also intervened several times since May 2015 to notify WCCMH that its actions are illegal and to direct WCCMH to reverse these illegal actions. Nevertheless, despite MDHHS's and administrative law judges' direction, WCCMH has refused to reverse the reductions, and has appealed Mr. Waskul's decision.

The claims set forth in Plaintiffs' verified complaint show that WCCMH has clearly violated federal and state law. WCCMH violated Plaintiffs' right to due process by failing to give any notice of appeal rights in April, when the letter from Sally Amos O'Neal was sent; on May 15, 2015, when the budget reduction was instituted; and after MDHHS intervened in early June 2015, when it sent notices of "adequate action" that failed to comply with statutory and constitutional requirements.

WCCMH has also violated Plaintiffs' established rights under the Social Security Act. The CLS services budget reduction imposed by WCCMH has violated Plaintiffs' right to an IPOS "sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 U.S.C. § 1396a(a)(10)(B). By failing to provide medical assistance with reasonable promptness to eligible participants, WCCMH has also violated 42 U.S.C. § 1396a(a)(8) and 42 U.S.C. § 1396a(a)(10). Plaintiffs' support services, which allowed them to participate in the community, have been curtailed because their budgets have been slashed and paid CLS providers cannot readily be found to work at such low rates; indeed, several of Plaintiffs' CLS providers have quit. Defendants, by refusing services based on cost, have thereby failed to make services available to Plaintiffs. This makes it impossible for

23

participants to obtain adequate medically necessary services with reasonable promptness.

Finally, WCCMH has failed to provide mental health services suited to Plaintiffs' condition, as required by MCL 330.1708(1), and has also failed to provide a written individual plan of service addressing, "as either desired or required by the recipient, the recipient's need for . . . health care . . . transportation, and recreation." MCL 330.1712(1).

Defendants' failure to provide Plaintiffs with an IPOS adequately addressing their needs for health care, transportation, and recreation amounts to neglect under MCL 330.1722(1), as does Defendants' failure to provide Plaintiffs with mental health services suited to their condition. "A recipient of mental health services who is abused or neglected has a right to pursue injunctive and other appropriate civil relief." MCL 330.1722(3).

## C. Plaintiffs will be irreparably harmed without a preliminary injunction

The facts set forth in Plaintiffs' Complaint establish that Plaintiffs will suffer irreparable harm unless a preliminary injunction is issued. Properly stated, the definition of irreparable harm is whether there is or will be a "wrong which cannot be adequately redressed by relief on the merits*." N.Y. Pathological and X-Ray Laboratories, Inc., v. Immigration and Naturalization Service*, 523 F. 2d 79, 81 (2d Cir. 1975).

Since the rate reduction imposed on May 15, 2015, Plaintiffs have been unable to budget for medically necessary services, and some have lost CLS providers. Plaintiff Schneider, for example, is currently receiving only 65 of the 93 hours of CLS services per week required by his IPOS. Although his IPOS specifically requires him to have five days out in the

community, Mr. Schneider is now unable to budget for medically necessary items like transportation and community activities without further reducing his CLS providers' pay and losing additional providers.

Mr. Schneider's grandmother has been paying out of pocket for transportation and community activity expenses, and WCCMH has refused to budget for these medically-necessary expenses. She has also been caring for Mr. Schneider herself during time he should be receiving paid CLS services, despite the fact that she is seventy-five years old and underwent heart surgery within the last year.

The reduction has increased the risk of institutionalization for all Plaintiffs, the very risk that CLS services under the HSW are designed to prevent. There is no after-the-fact remedy for these lost opportunities, and immediate action is needed to halt the irreparable harm being caused to Plaintiffs.

**D. The public interest will be served by a preliminary injunction**

The goal of CLS services under the HSW is to enable severely developmentally-disabled individuals to lead as normal a life as possible and avoid institutionalization. In addition to being more humane, CLS services are cheaper than institutionalization.

> "In pursuit of efficiency and cost-efficiency in treatment and habilitation, research demonstrates clearly and overwhelmingly that community living is a substantially more effective approach to assisting people to achieve their potential in living independently than the care that occurs in institutional environments."

*The Effects of Community vs. Institutional Living on the Daily Living Skills of Persons with Developmental Disabilities?* Lakin, Larson, and Kim, 2011. When plaintiffs must be institutionalized because they are unable to receive the support to which they are entitled under the HSW, the public pays more.

25

The public also has an interest in ensuring that its disabled population receive the most humane and effective treatment possible.

> "There is a high preponderance of evidence that individuals moving from institutional to community settings consistently develop their daily living skills (adaptive behavior) to a higher level than their matched peers who remain institutionalized and/or that they themselves had developed prior to leaving the institutional settings. The consistency of these findings is notable and rare in social research." *Id.*

### E. A Preliminary Injunction Will Not Prejudice Defendants

Besides being beneficial to the public, entry of the injunction causes no harm to Defendants. Being forced to comply with federal and state law cannot be considered harm. *Mylan Pharms. Inc. v. Shalala*, 81 F.Supp. 2d 30, 45 (D.D.C. 2000) ("It is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers.")  Since a preliminary injunction in this case benefits the public interest, Defendants cannot claim to be harmed by such an injunction. See *Illinois Hospital Assoc. v. Illinois Dep't of Public Aid*, 576 F.Supp. 360, 371 (N.D. Ill. 1983) ("no state may characterize its duty to comply with the requirements of an elective program such as Medicaid as constituting a hardship to its citizens").

### IV. CONCLUSION

Plaintiffs respectfully request that this Court grant a preliminary injunction 1) enjoining Defendants from refusing to reinstate the pre-May 15, 2015 level of funding and services to Plaintiffs and to all other CLS service recipients until lawful individual plan of service meetings are conducted and CLS service recipients are offered notice of any proposed cuts and an opportunity to be heard regarding any objections they may have to the cuts; 2) Preliminarily and permanently enjoin WCCMH from imposing the rate reduction, new budget calculation method, and unilateral hours

reductions; and 3) Preliminarily and permanently enjoin WCCMH from denying participants their right to procedural due process.

Respectfully submitted,

/s/ Nicholas A. Gable (P79069)           /s/ Lisa Ruby (P46322)
LEGAL SERVICES OF SOUTH CENTRAL MICHIGAN    MI POVERTY LAW PROGRAM
Attorney for Plaintiffs                  Attorney for Plaintiffs
420 N. Fourth Ave.                    220 E. Huron #600A
Ann Arbor, MI 48104                 Ann Arbor, MI 48104
(734) 665-6181 ext. 127             (734) 998-6100 ext. 117
ngable@lsscm.org                    lruby@mplp.org

March 30, 2016

**CERTIFICATE OF SERVICE**

On March 30, 2016, I served Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction with Supporting Brief, and all accompanying exhibits, on all defendants or counsel of record by first-class US mail, postage prepaid at the addresses below:

Stefani Carter
4007 Carpenter Road, #124
Ypsilanti, MI 48197

William Morris, MI Dept. of Attorney General
525 W Ottawa St. Ste. 338
Lansing, MI 48933-1067

Community Mental Health Partnership
of Southeast Michigan & Jane Terwilliger
705 N. Zeeb Rd Suite #2102 (2nd Floor)
Ann Arbor, MI 48103

Respectfully submitted,

/s/ Nicholas A. Gable (P79069)           March 30, 2016
LEGAL SERVICES OF SOUTH CENTRAL MICHIGAN
Attorney for Plaintiffs
420 N. Fourth Ave.
Ann Arbor, MI 48104
(734) 665-6181 ext. 127
ngable@lsscm.org