## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DEREK WASKUL, ET AL.,

      Plaintiffs,                            No. 2:16-cv-10936-AJT-APP

v.                                         Hon. Arthur J. Tarnow

WASHTENAW COUNTY COMMUNITY
MENTAL HEALTH, ET AL.,

      Defendants.

_____/

## PLAINTIFFS' POST-EVIDENTIARY HEARING BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

## I.  PROCEDURAL HISTORY AND STANDARD

### A. Procedural History

Plaintiffs filed a motion for a Preliminary Injunction on March 30, 2016. The hearing, originally scheduled in the late afternoon on May 2, 2016, was adjourned when defendants met with plaintiffs before the hearing and attempted to clarify a "fundamental misunderstanding" about the budget calculation method at issue.

The hearing was rescheduled for May 19, 2016, at which, through a dialogue with the Court, the parties put a tentative consent agreement on the record. The Court ordered defendants to draft a Consent Order consistent with the May 19, 2016 discussion, to be reviewed by plaintiffs and submitted to the Court, setting

forth a budget calculation that did not cap the budgets for self-determination participants who receive Community Living Support (CLS) services under the Habilitation Supports Waiver in Washtenaw County. As explained in plaintiffs' Motion for Entry of Order, the defendants failed to submit an order that complied with the Court's direction, and refused to accept plaintiffs' proposed order. The Court denied the parties' cross-motions for entry of order and scheduled an evidentiary hearing.

The first part of the evidentiary hearing was held on August 1, 2016, at which the plaintiffs offered testimony from Cynthia Waskul (Derek Waskul's mother and guardian) and Kathleen Homan, the Executive Director of the Washtenaw Association for Community Advocacy. The second part of the evidentiary hearing was held on September 20, 2016, at which the plaintiffs recalled Kathleen Homan and offered testimony from Kerry Kafafian (Kevin Wiesner's mother and guardian). Defendant Washtenaw County Community Mental Health (WCCMH) called one witness, Sally Amos-O'Neal. The regional and state defendants did not call any witnesses or submit any documents at the hearings. Plaintiffs submit this post-hearing brief at the direction of the Court.

**B. Standard**

In ruling on a motion for a preliminary injunction, the Court must consider "(1) the likelihood that the party seeking the preliminary injunction will succeed on

the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997). "[A] finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, 'shown serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'" *Id.* at 400 (quoting *Gaston Drugs, Inc. v. Metropolitan Life Ins. Co.*, 823 F.2d 984, 988 n.2 (6th Cir. 1987)).

## II. ARGUMENT

### A. Plaintiffs have shown that they will continue to suffer irreparable harm as long as a preliminary injunction is not granted.

Numerous courts have found irreparable harm where Medicaid beneficiaries' due process rights have likely been violated and the beneficiaries face loss of Medicaid services.[1] Plaintiffs have been found to suffer irreparable

---

See, e.g., *Knowles v. Horn*, 2010 WL 517591 (N.D. Tex. Feb. 10, 2010) (finding irreparable harm where in-home Medicaid services under home and community-based waiver program terminated without due process*); Cota v. Maxwell-Jolly*, 688 F. Supp.2d 980 (N.D. Cal. 2010) (finding plaintiffs likely to succeed on due

harm when an unwarranted lapse in Medicaid coverage has led to severe restrictions in medically necessary healthcare that they otherwise are unable to afford. See *Markva v. Haveman*, 168 F. Supp. 2d 695, 718-719 (E.D. Mich. 2001), aff'd 317 F.3d 547 (6th Cir. 2003). Indeed, courts have long-recognized irreparable harm where reductions or terminations of Medicaid services will create the potential or actual loss of health care. See *Beltran v. Meyers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (holding irreparable injury is established when enforcement of a Medicaid policy may deny needed medical care); *Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983) (termination of Medicaid benefits that causes individuals to forego such necessary medical care is clearly irreparable injury); *Caldwell v. Blum*, 621 F.2d 491, 498 (2nd Cir. 1980) (finding harm where Medicaid applicants would, absent relief, be exposed to the hardship of being denied essential medical benefits).

Numerous courts have found irreparable harm in situations closely analogous to the current case. See *K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479,

---

process claims and that the reduction or elimination of public medical benefits is sufficient to establish irreparable harm to those likely to be affected by the program cuts); *Crawley v. Ahmed*, 2009 WL 1384147 at 28 (E.D. Mich. May 14, 2009) (finding plaintiffs likely to succeed on their Medicaid due process claims and that irreparable harm existed because it is undeniable that the unpaid bills, loss of needed medical assistance, and ultimately poor health suffered by Plaintiffs cannot be adequately addressed by the promise of future Medicaid coverage).

493 (D. Idaho 2014) (finding that developmentally disabled adults were likely to

suffer irreparable harm where, due to reduction of payments for home and

community-based services, many named plaintiffs in the class action were at risk

of being institutionalized, and all of them risked stagnating or more likely

regressing in their functional levels because of reduced levels of support they could

afford with their diminished benefits), aff'd *K.W. ex rel. D.W. v. Armstrong*, 789

F.3d 962 (9th Cir. 2015); *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107 (4th Cir.

2013) (upholding a preliminary injunction and dismissing appeal after MCO

reduced developmentally-disabled individuals' community support services under

North Carolina's equivalent waiver program; the Court ruled that Defendants

failed to comply with the notice and appeal rights provided in the Medicaid statute

and Fourteenth Amendment).[2] In addition to inadequate medical care, courts have

---

[2] See also *Benjamin H. v. Ohl*, 1999 WL 34783552 (S.D. W.Va. July 15, 1999), where the court granted a preliminary injunction, finding that plaintiffs were likely to succeed on their Medicaid due process and other claims. The court found irreparable harm because the plaintiffs were being denied home and community based services they needed, including therapy, habilitation services, and respite care; plaintiffs were losing skills previously acquired, where existing services were insufficient to maintain them; and families and care givers were experiencing unnecessary stress due to the lack of appropriate services. In *Peter B. v. Sanford*, 2010 WL 5912259 (D. S.C. Nov. 24, 2010), the South Carolina Medicaid agency reduced medical and personal care services to plaintiffs who had behavioral and special needs that benefitted from a stable environment and personalized treatment. The plaintiffs moved to enjoin the reductions, providing evidence of their declining mental and physical conditions and lost opportunities of community living. While

also found actions that force plaintiffs to pay out-of-pocket for care and/or forego other necessary expenditures to be non-compensable, irreparable injuries. See, e.g., *Schalk v. Teledyne*, 751 F. Supp. 1261 (W.D. Mich. 1990); *Mowbray v. Kozlowski¸* 725 F.Supp. 888 (W.D. Va. 1989); *Reed v. Lukhard*, 578 F. Supp. 40, 42 (W.D. Va. 1983); *Claus v. Smith*, 519 F. Supp. 829, 831 (N.D. Ind. 1981).

Cynthia Waskul testified that, as a result of the new budget calculation method imposed on May 15, 2015, the Medicaid benefits for her son, Derek Waskul, were reduced; as a result of the new calculation method, she is unable to budget for additional medically-necessary services without reducing Derek's CLS provider rate. August 1, 2016 Hr'g Tr. 23:15-19, 24:1-4. Ms. Waskul testified that Derek is currently not receiving adequate CLS services, and that he is short-staffed. *Id*. at 24:10-15. This results in Derek being more lethargic, depressed, and refusing to eat. *Id*. at 24:16-25. The lack of services has made it more difficult for Derek to make and maintain relationships in the community. *Id*. at 24:9.

Ms. Waskul testified that the lack of adequate CLS services has been "overwhelming" for her, and that she worries about Derek's future because he is not currently receiving the services necessary for him to be happy and have a

_____

acknowledging that the plaintiffs' at home care is complicated, burdensome, and inexact, the court decided that, if anyone knows what might be the best, among many less than perfect alternatives, it is the plaintiffs, their families, and their physicians. The court concluded that a preliminary injunction should lie.

purposeful life. *Id*. at 25:17-24. All of Ms. Waskul's post-May 15, 2015 requests for additional CLS services have been denied. *Id*. at 26:8. Derek requires 24/7 care, *Id*. at 34:11, but Ms. Waskul has been unable to hire new staff due to the low provider rate and is currently providing significant unpaid services to meet Derek's unmet needs. *Id*. at 35:19-21; 37:17-18.

Kerry Kafafian testified that her son, Kevin, is currently unable to do the activities specified in his Individual Plan of Service (IPOS). September 20, 2016 Hr'g Tr. 33:15-25. The activities in Kevin's IPOS are medically necessary and were determined through the person-centered planning process. *Id*. at 70:2-7.[3] Medical documentation was submitted when the IPOS was developed. *Id*. at 75:8-12, 17-18. Ms. Kafafian testified that Kevin needs repetition and practice, and that he must learn how to function outside of the home; if Kevin is not regularly in the community five times a week developing functional skills, he becomes isolated and it is "a disaster." *Id*. at 34:3-21; 35:8-11. Kevin is currently not able to go into the community five days a week. *Id*. at 33:24-25.

Kevin requires two staff with him at all times due to his aggressive tendencies and "elopement behaviors." *Id*. at 35:17-24. However, Ms. Kafafian is currently unable to budget for staff necessary to take Kevin into the community;

---

[3] Ms. Kafafian testified specifically about the concrete benefits of certain activities, such as eating out at restaurants like Red Robin. *Id*. at 70:18-25; 71:1-24.

although she has sufficient staffing hours, she lacks the financial ability to pay for the community outings. *Id*. at 36:12-22. Kevin is "stuck at home due to financial constraints." *Id*. at 37:1.

Since May 15, 2015, Ms. Kafafian has made several requests for CLS Medicaid funding to cover the specific activities listed in Kevin's IPOS. *Id*. at 44:5-7. However, all of her requests were denied. *Id*. at 44:14. Due to her inability to budget for necessary community activities, Kevin "hasn't gone out very much." *Id*. at 46:6. When she does take Kevin out, Ms. Kafafian has been forced to dip into her savings, spending money that she had put aside for other purposes, such as property taxes. *Id*. at 46:7-11. Kevin is "becoming more isolated." *Id*. at 46:21. Without consistency in his routine, taking Kevin into the community has become "more risky." *Id*. at 46:24. When Kevin's needs in his IPOS are being met, Kevin is "happy, content"; he "goes out into the communities with minimal issues and is able to be part of society." *Id*. at 48:25; 49:1-2. But over the past year, Kevin has been "more isolated in his behavior related to that of just being unhappy being in the home; hitting walls, standing by the front door just pounding on the door looking at the car because he wants to goes [sic] somewhere. So he seems to be to all appearances to me upset in that sense." *Id*. 49:9-14. In public, Kevin is "more likely to run in a way that is dangerous to him and others." *Id*. at 49:15-16. "If this continues where he gets more and more isolated, we won't be able to take him out

even for just a doctor's appointment or anything….it will really deteriorate." *Id*. at
50:2-5.

Kathleen Homan, president of Plaintiff Washtenaw Association for
Community Advocacy (WACA), testified that, since the May 15, 2015 reductions,
the amount of time she has spent handling self-determination advocacy has
"increased dramatically." August 1, 2016 Hr'g Tr. 44:4-6. The WACA has
received an increase in calls about the reductions, and has had to increase its
meetings and time spent with people on CLS self-determination budgets. *Id*. at
46:11-14. This has not allowed the WACA "to do the rest of the work we need to
do." *Id*. at 46:16-17.

Ms. Homan testified that all of her work at the WACA involves advocating
for people with developmental disabilities in Washtenaw County. *Id*. at 40:12-16.
All three named plaintiffs are members of the WACA. *Id*. at 40:17-19. Ms. Homan
also testified that the May 15, 2015 reductions have generally negatively affected
the CLS participants with whom she works, and that CLS recipients in the
community are still suffering harm because of the new budget calculation method.
*Id*. at 44:11-17. CLS recipients are having trouble finding staff and are unable to
adequately budget for transportation, creating a situation in which "people are
unable to leave their homes." *Id*. at 44:20-23.

Plaintiffs have clearly demonstrated that they have suffered and will

continue to suffer irreparable harm as long as the May 15, 2015 budget reduction and new calculation method are not enjoined.

## B. Plaintiffs have shown that they are likely to prevail on the merits of their claims.

Plaintiffs' claims are essentially twofold: first, that they have been, and continue to be, denied due process; and second, that they continue to be denied medically-necessary services based on preset limits on cost, in violation of federal and state law. There are two aspects to the substantive violations: first, that all Washtenaw County CLS self-determination recipients suffered a budget reduction on May 15, 2015, which has been reversed only for a few individuals; and second, that all Washtenaw County CLS self-determination recipients continue to be subject to the post-May 15, 2015 budget calculation method, which caps participants' budgets and renders them unable to budget for already approved, medically-necessary goods and services within their IPOS.

### 1. Plaintiffs have proved that CLS self-determination participants' budgets were reduced on May 15, 2015 and have not been restored, with the exception of approximately six individuals.

Defendant WCCMH called one witness, Sally Amos O'Neal, the former interim director of the Washtenaw Community Health Organization and the current director of customer service at Washtenaw County Community Mental Health. Ms. Amos O'Neal penned the April 9, 2015 letter notifying all CLS self-determination

participants in Washtenaw County of the May 15, 2015 reduction.

As explained in the letter, introduced by Defendants as Exhibit E, "[e]ffective May 15, 2015, the Washtenaw Community Health Organization (WCHO) will be *reducing* our Community Living Support (CLS) rate…" Defendants' Exhibit E (emphasis added). While insisting that the reduction is "not a reduction in services," the letter admits that the reduction "may reduce the amount you can pay your staff." *Id*.

At the hearing, Ms. Amos O'Neal testified that the new $13.88 rate was implemented on May 15, 2015, and that this new rate equated to a lower total budget amount for CLS participants. September 20, 2016 Hr'g Tr. 117:8-9; 120:1-3. Ms. Amos O'Neal testified that the rate was not restored after the WCHO received the state directive in June 2015 ordering it to reverse the reductions. *Id*. at 118:9-11. Nor were the rates restored by the time the WCHO allegedly conducted person-centered-planning meetings with participants after June 2015, at which time participants were finally given notice of their hearing rights.[4] *Id*. at 118:22-24.

Ms. Amos O'Neal testified that the April 9, 2015 letter was sent to every self-determination participant in Washtenaw County. *Id*. at 117:4-7.  Although Ms. Amos O'Neal testified that about 150 individuals received the letter, *Id*. at 98:10, a Freedom of Information Act request submitted to Defendant WCCMH in

---

[4] Notices of hearing rights, which, as explained *infra*, were deficient.

November 2015 indicated that, as of November 30, 2015, 169 participants received CLS services under the Habilitation Supports Waiver alone. Exhibit A.

To the extent that defendants allege any substantive defense to this rate/budget reduction, it appears to be limited to the claim that the rates have been restored, making plaintiffs' claims moot. Indeed, Ms. Amos O'Neal testified that the pre-May 15, 2015 level of service has been restored. *Id.* at 110:23-24. Yet it was in part Defendant WCCMH's categorical refusal to restore the pre-May 15, 2015 rate for any individuals besides those who timely requested administrative hearings that forced plaintiffs to file this lawsuit. Plaintiffs are aware of only five individuals whose CLS rates have been restored to their pre-May 15 level, three of whom are the named plaintiffs; and Defendant WCCMH has appealed the administrative law judge's orders restoring those rates.[5] Ms. Amos O'Neal testified

---

[5] Defendants have raised almost only routine procedural defenses (e.g., mootness, abstention, immunity, etc.), which plaintiffs believe are without merit. Plaintiffs prefer to reserve their arguments concerning those issues to motions for summary judgment, and to point out for now simply that voluntary cessation of an illegal activity moots the claim only if defendants can meet their "heavy burden" to show that the conduct in question will never be repeated. *See Friends of the Earth v. Laidlaw Environmental Services, Incorporated*, 528 U.S. 167, 190 (2000). Defendants who discontinue the challenged conduct while proclaiming its legality (for example, by appealing the orders forcing them to discontinue the conduct) are particularly unlikely to succeed in mooting a case. *Knox v. Service Employees International Union, Local 1000*, 132 S. Ct 2277, 2287 (2012). The named plaintiffs, therefore, continue to have live claims concerning the restoration of their pre-May 15, 2015 CLS rates.

that only six individuals had the reductions reversed in administrative appeals. *Id*.
at 99:16-17. Defendants have offered no evidence to support Ms. Amos O'Neal's
assertion that the pre-May 15, 2015 level of service has been fully restored for all
CLS participants in Washtenaw County; and counsel for Defendant WCCMH
agreed at hearing that the CLS rates have been restored for only a few individuals.[6]

At hearing, defendants also appeared to argue that the recent 6% increase to
the base CLS rate has fully restored all CLS participants to their pre-May 15, 2015
rate levels.[7] Ms. Amos O'Neal testified that, effective August 1, 2016, there was a
six percent increase to the base rate of CLS services. *Id*. at 102:19-21. However,
defendants failed to show that this increase raised *any* CLS participant's rate to a
level above his or her pre-May 15, 2015 CLS rate. CLS self-determination
participants' rates were reduced to $13.88 effective May 15, 2015; after receiving
the state's June 2015 directive, WCCMH persuaded several participants who
complained about the reductions or appealed to agree to a "negotiated" rate of

---

[6] MR. GABLE: I think at this point the only point of agreement is that the named
plaintiffs' CLS rates have been restored to the prior levels. We do not agree that the
rates have been restored for any other CLS recipient affected by the reductions.
And we maintain that the new budget calculation method has not been reversed for
named plaintiffs or any other CLS recipient affected....THE COURT: Who's going
[sic] speak for the defendants? MR. [sic] CARTER: Stefani Carter, Your Honor.
THE COURT: If you'll just confirm what he said or dispute it? MR. CARTER:
Where are we, Your Honor, I believe that that that's a correct statement. Hr'g Tr. 9.

[7] This argument is not raised in defendants' pleadings.

$14.48. See Plaintiffs' Complaint, pps 115-117. For the few individuals who agreed, this $14.48 rate merely mitigated the damage done by the reductions. The base CLS rate is now $14.72, 24 cents higher than the "negotiated" rate, which does not prove that any CLS recipient is receiving the same rate as before May 15, 2015.[8] Kathleen Homan testified that she has communicated with CLS self-determination individuals who are not currently satisfied with their current level of services. August 1, 2016 Hr'g Tr. 71:16-19.

Plaintiffs have shown that self-determination participants' CLS rates were reduced on May 15, 2015 and, with the exception of perhaps five individuals, have not been restored.

**2. Plaintiffs have proved that CLS self-determination participants were subjected to a new budget calculation method on May 15, 2015, which continues to cap their budgets.**

Sally Amos O'Neal testified that the post-May 15, 2015 budget calculation method is different from the pre-May 15, 2015 method. September 20, 2016 Hr'g

---

[8] Of course, in terms of relief, if any CLS recipients affected by the cuts *have* been raised to a higher rate than their pre-May 15, 2015 rate, there would be no need to reverse the reduction as to those individuals, and plaintiffs' requested relief simply would not apply to them. The simplest solution, assuming the new budget calculation method is first reversed and budgets are no longer capped, is to send notice to the participants who received the April 9, 2015 letter, notifying them of the availability of increased services if they can demonstrate need pursuant to the person-centered-planning process. Plaintiffs proposed such a notice in their proposed consent order.

Tr. 120:20-23. Ms. Amos O'Neal acknowledged that additional line items are now subtracted and come out of the starting total budget amount. *Id*. at 122:1-5; 15-17. The result of this new calculation method is that participants can only redistribute money within their budgets (i.e., reduce their provider rate in order to fund services) or seek unpaid natural supports. *Id*. at 122:18-25; 123: 3-6.

The difference between the pre and post-May 15, 2015 budget calculation methods was also explained in detail by Cynthia Waskul, Kerry Kafafian, and Kathleen Homan. August 1, 2016 Hr'g Tr. 21-22; 43:4-19; September 20, 2016 Hr'g Tr. 37:17-25; 38:1-12; 41:4-25; 42-43. See also April 26, 2016 affidavit of Cynthia Waskul; Plaintiffs' Exhibit 6 (Affidavit of Kerry Kafafian); Plaintiffs' Exhibit 3 (Affidavit of Kathleen Homan). At the September 1, 2016 hearing, Ms. Homan, during cross-examination, walked through an excel version of the budget worksheet currently used by the fiscal intermediary, which uses the post-May 15, 2015 calculation method. September 1, 2016 Hr'g Tr. 17-20. Ms. Kafafian also walked the Court through her affidavit, introduced as Plaintiffs' Exhibit 6, noting that an increase in transportation and community activity expenses caused the provider rate to drop in the excel spreadsheet. *Id*. at 40-41.

The testimony has established that CLS participants' budgets are now capped, and that participants can only reallocate funding within their budgets; the fiscal intermediary cannot add money to the starting budget listed in the budget

worksheet. *Id*. at 24:11-16 (Ms. Homan agreeing that "what you see is what you get in terms of the dollar amount in this budget"). However, plaintiffs have also established that the dollar amount necessary for participants' services can vary depending on individual need, both in terms of transportation costs and community activity expenses. *Id*. at 24:19-25. Every recipient is supposed to have an individualized plan, but this is impossible if the cost associated with medically-necessary services is capped at the outset and is not determined on a person-centered basis. *Id*. at 25:1-3. Each recipient's services are different, and the cost associated with accessing those services differs depending on the recipient.

On cross-examination, Ms. Amos O'Neal was shown the excel version of the budget worksheets used by the fiscal intermediary, which operates according to the post-May 15, 2015 budget method and is now used for all self-determination rates. *Id*. at 28:25; 29:1-2. Counsel for plaintiffs proposed an example, in which two otherwise similarly-situated CLS self-determination participants must travel different distances in order to participate in the community. An additional $100 for transportation costs was added to the budget of the participant who must travel farther, and plaintiffs' counsel asked Ms. Amos O'Neal, "what happens to the final wage that you can pay for your employee whenever you add transportation cost?" To which Ms. Amos O'Neal responded, "you can see that it went down." *Id*. at 125:19-21. Yet Ms. Amos O'Neal admitted that self-determination participants

have individual needs, which could include different transportation needs. *Id*. at 126:2-3.

Ms. Amos O'Neal concisely encapsulated the problem with the new budget calculation by replying, "yes, that's math," in response to the question, "if we increase the transportation costs for this consumer who lives farther away to say $200 as opposed to $100, do you see the total wage that that individual can pay his employee decreases?" *Id*. at 126:15-19.

Ms. Waskul and Ms. Kafafian both testified that Derek and Kevin are still subject to the new budget calculation method. August 1, 2016 Hr'g Tr. 23:1-19; Plaintiffs' Exhibit 6 (Affidavit of Kerry Kafafian).[9] Ms. Kafafian testified that she made specific requests for increases in CLS services based on the actual costs of the activities specified in Kevin's IPOS; all of her requests were denied. September 20, 2016 Hr'g Tr. 63:1-17; 44:5-14. Contrary to opposing counsel's characterization of the IPOS activities as a "wish list," Ms. Kafafian testified that all of the activities in Kevin's IPOS are medically necessary and supported by medical documentation. *Id*. at 66:15-16; 70:2-7; 8-18.[10] Martha Schneider, plaintiff

---

[9] See also, e.g., September 20, 2016 Hr'g Tr. 68:10-18: Q: "Is your budget still capped?" A: "Yes." Q: And so if you add transportation…what would happen to the hourly rate?" A: "It would drop significantly." Q: And the same thing would happen with community activities?" A: "Yes."

[10] Regardless, all services identified in an IPOS are medically-necessary. Michigan Medicaid Provider Manual, Section 1.7, page 5.

Schneider's grandmother and guardian, although she did not testify, has stated in affidavits submitted to the Court that Cory is still subject to the new budget calculation method.[11]

Plaintiffs have shown that they, along with all other self-determination CLS participants, were subjected to a new budget calculation on May 15, 2015 that continues to cap their budgets.

### 3. Plaintiffs have proved that Defendants violated the due process rights of all CLS self-determination recipients in Washtenaw County.

Defendants violated plaintiffs' due process rights on three different occasions: first, when the April 9, 2015 letter was sent; second, on May 15, 2015, when the rate reduction and new budget calculation were implemented; and third, after June 1, 2015, when Defendant WCCMH provided participants with defective notices of hearing rights when implementing the rate reduction into their IPOS.

It is undisputed that no notice of hearing rights was provided with the April 9, 2015 letter, or on May 15, 2015, when the reduction was imposed. See, e.g., August 1, 2016 Hr'g Tr. 22:4-6. Participants were not notified that their budgets would be calculated differently and that, because of the different budget calculation method, the funds available for their medically-necessary CLS services would be reduced. September 20, 2016 Hr'g Tr. 120:24-25; 121:1. Defendant

---

[11] Her testimony was largely duplicative of Ms. Kafafian's and Ms. Waskul's, and was not offered in the interest of time.

WCCMH now admits that it "erred" in not providing proper notice. *Id*. at 97:12-14. WCCMH's position is that it somehow cured these violations after receiving the June 2015 directive from Defendant MDHHS. *Id*. at 98:1-7.

However, as plaintiffs have explained in their Complaint and other pleadings, the post-June 4, 2015 notices of hearing rights were deficient in several ways. The later notices of hearing rights described the action taken as "adequate," and were not "negative advance action" notices;[12] defendants' notices not cite any statute or policy authorizing the reduction in services; they did not state what was reduced or why; and because these later notices did not acknowledge the reduction in services, no reason for the reduction was given in the notices. See 42 C.F.R § 431.210. Defendants have offered no defense to these violations.

Indeed, Defendant WCCMH's argument that the MDHHS letter prompted immediate and sufficient corrective action is undercut by the fact that WCCMH continued to argue that the May 15, 2015 reductions were not in fact a reduction in amount, scope, and duration of services, and therefore not appealable, as late as January 2016. See WCCMH's Response to Motion for Summary Disposition, page 4 ("Although there has been no change, reduction, or termination in the Appellant's CLS services, there was a change in the Self-Determination budget").

---

[12] Significantly, only "negative advance action" notices trigger the right to continued benefits pending a hearing.

Defendants have not provided sufficient notice and an opportunity to be heard to any CLS recipient in Washtenaw County since sending the April 9, 2015 letter, although a select few managed to reach administrative law hearings. Both CLS recipients and their guardians (if they have them) have considerable difficulty advocating for themselves, especially within such a complex system. August 1, 2016 Hr'g Tr. 72:16-25. Although individual recipients' circumstances may have changed over the past year, the violations remain the same.

**4. This Court can grant the relief requested by plaintiffs.**

At the September 20, 2016 hearing, defendants attempted to characterize plaintiffs' requests for relief as at best impracticable, and at worst illegal. These arguments were based on a misstatement of plaintiffs' request for relief, and a new and thoroughly unconvincing argument about double billing.

First, counsel for WCCMH stated that plaintiffs asked "for a preliminary and permanent injunction to enjoy [sic] WCCMH from opposing [sic] a rate reduction." September 20, 2016 Hr'g Tr. 111:5-7. In fact, plaintiffs are requesting that the Court "enjoin WCCMH from imposing *the* rate reduction, new budget calculation method, and unilateral hours reductions." Plaintiffs' Motion for Preliminary Injunction (emphasis added). Based on this misstatement of plaintiffs' request for relief, Ms. Amos O'Neal testified that a restraining order preventing WCCMH from adjusting rates in general would be inappropriate. September 20,

2016 Hr'g Tr. 114:10-13. But plaintiffs are clearly requesting only that the specific May 15, 2015 reductions be enjoined, and that subsequent reductions only occur if the participant is first provided proper notice and an opportunity to be heard. Plaintiffs' position is not that WCCMH can never reduce rates.

By way of attempting to make the plaintiffs' requests for relief look improper, Ms. Amos O'Neal testified about plaintiffs' supposed request to monitor WCCMH's records. *Id*. at 114-115. According to WCCMH's counsel, plaintiffs' made this request "for some purpose, I'm not sure what." Actually, plaintiffs made this request in the limited context of proposing a consent order at the Court's direction, and the monitoring provision ridiculed by defendants came from the Court itself. May 19, 2016 Hr'g Tr. 13. Furthermore, there are numerous ways to avoid HIPAA violations stemming from a monitoring provision - for instance, a redaction or confidentiality order, *in camera* inspections, or appointment of a special master by the Court.

Defendants' primary substantive defense at this point appears to be that the pre-May 15, 2015 budget calculation method constituted illegal "double billing," and that therefore the relief sought by plaintiffs would be illegal. This argument is neither supported by the facts nor by law.[13]

---

[13] Defendants have relied on only one document to support this argument, a letter from April 2012 that Defendant WCCMH claims began the practice of adding additional line items to the CLS budgets. The document speaks for itself, but

Ms. Amos O'Neal testified[14] that the pre-May 15, 2015 billing method was

instituted in 2012. September 20, 2016 Hr'g Tr. 92. First, plaintiffs note that this

testimony is irrelevant, because plaintiffs are seeking relief for continuous

violations of their rights under federal law; previous permutations of the billing

system are irrelevant to plaintiffs' claims that they are, today, improperly being

denied medically-necessary services on the basis of cost. Plaintiffs have never

alleged entitlement to a specific billing system, just the right to receive medically-

necessary services for which they are approved.

Moreover, it appears that the practice of adding additional line items did not

in fact begin in April 2012. In Derek Waskul's budget worksheet from February

2012, an additional line item for community activities (called "goods and services"

and billed under Medicaid code T5999) is added to the base hourly provider rate

multiplied by the number of approved hours. Exhibit B. *This* practice, by which

community activities are added as a separate line item and billed under non-CLS

---

plaintiffs note that the April 2012 letter says nothing about double billing, and does
not even say anything about adding additional line items. The letter merely says
that CLS participants will begin receiving additional money for services.

[14] Plaintiffs note that Ms. Amos O'Neal has not established the requisite
foundational knowledge and expertise to testify about the double billing issue. She
laid no foundation as to her knowledge of financial matters, and later in her
testimony professed almost complete ignorance of the fiscal intermediary's
activities, which include such billing questions – see, e.g., *Id*. at 121-122.

billing codes, appears to be improper billing per the MDHHS guidelines. This was not "double billing," but rather "wrong code billing"—under the guidelines all CLS services must be billed under a CLS billing code (H2015 or H0043).

Beginning in April 2012, the WCHO apparently began billing correctly – namely, by billing transportation and community activities under the CLS billing codes (H2015 or H0043). Perhaps because the dollar amount of "goods and services" under the T5999 code was limited, correctly moving these expenses under the CLS codes in April 2012 led to participants getting slightly more money, as referenced in the April 2012 letter; however, the budgets were not calculated differently. Under both billing systems, "services" were billed in addition to provider hours. Under both systems, participants received roughly the same dollar amount of services. All that changed was the billing code.

Defendants appear to have conflated two different time periods: first, before April 2012, when the WCHO did in fact appear to be billing improperly by billing additional line items under non-CLS Medicaid codes; and after April 2012, when additional line items *continued* to be added to the budget, but were now correctly billed under the CLS "all-inclusive" billing codes.[15]

According to Ms. Amos O'Neal, the WCHO began improperly "double

_____

[15] Discovery will clarify this issue. Until defendants present any credible evidence that what plaintiffs' are requesting is improper "double billing," a preliminary injunction should be issued.

billing" CLS services in 2012: "additional line items were added into the budget which essentially was then double paying for the CLS services." *Id*. at 93:5-7. When asked to explain what double billing meant, Ms. Amos O'Neal stated that the WCHO "added additional budget items to essentially pay twice for transportation, twice for training, etc." *Id*. at 94:9-11. When the Court asked for clarification, Ms. Amos O'Neal stated, "[w]e were paying for CLS, then we were paying for transportation where transportation was included in CLS." *Id*. at 94:19-21. Questioned still further, Ms. Amos O'Neal stated that individuals "were receiving more money" as a result of this practice. *Id*. at 95:4-5. The result of this "double billing" was that "our costs were far higher." *Id*. at 95:22. This created a deficit, *Id*. at 96:3, and so the April 9, 2015 letter was an "attempt to ring [sic] in these costs and correct this problem." *Id*. at 96:22-23. Ms. Amos O'Neal's testimony makes it clear that the new budget calculation method was implemented as a cost reduction strategy, not as a response to a legal mandate.

Ms. Amos O'Neal's testimony, as set forth above, was the beginning and end of defendants' double billing argument. Defendants have offered no legal argument or documentation to support their claim that their pre-May 15, 2015 practice was improper. No letters from the state or federal government were introduced. The state defendant and regulatory agency, Defendant MDHHS, has offered no testimony or argument on this point.

24

Ms. Amos O'Neal's testimony proved nothing other than the fact that the WCHO's costs were higher when providing additional services. Individuals receiving more money does not equate to double billing. Examining a pre-May 15, 2015 budget calculation worksheet (such as that attached to plaintiffs' complaint as Exhibit M), it is clear that additional line items were never "double billed." The formula was simply inverted on May 15, 2015. Before, additional line items were added to the provider rate before being divided by the number of hours and thus rolled into the Medicaid rate. The Medicaid rate was flexible, not capped. After May 15, 2015, the budget formula was turned upside down. The individual line items always were part of the Medicaid rate; but now, the Medicaid rate is no longer flexible and is used as a cap throughout the budget calculation.

Indeed, Ms. Amos O'Neal admitted at one point in her testimony that the pre-May 15, 2015 calculation method was *not* double billing, stating that, if transportation were billed separately but ultimately put "under the CLS rate," that would be "appropriately billed and clean in any audit or any review." *Id*. at 116:8-17. In describing this "clean" system, Ms. Amos O'Neal was describing a system that would be exactly the same as the pre-May 15, 2015 system, by which additional line items were added for transportation but ultimately included within CLS services and billed under a CLS billing code—i.e., "under the CLS rate." Defendants proposed and were prepared to agree to such a system in a consent

25

order, but only for transportation. *Id*. at 130:6-22. Clearly, defendants *can* legally do what plaintiffs are seeking.

Plaintiffs have never disputed that CLS transportation should not be billed under separate codes, for example under the S2015 code; Ms. Homan testified as such. August 1, 2016 Hr'g Tr. 65:3-5. On the other hand, it is clear that multiple budget items can and should be combined into the CLS billing code and billed to Medicaid. *Id*. at 12-22. Defendants have failed to show how any CLS costs were ever "double billed."

While not directly pertinent to whether federal and state law have been violated, plaintiffs must briefly address Ms. Amos O'Neal's response to the Court's question regarding the administrative actions taken by WCCMH to remedy its budget deficit. Ms. Amos O'Neal testified, "72 employees were lost. Our administrative budget is the lowest in the state at four percent. We're a very lean organization to maintain funds to serve the individuals." *Id*. at 107:5-8. On the "leanness" issue, Ms. Amos O'Neal's testimony is directly contradicted by the public record regarding the WCCMH budget.[16]

---

[16] WCCMH's budget can be found at http://www.ewashtenaw.org/government/departments/community_mental_health/wccmh-board/9-16-16-wccmh-board-materials.pdf, contained within the most recent board minutes. (See page 18). WCCMH has an 11.4% administrative budget (Total Operating Revenue: $75,589,997; Total Administrative Expenses: $8,638,540.58) for fiscal year 2016, making the 4% administrative budget that was

Additionally, upon information and belief, plaintiffs dispute that seventy-two employees were lost. While discovery is required to prove it, plaintiffs believe that the dissolution of the WCHO resulted in its employees simply moving to newly created entities, and that few staff were terminated in response to the budget shortfall. Additionally, upon information and belief, certain positions were re-categorized as "service" rather than "administrative" positions to create the illusion that the administrative budget was reduced.

### C. Defendants and third parties will not be harmed if an injunction is granted, and the public interest favors granting an injunction.

Plaintiffs incorporate and rely on their arguments in their Motion for Preliminary Injunction to support their right to injunctive relief under the third and fourth factors of the preliminary injunction test. Plaintiffs also request that bond be waived, because this is a lawsuit to enforce important federal rights of public interest. See *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (bond routinely waived in such cases). Plaintiffs additionally request that the Court use its discretion to waive bond based on the fact that the individual plaintiffs are indigent and qualify for need-based public benefits.

### III. CONCLUSION AND RELIEF REQUESTED

Plaintiffs respectfully request that this Court grant their Motion for

---

testified to plainly false. It is also worth noting that CLS services are 1.2 million dollars under budget. (See page 14).

Preliminary Injunction. A proposed Order is attached to this brief as Exhibit C.

Respectfully submitted,

/s/ Nicholas A. Gable (P79069)          /s/ Lisa Ruby (P46322)
LEGAL SERVICES OF SOUTH              MICHIGAN POVERTY
CENTRAL MICHIGAN                     LAW PROGRAM
Attorney for Plaintiffs              Attorney for Plaintiffs
420 N. Fourth Ave.                   220 E. Huron #600A
Ann Arbor, MI 48104                  Ann Arbor, MI 48104
(734) 665-6181 ext. 127              (734) 998-6100 ext. 117
ngable@lsscm.org                     lruby@mplp.org


/s/ Kyle Williams (P77227)
MI PROTECTION AND ADVOCACY
SERVICE, INC.
Attorney for Plaintiffs
4095 Legacy Pkwy Ste. 500
Lansing, MI 48911-4264
(517) 487-1755
kwilliams@mpas.org

October 10, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2016 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

/s/ Nicholas A. Gable (P79069)                    October 10, 2016
LEGAL SERVICES OF SOUTH CENTRAL MICHIGAN
Attorney for Plaintiffs
420 N. Fourth Ave.
Ann Arbor, MI 48104
(734) 665-6181 ext. 127
ngable@lsscm.org