UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DEREK WASKUL, ET. AL., | |
| Plaintiffs, | Case No. 16-10936 |
| v. | SENIOR U.S. DISTRICT JUDGE ARTHUR J. TARNOW |
| WASHTENAW COUNTY COMMUNITY MENTAL HEALTH, ET. AL., | U.S. MAGISTRATE JUDGE ANTHONY P. PATTI |
| Defendants. / | |

**ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION [8]**

Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction on March 30, 2016 [8]. This motion sought to enjoin Defendants from refusing to reinstate the pre-May 2015 levels of funding and services to Plaintiffs, and to all other Community Living Support (CLS) service recipients, until lawful individual plan of service meetings were conducted, and CLS service recipients were provided adequate notice of proposed cuts with a meaningful opportunity to be heard. They further seek to preliminarily and permanently enjoin Defendant Washtenaw County Community Mental Health (WCCMH) from imposing a rate reduction, new budget calculation, and unilateral hours reductions; and to further preliminarily and permanently enjoin Defendant WCCMH from denying participants their right to procedural due process. Defendants Cortes and WCCMH responded on April 18, 2016 [20], and Plaintiffs replied on April 26, 2016 [27]. Defendant Lyon responded

on April 20, 2016 [21], and Plaintiffs replied on April 26, 2016 [25]. Defendants Terwilliger and Community Mental Health Partnership (CMHP) responded on April 20, 2016 [22], and Plaintiffs replied on April 26, 2016 [26].

For the reasons stated below, Plaintiffs' Motion for a Preliminary Injunction [8] is **DENIED.**

## PROCEDURAL HISTORY

A hearing was held on May 19, 2016. At this hearing, the Court ordered the parties to produce a consent order that applied to all CLS participants, allowed for outside monitoring, and that, if additional services are requested, they would go through the IPOS process to determine their medically necessary, and if so, the total budget would increase. Neither side was able to reach an agreement regarding the terms of a proposed consent order. The Court held an evidentiary hearing on the Motion on August 1, 2016 and September 20, 2016. Plaintiffs and Defendants filed supplemental briefs on October 10, 2016. [50]; [51]; [52]; [53].

## FACTUAL BACKGROUND

The named Plaintiffs include four individuals suffering from various forms of developmental disabilities. Their guardians are suing on their behalf. Washtenaw Association for Community Advocacy (WACA) is also a Plaintiff, bringing this action on its own behalf, as well as on behalf of its members that have been affected directly by Defendants' alleged unlawful policies and practices. Defendants include Washtenaw County Community Mental Health (WCCMH), Community Mental

Health Partnership of Southeast Michigan (CMHP), and employees of County and State Health Departments who are being sued in their official capacity.

Michigan's state Medicaid plan provides for home and community-based services for approved beneficiaries under a waiver, referred to as a Habilitation Supports Waiver (HSW), for those who would otherwise require treatment in a facility. This Community Living Support (CLS) program is predicated upon the participant's right to self-determination, to structure his or her own plan of service according to medical need. Washtenaw County Health Organization (WCHO) was the Prepaid Inpatient Health Plan (PIHP) that provided Plaintiffs' Medicaid-funded mental health specialty service and support. WCHO contracted with Community Support and Treatment Services (CSTS) to provide these services in the Washtenaw area. WCHO subsequently was dissolved around October 1, 2015. At that time, CSTS changed its name to Washtenaw County Community Mental Health (WCCMH), became the county mental health agency, and assumed the responsibilities of WCHO, including providing notices of fee reductions and defending appeals of these reductions before an ALJ. Additionally, Defendant Community Mental Health Partnership (CMHP) became Washtenaw County's PIHP in January 2014.

In 2008, CLS service recipients received a single, all-inclusive rate that included payment for budget items including, *inter alia*, staff salary, transportation, equipment, supply material, community activities, and staff training. [20-5]. In 2012, WCHO altered the budget process for CLS participants and included, alongside the

previous 2008 all-inclusive budget method, additional funding for staff training, transportation, goods and activity costs, in addition to amount of community living support hours that participants had previously received. [20-7]. In effect, this duplicated funding for the line items, as their cost was also included in the all-inclusive CLS budget rate set in the 2008 method.

In April 2015, CLS participants were provided a letter explaining that the budget would be cut, commencing in May. Participants were informed that the CLS rate would be set at $13.88; their level of services would remain the same, but the amount participants could pay their staff might be affected. [20-8]. Participants were not notified of any hearing rights in this letter, which Defendants admit was an error. [*See* 20-7; 48 at 97, ¶¶12-14]. On May 15, 2015, because of a budgetary crisis, CLS funding was in fact cut. This reduction set CLS participants back to a single, all-inclusive rate, identical to the method employed in 2008.

On June 4, 2015, the Michigan Department of Health and Human Services, (MDHHS), sent notice to WCCMH that its decision reducing CLS participants' provider rate did not conform to the approved budget authority in the HSW application, and requested that WCCMH retroactively restore the CLS rate to the level of May 15, 2015 for all those affected by this action. Starting in late June 2015, Defendant WCCMH began incorporating the budget reductions into CLS participant individual plans of service (IPOS). When participants were given these new IPOS,

they were provided notice of their right to a hearing under a notice of "adequate action." [8, Exhibit F].

Named Plaintiffs appealed and while Defendant WCCMH did restore the rate to the May 15, 2015 amount, it did not restore the prior method of calculating this rate, leaving the actual total of the Plaintiffs' CLS budgets capped, resulting in a budget inadequate to cover medically necessary transportation and community living service, per named Plaintiffs' affidavits. [27, Pg ID 511-517; Pg ID 542-544; Pg ID 546-552]. As of August 1, 2016, the CLS rate for all participants was increased by 6%, resulting in the current Medicaid rate being of $14.72. [48 at 102 ¶¶19-25; 103 ¶¶1-12].

Plaintiffs present the following claims: failure to provide procedural due process rights under 42 U.S.C. § 1983; violation of the statutory right to be heard under the Medicare Act; violation of the Social Security Act, through the failure to authorize services in the amount, scope, or duration required to reasonably achieve its purpose; violation of the Social Security Act's right to receive services with reasonable promptness; and violation of Michigan Mental Health Code 330.1722(1), which provides that no recipient of mental health services shall be subject to abuse or neglect.

Plaintiffs seek to enjoin Defendants from refusing to reinstate the pre-May 2015 levels of their funding and services, and to all other Community Living Support (CLS) service recipients, until lawful individual plan of service meetings are

conducted, and CLS service recipients are provided adequate notice of proposed cuts and an opportunity to be heard. They further seek to preliminarily and permanently enjoin Defendant Washtenaw County Community Mental Health (WCCMH) from imposing the rate reduction, new budget calculation, and unilateral hours reductions; and to further preliminarily and permanently enjoin Defendant WCCMH from denying participants their right to procedural due process.

## ANALYSIS

When evaluating a motion for preliminary injunction, the Court must consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (quoting *Rock & Roll Hall of Fame v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998)). While no single factor is controlling of the outcome, if "there is simply no likelihood of success on the merits," that is usually "fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

Defendants challenge Plaintiffs' motion on the basis that Plaintiff is unlikely to prevail on its claim, that Plaintiff cannot show harm, that Plaintiff Washtenaw Association for Community Advocacy (WACA) does not have standing, and that Defendants have Eleventh Amendment immunity.

1. **STANDING OF PLAINTIFF WASHTENAW ASSOCIATION FOR COMMUNITY ADVOCACY (WACA)**

Plaintiff WACA is a non-profit organization whose mission and purpose includes, *inter alia*, advocating for persons with developmental disabilities and their families. WACA claims that "[a]ll 169 HSW CLS services recipients in Washtenaw County, including the named individual Plaintiffs in this case, qualify for WACA services, and have been directly harmed by Defendants' practices." [8 at 22].

WACA claims to have associational standing to bring suit on behalf of its members. To successfully assert associational standing, the association must show: (1) "the organization's members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserts nor the requested relief requires the participation of individual members in the lawsuit." *Friends of Tims Ford v. Tenn. Valley Authority*, 585 F. 3d 955, 967.

WACA claims that, under the reasoning of *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333 (1977), it has associational standing. WACA fails to have associational standing because the 169 people for whom it claims associational standing to bring the lawsuit have not been shown to be members of the organization. In *Hunt*, the association in question was a state agency that did not have the type of members typically connected to previous associational standing cases. *Id.* The Court in *Hunt* found that, although the individuals that the agency was purporting

to represent were not "'members'…in the traditional trade association sense, they possess all of the indicia of membership in an organization" because "[t]hey alone elect the members of the Commission; they alone may serve on the Commission; (and) they alone finance its activities, including the costs of this lawsuit." *Id* at 344-45. Given this pervasive role of the individuals, the agency thus was considered to have associational standing, despite not representing "members" in the traditional sense.

There is no viable argument that the 169 unnamed people that WACA purports to represent are members of the organization. At the August 1, 2016 hearing, WACA's Chief Executive Officer Kathleen Homan testified that, to become a member of WACA, an individual must pay a membership fee. [44 at 55, ¶17-21]. Homan went on to testify that out of the 169 individuals WACA is purporting to represent in the lawsuit, only 30 are in any way associated with WACA in that they had contacted her, and she did not have the names of all of those who had been in contact with her. [44 at 56, ¶16-22]. Additionally, she revealed that she could not state how many of those 30 people were actual members of WACA, and could only state with certainty that the three named Plaintiffs were dues paying members. [44 at 55-57]. Homan did not present any evidence that any of these 169 HSW CLS services recipients had any role in WACA, similar to the individuals in *Hunt*, which would make them equivalent to a member and provide WACA associational standing.

Therefore, WACA does not have associational standing to represent the individuals whose interests they seek to represent.

While an association may have standing independently, it must still establish the constitutional requirements of standing: (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992). WACA has not shown that it will likely satisfy the requirements of individual standing in this case.

At the evidentiary hearing on August 1, 2016, Homan testified that the damages incurred by WACA were economic in nature, stating that the increased number of advocacy requests from individuals receiving self-determination CLS services from MCCMH in 2015 and 2016 caused increased staffing costs. [44 at 46; ¶ 5-20]. However, Homan was unable to provide any evidence of concrete harm suffered by WACA. There was no evidence of how many additional advocacy requests were received by the organization, or details presented about what type of staffing changes were required, causing the expenditure of additional funds. Instead, the only evidence provided was the conclusory statement that approximately thirty CLS recipients contacted Homan, or spoke with her at town meetings about the CLS budget reductions. [44 at 39-57].

Additionally, redressability has not been established by the testimony offered at the evidentiary hearing or in any accompanying briefs. Standing is much more difficult to establish when:

> a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else ... causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction.

*Barry v. Corrigan*, 79 F. Supp. 3d 712, 724–25 (E.D. Mich. 2015), *reconsideration denied sub nom. Barry v. Lyon*, No. 13-CV-13185, 2015 WL 1322728 (E.D. Mich. Mar. 24, 2015), and *aff'd sub nom. Barry v. Lyon*, No. 15-1390, 2016 WL 4473233 (6th Cir. Aug. 25, 2016), citing *Lujan*, 504 U.S. at 562.

In this case, WACA has not shown that the issuing of an injunction would address their alleged economic harm; in fact, issuance of injunctive relief is as likely to create more questions and inquiries from CLS services participants, as it is to decrease those requests. Therefore, since the number of advocacy requests, and thus the economic harm alleged by WACA, depends on the actions of third parties not before the Court, and beyond the Court's control, WACA lacks independent standing.

Lastly, WACA cannot establish the irreparable harm required in a preliminary injunction. It alleges economic damages only. However, "a plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by money damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F. 3d 566, 573 (6th Cir. 2002).  Therefore, even if WACA had shown evidence of an economic harm that could be traced to the actions of Defendants, the harm itself would be fully compensable by monetary damages.

Because there is not a likely of success for finding associational standing, the remainder of this order will address the Motion as applicable to the named Plaintiffs.

2. **PLAINTIFFS HAVE NOT SHOWN A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS UNDER THEIR SOCIAL SECURITY ACT AND MICHIGAN MENTAL HEALTH CODE CLAIMS**

Plaintiffs bring claims against Defendants Cortes, Terrwilliger and Lyon for: (1) violation of the Social Security Act, failure to authorize services in the amount, scope or duration to reasonably achieve their purpose; (2) violation of Social Security Act, right to receive services with reasonable promptness; and (3) violation of Michigan Mental Health Code, MCL 330.1722(1), which provides that no "recipient of mental health services shall…be subjected to abuse or neglect." Plaintiffs base their claims on the fact that, while the CLS rate has been restored to the pre-May 15, 2015 rate, the prior method of calculating this rate has not been restored, leaving the actual total of the Plaintiffs' CLS budgets capped, allegedly leaving named Plaintiffs without a budget adequate to cover medically necessary transportation and community living service, per named Plaintiffs' affidavits. [27, Pg ID 511-517; Pg ID 542-544; Pg ID 546-552].

However, Plaintiffs have not shown a high likelihood of success on the merits of these claims. At the September 20, 2016 hearing, Ms. O'Neal, Director of Customer Service at WCCMH, testified that the May 15, 2015 rate resulted in illegal double billing. [48 at 92 ¶¶6-11]. Exhibit C, produced at the hearing and there entered into the record, a notice dated October 15, 2008 from Linda Brown, Chief Financial

Officer of the WCHO, directed to all providers of Community Living Services in Independent Settings, clarified the CLS rate, detailing what was included. The CLS rate, which was determined by Medicaid, was all-inclusive, including direct costs associated with services such as meal preparation, laundry, household care and maintenance, bathing, eating, dressing, shopping, money management, socialization and relationship building, transportation to and from community activities and attendance at medical appointments. [48 at 91 ¶¶18-24]. Development of the rate also included cost drivers, such as staff salary and fringes, staff and consumer transportation, equipment, supplies and materials, community activities and indirect costs such as staff training, administration, payroll expenses, and vehicle costs. *Id*.

On April 17, 2012, WCHO/CSTS sent self-determination individuals a letter explaining that:

> [y]our new budget still has the same amount of community living supports hours you currently have, but with this budget you will have additional funding for staff training, transportation, goods and activity costs at your disposal.

[Defendant's Exhibit D; 48 at 92, ¶¶ 6-25; 93, ¶¶1-7]. Per Ms. O'Neal's testimony, and from the plain text of both letters, this illustrates that, while the CLS base rate did not change, *i.e.* funds for staff training, transportation, goods and activities were included already in the all-inclusive rate, these costs additionally would be funded with line items, resulting in double payment of these costs in this calculation. [48 at 93, ¶¶ 3-7]. This calculation, which Plaintiffs seek to reinstate in this Motion, is

inappropriate, since these participants were being paid twice for the same service under this previous computation method. *Id.*

This double billing resulted in a budget crisis in the WCHO, which, according to Ms. O'Neal led to significant reductions in the administrative budget, reducing the workforce of the organization by seventy-two employees to continue servicing recipients. When these budgetary problems were examined, the inappropriate budget calculation method was discovered, and remedied in part with the actions in the letter from May 2015. [48 at 96, ¶¶1-24].

The Self-Determination Policy and Practice Guidelines issued by the Michigan Department of Health and Human Services, part of WCCMH's contract with the state, and which it must follow to retain certification as a mental health provider in Washtenaw County, were also entered into evidence. In pertinent part, this contract provides:

> Self-determination arrangements must be developed and operated within the requirements of the respective contracts between the PIHP's and CMHSP's and the Michigan Department of Health and Human Services in accordance with federal and state law.

[Exhibit G; 48 at 99-102, ¶¶24-1]. Ms. O'Neal testified that the changes instituted by WCCMH in 2015 represented an attempt to bring WCCMH in line with this requirement.

Plaintiffs' counsel did not object to admission of these documents into the record at the hearing, nor to any of Ms. O'Neal's testimony regarding these

documents, or her conclusion that they establish that the previous calculation method resulted in double billing, an inappropriate practice. Additionally, during cross-examination, Plaintiffs did not challenge Ms. O'Neal's testimony concerning the double billing. It was not until their post-hearing supplemental brief that Plaintiffs began attempts to refute the testimony of Ms. O'Neal regarding the double billing issue. [50, 23-26]. This all-inclusive argument has been present in Defendants' filings in response to the Motion for Preliminary Injunction, and both documents were exhibits to the response filed by Defendants Cortes and WCCMH on April 18, 2016. [20-5; 20-6]. If Plaintiffs wished to challenge this argument at this stage, the proper place would have been during the hearing where Defendants and Ms. O'Neal would have opportunity to respond. Therefore, the Court does not find the argument against the double billing evidence provided by Ms. O'Neal to be persuasive, especially as it is unsupported by evidence.

Furthermore, it is undisputed that named Plaintiffs currently receive either the same or higher rates than they received prior to May 2015. Plaintiffs have not shown that they are entitled to the reinstatement of a calculation method that violates Medicaid regulations and existing contracts between WCCMH and the State and PIHP. Therefore there is not a high likelihood of success to claims under the Social Security Act or the Michigan Mental Health Code.

Guidelines addressing methodology to develop and implement individual budgets for self-determination participants, part of the contract with the state and

their PIHP, provide that self-determination participants have a right to services and support. They do not provide a right "that they obtain those services and supports at a certain cost." [Exhibit I; 48 at 134-137]. Rather, the budget must "provide sufficient resources to enable the individuals to find qualified and capable providers." *Id*. In this case, Plaintiffs Waskul and Kafaian testified that their budgets were not adequate to meet their IPOS and fulfill their medically necessary requirements, and pointed to the changed budget calculation method as the source of these on-going problems. However, testimony at the hearing does not support a finding that harm is irreparable or that it is due to the budget calculation change.

    First, Ms. Waskul testified that she has been unable to fully staff Derek's increased hours of CLS service because she has not been able to find a person that he approves of. She further testified that, if the rate had not been reduced originally, then she would not be in this position because it caused her to lose the former staffer who was "the best person that [Derek] has had so far." [44 at 30, ¶¶17-24]. However, that decision was appealed, and Waskul prevailed, resulting in reinstitution of the prior amount. She testified that the rate has been kept the same for the one staff remaining, but that she has been unable to hire a replacement for the empty staffer position because she has not found anyone who will be approved by her son, because they are "particular about who we are going to hire." [*Id* at 29, ¶14-30, ¶16]. Per testimony, the cause for the failure to hire a new staffer is not attributable to a lack of staffers

willing to work for the CLS rate, but rather a desire to hire someone who meets the unique needs of her son, and this is denying Derek all the services that he requires.

Ms. Kafafian also testified concerning harm that her son, Plaintiff Kevin Wiesner, is suffering, allegedly as a result of the pre-2015 budget rate calculation. However, this testimony does not support a high likelihood of success on the merits. Kevin's budget has been increased by 6% following a re-opening of his individualized plan of service, increasing his individual rate from $13.88 to $14.72. [48 at 58, ¶25- 60, ¶17]. The harm testified to by Ms. Kafafian was caused by the denial of additional funds for transportation and community activities. These denials are currently under appeal and are not properly before the Court at this time. [48 at 45, ¶3-46 ¶14; 48 at 55, ¶14-56, ¶2].

Because Plaintiffs have not shown that they are entitled to a budget calculation rate that violates state contract and would constitute double billing, and since they have individual CLS rates that are currently above what they were previously receiving and have pending appeals of denials of increased funds, there has not been a showing of irreparable harm.

3. **PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM WITH RESPECT TO THEIR CONSTITUTIONAL AND STATUTORY NOTICE CLAIMS**

Plaintiffs bring constitutional and statutory notice claims against Defendants Cortes, Terwilliger and Lyon. There is no dispute that the April 2015 letter notifying CLS service recipients in Washtenaw County was not an adequate notice, because

parties were not advised of their right to appeal. [48 at 97, ¶¶8-14]. However, after being notified by the Michigan Department of Health and Human Services that this letter violated the Budget Authority Process in the Habilitation Supports Waiver application because of its failure to inform recipients how to request a Medicaid Fair hearing or to work with the PCP process if they had concerns about the reduction. [8-7]. Following this notification, CLS service recipients were given a notice of their right to appeal, which all named Plaintiffs in fact received. [1 at ¶105]. Plaintiffs allege in their post-hearing supplemental brief that this notice was inadequate under 42 C.F.R § 431.210 because, *inter alia*, these notices did not cite any policy authorizing the reduction in services and did not state what was reduced or why. [50 at 19].

However, it is undisputed that all named Plaintiffs did in fact appeal the reduction and received a favorable decision from the administrative law judge. Therefore, there can be no irreparable harm suffered by the named Plaintiffs as a result of the inadequate notice provided in June 2015.

### 4. SUBSTANTIAL HARM TO OTHERS AND WHETHER THE PUBLIC INTEREST WOULD BE SERVED BY ISSUING THE INJUNCTION

Defendants showed evidence that, under the previous budget calculation method, Washtenaw County was in violation of Medicaid regulations and of contracts with the state, causing the previous organization that provided mental health services to face severe budgetary difficulties. Therefore, granting the requested injunction may

in fact cause possible harm to others, against the public interest, as damage could be suffered by other Medicaid recipients in the area and this also weighs against an injunction.

### 5. CONCLUSION

In conclusion, consideration of the four factors governing issuance of the preliminary injunction weighs against granting the requested relief for any of the Plaintiffs. Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction [8] is **DENIED.**

**SO ORDERED**.

Dated: November 22, 2016

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge