## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DEREK WASKUL, by his guardian, Cynthia Waskul;
CORY SCHNEIDER, by his guardians, Martha and Wendy Schneider;
KEVIN WIESNER, by his guardian, Kerry Kafafian;
ROGER ERLANDSON, by his guardian, Maureen Forrest;
LINDSAY TRABUE, by her guardian, Kristin Kill;
HANNAH ERNST, by her guardians, Susan and Robert Ernst;
and WASHTENAW ASSOCIATION FOR COMMUNITY ADVOCACY,

     Plaintiffs,                         No. 2:16-cv-10936-AJT-EAS

v.                                  Hon. Arthur J. Tarnow

                                  Hon. Elizabeth A. Stafford

WASHTENAW COUNTY COMMUNITY
MENTAL HEALTH; TRISH CORTES, in her official
capacity as Director of Washtenaw County Community
Mental Health; MICHIGAN DEPARTMENT OF
HEALTH AND HUMAN SERVICES; ROBERT GORDON, in
his official capacity as Director of Michigan Department of
Health and Human Services; JANE TERWILLIGER
in her official capacity as Director of Community
Mental Health Partnership of Southeast Michigan; and
COMMUNITY MENTAL HEALTH PARTNERSHIP OF
SOUTHEAST MICHIGAN,

     Defendants.

_____/

## **PLAINTIFFS' FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

# **Table of Contents**

PRELIMINARY STATEMENT ................................................................5

JURISDICTION AND VENUE ...............................................................7

PARTIES ..................................................................................................7

FACTS ......................................................................................................9

  A.  The Medicaid Program and the Habilitation Supports Waiver ...................... 9

  B.  Right to Self-Determination Under the Habilitation Supports Waiver ........ 16

  C.  Financing the HSW in Michigan ................................................................... 22

  D.  WCHO's Reformation and Budget Crisis ..................................................... 24

  E.  The April 2015 Letter and the May 2015 Cuts ............................................ 29

    The April 2015 Letter and the Inversion of the Budget Process ....................34

    Comparison Between What WCHO Did and What the State Had Told
    the Federal Government It Would Do ..............................................................38

    Failure To Provide Adequate Notice ...............................................................40

    WCCMH's "Double Counting" Explanation ..................................................40

    The Post-May 2015 Process and Its Effect on CLS Participants.....................42

  F.  Post-June 4, 2015 Notice of Hearing Rights ................................................ 43

  G  WCCMH's Knowledge of Illegality ............................................................ 48

PLAINTIFFS' FACTS ...........................................................................49

  DEREK WASKUL ..............................................................................................49

    A. Mr. Waskul's Disabilities; Effect of the May 15, 2015 Cuts. .................50

    B. Administrative Law Hearing and Subsequent Developments. ................55

  CORY SCHNEIDER.............................................................................................59

    A. Mr. Schneider's Disabilities and Staffing Before the May
    15, 2015 Cuts. ............................................................................................59

    B. Effect of the May 15, 2015 Cuts. ............................................................61

  KEVIN WIESNER ...............................................................................................65

    A. Mr. Wiesner's Disabilities; Background. ...............................................65

    B. Effect of the May 15, 2015 Cuts............................................................66

    C. Improper Notice of Hearing Rights and Lack of Benefits
    Pending. .....................................................................................................67

ROGER ERLANDSON.........................................................................71

LINDSAY TRABUE...........................................................................75

HANNAH ERNST .............................................................................77

WASHTENAW ASSOCIATION FOR COMMUNITY ADVOCACY
(WACA) ..........................................................................................78

CLAIMS FOR RELIEF..........................................................................80

COUNT I – FAILURE TO PROVIDE CONSTITUTIONALLY
ADEQUATE NOTICE AND RIGHT TO BE HEARD (All Plaintiffs
Against Defendants Cortes, Terwilliger, and Gordon)......................80

COUNT II – VIOLATION OF STATUTORY RIGHT TO NOTICE
AND AN OPPORTUNITY TO BE HEARD (All Plaintiffs Against
Defendants Cortes, Terwilliger, and Gordon) ...................................83

COUNT III – VIOLATION OF SOCIAL SECURITY ACT –
FAILURE TO AUTHORIZE SERVICES IN THE AMOUNT, SCOPE,
OR DURATION TO REASONABLY ACHIEVE THEIR PURPOSE
(All Plaintiffs Against Defendants Cortes, Terwilliger, and Gordon).............87

COUNT IV – VIOLATION OF SOCIAL SECURITY ACT – RIGHT
TO RECEIVE SERVICES WITH REASONABLE PROMPTNESS (All
Plaintiffs Against Defendants Cortes, Terwilliger, and Gordon) ...................89

COUNT V – VIOLATION OF ADA, TITLE II, 42 U.S.C. § 12131 ET
SEQ. (All Plaintiffs Against Defendants Gordon, Terwilliger, Cortes,
CMHPSM, and WCCMH)...................................................................92

COUNT VI – VIOLATION OF REHABILITATION ACT, 29 U.S.C.
§ 794 (All Plaintiffs Against All Defendants) ...................................95

COUNT VII – VIOLATION OF 42 U.S.C. § 1396n(c)(2)(A) —
FAILURE TO TAKE NECESSARY SAFEGUARDS TO PROTECT
THE HEALTH AND WELFARE OF WAIVER SERVICES
RECIPIENTS (All Plaintiffs Against Defendant Gordon)...............96

COUNT VIII – VIOLATION OF 42 U.S.C. § 1396n(c)(2)(C) —
FAILURE TO PROVIDE A MEANINGFUL CHOICE BETWEEN
INSTITUTIONALIZATION AND HOME AND COMMUNITY
BASED SERVICES (All Plaintiffs Against Defendant Gordon)....................99

COUNT IX – THIRD-PARTY BENEFICIARY CLAIM FOR
VIOLATION OF ASSURANCES GIVEN IN THE HSW WAIVER
APPLICATION AND IMPLEMENTED IN THE MDHHS/PIHP
CONTRACTS (All Plaintiffs Against Defendants Gordon, Terwilliger,
and CMHPSM) ..................................................................................... 101

COUNT X – VIOLATION OF MICHIGAN MENTAL HEALTH
CODE – VIOLATION OF MCL 330.1722(1) (All Plaintiffs Against
Defendants WCCMH and CMHPSM) .................................................... 109

RELIEF REQUESTED ........................................................................... 111

This First Amended and Supplemental Complaint is identical to the document an-
nexed to the motion for leave to file, except for (a) updating the signature block
and the filing and service dates, (b) substituting Director Gordon for former Direc-
tor Lyon, pursuant to Fed. R. Civ. P. 25(d), and (c) correction of the citation error
in paragraph 466(b), as noted in open court on February 6, 2019.

Plaintiffs allege:

## PRELIMINARY STATEMENT

1.    This is an action to restore services and supports Defendants are obligated to provide to the individual Plaintiffs and those similarly situated to enable them to avoid institutionalization.

2.    Plaintiffs are (a) six severely developmentally-disabled adults receiving medically necessary Community Living Support (CLS) services through Washtenaw County Community Mental Health (WCCMH), which allow them to avoid institutionalization, and (b) the Washtenaw Association for Community Advocacy (WACA), a non-profit organization that, among other things, advocates for persons with developmental disabilities and their families in order to help them obtain and maintain services.

3.    Prior to May 2015, Plaintiffs and the members of WACA received medically necessary CLS services and supports in accordance with their individual plans of service (IPOSs), pursuant to budgets that properly provided for the cost of obtaining those services and supports.

4.    In May 2015, however, Defendants changed the budgeting methodology and improperly imposed top-down caps on the amounts that

Plaintiffs could pay for their medically necessary services and supports. Instead of determining what services and supports were necessary and budgeting for them, Defendants now imposed an artificial cap on a medically irrelevant "rate" that they used for their own internal accounting and statistical reporting purposes, and they required all aspects of Plaintiffs' budgets to be included within that single "rate."

5.   Defendants effected this change simply to save money, without regard for the impact on those they were duty-bound to serve and without providing proper notice or a truthful description of what it was they were doing.

6.   As a result of the budgeting change, Plaintiffs have faced severe cutbacks in services and are at risk of institutionalization.

7.   Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 12133, and 29 U.S.C. § 794a based on violations of their rights expressly conferred by the Social Security Act, the Americans with Disabilities Act, the Rehabilitation Act, and the United States Constitution. Plaintiffs bring additional state claims pursuant to Michigan's Mental Health Code and as third-party beneficiaries of the contract whereby Defendant Michigan Department of Health and Human Services (MDHHS) delegated certain implementation of the Medicaid

program at issue to Defendant Community Mental Health Partnership of Southeast Michigan (CMHPSM).

## JURISDICTION AND VENUE

8.  This Court has jurisdiction over Plaintiffs' federal and constitutional claims under 28 U.S.C. § 1331.

9.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

10. Venue in the Eastern District is proper because Plaintiffs reside in Washtenaw County, Michigan, and because all the events complained of herein occurred in Washtenaw County, Michigan. Washtenaw County is in the Eastern District of Michigan.

## PARTIES

11. Individual plaintiffs, Derek Waskul (guardian Cynthia Waskul), Cory Schneider (guardians Martha Schneider and Wendy Schneider), Kevin Wiesner (guardian Kerry Kafafian), Roger Erlandson (guardian Maureen Forrest), Lindsay Trabue (guardian Kristin Kill), and Hannah Ernst (guardians Susan and Robert Ernst) are residents of Washtenaw County, Michigan and Medicaid recipients. All are participants in the CLS program offered under Michigan's Medicaid Habili-

tation Supports Waiver (HSW) and administered by WCCMH and its predecessor, the Washtenaw Community Health Organization.

12. Guardians for the individual Plaintiffs are suing on Plaintiffs' behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

13. WACA brings this action on behalf of its members who have been directly affected by Defendants' unlawful policies and practices.

14. Defendant WCCMH is a community mental health authority created pursuant to MCL 330.1205. It provides mental health services to Washtenaw County adults with a severe and persistent mental illness, children with a severe emotional disturbance, and individuals with a developmental disability.

15. Trish Cortes is the Director of WCCMH and is being sued in her official capacity.

16. Robert Gordon is the Director of Michigan's Department of Health and Human Services (MDHHS, or the Department) and is being sued in his official capacity. Mr. Gordon is the successor in office to Nick Lyon and is substituted pursuant to Fed.R.Civ.P. 25(d). The Department itself is also made a defendant herein, but solely on Count VI.

17. The Department is the single state agency responsible for administering Medicaid in Michigan. 42 U.S.C. § 1396a(a)(5).

18. Jane Terwilliger is the Executive Director of the Community Mental Health Partnership of Southeast Michigan (CMHPSM) and is being sued in her official capacity.

19. The CMHPSM is a specialty prepaid inpatient health plan (PIHP) and is considered a Medicaid managed care organization under MCL 400.109f.

20. Medicaid managed care organizations are responsible for making medical assistance available and accessible to Medicaid beneficiaries within their region. 42 U.S.C. § 1396b(m).

## FACTS

### A. The Medicaid Program and the Habilitation Supports Waiver

21. The Medicaid program is jointly funded and administered by the state and federal governments under Title XIX of the Social Security Act.

22. The Medicaid program provides medical assistance for certain low-income children, families, pregnant women, disabled adults, and elderly people.

23. The Medicaid Act creates a "cooperative federal-state program" through which states that elect to participate receive federal financial assistance to pay for the medical treatment of specific groups of needy individuals.

24.   Michigan must operate its Medicaid program in compliance with fed-
      eral Medicaid statutes and regulations and other federal laws, includ-
      ing the Americans with Disabilities Act and the Rehabilitation Act.

25.   To receive federal funding, states, including Michigan, are required
      first to formulate a plan that meets federal requirements.

26.   Michigan must submit its plan to the federal Centers for Medicare and
      Medicaid Services (CMS), specifying how the Medicaid program will
      be administered in the State. This is called the State Plan. 42 U.S.C.
      § 1396a(a). The State Plan contains and describes the nature and
      scope of the State's Medicaid program. 42 C.F.R. § 430.10.

27.   Federal law requires that each State Plan "provide for the establish-
      ment or designation of a single State agency to administer or to super-
      vise the administration of" the Plan. 42 U.S.C. § 1396a(a)(5); *see* 42
      C.F.R. § 431.10(b)(1). In Michigan, as alleged above, MDHHS is that
      "single state agency," and Defendant Gordon is its administrator.

28.   The designated agency may not delegate to others its "authority to su-
      pervise the plan or to develop or issue policies, rules, and regulations
      or program matter." 42 C.F.R. § 431.10(e).

29.   The State must ensure, through its contracts, that each MCO (Man-
      aged Care Organization), PIHP (Prepaid Inpatient Health Plan), and

PAHP (Prepaid Ambulatory Health Plan) oversees and is accountable for any functions and responsibilities that it delegates to any subcontractor. 42 C.F.R. § 438.230. As alleged below, MDHHS, through Defendant Gordon, has implemented this obligation in its contract with Defendant CMHPSM but has failed to ensure Defendant CMHPSM's compliance with that contract.

30. A state's plan must provide coverage to seven designated classes of needy individuals, termed "categorically needy," for at least seven specific kinds of medical care or services. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i), 1396d(a).

31. A state may, if it chooses, extend this coverage to other designated populations, termed "medically needy." *See* 42 U.S.C. § 1396a(a)(10)(C).

32. Additionally, the state may choose to expand the care and services available under its plan beyond the seven mandated categories. *See id*. §§ 1396a(a)(10)(A), 1396d(a) (defining "medical assistance" by enumerating twenty-eight types of care and services).

33. CMS grants waivers to "permit states to offer, under a waiver of statutory requirements, an array of home and community-based services

that an individual needs to avoid institutionalization." 42 C.F.R. § 441.300.

34. Michigan's State Plan includes the provision of home and community-based services to approved Medicaid beneficiaries under a waiver, "granted under 42 C.F.R. Part 441, subpart G," who would otherwise require services in an institution. Attachment 2.2-A to the Michigan State Plan. This waiver is called the Habilitation Supports Waiver (HSW) in Michigan.

35. Michigan elected, applied, and was approved to receive funding under the HSW to furnish waiver services to assist individuals with developmental disabilities with activities of daily living necessary to permit them to live in their own home or rental unit in a community-supported living arrangement setting.

36. Waivers granted pursuant to 42 U.S.C. § 1396n(c) allow the state to include as "medical assistance" under such plan "payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a

nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan." 42 U.S.C. § 1396n(c).

37. Under such a waiver, the state may forgo compliance with statewide, comparability, and certain community income and resource rules, but must otherwise comply with all other federal Medicaid requirements. *See* 42 U.S.C. § 1396n(c)(3).

38. Federal law lists the type of services which may be offered under Michigan's HSW waiver. 42 U.S.C. § 1396u; *see also* 42 C.F.R. § 440.180.

39. Michigan elected to make all Medicaid home and community-based living arrangement services under 42 U.S.C. § 1396u and 42 C.F.R. § 440.180 available to individuals on the HSW. *See* MCL § 400.109c.

40. The federal statute defines "community supported living arrangement services" as assistance to developmentally disabled individuals in activities of daily living necessary to permit them to live in their own home or apartment, in a community supported living arrangement setting. 42 U.S.C. § 1396u. It also includes personal assistance and "support services necessary to aid an individual to participate in community activities." *Id.* § 1396u(a)(7).

41.   Michigan has included within its HSW services "Community Living Supports" (CLS), which "facilitate an individual's independence, productivity, and promote inclusion and participation." Michigan Medicaid Provider Manual (MPM) § 15.1.

42.   An individual receives services under the HSW when, "if not for the availability of the home and community-based services, [he or she would] require the level of care provided in an intermediate care facility for the mentally retarded (ICF/MR)." HSW Eligibility Certification, available at http://www.michigan.gov/documents/mdhhs/MI_Choice_Waiver_1915-b_537092_7.pdf. In other words, but for the provision of CLS services, eligible individuals would require the level of care provided in an institution.

43.   MDHHS contracts with CMHPSM, a PIHP and a Medicaid managed care organization, to provide or arrange for services for enrollees in its region. *See* 42 U.S.C. § 1396u-2(a)(1)(B); MCL 400.109f.

44.   CMHPSM, in turn, contracts with WCCMH, an organization statutorily required to provide and arrange for mental health services to individuals with developmental disabilities in Washtenaw County, to provide or arrange services for Medicaid enrollees.

45.  CMHPSM, as a Medicaid managed care organization, is responsible for "providing defined inpatient services, outpatient hospital services, physician services, other specified Medicaid state plan services, and additional services approved by the centers for Medicare and Medicaid services under section 1915(b)(3) of title XIX of the social security act, 42 U.S.C. § 1396n." MCL 400.109f(2)(A).

46.  The relationship between MDHHS, CMHPSM, and WCCMH is represented in the following graphic published by the University of Michigan and Blue Cross Blue Shield of Michigan's Center for Healthcare Research & Transformation:[1]

---

[1] The Michigan Department of Community Health is now part of MDHHS.



PIHP = Prepaid Inpatient Health Plans
CMH = Community Mental Health Services Programs
CA = Substance Abuse Coordinating Agencies

47.     Michigan has a long history of authorizing CLS services under the HSW (the provision authorizing the HSW was first added to the Social Security Act in 1981), which are seen as a humane and cost-effective alternative to institutionalization.

**B. Right to Self-Determination Under the Habilitation Supports Waiver**

48.     The core of the CLS program is the participant's right to self-determination. Exhibit A, HSW, Appendix E-2. This means both that the participant structures his or her own plan of service according to

16

medical need and that the participant has a significant degree of flexibility in implementing the plan.

49.   States decide whether to allow participant-directed services. If so, the state must complete Appendix E of the HSW and specify which aspects of the services are participant-directed. *See* CMS Instructions, Technical Guide, and Review Criteria, page 213 *et seq*.

50.   Michigan has elected to allow participant-directed services in connection with the HSW. Participant direction fosters the overall goals of HSW services, which are to preserve the independence of the client, avoid institutionalization, and assist in the integration of the client into the community. Participant direction also assists in setting up realistic costing to achieve this, avoiding arbitrary limits that will defeat these purposes.

51.   In accordance with 42 C.F.R. § 441.301(b)(1)(i), a participant-centered service plan of care, known in Michigan as an Individual Plan of Service (IPOS), is developed for each participant employing the person-centered planning procedures specified in Appendix D of the HSW.

52.   Central to developing a client's IPOS is identification of the services and supports that are medically necessary for that client.

53. Medical necessity criteria is defined in Michigan's Medicaid Provider Manual as supports, services, and treatment "intended to treat, ameliorate, diminish or stabilize the symptoms of mental illness, developmental disability, or substance use disorder." MPM § 2.5.A.

54. Medical necessity criteria also includes supports, services, and treatment "designed to assist the beneficiary to attain or maintain a sufficient level of functioning in order to achieve his goals of community inclusion and participation, independence, recovery, or productivity." *Id*.

55. The determination of a medically necessary support, service, or treatment must be based on information provided by the beneficiary and/or his family and clinical information from the beneficiary's primary care physician or other qualified health care professionals who have evaluated the beneficiary. MPM § 2.5.B. It must be "[s]ufficient in amount, scope, and duration . . . to reasonably achieve its purpose," and it must be "[d]ocumented in the individual plan of service." *Id*.

56. The IPOS thus embodies the medical necessity determination as to each individual participant.

57. The IPOS is implemented through a budget that is developed with the participant using the person-centered planning process. The IPOS and

its implementing budget are interdependent and developed in conjunction with one another. Only after the participant's medical needs have been determined can the plan of service be budgeted. HSW Appendix E-2(b)(ii).

58. "An individual budget includes the expected or estimated costs of a concrete approach of obtaining the mental health services and supports included in the [IPOS]" (Self Determination Guideline II.C.).

59. "The amount of the individual budget is determined by costing out the services and supports in the IPOS, after a IPOS that meets the participant's needs and goals has been developed. In the IPOS, each service or support is identified in amount, scope and duration (such as hours per week or month). The individual budget should be developed for a reasonable period of time that allows the participant to exercise flexibility (usually one year)." HSW Appendix E-2(b)(ii) (emphasis added).

60. As set forth in the Behavioral Health chapter of the Michigan Medicaid Provider Manual (MPM), services cannot be denied "based solely on preset cost limits on the amount, scope, and duration of services." MPM § 2.5.C., pg. 14. "Instead, determination of the need for services shall be conducted on an individualized basis." *Id*.

61.  These provisions of the Michigan Manual implement the requirement of the Social Security Act and federal regulations that "lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan." 42 U.S.C. § 1396a(a)(2); 42 C.F.R. § 433.53(c)(2).

62.  Also, in accordance with 42 C.F.R. § 431.51, a participant may select any willing and qualified provider to furnish waiver services included in the service plan. The participant (most often his or her guardian) selects and hires service providers who fit the participant's individual needs, assuming the role of a traditional provider agency. The participant can hire and fire staff, schedule staff, and "determine staff wages and benefits subject to State limits." HSW, Appendix E-2(a)(ii).

63.  There are no state limits for staff wages under the HSW.

64.  In the HSW application, the state has the option to check this box: "There is a limit on the maximum dollar amount of waiver services authorized for each specific participant." Michigan's application provides: "Not applicable- The State does not impose a limit on the amount of waiver services…" HSW Appendix C-4(a). This is in accordance with state policy, which prohibits services from being denied

based "solely on preset limits of the cost, amount, scope, and duration of services." MPM § 2.5.C., pg. 14.

65.    Michigan specifically gives participants the right to reallocate funds among services included in the budget, as well as to determine the amount paid for services. HSW, Appendix E-2(b)(i).

66.    "Both the participant and the PIHP must agree to the amounts in the individual budget before it is authorized for use by the participant. This agreement is based not only on the amount, scope and duration of the services and supports in the IPOS, but also on the type of arrangements that the participant is using to obtain the services and supports. Those arrangements are also determined primarily through the PCP [person-centered planning] process." HSW Appendix E-2(b)(ii); *see also* 42 C.F.R. § 441.301(c)(2)(ix).

67.    The participant must have the authority through the person-centered planning process to budget for services that fall within the amount, scope, and duration of his or her IPOS.

68.    Finally, "[t]he mental health agency (PIHP or designee) must provide the participant with information on how to request a Medicaid Fair Hearing when the participant's Medicaid-funded services are changed, reduced or terminated as a result of a reduction in the individual

budget or denial of the budget adjustment." HSW Appendix E-2(b)(iv). This requirement is also found in the Medicaid Act and its implementing regulations. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.205.

## C. Financing the HSW in Michigan

69.   Financing for the Habilitation Supports Waiver in Michigan is effected through managed care/capitation procedures. The central characteristic of those procedures is that the State and its Medicaid agencies are not reimbursed on a fee-for-services basis by the federal government for services provided under the Waiver. Instead, reimbursement occurs on a "capitation" basis, under which the relevant operating unit receives a fixed amount for each person enrolled in the program, regardless of how much (or how little) in the way of services the operating unit actually provides to that person.

70.   In this case, the relevant operating unit is the PIHP — which, as alleged in more detail below, was originally the Washtenaw Community Health Organization (WCHO) and then became Defendant CMHPSM. As the acronym PIHP indicates, these were *prepaid* health plans. The word "prepaid" refers to funding on a capitation basis: the PIHP receives payment in advance of the same fixed amount for each enrolled

client, regardless (to repeat) of the amount of services any given client ends up needing.

71. On the expenditure side, the PIHP uses the aggregate of the capitation funds it has received to pay for the services it provides.

72. There is no direct relationship between funding and expenditures. Neither the amount of services provided to any one client nor the cost of providing those services bears any relation to the capitation amount the PIHP received for enrolling that client.

73. Accordingly, with respect to their HSW operations, PIHPs are not pass-through entities, in which some other entity bears the risk that needed services during the course of a year will exceed the expected amount. Rather, they use their own funds, received through the capitation process, to pay for whatever services turn out to be required. PIHPs are thus risk-bearing entities exactly like insurance companies,

74. Also exactly like insurance companies, PIHPs can make money or lose money depending on whether the "premiums" (here, the capitation payments) are, in the aggregate, greater or less than the "losses" (payments for needed services).

75. Because they are risk-bearing entities that can in fact lose money, PIHPs have a financial incentive to provide as little in the way of ser-

vices as they can. The Medicaid statute and regulations and the Michigan Habilitation Waiver recognize this incentive and contain specific provisions to prevent PIHPs' financial incentives from operating to the detriment of their clients, specifically including the beneficiary protection, service, and quality assurance provisions of 42 U.S.C. § 1396u-2(b), (c), and the MPM provision, cited above, that services cannot be denied based on preset cost limits on the amount, scope, and duration of services.

**D. WCHO's Reformation and Budget Crisis**

76.   Prior to 2014, WCHO was the PIHP for Washtenaw County, as well as for three other counties — Lenawee, Livingston, and Monroe.

77.   Until about December 10, 2013, Defendant CMHPSM was simply a coordinating organization for the four counties that were served by WCHO as PIHP.

78.   During this timeframe, WCHO was also a Community Mental Health Service Provider (CMHSP), although it mostly contracted with Community Support and Treatment Services (CSTS) to provide those services. Until 2002, CSTS had been called Washtenaw County Community Mental Health (WCCMH).

79.   One of the services CSTS provided was to oversee the development of participants' IPOSs and associated budgets. Once the budget was developed, it was managed and implemented for the participants by a fiscal intermediary.

    a.  The use of a fiscal intermediary allows participants to employ their own staff directly without having to manage administrative details such as payroll, taxes, and W2s, which are handled by the fiscal intermediary.

    b.  The fiscal intermediary for the majority of Plaintiffs is the Community Living Network (CLN), which operates under the d/b/a of Community Alliance of Southeastern Michigan. Other plaintiffs use GI Independence.

80.   In 2013, the State of Michigan issued new regulations that a CMHSP could not also be a PIHP — that is, that an entity providing direct mental health services to the community (a CMHSP) could not also be the prepaid inpatient health plan that received Medicaid capitation funding. Since WCHO was both, organizational changes became necessary.

81.   As of approximately December 10, 2013 (the date of Defendant CMHPSM's "enumeration" in the National Provider Index operated

by CMS), Defendant CMHPSM, which had up to that point been merely an umbrella coordinating organization for the mental health services of the four counties including Washtenaw, started the process of becoming an operating PIHP. The goal was to move WCHO's PIHP operations to CMHPSM and have WCHO continue simply as a service provider.

82. As of January 2014, WCHO's PIHP operations and staff were transitioned to CMHPSM.

83. There was never more than one actual operating PIHP for Washtenaw and its three sister counties. Before January 2014, the PIHP was WCHO; thereafter, it was CMHPSM.

84. In summer 2014, WCHO informed Washtenaw County that it was facing a shortfall of several million dollars.

85. A Behavioral Health Task Force issued a report in February 2015, in which it recommended dissolving WCHO and creating a new Community Mental Health Agency. Exhibit B, Behavioral Health Task Force, Final Report.

86. The Behavioral Health Task Force also specifically recommended targeting Community Living Support services in order to reduce the deficit. Exhibit B.

87.   In October 2015, WCHO was dissolved and CSTS changed its name back to WCCMH, the defendant in the present case.

88.   CSTS and WCCMH are and always have been the same organization, having merely gone through a name change in 2002 and a reversal of that name change in 2015.

89.   CSTS/WCCMH was and always has been the party responsible for servicing the Medicaid contract for the waiver services at issue in this action. It has at all times operated as a contractor to the PIHP, either directly (before 2014 and after October 2015) or as a subcontractor to WCHO when WCHO was a CMHSP but no longer the PIHP.

90.   There was no cessation of operations as WCHO dissolved and CSTS changed its name back to WCCMH. As WCHO dissolved and WCCMH became the county mental health agency, the same service population continued to receive the same services from the same service provider in the same geographic area with no interruption.

91.   In general terms, service personnel in the WCHO/CSTS operation remained at CSTS as it changed its name to WCCMH, whereas personnel on the PIHP side of the operation moved to CMHPSM.

92.    Because the operative events alleged in Sections E and F below over-

lapped with these transitions, keeping track of the players can become

difficult, and the following timeline is thus provided for convenience:

| Time Period | Who Was Doing What |
| --- | --- |
| December 2013 and earlier | • WCHO was the PIHP for Washtenaw County (and Livingston, Lenawee, and Monroe Counties). It received Medicaid capitation funds and disbursed those funds (and other funds it received) to pay for mental health services in the four counties.<br>• WCHO was also a Community Mental Health Service Provider, but it subcontracted most of those functions to CSTS.<br>• CSTS was the operating service provider, under contract to WCHO. CSTS was the entity that interacted with self-determination clients and developed their IPOSs and budgets.<br>• CMHPSM was an umbrella coordinating organization for the mental health operations of the four counties. |

| Time Period | Who Was Doing What |
|---|---|
| January 2014 to October 2015 | • WHCO was no longer a PIHP. It was solely a service provider (CMHSP), and it continued to sub-contract most of those functions to CSTS.<br>• CSTS remained the operating service provider, under contract to WCHO. It continued to be the entity that interacted directly with clients.<br>• CMHPSM became an operating PIHP and thus was the entity that received Medicaid capitation funds and disbursed those funds to pay for mental health services in the four-county area. |
| October 2015 to present | • WCHO is dissolved.<br>• CSTS changes its name to Washtenaw County Community Mental Health (WCCMH) and continues as the service provider that interacts directly with clients on IPOSs and budgets.<br>• CMHPSM continues as the PIHP. |

### E. The April 2015 Letter and the May 2015 Cuts

*The Budget Process for CLS Services Participants Prior to May 15, 2015*

93.    Prior to May 15, 2015, and from at least April 2012, the IPOS budget

for CLS services participants was built up from the individual service

and support components of the IPOS. The services and supports in-

clude both staff, who assist participants in the activities of daily liv-

ing, and other items specified in the IPOS, such as transportation and community activities.

94.   The build-up of the budget started with an hourly pay rate for each of the paid CLS providers, which was multiplied by the number of hours specified for that provider (or type of provider) in the IPOS to establish the services component of the budget.

95.   To this services component were added additional line items, such as workers compensation, staff training, and transportation. The CLS participant's final annual CLS budget consisted of the sum of all of these items, plus the fee of the "fiscal intermediary" that handled paying staff and monitoring the participant's ongoing usage of services.

96.   Thus, Plaintiff Waskul's budget for the period March 16, 2015 to March 11, 2016, which was approved by WCHO on March 16, 2015 (Exhibit C) was for a total of $29,182.56 and was derived as follows:

a.   32.5 weekly hours (1690 annual hours) of CLS personnel, at $13.88 per hour, for a total of $23,457.20 in "Personnel Hours," *plus*

b.   74 annual hours of Staff Training, at $13.88, for a total of $1,027,32, *making*

   c. a "Direct Care Costs to be paid by WCHO" subtotal of $24,482.32, *to which were added*

   d. "Community Supports" of $3,498.24, consisting of

      i. Transportation of $175/month, or $2,100 for the year, *and*

      ii. Workers compensation expense for two staff members of $398.16 for the year, *and*

      iii. "Community Participation" expenses of $60/month, *and*

      iv. $280.08 for an Annual Recreation Pass, *making*

   e. a "Subtotal WCHO Obligation" of $27,982.56, *to which was added*

   f. the Fiscal Intermediary Administrative Fee of $100/month, or $1,200 for the year, *making*, finally,

   g. "Total Costs" for the 360-day budget period of $29,182.56.

97. For its own statistical reporting purposes, WCHO then separated this amount into two components, reporting the $27,982.56 "WCHO Obligation" under code H2015 (Comprehensive Community Support Services, per 15 minutes) of the Healthcare Common Procedure Coding System (HCPCS) and the Fiscal Intermediary fee under code T2025 (Waiver services, not otherwise specified). It also divided the WCHO obligation by 6,760, the number of 15-minute segments in the

1690-hour annual CLS personnel authorization, to obtain a "15 Minute H2015 Variable Rate" of $4.14 (*i.e.*, $16.56 per hour).

98.   None of the calculations described in the preceding paragraph, however, affected either Plaintiff Waskul or the amounts the fiscal intermediary paid out on his behalf — for CLS personnel, for transportation, for the recreation pass, or for anything else.

99.   Nor did WCHO's coding affect the amounts CMHPSM received as reimbursement from State or Federal Medicaid funds on account of services and supports supplied to Plaintiff Waskul, because WCHO received no such reimbursement. CMHPSM was a PIHP: it had already been paid to provide these services and supports by receiving its fixed capitation amount when it reported Plaintiff Waskul as an enrollee.

100.   The only relevance of WCHO's statistical coding for Medicaid reimbursement purposes was that CMHPSM's 2015 expenses would be included in its actuarial calculations to support its 2016 capitation rate (and/or future rates). That is, if CMHPSM spent more than it had anticipated on H2015 services in 2015, it could — like any insurance company — ask for a (prospective) rate increase for the following year. None of that, however, affected either the services WCHO on

behalf of CMHPSM had agreed were medically necessary in Plaintiff Waskul's 2015 IPOS or the amounts CMHPSM had agreed to pay — in 2015, from its own funds, obtained from its aggregate 2015 capitation payments — in the budget CMHPSM (through its contracting service provider) and Plaintiff Waskul jointly developed from the IPOS.

101. Prior to January 2014, WCHO was itself the funding PIHP. Thereafter, the funding PIHP became CHMPSM, with first WCHO and then WCCMH administering the CLS program in Washtenaw County on CHMPSM's behalf. Both before and after January 2014, it remained true that (a) the PIHP (now CHMPSM) paid for CLS services out of its own aggregate capitation funds, and (b) the coding of payments was solely for the purpose of the PIHP's statistical reporting for its future ratemaking purposes.

102. Prior to May 15, 2015, all plaintiffs' budgeting processes were substantially as described above with respect to Plaintiff Waskul. There were, of course, individual variations in amounts of services and support received, but in all cases the service component of the budget was built up by applying an agreed rate (hourly in most cases; *per diem* in the case of recipients receiving 24/7 care (like Plaintiff Schneider)) to

33

the amount of services provided for in the IPOS, and then adding amounts for other services and supports such as staff training, workers compensation, and transportation.

103.  There were likewise minor variations as among the individual plaintiffs in the PIHP's statistical reporting as to them — *per diem* services were reported under HCPCS code H0043 instead of H2015, for example — but in each instance the budgeted services were provided by the PIHP from its own capitation funds, and the statistical reporting was solely for future ratemaking purposes.

### *The April 2015 Letter and the Inversion of the Budget Process*

104.  All this changed dramatically — and very much for the worse — on April 9, 2015. On that date WCHO sent a letter to all participants receiving CLS services, stating that what the letter called "our Community Living Support (CLS) rate" would be "reduc[ed]" to $13.88 per hour, effective May 15, 2015. Exhibit D, Letter to CLS Participants from Sally Amos O'Neal. The letter further stated that "[t]he new rate . . . includes worker's compensation, transportation, community participation, taxes, and training." It then claimed, contradictorily, that "[w]hile this is not a reduction in your current level of services, it may reduce the amount you can pay your staff." *Id*.

105.   What the letter described as WCHO's "CLS rate," however, was not a rate to be paid to providers at all but a pure artifact of WCHO's statistical reporting. Previously, the rate reported by WCHO under code H2015 (or H0043 for *per diem* participants) could vary from participant to participant, depending on the level of non-staff services required by that participant's IPOS. If, for example, Plaintiff Waskul had not required a town recreation pass, at an annual cost of $280, the amount WCHO would have reported under code H2015 as to him would have decreased slightly, from $4.14 per 15-minute segment to $4.10. Nothing else — including the amounts he paid his staff — would have changed.

106.   Now, however, the entire budgetary process was reversed. Instead of costing out necessary services and supports and then reporting the results for statistical purposes, WCHO now required that participants start with a fixed H2015 rate of $13.88 per hour ($3.47 per 15-minute segment) and work backwards to an amount that could be paid for staff by subtracting out the cost of all the non-staff services and supports.

107. WCHO's change in the budgeting process was continued by WCCMH on WCHO's dissolution in October 2015. The change continues to this day and, unless enjoined, will continue in the future.

108. The change in budgeting violates the requirement of HSW Appendix E-2(b)(ii) that "[t]he amount of the individual budget is determined by costing out the services and supports in the IPOS."

109. As a result of WCHO's illicit change in budgeting procedure, participants' IPOS budgets were instantly and drastically reduced. To continue with the example of Plaintiff Waskul, the new, uniform $3.47 H2015 rate was a 16.2% reduction from the previous $4.14 WCHO had been reporting statistically in his case. That meant that, if nothing else changed in his budget for non-staff services and supports, the amount he could pay his staff would be reduced by 18.5%. In fact, WCHO made other changes at the same time — such as taking the fiscal intermediary fee out of the H2015 amount even though it was reported separately for statistical purposes — so that the amount Plaintiff Waskul could pay staff went from $13.88 per hour to $9.63.

110. Each of the other named plaintiffs (except, as alleged below, Plaintiff Trabue, who was at that time under the age of 18 and thus not a CLS participant) suffered similar reductions.

111.   Numerous members of WACA have suffered similar reductions.

112.   Rather than developing an individual plan and then budgeting for it, participants were now forced to fit their plans within a budget that was capped at a specific rate times the number of staff hours in the IPOS, regardless of the extent of non-staff services and supports provided for in the IPOS and regardless of the actual rates that WCHO had previously approved paying individual staffers. For all participants for whom WCHO had been reporting an H2015 rate of more than $13.88 before May 15, 2015, the amount that could be paid for services was reduced, and the rate that could be paid to CLS staff was likewise reduced from the amounts previously authorized.

113.   Moreover, participants' budgets were effectively capped, because budgeting for additional medically necessary services, such as additional community activities, would further reduce the CLS providers' pay, making it difficult to find and maintain paid CLS providers at such a low rate. Adding money for a line item like transportation must now come out of some other part of the budget, usually the provider hourly rate.

114.   Ms. Amos O'Neal acknowledged in her April 2015 letter that the change would (she said "may") reduce the amount that participants could pay staff.

115.   Each paid staff person of each of the named plaintiffs in this action was approved by WCHO to be a CLS provider. So, too, were many paid staff persons of the members of WACA.

116.   The amounts those approved staff members were being paid were set forth in the participants' budgets, which WCHO had likewise approved.

117.   At no point in connection with the April 2015 letter did WCHO, either directly or through its contractor, CSTS/WCCMH, determine that these approved staff personnel should no longer be approved.

### *Comparison Between What WCHO Did and What the State Had Told the Federal Government It Would Do*

118.   In 2010, when it obtained its most recent Habilitation Supports Waiver, the State of Michigan told the federal government what it expected to pay for CLS services during the course of the waiver. (The HSW expired at the end of 2014, but it has been extended since that time by a succession of 90-day extensions.)

119. The $3.47 "CLS rate" imposed by WCHO in the April 2015 letter is significantly less than the average rates the State had told the federal government it expected to pay.

120. Thus, when Michigan applied for the HSW in 2010, it told the federal government that it expected that the average CLS rates (per 15-minute segment) it would pay in the course of the five years (2010-2014) of the HSW would be:

| Waiver Year | Average CLS Rate |
| --- | --- |
| 2010 | $4.20 |
| 2011 | $4.38 |
| 2012 | $4.57 |
| 2013 | $4.77 |
| 2014 | $4.98 |

121. Accordingly, when WCHO arbitrarily imposed a $3.47 cap on "CLS rates" in the April 2015 letter, it was setting a rate 17.4% lower than the *lowest* average rate the State had told the federal government it expected to pay, and fully ***31.3% lower*** than the rate the State had said it expected to pay in 2014, the then-most-recent year of the Habilitation Supports Waiver.

122. This effort of the WCHO bureaucrats to balance their budget on the backs of those they were duty-bound to serve is all the more disgraceful when one considers that Washtenaw County is a high-cost county

relative to most of the rest of the State of Michigan (indeed, in most years it is the *highest* cost county in the State), so that one would expect the cost of services and supports in Washtenaw to be *higher* than the statewide average, not lower.

### Failure To Provide Adequate Notice

123.   The April 2015 letter from Ms. Amos O'Neal failed to give notice to participants of their right to request a Medicaid fair hearing. The April 2015 letter did not give any reason for the intended action or cite any specific regulation supporting the action. The April 2015 letter was not based on medical necessity criteria, and did not provide an explanation of the circumstances under which benefits would be maintained should a hearing be requested.

### WCCMH's "Double Counting" Explanation

124.   Subsequent to the commencement of this action, WCCMH has asserted that the budgeting change was necessary to avoid "double billing," and that the manner in which budgets were being calculated prior to May 2015 was tantamount to Medicaid fraud.

125.   Those assertions are not correct.

126. WCCMH has asserted that, from 2008 to 2012, WCHO's CLS rates were calculated on an "all inclusive" basis (*i.e.*, on a basis that included transportation and other non-staff services).

127. Even if that assertion is true, and even if the 2008 memorandum that WCCMH says implemented the practice survived the subsequent representation by the State of Michigan to CMS in Appendix E-2(b)(ii) of the 2010 HSW Application as to the manner in which budgets would be costed out, WCHO made the affirmative choice in 2012 to go to the build-up budgeting method described herein, specifically telling CLS participants that it was doing so in order to increase the services and supports available to them. See Exhibit E.

128. WCHO's decision to increase services and supports was within its powers as a PIHP to make and affected only WCHO's expenditure of its own capitation funds.

129. There was no "double counting." Both before and after the 2012 budgeting change, the CLS rates WCHO reported under line H2015 would properly have included additional expenses, services, and supports such as workers compensation, transportation, and the like. Even assuming WCCMH's current description of the pre-2012 process is

correct, the reported rates were simply higher after 2012 than they were before.

130. Neither the Habilitation Supports Waiver nor any other aspect of Michigan or Federal Medicaid law requires working backwards from a single, fixed H2015 statistical reporting rate to participants' budgets under this self-determination program.

131. Indeed, as alleged above, the backwards budgeting currently being imposed by Defendants WCCMH and CMHPSM (and Defendants Cortes and Terwilliger as their Directors), and being acquiesced in by Defendant Gordon as director of MDHHS, is expressly *contrary* to HSW Appendix E-2(b)(ii).

### The Post-May 2015 Process and Its Effect on CLS Participants

132. The effect of the illicit budgeting change in 2015 is illustrated by Plaintiff Waskul, who is severely autistic. The effect of the April 9, 2015 letter was to immediately reduce the amount he could pay his providers from approximately $12.00 an hour ($13.88 an hour gross of employment taxes) to $9.63. The change was implemented by transmogrifying Waskul's CLS provider rate into an overall, all-inclusive CLS reimbursement rate. Previously, items that had been budgeted separately from the provider rate were used to build up the

Medicaid reimbursement rate. Now, they all had to be shoehorned into a single fixed rate.

133.   Thus, as alleged above, at the end of the new process, Waskul was told he could pay at most $9.63 per hour to his providers, the "max rate for employee wage." Exhibit C, Waskul Post-May 15, 2015 Budget.

134.   This was a reduction of 20% in the amount Waskul could pay for the care he needed — care that was certified as medically necessary in his approved IPOS.

135.   This budget reduction and new calculation method affected all CLS participants in Washtenaw County.

## F.  Post-June 4, 2015 Notice of Hearing Rights

136.   MDHHS sent notice to Defendant WCCMH's predecessor on June 4, 2015, warning it that its decision to reduce CLS participants' budgets did not conform to the approved budget authority process in the Habilitation Supports Waiver application. Exhibit F, Letter from Jeffrey Wieferich to Sally Amos O'Neal.

137.   MDHHS noted that "Medicaid-funded services are changed, reduced, or terminated as a result of a reduction in the individual budget." *Id*.

138. In response to MDHHS's letter, Defendant WCCMH's predecessor claimed that it was "collaborating with the individual and/or guardian to review the Individual Plan of Service (IPOS) and the Self Determination budget. Upon review with all parties, the IPOS will be reviewed and signed off on by the individual and/or guardian and the CMHSP . . . Through the completion and signature on the updated IPOS, each individual and/or guardian will be provided Adequate Notice of Rights." Exhibit G, WCHO Response to MDHHS.

139. Starting in late June 2015, Defendant WCCMH's predecessor began reopening participants' IPOS to incorporate the budget reductions.

140. Upon information and belief, contrary to MDHHS's demand that Defendant WCCMH's predecessor comply with the person-centered planning process when reopening the IPOS, Defendant WCCMH's predecessor often simply had clinical staff call participants and notify them that their IPOS would be redone.

141. Upon information and belief, the clinical staff of Defendant WCCMH's predecessor usually showed up at participants' homes with an IPOS reflecting the reduction already incorporated and asked them to sign it.

142. When Defendant WCCMH's predecessor incorporated the CLS budget reduction into participants' IPOS, it provided a notice of hearing rights with the new IPOS.

143. These later notices of hearing rights described the action taken as "adequate," and were not negative advance action notices. Exhibit H, Post-June 4, 2015 Notice of Hearing Rights (for Plaintiff Schneider).

144. These later notices did not cite any statute or policy authorizing the reduction in services.

145. These notices did not state what was reduced or why.

146. Because these later notices did not acknowledge the reduction in services, no reason for the reduction was given in the notices.

147. Upon information and belief, Defendant WCCMH's predecessor told participants at the time the hearing notice was provided that the CLS budget reduction was not appealable and that they should not bother requesting a hearing.

148. A number of recipients, including Plaintiff Erlandson, did not request hearings because of these representations.

149. Defendant WCCMH's predecessor did not even provide these post-June 4 notices to all recipients. Plaintiffs Erlandson and Ernst did not receive these notices.

150.  Upon information and belief, the majority of recipients did not receive even this deficient notice.

151.  At two local dispute meetings held in late summer and early fall 2015 (just about the time WCHO was dissolving and CSTS was changing its name to WCCMH), Defendant WCCMH continued to argue that the budget reduction was not an appealable issue. Defendant WCCMH also argued that the Michigan Administrative Hearing System (MAHS) did not have jurisdiction to hear the named Plaintiffs' cases.

152.  Defendant WCCMH continued to assert that MAHS did not have jurisdiction to hear CLS budget reduction appeals through February 2016.

153.  Per testimony from Sally Amos O'Neal at the September 20, 2016 evidentiary hearing held in this matter, only about 19 of around 170 CLS participants in Washtenaw County reached administrative hearings by an appeal based on this later notice of hearing rights.

154.  Although Defendant WCCMH also assured MDHHS that it had "reversed the CLS rate retroactive to May 15, 2015 pending results of the Medicaid Fair Hearings Process scheduled for July 1, 2015," it did not do so for every individual.

155.   For the few CLS participants who requested a hearing notwithstanding the defective notice, Defendant WCCMH did not immediately restore the rate to the pre-May 15, 2015 amount; instead, it sought to impose a rate of $14.48, which it borrowed from Michigan's Children's Waiver.

156.   Defendants later postured the $14.48 rate as "negotiated." Upon information and belief, however, this rate was never "negotiated"; rather, participants were told they could have the $14.48 rate or the $13.88 rate.

157.   Due to, among other things, differences in the service populations and waiver structures, the Children's Waiver rates are not a valid basis of comparison to rates for HSW CLS services.

158.   Both the $14.48 rate and $13.88 rate were inputs to the illicit post-May 15, 2015 budgeting method, which inappropriately ignores non-staff services and supports in setting the overall amount available under the budget.

159.   Since this lawsuit was filed, Defendants have slightly raised the CLS rate several times, but all participants' budgets are still set without any reference to non-staff services and supports.

160.   The harm to Plaintiffs is irreparable. Plaintiffs have no adequate remedy at law to prevent the continuing wrong and irreparable injury caused by Defendants' acts.

### WCCMH's Knowledge of Illegality

161.   Due to the WCHO/WCCMH budget crisis, an outside consultant, Health Management Associates (HMA), was brought in around the time of the merger to review WCCMH's budget.

162.   In a draft report dated December 17, 2015, HMA wrote: "The Community Living Supports program area is another with cost metrics that bear scrutiny. WCCMH leadership has indicated to HMA that they already have made changes that will reduce costs in this area and that they will continue to evaluate and explore options for improved cost effectiveness while maintaining quality. We encourage these continuing efforts." Exhibit I, HMA Draft Report, page 12.

163.   In a letter sent to PIHP executive directors on October 22, 2015, MDHHS had notified Defendants CMHPSM and WCCMH that the "changes that will reduce costs" mentioned in the HMA letter were illegal. Exhibit J, Letter from Thomas Renwick to PIHP Executive Directors.

164.   Specifically, MDHHS condemned "PIHPs and/or their provider net-
works [implementing] a practice of using assessments or screening
tools to determine, limit or restrict the amount, scope, or duration of a
service." *Id*.

165.   The letter states that "it is the person-centered planning process and
medical necessity criteria that determine the amount, scope and dura-
tion of services." *Id*.

166.   Moreover, MDHHS stated that "it also bears reminding that the PIHP
is obligated to ensure that medically necessary supports, services or
treatments or treatment are sufficient in amount, scope and duration to
reasonably achieve their purpose." *Id*.

167.   The "changes that will reduce costs," criticized by MDHHS in the let-
ter and affecting the named Plaintiffs' CLS services, went into effect
in May 2015, and have not been reversed despite several individual
administrative law decisions reversing the reductions.

## PLAINTIFFS' FACTS

### *DEREK WASKUL*

168.   Plaintiff Waskul incorporates all paragraphs above.

A. **Mr. Waskul's Disabilities; Effect of the May 15, 2015 Cuts.**

169.  Plaintiff Derek Waskul (Mr. Waskul) suffers from a severe cognitive impairment and autism.

170.  He is in his mid-thirties, but cannot function independently and requires 24/7 supervision.

171.  Both Mr. Waskul and his guardian are members of WACA.

172.  Mr. Waskul receives Home Help Services through MDHHS, and Cynthia Waskul, his mother and legal guardian, provides about ten hours of unpaid natural support per day, but Mr. Waskul depends on two paid CLS providers seventy hours per week.

173.  Mr. Waskul receives CLS services under the HSW.

174.  Through his guardian, Mr. Waskul participates in the CLS self-determination process.

175.  Prior to May 15, 2015, Mr. Waskul's CLS providers were paid $13.88 an hour before taxes.

176.  Mr. Waskul's budget included separate items for training, transportation, community activities, and worker's compensation.

177.  Mr. Waskul's pre-May 15, 2015 IPOS budget was developed based on the medically necessary services authorized by his IPOS.

178.   Mr. Waskul received the April 9, 2015 letter from Sally Amos
       O'Neal, described above and attached as Exhibit D, and his budget
       was reduced and entirely recalculated effective May 15, 2015, as al-
       leged above.

179.   The result of this unilateral interference with Mr. Waskul's budget
       was that Mr. Waskul was forced to lower the hourly rate he could pay
       his CLS staff from $12.00 per hour after taxes ($13.88 per hour gross)
       to around $9.50 per hour after taxes.

180.   Prior to May 15, 2015, Mr. Waskul's total yearly budget amount was
       $29,182.56. Exhibit C, Budget Created February 12, 2015.

181.   After the May 15, 2015 reduction, Mr. Waskul's total budget amount
       was only $26,957.20. Exhibit K, Budget Created May 18, 2015.

182.   Defendant WCCMH has never offered any justification based on
       medical need for the reduction of Mr. Waskul's budget, and no such
       justification exists.

183.   Prior to May 15, 2015, Defendant WCCMH's predecessor (WCHO)
       had reduced the staff hours specified in Mr. Waskul's IPOS, and Mr.
       Waskul had a pending fair hearing request related to that reduction.

184.   At a meeting on June 12, 2015, counsel for Mr. Waskul stated that the
       pending fair hearing request would be amended to include the

May 15, 2015 budget reduction. In response, representatives of WCHO said they would reverse the budget reduction and asked Mr. Waskul to withdraw his hearing request.

185. Katie Snay, Fair Hearings Officer for Defendant WCCMH and its predecessor, confirmed around June 30, 2015 that the reduction in the amount Mr. Waskul could pay his CLS providers had been reversed.

186. With that assurance, Mr. Waskul withdrew his pending request for a Medicaid fair hearing.

187. By notice dated July 20, 2015, however, WCHO unilaterally reduced Mr. Waskul's budget and imposed a budget based solely on staff hours and using an overall rate of $14.48 per hour. It did so notwithstanding its assurances at the June 12 meeting and notwithstanding that Michigan policy allows the IPOS and budget to be developed only through the person-centered planning process, MPM, § 15, page 975.

188. That is, WCHO started with an overall amount based on staff hours (staff hours times the unilaterally determined "CLS rate" of $14.48 per hour) and then proceeded to *subtract* from that overall amount the cost of the non-staff services and supports specified in the IPOS in order to obtain an amount that could be paid to staff.

189. The notice of action sent to Mr. Waskul stated that the reduction would be imposed unilaterally, explicitly acknowledging that Mr. Waskul did not agree to the reduction. Exhibit L, Notice of Hearing Rights, July 20, 2015.

190. This time, WCCMH's predecessor admitted that the change was a "reduction in services" and correctly characterized the July 20 notice as a negative advance action notice. *Id*. At the subsequent administrative law hearing, however, Defendant WCCMH claimed that this notice was a mistake, and that no notice with hearing rights (or an adequate action notice) should have been given on the basis that there was no reduction in services.

191. Upon information and belief, this was the only negative advance action notice subsequently sent to CLS participants who had received the April letter.

192. The only justification provided in the July notice was that the new imposed rate of $14.48 was the maximum state rate allowed under the Children's Waiver. *Id*.

193. The Children's Waiver, however, is a separate waiver program that is not relevant to Mr. Waskul. Although there is a maximum rate set by

the state under the Children's Waiver, there is no such rate under the HSW.

194.  After receiving the July 20 notice, Mr. Waskul requested a local dispute hearing and a Medicaid fair hearing.

195.  After a local dispute resolution meeting, Defendant WCCMH issued a decision affirming the reduction in services, citing its need "to be good stewards of Medicaid dollars." Exhibit M, August 24, 2015 Local Dispute Resolution Committee Report of Findings.

196.  Although Mr. Waskul's primary care provider wrote a letter stating that "a lowering of Derek's self-determination budget would be devastating to Derek," Exhibit N, Letter from Maria Heck, DO, Defendant WCCMH did not take this into account.

197.  Doctor Heck also wrote, "[a]s a young man with severe cognitive impairment and autism, Derek needs stability, consistency and dependability. With the proposed changes, which would lower the staff wage, Derek will lose his current staff whom he has developed relationships with. Derek's current staff have facilitated and helped Derek to develop meaningful relationships in the community. Social interaction with others is a very important piece in the purpose of the self-determination arrangement." *Id.*

198. "Without constancy, Derek will inevitably have increased anxiety, increased behavior problems, and increased autism symptoms. Autism is a disorder that requires a need for sameness. As his doctor, I ask that you consider Derek's specific medical needs when making this decision." *Id*.

199. Despite Doctor Heck's clear direction, Defendant WCCMH nevertheless ignored Mr. Waskul's medical needs and reduced his CLS budget.

### B. Administrative Law Hearing and Subsequent Developments.

200. Mr. Waskul requested a Medicaid Fair Hearing shortly after receiving the July 20, 2015 notice of hearing rights.

201. When Mr. Waskul requested the Medicaid hearing, the rate that Defendants used to calculate his budget was restored to its full pre-May 15, 2015 amount, but the manner of the budget calculation — *i.e.*, starting with a single, overall amount based on staff hours and then subtracting out non-staff services and supports — was not changed.

202. A Medicaid Fair Hearing was held by the Michigan Administrative Hearing System (MAHS) on October 14, 2015.

203. Mr. Waskul's two paid CLS providers both testified under oath that they could not continue to work at the reduced rate.

204. Medical evidence was admitted stating that losing any of his current CLS providers would be detrimental to Mr. Waskul's health.

205. Despite Mr. Waskul's evidence that the rate reduction would force his CLS staff to quit and lead to harm, at the urging of Defendant WCCMH ALJ Steven Kibit issued a dismissal order asserting that he had no jurisdiction on the basis that there had been no reduction in the amount, scope, and duration of Mr. Waskul's services. Exhibit O, Order of Dismissal.

206. For unknown reasons, the overall rate Defendants used to calculate Mr. Waskul's budget was not reduced again after the dismissal, but stayed at the pre-May 15, 2015 rate.

207. On November 25, 2015, ALJ Kibit *sua sponte* issued an Order Vacating Dismissal, ruling that MAHS did in fact have jurisdiction to hear the case. Exhibit P.

208. Specifically, ALJ Kibit ruled that MAHS had jurisdiction because the reduction in Mr. Waskul's CLS budget did confer the right to a Medicaid Fair Hearing, and ordered a new hearing.

209. After ALJ Kibit had dismissed the case for lack of jurisdiction, Mr. Waskul's provider Christina Pulcifer quit, and Mr. Waskul did not

have enough staff to provide the medically necessary services required by his IPOS.

210. It generally takes significant time to find a suitable replacement for Mr. Waskul's CLS providers, because Mr. Waskul must be familiar with the provider and have established a certain level of trust.

211. Given the nature of their disabilities, the same is true of many of the other individual Plaintiffs and many members of WACA.

212. Mr. Waskul was at risk of losing his other paid CLS provider as well because of the uncertainty surrounding her job.

213. On February 18, 2016, ALJ Kibit granted Mr. Waskul's Motion for Summary Disposition and ordered Defendant WCCMH to reverse the budget reduction.

214. On February 29, 2016, Defendant WCCMH sent Mr. Waskul an Order Certification, certifying that ALJ Kibit's Order had been implemented.

215. Despite its representations in the Order Certification, Defendant WCCMH did not reverse the new budget calculation method, and it purported to appeal ALJ Kibit's decision.

216. Mr. Waskul currently cannot budget for any additional needs without reducing the amount he can pay his CLS providers.

217. Defendant WCCMH denied Mr. Waskul's requests for additional CLS hours on the sole basis that he was not using his full allotted hours.

218. Mr. Waskul was unable to use his full hours because he was unable to fill Ms. Pulcifer's position due to the inadequately low provider rate.

219. Mr. Waskul's guardian was eventually forced to hire her husband to fill Ms. Pulcifer's hours, at which time Defendant WCCMH approved the request for additional hours, increasing Mr. Waskul's hours from 37.5 to 70 hours per week.

220. Mr. Waskul is currently unable to find suitable CLS providers willing to work at the current rate, but he cannot increase the provider rate without decreasing some other part of his budget.

221. Ms. Waskul's husband can provide the bulk of the paid CLS services only on weekends and in the evening, leaving Mr. Waskul short-staffed during the week.

222. As a result of this short-staffing, Mr. Waskul goes three weekdays (Monday through Wednesday) without his normal community routine and is confined to his home on those days.

223. This serious reduction in community involvement has had a serious deleterious effect on Mr. Waskul's health.

a.  Without the necessary amount of community involvement and so-
cial interaction, Mr. Waskul becomes lethargic and depressed, of-
ten refusing to eat. The resultant excess sitting has worsened Mr.
Waskul's scoliosis.

b.  Certain relationships that Mr. Waskul had developed in the com-
munity are deteriorating. For example, Mr. Waskul is no longer
able to go to the farmer's market in Ann Arbor on Wednesday,
where he had developed special relationships with certain vendors,
because he has no CLS providers during the day on Wednesday.

c.  Currently, Mr. Waskul frequently refuses to get out of the car
when taken into the community, and his CLS provider has been
forced to turn around and go home. Mr. Waskul has refused to get
out of the car even when accompanied by his mother. In the com-
munity, he now becomes angry and potentially poses a danger to
himself and others.

### *CORY SCHNEIDER*

224.  Plaintiff Schneider incorporates all paragraphs above.

### A.  <u>Mr. Schneider's Disabilities and Staffing Before the May 15, 2015 Cuts.</u>

225.  Mr. Schneider has been diagnosed with autism and a developmental
disability, and he suffers from an undiagnosed behavior disorder.

226.  Mr. Schneider is twenty-one years old but cannot function inde-
      pendently. He has received CLS services under the HSW since he
      turned eighteen.

227.  Both Mr. Schneider and his guardian are members of WACA.

228.  Due to his extremely limited speech and the likelihood of self-
      inflicted harm, Mr. Schneider requires 24/7 care.

229.  Mr. Schneider's CLS providers are necessary to help Mr. Schneider
      lead as normal a life as possible and avoid institutionalization.

230.  Among other things, the CLS providers help Mr. Schneider to cross
      the street, engage in basic social interactions, remind him to use the
      bathroom, and monitor his aggression.

231.  Caring for Mr. Schneider is a strenuous job involving constant moni-
      toring. Mr. Schneider is over six feet tall and has aggressive tenden-
      cies resulting from his behavioral disorder, which CLS staff need to
      control to prevent him from hurting others or himself.

232.  Mr. Schneider's IPOS provides for 168 hours of CLS services per
      week (24/7).

233.  Prior to May 15, 2015, just as in the case of Plaintiff Waskul, Mr.
      Schneider's IPOS budget was calculated by applying the actual hourly
      pay rates for his paid CLS providers to the number of hours they

worked and then adding in additional line items for non-staff services and supports.

234. Mr. Schneider had around four paid CLS providers prior to May 15, 2015. His lead CLS provider, Stacey Rozsa, who has been with him for at least six years, was paid around $13.50 per hour, and his other three CLS providers were paid around $10.00 per hour.

## B. **Effect of the May 15, 2015 Cuts.**

235. Mr. Schneider received the April 9, 2015 letter informing him that his budget would be changed as described above with respect to Plaintiff Waskul.

236. The letter did not give notice to Mr. Schneider of his right to a Medicaid Fair Hearing. Only much later, on November 18, 2015, did Defendant give Mr. Schneider a notice of hearing rights and permit him to request an administrative hearing.

237. The notice was not the required advance adverse action notice. It was given well after the budget reduction was implemented and incorrectly stated that the action taken was "adequate."

238. Because the notice described the action taken as "adequate," the notice on its face did not provide Mr. Schneider an opportunity to request a timely hearing and receive benefits pending, because pending

benefits require "a termination, reduction, or suspension of a service that was previously authorized."

239. The specific regulation cited in the notice simply stated that the amount, scope, and duration of an IPOS must be sufficient, and that the Medicaid agency "may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." *Id*.

240. For the reasons outlined above, the rate reduction was not simply a new set rate for paid CLS providers. Rather, the budget was reduced, and amounts that previously had their own line items now had to be taken from a single amount calculated based solely on Mr. Schneider's staff hours.

241. As a consequence, the take-home pay both of Ms. Rozsa and of the other three CLS providers was reduced from the amounts that WCCMH and/or its predecessor had previously approved.

242. Defendant WCCMH reduced Ms. Rozsa's pay rate, which then fluctuated for no apparent reason in subsequent months between $11.50 and $12.00 per hour.

243.   After the May 15, 2015 budget recalculation, the pay rate for Mr. Schneider's CLS providers was frozen at around $10 per hour for new providers.

244.   Because of the budget imposed by Defendant WCCMH, Mr. Schneider is unable to maintain his current paid CLS providers or find suitable replacement providers, and consequently is not receiving the medically necessary services required by his IPOS.

245.   After May 15, 2015, Mr. Schneider's grandmother, Martha Schneider, made numerous attempts to find replacement CLS providers, posting at Eastern Michigan University and on care.com.

246.   Due to the low pay rate and the difficult nature of the work involved, Mr. Schneider was unable to find suitable replacement CLS staff.

247.   Between May 2015 and April 2016, Mr. Schneider could only employ two paid CLS providers for about sixty-five of his ninety-three then-scheduled hours a week. Mr. Schneider's grandmother provided unpaid care for Mr. Schneider the remaining 103 hours of the week.

248.   Ms. Schneider is seventy-five years old and underwent heart surgery within the last year.

249. On February 18, 2016, ALJ Kibit granted Mr. Schneider's Motion for Summary Disposition and ordered Defendant WCCMH to reverse the budget reduction.

250. On March 4, 2016, Defendant WCCMH sent Mr. Schneider an Order Certification, certifying that ALJ Kibit's Order had been implemented.

251. However, Defendant WCCMH has not reversed the budget calculation method.

252. Although Mr. Schneider's IPOS specifically requires him to have five days out in the community, Mr. Schneider is now unable to budget for additional medically necessary items like transportation and community activities without further reducing his CLS providers' pay.

253. Mr. Schneider's grandmother has paid, and continues to pay, out of pocket for transportation and community activity expenses.

254. On December 4, 2015, Mr. Schneider requested $400 monthly for transportation and $200 monthly for community activities. Mr. Schneider's amended IPOS from December 4, 2015 states that "these costs are above what the current self-determination budget covers."

255. Defendant WCCMH did not provide Mr. Schneider notice of his hearing rights when it denied this request for medically necessary services.

256. Ms. Schneider was recently forced to hire her 77-year-old husband, Dick Schneider, to provide paid CLS services due to her inability to find providers willing to work at the low rate available under Defendants' budget method.

257. Over the 2016 Christmas holiday, Mr. Schneider's grandfather provided nearly 150 hours of paid CLS services.

258. Mr. Schneider is receiving regular treatment for kidney failure.

259. Another CLS provider recently quit, and Ms. Schneider is still unable to hire sufficient staff at the current rate.

260. Mr. Schneider's grandfather and grandmother are now providing around 75 hours of CLS services per week, nearly 50% of the CLS support required by Mr. Schneider's IPOS, because Mr. Schneider is still short-staffed and cannot find CLS providers to work at the current rate.

### *KEVIN WIESNER*

261. Plaintiff Wiesner incorporates all paragraphs above.

**A. <u>Mr. Wiesner's Disabilities; Background.</u>**

262. Plaintiff Kevin Wiesner (Mr. Wiesner) is twenty years old. He has severe developmental disabilities and suffers from seizures.

263. Mr. Wiesner collapses during seizures and risks striking his head on objects while falling. In addition to preventing him from collapsing during seizures, his paid CLS providers must also pass a magnet over his Vagus Nerve Stimulator, which sends an electric charge to his brain. CLS staff must also ensure that Mr. Wiesner coughs up food to prevent blockage of his airways during seizures.

264. Both Mr. Wiesner and his guardian are members of WACA.

265. Mr. Wiesner receives about 85 hours of care per week in his IPOS.

266. Mr. Wiesner requires at least two CLS staff with him at all times in public.

267. Mr. Wiesner has been receiving CLS services under the HSW since he turned eighteen.

268. Mr. Wiesner's pre-May 15, 2015 hourly CLS provider rate of $12.00 per hour allowed for transportation and community activities to be budgeted outside of the caregiver rate, although he did not have a written budget between the time he transitioned from the Children's Waiver and the May 15, 2015 cuts.

## B. Effect of the May 15, 2015 Cuts.

269. Mr. Wiesner's IPOS requires medically necessary community activities.

270.   Mr. Wiesner's guardian was prepared to ask that medically necessary transportation and community activity expenses be budgeted when she received the April 9, 2015 letter from Sally Amos O'Neal.

271.   The April 2015 letter and subsequent discussions with WCHO, Defendant WCCMH's predecessor, convinced Mr. Wiesner's guardian that she could not budget for those medically necessary services without reducing Mr. Wiesner's CLS providers' pay rate to an unlivable wage.

272.   On May 15, 2015, Mr. Wiesner's CLS budget was reduced and recalculated as described above with respect to Plaintiffs Waskul and Schneider, so that the amount Mr. Wiesner could pay his CLS providers was lowered to $11.50 per hour.

273.   The result was that Mr. Wiesner's overall CLS budget was reduced, and the amount of services he could obtain was likewise reduced.

274.   This reduction caused Mr. Wiesner to breach his employment contracts with his CLS staff.

C. **Improper Notice of Hearing Rights and Lack of Benefits Pending.**

275.   Mr. Wiesner received no notice of hearing rights either in April 2015, when the letter was sent, or on May 15, 2015, when the budget reduction was instituted.

276. Mr. Wiesner refused to sign an amended IPOS in July 2015, which would have implemented the reduced budget in his IPOS.

277. At that time, Mr. Wiesner received a notice of his hearing rights, dated July 7, 2015 (a notice of "adequate action"), and requested a hearing.

278. Defendant WCCMH reduced Mr. Wiesner's services before providing the July 7, 2015 notice, which was not a negative advance action notice.

279. Because the July 7th notice described the action taken as "adequate," the notice on its face did not provide Mr. Wiesner an opportunity to request a timely hearing and receive benefits pending, because pending benefits require a termination, reduction, or suspension of a service that was previously authorized.

280. Mr. Wiesner was forced to pay his CLS providers reduced wages for two months.

281. When Mr. Wiesner requested the hearing in August 2015, Defendant WCCMH raised his CLS rate, but not to the full prior amount.

282. Instead, this was a "compromised" rate of $14.48, which WCCMH borrowed from the Children's Waiver.

283. Mr. Wiesner received no retroactive benefits for his CLS providers.

284.    An administrative mix-up concerning Mr. Wiesner's guardian paper-
        work prevented his hearing request from being properly processed un-
        til December 2015.

285.    Upon information and belief, it was only in December 2015 that Mr.
        Wiesner was told by Katie Snay, Fair Hearings Officer for WCCMH,
        that Defendant WCCMH had restored his CLS provider rate to the full
        $12.00.[2]

286.    Moreover, the pre-May 15, 2015 method of calculating the budget
        was not reinstated pending the Medicaid fair hearing.

287.    Mr. Wiesner's guardian paid out of pocket for community activity and
        transportation expenses.

288.    When Mr. Wiesner's guardian requested reimbursement for these ex-
        penses, she was told that additional line items would need to be added
        to his IPOS.

289.    Adding these additional budget line items would only continue to re-
        duce Mr. Wiesner's CLS provider pay rate.

_____

[2] Although under the HSW a self-determination participant has the right to hire
staff, the fiscal intermediary handles all administrative work pertaining to the CLS
providers' wages. The participant therefore would not know what the providers'
rate is without looking at the providers' pay stubs or asking the fiscal intermediary
directly.

290.  Since the budget reduction was imposed, Mr. Wiesner has lost one CLS provider due to the inability to pay sufficient wages.

291.  Over the past year, because of her inability to budget for additional services without reducing Mr. Wiesner's hourly provider rate, Mr. Wiesner's guardian had to pay for the majority of Mr. Wiesner's community activity and transportation needs out of pocket.

292.  These expenses contributed to causing Mr. Wiesner's guardian to fall behind on her property taxes, putting her at risk of foreclosure.

293.  Mr. Wiesner has suffered harm as a result of the illegal reduction in his CLS budget, and as a result of WCCMH's refusal to budget for transportation and community activities.

294.  A state ALJ again ruled that WCCMH had inappropriately denied Kevin Wiesner medically necessary services (MAHS Docket No. 16-008576). ALJ Kibit found that WCCMH had both failed to comply with his March 16, 2016 Decision and Order and had improperly denied Ms. Kafafian's new request for an increase in funding for Kevin's approved CLS budget.

295.  Defendant WCCMH appealed this decision, but reconsideration was denied.

296. Although Mr. Wiesner's IPOS currently requires him to have 3 CLS providers, Mr. Wiesner's guardian has been able to hire only two since January 2017 because the rate that she can offer is too low.

297. Mr. Wiesner is currently receiving only about 80 of the 120 CLS hours per week required by his IPOS.

298. Mr. Wiesner's guardian is unable to work during the time she has to stay home with Mr. Wiesner, which has taken a financial toll on her.

299. Mr. Wiesner's behavioral issues have also become worse in the last few months due to being stuck at home more.

300. Because Mr. Wiesner requires two-on-one staffing in the community, the inability to hire a third CLS provider has also negatively impacted Mr. Wiesner's ability to get into the community during the hours that are currently provided. This is because Mr. Wiesner's guardian now cannot balance her work schedule in such a way as to be home at the same time as the two CLS providers and accompany them into the community, due to the fact that she must stay home at other times to cover the hours that the third CLS staff would provide.

## ROGER ERLANDSON

301. Plaintiff Erlandson incorporates all paragraphs above.

302.  Mr. Erlandson suffers from severe autism and cognitive impairments. Although he is 37 years old, he requires 24/7 care and supervision.

303.  Both Mr. Erlandson and his guardian are members of WACA.

304.  Mr. Erlandson began receiving CLS services under the Habilitation Supports Waiver using a self-determination arrangement around four years ago.

305.  Because he receives 24/7 care, the costs WCCMH and CMHPSM incur with respect to his CLS services are coded H0043 for statistical reporting purposes. His actual staff budget, however, consists of a combination of *per diem* and hourly charges, depending on the provider.

306.  In his pre-May 15, 2015 budgets, Mr. Erlandson had the ability to increase his spending for additional line item costs like transportation without reducing his hourly provider rate.

307.  Mr. Erlandson received the April 9, 2015 letter, attached as Exhibit D. The letter was sent only to Mr. Erlandson, not to his guardian, and did not give Mr. Erlandson notice of his right to a hearing.

308.  On May 15, 2015, Mr. Erlandson's budget was reduced and recalculated.

309. Mr. Erlandson's guardian, desiring to request a Medicaid fair hearing, consulted with WCHO staff and a private attorney.

310. Mr. Erlandson's guardian was advised by WCHO staff that she did not have the right to request a hearing because there had been no reduction in the amount, scope, or duration of services.

311. Relying on the April 9, 2015 letter and the statements of WCHO, the private attorney advised that Mr. Erlandson's guardian did not have the right to pursue a Medicaid fair hearing.

312. Mr. Erlandson never received a post-June 4, 2015 notice of hearing rights.

313. On the advice of a friend and fellow CLS self-determination guardian, Mr. Erlandson's guardian stated her intention to file a grievance against WCHO, at which point she was offered, and accepted, the $14.48 "compromise" rate.

314. Since the post-May 15, 2015 budget calculation method went into effect, Mr. Erlandson has been unable to budget for the medically necessary services in his IPOS.

315. Mr. Erlandson's guardian expends significant out-of-pocket costs — well over $3,000 per year — for the medically necessary services and

supports in Mr. Erlandson's IPOS that cannot be paid for under the post-May 2015 budget methodology.

316. Most recently, Mr. Erlandson attempted to budget for a CLS staff supervisor, as explicitly provided for in his IPOS. The supervisor is necessary to train staff on Mr. Erlandson's unique needs, and is specifically included in Mr. Erlandson's IPOS.

317. The request was initially denied on the basis that it was not medically necessary, but *all* services described in the IPOS are medically necessary. In reality, under the new budget calculation method, WCCMH simply *cannot* budget for the supervisor without reducing another part of the budget.

318. WCCMH was eventually forced to concede that hiring a supervisor was appropriate, but it continued to make no provision in the budget for doing so. In order to avoid reducing the wages of CLS staff to untenably low levels, Mr. Erlandson's guardian has been forced to pay out of pocket for a significant portion of the cost of the supervisor.

319. Mr. Erlandson continues to suffer harm each day that his pre-May 15, 2015 CLS service levels and budget calculation method are not reinstated.

**LINDSAY TRABUE**

320. Plaintiff Trabue incorporates all paragraphs above.

321. Ms. Trabue has been diagnosed with Down syndrome, and her IQ is 38.

322. Both she and her guardian are members of WACA.

323. Ms. Trabue is non-verbal and possesses only the most basic functional skills. She requires 24/7 care.

324. Ms. Trabue has received CLS services under a self-determination arrangement only since December 2015. Therefore, unlike the other named plaintiffs, she did not receive the April 2015 letter and experience a budget reduction on May 15, 2015.

325. However, Ms. Trabue has always been subject to the post-May 15, 2015 budget calculation method, and has consequently suffered from a CLS budget in which the cost of non-staff services and supports is subtracted from an overall amount based on staff hours and a single, overall rate, thereby reducing the amount that can be paid to staff.

326. Ms. Trabue's overall rate started at $13.88, but was almost immediately increased to $14.48 at the request of her guardian.

327. From the beginning of her self-determination arrangement, Ms. Trabue's budget has not included separate a line item for transportation

expenses, but requires transportation to be taken out of the overall amount calculated by applying the $14.48 rate to the approved staff hours in her IPOS.

328. Because Ms. Trabue travels around 600 miles per month to meet her medically necessary community involvement needs, and the cost of that transportation reduces her providers' hourly wages.

329. From the beginning of her self-determination arrangement, Ms. Trabue's budget has not included a separate a line item for community activity expenses, but would require such expenses, if paid for by Defendant CMHPSM, to be taken out of the overall amount calculated by applying the $14.48 rate to the approved staff hours in Ms. Trabue's IPOS.

330. For example, Ms. Trabue has been diagnosed with non-alcoholic fatty liver disease, requiring significant physical activity each week.

331. Pursuant to her IPOS, Ms. Trabue participates in disabled bowling, yoga, dance, and gym activities, in part for her physical needs and in part to further her community integration.

332. The expense of these activities is and should be the obligation of Defendant CMHPSM, but Ms. Trabue's guardian has been forced to pay for all of these expenses out of pocket. She cannot take these expenses

out of the providers' pay, as she did with transportation, because do-ing so would reduce the providers' hourly rate to an untenable level.

333.  Because of Defendants' budgeting method and the capping of Ms. Trabue's budget at $14.48 times the IPOS staff hours, Ms. Trabue cannot add additional money for transportation or community activi-ties without losing other medically necessary services and supports.

## *HANNAH ERNST*

334.  Plaintiff Ernst incorporates all paragraphs above.

335.  Ms. Ernst has been diagnosed with Angelman Syndrome, a seizure disorder, and a moderate cognitive impairment.

336.  She is 20 years old, but cannot function independently.

337.  Both she and her guardians are members of WACA.

338.  Ms. Ernst was living at her guardians' home in May 2015 and em-ploying one CLS provider during the week.

339.  When the May 15, 2015 reduction went into effect, the provider's pay rate suddenly decreased from about $16 per hour to about $11.88 per hour.

340.  This provider subsequently quit due to the reduced rate.

341.  Due to her difficulty finding staff at the reduced rate, Ms. Ernst's guardians tried using a provider agency to receive services.

342. The provider agencies were not suitable for many reasons, and Ms. Ernst resumed a self-determination arrangement in July 2016.

343. In July 2016, Ms. Ernst was no longer living with her guardians and required additional staff.

344. Ms. Ernst's guardians hired four CLS providers, but were only able to do so because they had resolved to pay for all transportation and community activities themselves in order to offer a living wage.

345. To this day, Ms. Ernst's guardians pay out of pocket for *all* community activity and transportation expenses.

346. This is because, should Ms. Ernst budget for transportation and community activities in her individual budget, her provider rate would be reduced to an untenable level.

347. All of the transportation and community activities for which she is paying out of pocket are provided for in Ms. Ernst's IPOS.

348. Ms. Ernst's guardians pay about $1,000 out of pocket per month for these activities and transportation costs.

### *WASHTENAW ASSOCIATION FOR COMMUNITY ADVOCACY (WACA)*

349. Plaintiff WACA incorporates all paragraphs above.

350. WACA is a non-profit organization, established in 1949.

351.  Its mission and purpose include advocating for persons with developmental disabilities and their families in order to help them obtain and maintain services.

352.  WACA frequently advocates for self-determination recipients, often through participation in the person-centered planning process, and it regularly fields calls regarding CLS self-determination from participants and their guardians, providing information and answers to client questions.

353.  In addition to helping its members obtain services, WACA often provides representation to individuals whose services are reduced or terminated in administrative law hearings.

354.  Its service population is comprised mainly of persons with disabilities and their families.

355.  Its members include recipients of CLS services and their providers.

356.  All HSW CLS services recipients in Washtenaw County qualify for WACA's services.

357.  All named individual Plaintiffs are members of WACA.

358.  Many of WACA's clients, including the named individual Plaintiffs in this case, have been directly harmed by Defendants' practices.

359. WACA has an interest in protecting the interests of its developmentally disabled members.

360. The relief sought in this lawsuit would directly benefit WACA and its developmentally disabled members.

361. WACA has seen an increase in the number of advocacy requests from individuals with developmental disabilities who receive self-determination CLS services from Defendant WCCMH in 2015 and 2016, due to the reductions at issue in this case.

## CLAIMS FOR RELIEF

## COUNT I – FAILURE TO PROVIDE CONSTITUTIONALLY ADEQUATE NOTICE AND RIGHT TO BE HEARD (All Plaintiffs Against Defendants Cortes, Terwilliger, and Gordon)

362. Plaintiffs incorporate all paragraphs above.

363. The right to procedural due process is secured by the 14th Amendment, and public benefits are a constitutionally-protected property interest. *See Goldberg v Kelly*, 397 U.S. 254, 262 (1970).

364. Medicaid participants' hearing and notice rights under *Goldberg* are codified at 42 C.F.R. § 431.205(d): "The hearing system must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart."

365. Under *Goldberg,* the state must provide a meaningful notice stating the basis for the action and, when coverage is to be reduced or terminated, a pre-termination notice informing the claimant of the right to continue benefits pending a final administrative decision.

366. "The notice must comprise (1) a detailed statement of the intended action . . . (2) the reason for the change in status . . . (3) citation to the specific statutory section requiring reduction or termination; and (4) specific notice of the recipient's right to appeal." *Barry v. Lyon*, 834 F.3d 706, 719 (6th Cir. 2016).

367. In this case, Defendant WCCMH simply sent the April 2015 letter to all CLS participants in the county notifying them that the reduced rate/budget would be unilaterally imposed effective May 15, 2015.

368. Plaintiffs and the members of WACA were not advised in the letter of their right to appeal the rate and budget reduction, how to appeal, or how to obtain continued services pending the outcome of a hearing.

369. Defendant WCCMH reduced Plaintiffs' services, and those of the members of WACA, on May 15, 2015, well before providing the post-June 4, 2015 notices, which were not negative advance action notices.

370. Because the post-June 4th notices described the action taken as "adequate," the notices on their face did not provide participants an oppor-

tunity to request a timely hearing and receive benefits pending, be-
cause pending benefits require a termination, reduction, or suspension
of a service that was previously authorized.

371.  The specific regulation cited in the post-June 4, 2015 notices states
only that the amount, scope, and duration of an IPOS must be suffi-
cient, and that the Medicaid agency "may not arbitrarily deny or re-
duce the amount, duration, or scope of a required service under [42
C.F.R.] §§ 440.210 and 440.220 to an otherwise eligible beneficiary
solely because of the diagnosis, type of illness, or condition."

372.  Not all recipients, including two of the named plaintiffs, even received
this post-June 4, 2015 notice.

373.  Defendants violated Plaintiffs' constitutional rights to due process,
rights secured by the 5th and 14th Amendments and enforceable by
Plaintiffs pursuant to 42 U.S.C. § 1983, when they did not allow
Plaintiffs an opportunity to be heard and contest the reduction of their
CLS services.

374.  Defendants violated the constitutional rights of the members of
WACA to due process, rights secured by the 5th and 14th Amend-
ments and enforceable by the members of WACA pursuant to 42
U.S.C. § 1983, when they did not allow the members of WACA an

opportunity to be heard and contest the reduction of their CLS ser-

vices.

375.   Defendants' actions, under color of state law, have harmed Plaintiffs

and the members of WACA by depriving them, and continuing to de-

prive them, of medically necessary care, disrupting and diminishing

their development and mental health.

## COUNT II – VIOLATION OF STATUTORY RIGHT TO NOTICE AND AN OPPORTUNITY TO BE HEARD (All Plaintiffs Against Defendants Cortes, Terwilliger, and Gordon)

376.   Plaintiffs incorporate all paragraphs above.

377.   The Medicaid Act requires that a "State plan for medical assistance

must . . . provide for granting an opportunity for a fair hearing before

the State agency to any individual whose claim for medical assistance

under the plan is denied or not acted upon with reasonable prompt-

ness." 42 U.S.C. § 1396a(a)(3).

378.   42 C.F.R. 431.200 "[i]mplements section 1902(a)(3) [1396a(a)(3)] of

the Act, which requires that a State plan provide an opportunity for a

fair hearing to any person whose claim for assistance is denied or not

acted upon promptly."

379.  42 C.F.R. § 431.206 provides that the state must provide notice of a beneficiary's right to a hearing and instructions on how to request it "[a]t the time of any action affecting his or her claim."

380.  Notice given under 42 C.F.R § 431.210 must "contain (a) A statement of what action the State … intends to take; (b) The reasons for the intended action; (c) The specific regulations that support, or the change in Federal or State law that requires, the action; (d) An explanation of— (1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or (2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and (e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested."

381.  If a beneficiary requests a hearing before the date of action, the State may not terminate or reduce services until a decision is rendered after the hearing, unless it is determined at the hearing that the sole issue is one of Federal or State law or policy, and the agency promptly informs the beneficiary in writing that services are to be terminated or reduced pending the hearing decision. 42 C.F.R § 431.230(a)(1) and (2).

382. The budget reductions imposed by Defendant WCCMH were and are a reduction of a previously authorized service.

383. Defendant WCCMH simply sent out a letter in April 2015 stating that participants' CLS rates would be reduced and additional budget items included in (i.e. subtracted from) that rate.

384. Defendant WCCMH did not provide HSW participants adequate notice of hearing rights when it reduced their budgets on May 15, 2015.

385. Plaintiffs and the members of WACA were and are entitled to continued services under 42 C.F.R § 431.230 and 42 C.F.R § 431.210.

386. The post-June 4, 2015 notices did not provide HSW participants adequate notice of their hearing rights pursuant to 42 C.F.R § 431.210.

387. Defendant WCCMH reduced Plaintiffs' services, and those of the members of WACA, before providing the post-June 4, 2015 notices, which were not negative advance action notices.

388. Because the post-June 4th notices described the action taken as "adequate," the notices on their face did not provide participants an opportunity to request a timely hearing and receive benefits pending, because pending benefits require "a termination, reduction, or suspension of a service that was previously authorized."

389. The specific regulation cited in the post-June 4, 2015 notices simply states that the amount, scope, and duration of an IPOS must be sufficient, and that the Medicaid agency "may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition."

390. Not all recipients, including two of the named plaintiffs, even received this post-June 4, 2015 notice.

391. Defendant WCCMH violated Plaintiffs' right, and the rights of the members of WACA, to statutory due process by failing to provide proper notice.

392. Defendants have violated Plaintiffs' clearly established rights under 42 U.S.C. § 1396a(a)(3), rights enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983. *See Gean v. Hattaway*, 330 F.3d 758 (6th Cir. 2003).

393. Defendants' actions, under color of state law, have harmed Plaintiffs and the members of WACA by depriving them, and continuing to deprive them, of medically necessary care, disrupting and diminishing their development and mental health.

**COUNT III – VIOLATION OF SOCIAL SECURITY ACT – FAILURE TO AUTHORIZE SERVICES IN THE AMOUNT, SCOPE, OR DURATION TO REASONABLY ACHIEVE THEIR PURPOSE (All Plaintiffs Against Defendants Cortes, Terwilliger, and Gordon)**

394.   Plaintiffs incorporate all paragraphs above.

395.   Under 42 U.S.C. § 1396a(a)(10)(B), the individual Plaintiffs and the members of WACA have the right to services in the amount, scope, and duration akin to those of any other such individual under Medicaid.

396.   Under 42 C.F.R. § 440.230(b), "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose."

397.   The individual Plaintiffs and the members of WACA receive home and community based services to assist them with participating in community activities and to prevent institutionalization.

398.   CMS waived MDHHS's obligation to comply with the comparability requirements of § 1396a(a)(10)(B) in the HSW (implemented by 42 C.F.R. § 440.230(a)), but not the sufficiency requirements set forth in 42 C.F.R. § 440.230(b).

399.   The service group specified in the State's HSW must still receive services sufficient in amount, duration, and scope to reasonably achieve their purpose.

400.   Defendants' reduction of the individual Plaintiffs' IPOS budgets, and those of the members of WACA, has frustrated the purpose of the medically necessary services set forth in the IPOSs.

401.   The individual Plaintiffs have not received, and are currently not receiving, services sufficient in scope to achieve the services' purpose, in violation of their established rights under 42 U.S.C. § 1396a(a)(10)(B) and 42 C.F.R. § 440.230(b), rights enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983.

402.   Defendants' budgeting methodology systematically creates an unacceptable risk that each of the members of WACA will not receive services sufficient in scope to achieve the services' purpose, in violation of their established rights under 42 U.S.C. § 1396a(a)(10)(B) and 42 C.F.R. § 440.230(b), rights enforceable by the individual Plaintiffs, and by WACA on behalf of its members, pursuant to 42 U.S.C. § 1983.

403.   Defendants' actions, under color of state law, have harmed the individual Plaintiffs and the members of WACA by depriving them of medically necessary care and disrupting their development and mental health.

## COUNT IV – VIOLATION OF SOCIAL SECURITY ACT – RIGHT TO RECEIVE SERVICES WITH REASONABLE PROMPTNESS (All Plaintiffs Against Defendants Cortes, Terwilliger, and Gordon)

404.   Plaintiffs incorporate all paragraphs above.

405.   The Social Security Act, 42 U.S.C. § 1396a(a)(8) and (a)(10), requires the State to furnish medical assistance with reasonable promptness to all eligible individuals.

406.   Medical assistance includes "community supported living arrangement services" as defined in 42 U.S.C. §§ 1396u(a) and1396d(a)(23).

407.   "Community supported living arrangement services" is defined as approved services which assist a developmentally disabled individual "in activities of daily living necessary to permit such individual to live in the individual's own home, apartment, family home, or rental unit furnished in a community supported living arrangement setting." 42 U.S.C. § 1396u.

408.   It also includes "[s]upport services necessary to aid an individual to participate in community activities." 42 U.S.C. § 1396u(a)(7).

409.   The individual Plaintiffs' support services, which allowed them to participate in the community, have been curtailed because their CLS budgets have been reduced and have been capped by application of a

fixed rate to staff hours in the IPOS, regardless of the extent of non-staff services and supports specified in their IPOSs.

410.  In numerous cases, paid CLS providers cannot be readily found to work at the low rates available in such Plaintiffs' budgets under the new budgeting method.

411.  Several of such Plaintiffs' CLS providers have quit as a result of reductions and uncertainty in their pay. For the same reasons, replacements are generally unavailable, or are available only with significant delays.

412.  Defendants have failed to make services available to the individual Plaintiffs by imposing low reimbursement rates and refusing services based on cost.

413.  Defendants have failed to make services available to the individual Plaintiffs by capping their budgets without regard to the extent of non-staff services and supports specified in their IPOSs and in not allowing them to budget for additional medically necessary services and supports.

414.  This makes it impossible for participants to obtain adequate medically necessary services with reasonable promptness, in violation of 42 U.S.C. §§ 1396a(a)(8) and 1396 a(a)(10)(A).

415. Defendants have also violated state policy prohibiting services from being denied "solely on preset limits of the cost, amount, scope, and duration of services." MPM, § 2.5.C., pg. 14.

416. The post-May 15, 2015 budget calculation method and consequent inadequate provider reimbursement rates have effectively denied Plaintiffs the right to medical assistance in violation of 42 U.S.C. §§ 1396a(a)(8) and (10)(A).

417. Defendants' budgeting methodology systematically creates an unacceptable risk that each of the members of WACA will not receive adequate medically necessary services with reasonable promptness, in violation of 42 U.S.C. §§ 1396a(a)(8) and 1396 a(a)(10)(A).

418. Defendants have violated the individual Plaintiffs' clearly established rights, and those of the members of WACA, under 42 U.S.C. §§ 1396a(a)(8) and (10)(A), rights enforceable by the individual Plaintiffs, and by WACA on behalf of its members, pursuant to 42 U.S.C. § 1983.

419. Defendants' actions, under color of state law, have harmed the individual Plaintiffs and the members of WACA by depriving them of medically necessary care and disrupting and diminishing their development and mental health.

## COUNT V – VIOLATION OF ADA, TITLE II, 42 U.S.C. § 12131 *ET SEQ.*
### (All Plaintiffs Against Defendants Gordon, Terwilliger, Cortes, CMHPSM, and WCCMH)

420.   Plaintiffs incorporate all paragraphs above.

421.   Title II of the Americans with Disabilities Act (ADA) of 1990 (Title II), 42 U.S.C. § 12131 *et seq.*, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the service, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Rights of action with respect to violations of Title II are expressly conferred by 42 U.S.C. § 12133.

422.   A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d).

423.   "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities mean[s] a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591 (1999) (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)) (internal quotation marks omitted).

424. The ADA prohibits both outright discrimination and "identified unjustified 'segregation' of persons with disabilities." *Olmstead*, 527 U.S. at 600 (quoting § 12101(a)(2)). "Unjustified isolation" is therefore "properly regarded as discrimination based on disability." *Id*. at 597.

425. "Institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id*. at 600.

426. Isolation in a home can just as "severely diminish[] the everyday life activities" of people with disabilities. *Id.* at 601. *See Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016).

427. MDHHS, CMHPSM, and WCCMH are public entities receiving federal funds to administer the Medicaid program in Michigan. 42 U.S.C. § 12131(1).

428. The individual Plaintiffs and the members of WACA are individuals with a disability within the meaning of the ADA. 42 U.S.C. § 12102(1). Specifically, they are individuals whose impairment substantially limits one or more of their major life activities, who have a record of the impairment, and who are regarded by Defendants as having the impairment.

429.  The individual Plaintiffs and the members of WACA are qualified individuals, as that term is defined in the ADA. 42 U.S.C. § 12131(2). With or without reasonable modifications to the Defendants' rules, policies, or practices, Plaintiffs meet the essential eligibility requirements to receive Medicaid.

430.  Defendants have violated the ADA and have injured the individual Plaintiffs and the members of WACA by failing to provide them with CLS services for which they are eligible, thereby failing to provide services in the most integrated setting appropriate to their needs, depriving them of medical and related services, increasing the risk of institutionalization, and disrupting and diminishing their development and mental health.

431.  Defendants have further violated the ADA because the top-down budgeting practice that they have imposed creates a systematic risk that any CLS recipient with a significant amount of non-staff services in his or her IPOS, including all of the individual Plaintiffs and many members of WACA, will be unable to obtain CLS services for which s/he is eligible, will not receive services in the most integrated setting appropriate to his or her needs, will be deprived of medical and relat-

ed services, will face increased risk of institutionalization, and will be disrupted and diminished in his or her development and mental health.

432.   Defendants have further caused Plaintiffs Waskul and Wiesner to be confined to their homes for substantial and unjustifiable periods of time, due to the inability to hire sufficient and appropriate CLS staff to take them into the community. This does not merely place these Plaintiffs at risk of institutionalization; it is effectively equivalent to actual institutionalization.

433.   Defendants can avoid continuing these discriminatory activities through reasonable modifications of their programs and services. 28 C.F.R. § 35.130(b)(7).

434.   Defendants have violated Plaintiffs' clearly established rights under 42 U.S.C. § 12132, rights enforceable by Plaintiffs pursuant to 42 U.S.C. §§ 1983, 12133.

## COUNT VI – VIOLATION OF REHABILITATION ACT, 29 U.S.C. § 794
### (All Plaintiffs Against All Defendants)

435.   Plaintiffs incorporate all paragraphs above and specifically refer to the allegations of Count V.

436.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, together with its implementing regulations, including 28 C.F.R. § 41.51(d) and 45 C.F.R. § 84.4(b)(vii)(2), and the right of action granted by 29 U.S.C.

§ 794a, are all construed *in pari materia* with the ADA with respect to

*Olmstead*/"most integrated setting" claims.

437. By continuing to participate in the Medicaid program, and continuing to accept federal funding therefor, after enactment of 42 U.S.C. § 2000d-7, the State of Michigan has waived its Eleventh Amendment immunity for claims under the Rehabilitation Act related to its conduct of the Medicaid program.

438. Plaintiffs therefore have a right to relief under 29 U.S.C. § 794a against all Defendants for violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, to the same extent they have a right to relief against Defendants Gordon, Cortes, and Terwilliger as alleged in Count V.

## COUNT VII – VIOLATION OF 42 U.S.C. § 1396n(c)(2)(A) — FAILURE TO TAKE NECESSARY SAFEGUARDS TO PROTECT THE HEALTH AND WELFARE OF WAIVER SERVICES RECIPIENTS (All Plaintiffs Against Defendant Gordon)

439. Plaintiffs incorporate all of the paragraphs above.

440. Pursuant to 42 U.S.C. § 1396n(c)(2)(A), "[a] waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that . . . necessary safeguards (including adequate standards for provider participation) have been taken to protect

the health and welfare of individuals provided services under the waiver." *See also* 42 C.F.R. § 441.302(a).

441. These necessary safeguards include "adequate standards for all types of providers that provide services under the waiver," 42 C.F.R. § 441.302(a)(1); and "assurance that services are provided in home and community based settings, as specified in § 441.301(c)(4)," 42 C.F.R. § 441.302(a)(5).

442. These "home and community based settings" must support "full access of individuals receiving Medicaid HCBS to the greater community, including opportunities to seek employment and work in competitive integrated settings, engage in community life, control personal resources, and receive services in the community, to the same degree of access as individuals not receiving Medicaid HCBS," 42 C.F.R. § 441.301(c)(4)(i); must optimize, "but . . . not regiment, individual initiative, autonomy, and independence in making life choices, including but not limited to, daily activities, physical environment, and with whom to interact," 42 C.F.R. § 441.301(c)(4)(iv); and must facilitate "individual choice regarding services and supports, and who provides them," 42 C.F.R. § 441.301(c)(4)(v).

443.   Defendants WCCMH and CMHPSM's new budgeting method, which imposes a cap on the amount of CLS services self-determination recipients can receive, is not based on any sort of evaluation of the medical needs of the individual waiver program recipients, therefore putting recipients subject to the cap at risk.

444.   In allowing MDHHS's contractual agents to impose such a cap, Defendant Gordon (director of the single state agency responsible for administering the Medicaid program) has failed to take necessary safeguards to protect the health and welfare of individuals provided services under the HSW waiver.

445.   By allowing MDHHS's contractual agents to require that participants start with a fixed H2015 or H0043 rate and work backwards to an amount that can be paid for staff by subtracting out the cost of all the non-staff services and supports, Defendant Gordon has failed to ensure adequate standards for the self-determination providers who provide services under the waiver, because recipients are often left with inadequate funds to pay staff.

446.   By allowing MDHHS's contractual agents to cap CLS self-determination recipients' budgets without consideration of individual medical needs or goals, Defendant Gordon has failed to ensure that

services are provided in the home and community based settings specified in 42 C.F.R. § 441.301(c)(4), because recipients are no longer able to access and participate in the community to the extent and in the manner necessitated by their individual plans of service; because recipients are unable to optimize individual initiative, autonomy, and independence in making life choices; and because recipients' choices regarding services, supports, and providers are limited rather than facilitated.

447. The requirements of 1396n(c)(2)(A) are clearly intended to protect the health and welfare of Medicaid recipients receiving services under the HSW waiver, to confer rights on such recipients, and to impose a mandatory duty on the State. This mandatory duty is neither vague nor amorphous; rather, it is an unambiguous directive.

448. Defendant Gordon has violated the rights of the individual Plaintiffs and the members of WACA under 42 U.S.C. § 1396n(c)(2)(A), rights enforceable by Plaintiffs and the members of WACA pursuant to 42 U.S.C. § 1983.

**COUNT VIII – VIOLATION OF 42 U.S.C. § 1396n(c)(2)(C) —**
**FAILURE TO PROVIDE A MEANINGFUL CHOICE BETWEEN**
**INSTITUTIONALIZATION AND HOME AND COMMUNITY BASED**
**SERVICES (All Plaintiffs Against Defendant Gordon)**

449. Plaintiffs incorporate all of the paragraphs above.

450.  Pursuant to 42 U.S.C. § 1396n(c)(2)(C), "[a] waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that . . . such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded." *See also* 42 C.F.R. § 441.302(d).

451.  By allowing MDHHS's contractual agents to require that participants start with a fixed H2015 or H0043 rate and work backwards to an amount that can be paid for staff by subtracting out the cost of all the non-staff services and supports, Defendant Gordon has failed to ensure that waiver participants have a meaningful choice between home-and-community-based services and institutionalization, because the participants' consequent inability to pay adequate staff wages (or, under Hobson's Choice, to pay adequate staff wages only by forgoing vital non-staff services) leaves the participants at risk of — and, in many cases, in fact — being effectively homebound, unable to get out

into the community and unable to receive necessary care, services, and support.

452.  The "choice" between such a home-based existence and actual institutionalization is in fact no choice at all, and putting participants to such a "choice" violates the express assurances required under 42 U.S.C. § 1396n(c)(2)(C).

453.  The requirements of 1396n(c)(2)(C) are clearly intended to protect the health and welfare of Medicaid recipients receiving services under the HSW waiver, to confer rights on such recipients, and to impose a mandatory duty on the State. This mandatory duty is neither vague nor amorphous; rather, it is an unambiguous directive.

454.  Defendant Gordon has violated the rights of the individual Plaintiffs and the members of WACA under 42 U.S.C. § 1396n(c)(2)(C), rights enforceable by Plaintiffs and the members of WACA pursuant to 42 U.S.C. § 1983.

**COUNT IX – THIRD-PARTY BENEFICIARY CLAIM FOR VIOLATION OF ASSURANCES GIVEN IN THE HSW WAIVER APPLICATION AND IMPLEMENTED IN THE MDHHS/PIHP CONTRACTS (All Plaintiffs Against Defendants Gordon, Terwilliger, and CMHPSM)**

455.  This Count arises under 42 U.S.C. § 1983 against Defendants Gordon and Terwilliger by reason of (a) Defendant Gordon's failure to enforce MDHHS's responsibilities as the single state agency responsible

for administering Michigan's Medicaid program, and (b) Defendant Terwilliger's failure to ensure that Defendant CMHPSM complies with the PIHP Contract described below.

456.   This Count also arises under the common law of Michigan and/or federal common law against Defendant CMHPSM. To the extent the claim arises under Michigan law, this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

457.   As the single state agency responsible for administering Michigan's Medicaid program, MDHHS has a non-delegable duty to ensure compliance by its contractors and subcontractors with all requirements of the program, including such policies, rules, or regulations as it issues or undertakes in connection with the program. That duty arises under federal law (specifically 42 U.S.C. § 1396a(a)(5) and 42 C.F.R § 431.10).

458.   MDHHS has the right to, and does, subcontract for the performance of certain of those duties, but MDHHS remains responsible for its subcontractors' performance.

459.   MDHHS has implemented its responsibilities through, in part, a Medicaid Managed Specialty Supports and Services Concurrent 1915(b)/(c) Waiver Program Contract (the PIHP Contract) with

CMHPSM. The terms quoted herein are taken from the form PIHP Contract for Fiscal Year 2017, but on information and belief the actual contracts executed by MDHHS and CMHPSM throughout the relevant period contained materially identical terms.

460. In the PIHP Contract, Defendant CMHPSM agreed with MDHHS, among other things, as follows:

a. "Operation of the Concurrent 1915(b)/(c) Program must conform to . . . each . . . Waiver." (Section 7.0, "PIHP Responsibilities"; the Habilitation Supports Waiver at issue in this action is expressly included in that agreement).

b. The provisions of each Waiver were expressly incorporated into the PIHP Contract (Section 13.0F, "Entire Agreement," expressly incorporating "Approved Medicaid Waivers and corresponding CMS conditions").

c. In Section 3.0 (Service Requirements) in the Statement of Work in the PIHP Contract, CMHPSM obligated itself as follows:

> The PIHP shall provide covered state plan or 1915(c) services (for beneficiaries enrolled in the 1915(c) Habilitation Supports Waiver) in sufficient amount, duration and scope to reasonably achieve the purpose of the service. Consistent with 42 CFR 440.210 and 42 CFR 440.220, services to recipients shall not be reduced arbitrarily. Criteria for medical necessity and utilization control procedures that are consistent with the medical necessity criteria/service selection

guidelines specified by MDHHS and based on practice standards may be used to place appropriate limits on a service (CFR 42 sec.440.230).

461. Plaintiffs and the members of WACA are third-party beneficiaries of the PIHP Contract, because the agreement was made for their benefit and was intended by the parties thereto to be enforceable by the recipients against Defendant CMHPSM. In particular (and without limitation):

a. The PIHP Contract does not contain any provisions disclaiming third-party beneficiary rights.

b. Parallel MDHHS contracts (those for General State Fund Services) state that they do not create rights in recipients to certain services that are funded solely by the State, since those services are dependent on State appropriations and thus are not "entitlements." The services at issue in this action, however, are Medicaid services that *are* entitlements, and the contracts therefore do create rights in recipients with respect to those services.

462. In applying for the Habilitation Supports Waiver, the State of Michigan was required to, and did, give certain assurances to CMS about how activities under the waiver (if granted) would be conducted and how the rights of participants such as these Plaintiffs and the members

of WACA would be protected. Upon CMS's granting of the waiver, the assurances became binding contractual obligations of the MDHSS to CMS.

463. Under the PIHP Contract, Defendant CMHPSM is obligated to carry through MDHSS's obligations, and Plaintiffs and the members of WACA, as third-party beneficiaries, have the right to enforce CMHPSM's obligations.

464. Certain of the HSW assurances are as alleged in Counts VI and VII hereof. Also as alleged therein, violations of those assurances are enforceable by Plaintiffs and WACA (on behalf of its members) against Defendant Gordon pursuant to 42 U.S.C. § 1983.

465. The assurances given in the Waiver Application, however, included far more than boilerplate, check-the-box agreement to comply with the law. They included detailed and specific promises by MDHHS, in words chosen by the MDHHS, to conduct the waiver programs in certain ways.

466. Among these assurances were the following:

a. In Appendix C-4 of the application, Michigan checked the box that "The State does not impose a limit on the amount of waiver ser-

vices except as provided in Appendix C-3" (which does not have

any limits applicable here).

   b. In Appendix E-1 (at p. 123 of 192), Michigan states (emphasis

     added):

> An individual plan of service (IPOS) will be developed
> through this process with the participant, supports coordina-
> tor or other chosen qualified provider, and allies chosen by
> the participant. The plan will include the HSW waiver ser-
> vices needed by and appropriate for the participant. An in-
> dividual budget is developed based on the services and sup-
> ports identified in the IPOS *and must be sufficient to im-
> plement the IPOS.*

   c. In Appendix E-2 (Opportunities for Participant-Direction), Michi-

     gan states:

> The amount of the individual budget is determined by cost-
> ing out the services and supports in the IPOS, after a IPOS
> that meets the participant's needs and goals has been devel-
> oped. . . . This process involves costing out the services and
> supports using the rates for providers chosen by the partici-
> pant and the number of hours authorized by the IPOS. The
> rate for directly employed workers must include [taxes, un-
> employment insurance, and workers compensation].

467. The implementation of the WCCMH/CMHPSM top-down budgeting

system in May 2015 breached the obligation of Section 3.0 of the

Statement of Work that CMHPSM "provide covered state plan or

1915(c) services (for beneficiaries enrolled in the 1915(c) Habilitation

106

Supports Waiver) in sufficient amount, duration and scope to reasonably achieve the purpose of the service."

468.   The implementation of the WCCMH/CMHPSM top-down budgeting system in May 2015 breached the obligation of Section 3.0 of the Statement of Work that CMHPSM "services to recipients shall not be reduced arbitrarily."

469.   The service limitations effected by the implementation of the WCCMH/CMHPSM top-down budgeting system in May 2015 were not implemented to promote, but in fact flew in the face of, medical necessity, and they were not effected pursuant to "utilization control procedures that are consistent with the medical necessity criteria/service selection guidelines specified by MDHHS and based on practice standards," so that they breached Section 3.0 of the Statement of Work for this reason as well.

470.   The service limitations effected by the implementation of the WCCMH/CMHPSM top-down budgeting system in May 2015 breached the assurance in Appendix C-4 of the HSW Application that "[t]he State does not impose a limit on the amount of waiver services except as provided in Appendix C-3" (which does not have any limits applicable here).

471. The service limitations effected by the implementation of the WCCMH/CMHPSM top-down budgeting system in May 2015 breached the obligation of Appendix D-1 that the budget be sufficient to implement the IPOS.

472. The imposition of the WCCMH/CMHPSM top-down budgeting system in May 2015 breached the obligation that the individual budget be determined by costing out the services and supports in the IPOS, because "costing out" involves applying actual rates to services listed, not imposing arbitrary limits based on what was left over in a pre-determined cap after other services had been accounted for.

473. The imposition of the WCCMH/CMHPSM top-down budgeting system in May 2015 breached the obligation that the individual budget be determined by using the rates for providers chosen by the participant and the number of hours authorized by the IPOS, because the providers' rates (which had been previously approved) were not used, but the rates payable were reduced based on what was left over in a pre-determined cap after other services had been accounted for.

474. The individual Plaintiffs and the members of WACA are entitled to an injunction requiring Defendant Gordon to enforce the PIHP Contract for the benefit of Plaintiffs and the members of WACA and reverse

the May 2015 decision of CMHPSM and WCCMH to impose top-down budgeting.

475.   The individual Plaintiffs and the members of WACA are entitled to an injunction requiring Defendant Terwilliger to require Defendant CMHPSM to comply with the PIHP Contract for the benefit of Plaintiffs and the members of WACA and reverse the May 2015 decision of CMHPSM and WCCMH to impose top-down budgeting.

476.   The individual Plaintiffs and the members of WACA are entitled to an injunction requiring Defendant CMHPSM to reverse the May 2015 decision of CMHPSM and WCCMH to impose top-down budgeting.

## COUNT X – VIOLATION OF MICHIGAN MENTAL HEALTH CODE – VIOLATION OF MCL 330.1722(1) (All Plaintiffs Against Defendants WCCMH and CMHPSM)

477.   Plaintiffs incorporate all paragraphs above.

478.   The Michigan Mental Health Code provides that no "recipient of mental health services shall . . . be subjected to abuse or neglect." MCL 330.1722(1).

479.   "Neglect means an act or failure to act" by, among others, a CMH agency, "that denies a recipient the standard of care or treatment to which he or she is entitled under this act." MCL 330.1100b(19) (internal quotation marks omitted).

480. A recipient is entitled to "mental health services suited to his or her condition." MCL 330.1708(1).

481. Defendants' failure to provide Plaintiffs with mental health services suited to their condition amounts to neglect.

482. Michigan's Mental Health Code also provides that "[t]he responsible mental health agency for each recipient" shall provide a written individual plan of service addressing, "as either desired or required by the recipient, the recipient's need for . . . health care . . . transportation, and recreation." MCL 330.1712(1).

483. As alleged above, the IPOS and its implementing budget are interdependent. One cannot exist without the other. Since May 2015, however, Defendants WCCMH and CMHPSM do not provide CLS participants with actual budgets tied to the services and supports listed in the IPOS but only with a single, top-line amount that is calculated solely from staff hours and does not include separate calculations for, among other things, transportation and recreation.

484. Defendants' failure to provide Plaintiffs and the members of WACA with an actual budget explicitly referring to transportation and recreation constitutes a failure to provide Plaintiffs with a written IPOS ad-

dressing their needs for health care, transportation, and recreation and amounts to neglect.

485. Plaintiffs and the members of WACA seek by this action injunctive relief against Defendants WCCMH and CMHPSM under MCL 330.1722(3) to prevent the continuation of this neglect.

## RELIEF REQUESTED

A. Assume jurisdiction in this case;

B. Declare unlawful the rate reduction and new budget calculation imposed by Defendants WCCMH and CMHPSM and acquiesced in by Defendant Gordon on behalf of the Department;

C. Declare unlawful Defendants' denial of participants' right to self-determination generally;

D. Preliminarily and permanently enjoin Defendants from continuing to impose the new budget calculation method and/or any other method not in conformity with the assurances given and obligations assumed under the Habilitation Supports Waiver;

E. Preliminarily and permanently enjoin Defendants from denying participants their right to procedural due process;

F. Preliminarily and permanently enjoin Defendants WCCMH and CMHPSM from refusing to reinstate the pre-May 15, 2015 level of funding and services to Plaintiffs and to all other CLS service recipients until lawful IPOS meetings are conducted and CLS service recipients are offered notice of any proposed cuts and an opportunity to be heard regarding any objections they may have to the cuts;

G. Preliminarily and permanently enjoin Defendants from continuing to deprive CLS service recipients of CLS services in the most integrated setting appropriate to their service needs;

H. Assume continuing jurisdiction as may be necessary to monitor and enforce any relief granted;

I. Award Plaintiffs costs and reasonable attorney fees as provided by law; and

J. Grant such other relief as is just and proper.

Respectfully submitted,


/s/ Nicholas A. Gable (P79069)
LEGAL SERVICES OF SOUTH
CENTRAL MICHIGAN
Attorney for Plaintiffs
15 S. Washington Street
Ypsilanti, MI 48197
 (734) 665-6181 ext. 127
ngable@lsscm.org


/s/ Lisa Ruby (P46322)
MICHIGAN POVERTY
LAW PROGRAM
Attorney for Plaintiffs
15 S. Washington Street
Ypsilanti, MI 48197
(734) 998-6100 ext. 117
lruby@mplp.org


February 11, 2019

/s/ Edward P. Krugman (New York
Bar; admitted E.D. Mich.)
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
Attorney for Plaintiffs
275 Seventh Avenue, Suite 1506
New York, NY 10001
(212) 633-6967
krugman@nclej.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2019 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.


Respectfully submitted,


<u>/s/ Nicholas A. Gable (P79069)</u>
LEGAL SERVICES OF SOUTH CENTRAL MICHIGAN
Attorney for Plaintiffs
15 S. Washington Street
Ypsilanti, MI 48197
(734) 665-6181 ext. 127
ngable@lsscm.org