UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DEREK WASKUL, ET AL., | Case No. 16-10936 |
| Plaintiffs, | SENIOR U.S. DISTRICT JUDGE<br>ARTHUR J. TARNOW |
| v. | |
| WASHTENAW COUNTY COMMUNITY<br>MENTAL HEALTH, ET AL., | U.S. MAGISTRATE JUDGE<br>ELIZABETH A. STAFFORD |
| Defendants. | |
| _____/ | |

**ORDER CONSTRUING DEFENDANTS' MOTIONS TO DISMISS [129, 130, 131] AS RENEWED MOTIONS TO DISMISS THE AMENDED COMPLAINT AND GRANTING DEFENDANTS' MOTIONS; DENYING PLAINTIFFS' MOTION TO STRIKE [142]; AND CLOSING THE CASE**

Plaintiffs, severely developmentally disabled individuals living in Washtenaw County, receive Community Living Supports ("CLS") services through Medicaid's Habilitation Supports Waiver ("HSW"). These services are individually planned and budgeted for based on the participant's medical needs. This Medicaid program affords Plaintiffs the opportunity to live independently in the community as an alternative to institutionalization.

The Amended Complaint [146] challenges the current budgeting method Defendants use to implement the CLS program as insufficient to account for all of Plaintiffs' medically necessary services.

Before the Court are Michigan Department of Health and Human Services and Robert Gordon's ("State Defendants") Motion to Dismiss [129], Washtenaw County Community Mental Health and Trish Cortes' ("County Defendants") Motion to Dismiss or for Summary Judgment [130], and Community Mental Health Partnership of Southeast Michigan and Jane Terwilliger's ("Regional Defendants") Motion for Judgment on the Pleadings [131] filed on October 1, 2018. The Court held a hearing on the motions on February 6, 2019. On February 11, 2019, Plaintiffs filed an Amended Complaint [146] which rendered moot Defendants' motions for dismissal of the original complaint. Because the arguments raised in Defendants' motions [129, 130, 131] apply with equal force to the Amended Complaint, the Court construes the motions as renewed. For the reasons explained below, the Court **GRANTS** Defendants' motions to dismiss and **CLOSES** the case.

## FACTUAL BACKGROUND

Plaintiffs Derek Waskul, Cory Schneider, Kevin Weisner, Lindsay Trabue, and Hannah Ernst suffer from various developmental disabilities. Plaintiff Washtenaw Association for Community Advocacy ("WACA") is a non-profit organization that advocates for persons with developmental disabilities.

The individually named Plaintiffs participate in CLS, a Medicaid program predicated upon the right to self-determination to structure personal plans of service according to individual medical need. Michigan's CLS program offers Plaintiffs the

opportunity to obtain in-home and community services as an alternative to institutionalization.

On March 15, 2016, Plaintiffs commenced this action challenging the budgeting method used to implement the program. The original impetus for this litigation was a reduction in the CLS rate calculation, which took effect on May 15, 2015. Initially, Plaintiffs sought reinstatement of the pre-May 2015 rate.[1] Since the commencement of this action, however, the CLS rate has been raised several times and currently exceeds the pre-May 2015 rate. Despite the fact that all named Plaintiffs are receiving CLS rates higher than those assigned before May 2015, Plaintiffs challenge the existing budget procedure as inadequate.

---

[1] The Sixth Circuit has briefly summarized the CLS budget adjustments which precipitated this litigation: "Prior to 2012, individuals receiving services under the Program in Washtenaw County received a service budget based on a single, all-inclusive rate that was intended to cover both the personnel and the program delivery costs. In 2012, the predecessor agency to Washtenaw County Community Mental Health, Washtenaw Community Health Organization, changed the budget calculation method to allow for billing of the personnel costs and the associated costs as separate line items.

Amid budgeting struggles in 2015, WCCMH moved to revert to a single, all-inclusive budget method that allocated $13.88 to cover both personnel and the delivery costs of the Program. The reversion was to occur on May 15, 2015. The budgeting change did not reduce the total number of service hours recipients were authorized to receive. The effect of utilizing an all-inclusive rate, however, was to reduce the total budget amount for each recipient. As a practical matter, service recipients had to reduce the hourly rate they paid service providers to maintain the level of hours authorized prior to the budget change. The notice to recipients acknowledged this reality, stating that '[w]hile this is not a reduction in your current level of services, it may reduce the amount you can pay your staff.'" *Waskul, et al. v. Washtenaw Cnty. Cmty., et al.*, No. 16-2742 (6th Cir. Aug. 14, 2018).

In Michigan, a CLS participant's budget is calculated is through a Person-Centered Planning Process ("PCP Process"). Once the participant notifies a supports coordinator of his or her interest in self-determination, an Individual Plan of Service ("IPOS") is developed based on the medical needs of the participant. The IPOS includes the HSW services needed by and appropriate for the participant. It is prepared after a meeting with all relevant parties including the participant's guardians and supports coordinator.

At issue here is the budgeting method employed to implement the IPOS. That method provides:

> An individual budget includes the expected or estimated costs of a concrete approach of obtaining the mental health services and supports included in the IPOS. Both the [IPOS] and the individual budget are developed in conjunction with one another through the [PCP]. Both the participant and the PIHP [Prepaid Inpatient Health Plan] must agree to the amounts in the individual budget before it is authorized for use by the participant. This agreement is based not only on the amount, scope and duration of the services and supports in the IPOS, but also on the type of arrangements that the participant is using to obtain the services and supports . . . . determined primarily through the PCP process.
>
> Michigan uses a retrospective zero-based method for developing an individual budget. The amount of the individual budget is determined by costing out the services and supports in the IPOS, after a IPOS that meets the participant's needs and goals has been developed . . . .
>
> Once the IPOS is developed, the amount of funding needed to obtain the identified services and supports is determined collectively by the participant, the mental health agency (PIHP or designee), and others participating in the PCP process.

Amend. Compl. Ex. 2, Appendix E-2, ¶ b(ii).

The PIHP[2] sets an hourly rate for the providers and services included in the IPOS. The existing rate for all named Plaintiffs is at least $15.56/hour. That hourly rate is then multiplied by the number of hours in the IPOS to create an all-inclusive budget. With this all-inclusive budget, the participant has a significant degree of flexibility in implementing his or her IPOS. This is the very purpose of the self-determination program.

## PROCEDURAL HISTORY

Plaintiffs Derek Waskul, Cory Schneider, Kevin Wiesner, and WACA commenced this action on March 15, 2016. On March 30, 2016, Plaintiffs filed a Motion for Preliminary Injunction [8]. The Court held a two-day evidentiary hearing on the Motion [8] which began on August 1, 2016 and continued on September 20, 2016. On November 22, 2016, the Court issued an Order [55] denying Plaintiffs' Motion for Preliminary Injunction. The Court held that Plaintiffs were unlikely to succeed on the merits of their claims that WACA had associational standing and that Defendants had violated the Social Security Act and Mental Health Code. On December 15, 2016, Plaintiffs filed a Notice of Appeal [57] on the issue of whether WACA had associational standing.

---

[2] A PIHP is a Medicaid managed care organization responsible for making medical assistance available and accessible to Medicaid beneficiaries within their region. Defendant Community Mental Health Partnership of Southeast Michigan is the PIHP that covers Washtenaw County.

While awaiting the Sixth Circuit's ruling on the standing issue, Plaintiffs filed a second ("*Waskul II*") on July 20, 2017. Plaintiffs also filed a Motion for Leave to File an Amended Complaint [69] on August 9, 2017. The complaint in *Waskul II* and the Proposed Amended Complaint were virtually identical.

On August 14, 2018, albeit on narrow grounds, the Sixth Circuit affirmed this Court's ruling denying injunctive relief. The Sixth Circuit explained that because the named Plaintiffs' due process claims for injunctive relief were moot, WACA lacked associational standing to sue for injunctive relief on their behalf. *Waskul*, No. 16-2742.

On October 1, 2018, Defendants filed motions to dismiss [129, 130, 131] the complaint in *Waskul II*. The motions were fully briefed.

On February 6, 2019, the Court held a hearing on the motions. At the hearing, the Court granted Plaintiffs' Motion for Leave to file an Amended Complaint [69] and granted Defendants' motions for dismissal of the complaint in *Waskul II* as duplicative.

On February 11, 2019, Plaintiffs filed an Amended Complaint [146] alleging: Failure to Provide Constitutionally Adequate Notice in violation of the Due Process Clause (Count I); Violation of Statutory Right to Notice (Count II);[3] Failure to

---

[3] Plaintiffs have voluntarily dismissed Counts I and II.

Authorize Services in the Amount, Scope, or Duration to Reasonably Achieve their Purpose in violation of the Social Security Act (Count III); Failure to Furnish Medical Assistance with Reasonable Promptness in violation of the Social Security Act (Count IV); Violation of Title II of the Americans with Disabilities Act (Count V); Violation of Section 504 of the Rehabilitation Act (Count VI); Failure to Take Necessary Safeguards in violation of the Medicaid Act (Count VII); Failure to Provide a Meaningful Choice Between Institutionalization and Community Based Services in violation of the Medicaid Act (Count VIII); Third Party Beneficiary Claim for Violation of Assurances (Count IX); Abuse and Neglect in violation of the Michigan Mental Health Code (Count X).

## LEGAL STANDARDS

Defendants move to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, [Plaintiffs] must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a Rule 12(b)(6) motion to dismiss, the Court must "assume the veracity of [Plaintiffs'] well-pleaded factual allegations and determine whether [they are] entitled to legal relief as a matter of law." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Defendants also move for dismissal pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that the entire action is moot. Where a case is moot, the Court lacks subject-matter jurisdiction. "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008) (internal citations and quotation marks omitted).

ANALYSIS

I. **Mootness**

As an initial matter, Defendants argue that this action is moot because Plaintiffs' funding has been restored to, or has otherwise surpassed, the pre-May 2015 budget levels.

This argument mistakenly assumes that the only form of relief sought is an adjustment to the hourly rate. Plaintiffs, however, have repeatedly made clear that they are challenging the budgeting method, not simply the amount budgeted for. In the Amended Complaint, Plaintiffs ask this Court to enjoin Defendants from continuing to impose "any other [budgeting] method not in conformity with the assurances given and obligations assumed under the Habilitation Supports Waiver." Plaintiffs' claim—that the budgeting method denies them payment of medically necessary services—is ripe for review.

## II. Social Security Act (Counts III and IV)

42 U.S.C. § 1396a(a)(8) requires a state's Medicaid plan to "provide that all individuals wishing to make application for medical assistance under the plan [] have [the] opportunity to do so, and that such assistance [] be furnished with reasonable promptness to all eligible individuals." Section 1396a(a)(10)(B)(i) further requires that the Medicaid plan "not be less in amount, duration, or scope than the medical assistance made available to any other such individual[.]"

Plaintiffs argue that the payments furnished pursuant to their IPOSs are insufficient to ensure that the services provided are appropriate in amount, scope, and duration in violation of § 1396a(a)(10)(B) and are delivered with reasonable promptness in violation of § 1396a(a)(8).

In *Westside Mothers v. Olszewski*, 454 F.3d 532, 540 (6th Cir. 2006) ("*Westside Mothers II*"), the Sixth Circuit held that §§ 1396a(a)(8) and 1396a(a)(10) do not impose on states an obligation to provide direct medical services, but rather require states to "furnish medical assistance," i.e., financial assistance, to individuals with reasonable promptness. The Sixth Circuit has since explained the significance of this ruling:

> Prior to *Westside Mothers II*, it was an open question in our circuit whether a state's duty to provide "medical assistance" required it to ensure that all eligible individuals received services, and the weight of authority in other circuits favored such an interpretation. After *Westside Mothers II* and *Mandy R.*, it is clear that no such duty exists.

*Brown v. Tenn. Dep't of Fin. & Admin.*, 561 F.3d 542, 546-47 (6th Cir. 2009). Accordingly, §§ 1396a(a)(8) and (10)(B) impose on states only the duty to pay for services—not the duty to ensure that such services are provided. *Id.* at 545.

Nonetheless, *Westside Mothers II* left open the possibility for a private action under these provisions on the grounds that the payments distributed are "insufficient to enlist an adequate number of providers" and therefore "foreclos[e] the opportunity for eligible individuals to receive the covered medical services." 454 F.3d at 540. However, to state this type of claim for relief under §§ 1396a(a)(8) and (a)(10)(B), Plaintiffs must allege specific facts which establish that they have been effectively denied their right to medical assistance as a result of inadequate payments. *See id.*

The Amended Complaint is devoid of allegations which would support such a claim. Plaintiffs allege that CLS providers cannot be readily found to work at the rates available and that some providers have quit as a result of the low pay. Amend. Compl. ¶¶ 410-11. Plaintiffs further allege that they are unable "to budget for any additional needs without reducing the amount [paid to] CLS providers," ¶ 216, and to "find CLS providers to work at the current rate," ¶ 260.

But Plaintiffs' difficulty finding providers is based on their individual preferences, not based on their ability to pay. It is undisputed that Plaintiffs currently have, and have always had, the option of using providers who contract with Washtenaw County to deliver medically necessary services. As Defendants point

out, that Plaintiffs may prefer to hire their own staff does not render the services effectively unavailable. Moreover, Plaintiffs' general claim that the budget is inadequate is belied by the fact that they have failed to allege any specific, *medically necessary* services which they are being denied under the existing budgeting scheme.

The purpose of a self-determination plan is to allow the participants themselves to decide how to allocate the funding for their services and providers. Inherent in this process are budgetary decisions which may require Plaintiffs to spend less on certain services and more on others. The Court recognizes the immense financial and emotional toll imposed on participants and their families. The Court also recognizes, however, that requests for supplemental funding can, and should, be made through the PCP process. The allegations in the Amended Complaint do not support Plaintiffs' claim that they have been denied the opportunity to receive necessary medical services in violation of §§1396a(a)(8) and (a)(10)(B). *See Westside Mothers II*, 454 F.3d at 540. Accordingly, the Court will dismiss Counts III and IV.

### III. Free Choice Provisions (Counts VII and VIII)

Section 1396n(c)(2) authorizes state payment plans for the cost of home or community-based services. Under a CLS plan, "[s]tates may provide beneficiaries with assisted-living services rather than more-intrusive (and expensive) nursing-home services." *Price v. Medicaid Dir.*, 838 F.3d 739, 743 (6th Cir. 2016).

Section 1396n(c)(2) provides that a HSW waiver for community-based services shall not be granted unless the State provides assurances that:

> (A) necessary safeguards (including adequate standards for provider participation) have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services . . . .
>
> (C) such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals . . . .

Plaintiffs allege that Defendant Gordon, the Director of MDHHS, has failed to take necessary safeguards to protect their health and welfare in violation of § 1396n(c)(2)(A) and to provide a meaningful choice between institutionalization and home-and-community-based services in violation of § 1396n(c)(2)(C).

State Defendants argue that the Court should dismiss Counts VII and VIII because there is no recognized private right of action to enforce § 1396n(c)(2) or its regulations. To determine whether a statute confers a private right of action under 42 U.S.C. § 1983, the Court asks whether or not Congress intended to confer individual rights upon the class of beneficiaries. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). "Where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

Before the Supreme Court's ruling in *Gonzaga*, the Sixth Circuit had unambiguously held that §§ 1396n(c)(2)(A), (B), (C) and (E) gave rise to enforceable rights. *Wood v. Tompkins*, 33 F.3d 600, 611 (6th Cir. 1994). In light of *Gonzaga*, however, the Court can no longer rely exclusively on *Wood*. The issue of whether § 1396n(c)(2) confers private rights that can be enforced via § 1983 remains an open question in this Circuit.

Applying *Gonzaga*, and relying in part on *Wood*, the Ninth Circuit has ruled that the free choice provisions—§§ 1396n(c)(2)(C) and (d)(2)(C)—are enforceable under § 1983. *Ball v. Rodgers*, 492 F.3d 1094, 1107 (9th Cir. 2007). At least two district courts in this Circuit have reached similar conclusions. *See, e.g.*, *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 684 (S.D. Ohio 2017); *Michelle P. ex rel. Deisenroth v. Holsinger*, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005).

The Ninth Circuit's application of *Gonzaga* persuades this Court that § 1396n confers rights that may be enforced pursuant to § 1983. The problem with Plaintiffs' claim is that even if they *may* enforce §§ 1396n(c)(2)(A) and (C), they fail to state a claim for relief under these provisions.

With respect to § 1396n(c)(2)(A), Plaintiffs allege that Defendant Gordon has failed to take necessary safeguards to protect their health and welfare by allowing State and County Defendants to impose a "cap" on the amount of money CLS participants receive. Amend. Compl. ¶ 444. Plaintiffs essentially ask this Court to

find that the Director's conduct of setting a limit on the budget constitutes a violation of the Act. Such a claim is entirely without merit—it is the State's very responsibility to set the appropriate budget.

With respect to § 1396n(c)(2)(C), Plaintiffs allege that Defendant Gordon has failed to ensure that CLS participants have a meaningful choice between community-living and institutionalization. In *Rodgers*, the Ninth Circuit explained that § 1396n(c)(2)(C) confers upon individuals "[1] the right to be informed of alternatives to traditional, long-term institutional care, and [2] the right to *choose* among those alternatives." 492 F.3d at 1107. Plaintiffs maintain that deciding between in-home care and institutionalization presents them with a Hobson's Choice because if they opt for in-home care, they forgo "vital non-staff services" which leave them at risk of being effectively homebound and "unable to get out into the community." Amend. Compl. ¶ 451.

The only factual allegation which could even support this claim pertains to Plaintiff Waskul. Plaintiffs allege that Mr. Waskul "goes three weekdays (Monday through Wednesday) without his normal community routine and is confined to his home on those days. Amend. Compl. ¶ 222. Otherwise, the Amended Complaint merely refers, in general terms, to the fact that some of Plaintiffs' guardians pay out of pocket for community activities and transportation expenses. Amend. Compl. ¶¶ 253; 345.

These allegations are hardly sufficient to support Plaintiffs' claim that they are "effectively homebound" as a result of their participation in the CLS program. Involvement in community activities is factored into the IPOS budget determination. Should Plaintiffs require more money for medically necessary community activities, they may identify the vital non-staff services they are not receiving under their current IPOS and file a request for supplemental hours through the PCP process.

## IV. Integration Mandate (Counts V and VI)

The ADA's integration mandate provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The Rehabilitation Act contains a near-identical regulation. *See* 28 C.F.R. § 41.51(d). "[T]he remedies, procedures, and rights available under Title II of the ADA parallel those available under the Rehabilitation Act." *Carpenter-Barker v. Ohio Dep't of Medicaid*, No. 17-4301, 2018 WL 4189530, at *4 (6th Cir. Aug. 31, 2018), *cert. denied,* No. 18-715, 2019 WL 177614 (U.S. Jan. 14, 2019).

Counts V and VI allege "essentially one claim"—that Defendants' budgeting method puts Plaintiffs at risk of institutionalization in violation of *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) and the integration mandate.

In *Olmstead*, the Supreme Court held that unjustified isolation constitutes discrimination based on disability in violation of the ADA and Rehabilitation Act.

527 U.S. at 597. Courts have construed the decision broadly, finding that "*Olmstead* is not limited to individuals already subject to unjustified isolation, but also 'extend[s] to persons at serious risk of institutionalization or segregation.'" *Mitchell through Mitchell v. Cmty. Mental Health of Cent. Mich.*, 243 F. Supp. 3d 822, 842 (E.D. Mich. 2017) (quoting U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C., Q. 6 (last updated June 22, 2011), available at www.ada.gov/olmstead/q&a_olmstead.htm); *see also K.B. by T.B. v. Mich. Dep't of Health & Human Servs.*, No. 18-11795, 2019 WL 462512, at *11 (E.D. Mich. Feb. 6, 2019); *Kasich*, 244 F. Supp. 3d at 679.

"[A] plaintiff establishes a sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Mitchell*, 243 F. Supp. 3d at 842 (internal citations and quotation marks omitted).

Plaintiffs cannot establish that they are at serious risk of institutionalization in the traditional sense—this action was filed three years ago, but all of the individually named Plaintiffs still live at home. Nevertheless, relying on a Seventh Circuit decision, Plaintiffs argue that "isolation in the home for a person 'who can handle and benefit from' time out in the general community is also inconsistent with the

integration mandate." *Steimel v. Wernert*, 823 F.3d 902, 910, 918 (7th Cir. 2016) (holding that programs which allow "persons with disabilities to leave their homes only 12 hours each week, cooping them up the rest of the time, or render them at serious risk of institutionalization . . . violate the integration mandate unless the state can show that changing them would require a fundamental alteration of its programs for the disabled.").

The problem with this argument is two-fold. First, assuming this Court were to adopt the Seventh Circuit's interpretation of the integration mandate, the relief sought here—an overhaul of the budgeting method—would require a fundamental alternation of Defendants' programs for the disabled.

Second, Plaintiffs have not alleged how the current budgeting method has rendered them effectively institutionalized at home. The only allegation supporting this theory is that Plaintiffs Waskul and Weisner have been "confined to their home for a substantial and unjustifiable period of time, due to the inability to hire sufficient and appropriate staff to take them into the community." Amend. Compl. ¶ 432. The facts alleged here—which differ drastically from *Steimel* in which the plaintiffs left their homes for only 12 hours per week—do not support a plausible claim for deprivation of the right to receive treatment in an integrated setting. The ADA and Rehabilitation Act neither impose a "standard of care for whatever medical services [the state] render[s]" nor require the state to "provide a certain level of benefits to

individuals with disabilities." *Olmstead*, 527 U.S. at 603 fn.14. Though unfortunate for Plaintiffs, *Olmstead* does not "specifically require that states offer all the aid a patient wants." *Carpenter-Barker*, 2018 WL 4189530, at *5. Accordingly, the Court will dismiss Counts V and VI.

## V. Breach of Contract (Count IX)

Plaintiffs allege a third-party beneficiary claim for violation of assurances in the HSW and the PIHP contract. Appendix E-1(b) of the HSW Application provides, in pertinent part:

> [An IPOS] will be developed through this process with the participant, supports coordinator or other chosen qualified provider, and allies chosen by the participant. The plan will include the HSW waiver services needed by and appropriate for the participant. An individual budget is developed based on the services and supports identified in the IPOS and must be sufficient to implement the IPOS.

Plaintiffs argue that State and Regional Defendants breached their obligation pursuant to Appendix E-1 by using a budgeting system insufficient to implement their IPOSs. Plaintiffs concede, however, that this claim is inseparable from their statutory claims. [Dkt. #153-1 at 4]. Because Counts III-VIII fail to state a claim for relief, Count IX also must fail.

## VI. Michigan Mental Health Code (Count X)

M.C.L. § 330.1722 provides: "A recipient of mental health services shall not be subjected to abuse or neglect." This statute guarantees that "a recipient of mental health services shall not be subjected to non-accidental physical or emotional harm

or sexual abuse and shall not be denied 'the standard of care or treatment to which he or she is entitled under [Code].'" *Carl v. Muskegon Cnty.*, No. 319017, 2015 WL 849011, at *5 (Mich. Ct. App. Feb. 26, 2015).

Plaintiffs argue that Defendants' failure to provide them with "an actual budget explicitly referring to transportation and recreation" amounts to neglect.

As an initial matter, Defendants argue that they are entitled to governmental immunity pursuant to M.C.L. § 691.1407.[4] Defendants further argue that Plaintiffs are not entitled to a particular budgeting procedure under the Code.

"In order to defeat [D]efendants' claims for qualified immunity under Michigan law, [Plaintiffs] must offer sufficient evidence of gross negligence." *Lanman v. Hinson*, 529 F.3d 673, 690 (6th Cir. 2008). Here, Plaintiffs have not even alleged that Defendants were grossly negligent with respect to adjusting the budget. Moreover, as explained in prior sections of this opinion, Plaintiffs have failed to allege sufficient facts to support their claim that Defendants subjected them to "non-accidental physical or emotional harm" or otherwise deprived them of "the standard of care or treatment to which [they] are entitled." As such, Count X is dismissed.

---

[4] Plaintiffs filed a Motion to Strike [142] the part of County Defendants' Reply [139] in which they assert the governmental immunity defense. Plaintiffs submit that County Defendants improperly raised this defense for the first time in their Reply. As County Defendants note, however, they raised this first as an Affirmative Defense, and again in their previous Motion for Summary Judgment [19]. Accordingly, Plaintiffs' Motion to Strike [142] is denied.

## Conclusion

The importance of ensuring that the most vulnerable members of our community are properly cared for cannot be overstated. Plaintiffs here, understandably, seek additional funds to pay for providers and services. But based on the general allegations in the Amended Complaint, the Court cannot award Plaintiffs the relief they seek. Their appropriate recourse is through the PCP process.

Having dismissed all counts alleged in the Amended Complaint, the Court need not reach the remaining issues in Defendants' motions.

Accordingly,

**IT IS ORDERED** that Defendants' motions to dismiss [129, 130, 131] are **HEREBY RENEWED** and **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike [142] is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **CLOSED**.

**SO ORDERED**.

                                                s/Arthur J. Tarnow
                                                Arthur J. Tarnow
Dated: March 20, 2019                  Senior United States District Judge