# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: October 29, 2020

Ms. Laura Bailey Brown
Fisher Phillips
4900 Main Street, Suite 650
Kansas City, MO 64112

Ms. Stefani A. Carter
4007 Carpenter Road, Suite 124
Ypsilanti, MI 48197-0000

Ms. Margaret T. Debler
Ms. Marcelyn A. Stepanski
Rosati Schultz Joppich & Amtsbuechler
27555 Executive Drive, Suite 250
Farmington Hills, MI 48331-5627

Mr. Nicholas Abed Gable
Ms. Lisa S. Ruby
Michigan Immigrant Rights Center
15 S. Washington Street, Suite 201
Ypsilanti, MI 48197

Ms. Kristin M Heyse
Mr. William R. Morris
Ms. Tracy E. Van Den Bergh
Office of the Attorney General of Michigan
P.O. Box 30758
Lansing, MI 48909

Mr. Edward P. Krugman
National Center for Law and Economic Justice
275 Seventh Avenue, Suite 1506
New York, NY 10001

Re:  Case No. 19-1400, *Derek Waskul, et al v. Washtenaw County Community, et al*
Originating Case No. : 2:16-cv-10936

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0346p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DEREK WASKUL, by his guardian, Cynthia Waskul;
CORY SCHNEIDER, by his guardians, Martha and
Wendy Schneider; KEVIN WIESNER, by his guardian,
Kerry Kafafian; WASHTENAW ASSOCIATION FOR
COMMUNITY ADVOCACY; LINDSAY TRABUE, by her
guardian, Kristin Kill; HANNAH ERNST, by her
guardians, Susan and Robert Ernst,

                    *Plaintiffs-Appellants*,

     *v.*

WASHTENAW COUNTY COMMUNITY MENTAL HEALTH;
TRISH CORTES, in her official capacity as Director of
Washtenaw County Community Mental Health;
COMMUNITY MENTAL HEALTH PARTNERSHIP OF
SOUTHEAST MICHIGAN; JANE TERWILLIGER, in her
official capacity as director of Community Mental
Health Partnership of Southeast Michigan; MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES;
ROBERT GORDON, in his official capacity as Director
of Michigan Department of Health and Human
Services,

                    *Defendants-Appellees*.

No. 19-1400

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-10936—Arthur J. Tarnow, District Judge.

Argued: June 11, 2020

Decided and Filed: October 29, 2020

Before: CLAY, WHITE, and READLER, Circuit Judges.

---

### COUNSEL

**ARGUED:**  Edward P. Krugman, NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE, New York, New York, for Appellants.  Stefani A. Carter, STEFANI A. CARTER, PLLC, Ypsilanti, Michigan, for Appellees Washtenaw County Community Mental Health and Trish Cortes.  Marcelyn A. Stepanski, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees Community Mental Health Partnership of Southeast Michigan and Jane Terwilliger.  Tracy E. Van den Bergh, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan for Appellees Michigan Department of Health and Human Services and Robert Gordon.  **ON BRIEF:**  Edward P. Krugman, NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE, New York, New York, Nicholas A. Gable, LEGAL SERVICES OF SOUTH CENTRAL MICHIGAN, Ypsilanti, Michigan, Lisa Ruby, MICHIGAN POVERTY LAW PROGRAM, Ypsilanti, Michigan, for Appellants.  Stefani A. Carter, STEFANI A. CARTER, PLLC, Ypsilanti, Michigan, for Appellees Washtenaw County Community Mental Health and Trish Cortes.  Marcelyn A. Stepanski, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees Community Mental Health Partnership of Southeast Michigan and Jane Terwilliger.  Kristin M. Heyse, William Morris, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan for Appellees Michigan Department of Health and Human Services and Robert Gordon.

CLAY, J., delivered the opinion of the court in which WHITE, J., joined.  READLER, J. (pp. 46–54), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

CLAY, Circuit Judge.  In 2015, a predecessor to Defendant Washtenaw County Community Mental Health modified the methodology through which it allocated funding to individuals with disabilities receiving community living support services pursuant to a Medicaid waiver received by the State of Michigan.  Plaintiffs, five individuals receiving those services, together with the Washtenaw Association for Community Advocacy, challenge that methodology in this case against Defendants the Michigan Department of Health and Human Services, Community Mental Health Partnership of Southeast Michigan, Washtenaw County Community Mental Health, and the directors of these organizations.  In particular, Plaintiffs assert that by implementing or allowing implementation of this new methodology, Defendants violated provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(8), (a)(10)(A), (a)(10)(B),

1396n(c)(2)(A) and (C); Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; § 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Michigan Mental Health Code, Mich. Comp. Laws § 330.1722; and the terms of Michigan's Medicaid Habilitation Supports Waiver and the contracts implementing it. The district court dismissed Plaintiffs' claims in full.

For the reasons set forth in this opinion, we **REVERSE** the district court's decision and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

### Factual Background

The State of Michigan offers funding and support to qualifying individuals with disabilities to aid them in living independently in their own home communities, rather than in institutionalized care facilities, pursuant to a Medicaid waiver (the "Habilitation Supports Waiver" or the "Waiver") obtained from the federal government. This Community Living Support ("CLS") program furthers those individuals' self-determination by allowing them to structure their own support services based on their medical needs.

Plaintiffs in this case are five individuals who participate in Michigan's CLS program and the Washtenaw Association for Community Advocacy ("WACA"), a non-profit organization of which the individual Plaintiffs are members that advocates for support services for individuals with developmental disabilities. Plaintiff Derek Waskul has severe cognitive impairment and autism and requires 24/7 supervision. Plaintiff Cory Schneider has autism, a developmental disability, and an undiagnosed behavior disorder that also require 24/7 care. Plaintiff Kevin Wiesner has severe developmental disabilities and suffers from seizures. Plaintiff Lindsay Trabue has Down syndrome and is non-verbal. She has only very basic functional skills and also requires 24/7 care. Finally, Plaintiff Hannah Ernst has been diagnosed with Angelman syndrome, a seizure disorder, and cognitive impairment.

At bottom, Plaintiffs allege that a change in the method through which their CLS budgets are calculated has prevented them from receiving required services and support, in violation of federal and state law and Defendants' contracts with one another. Plaintiffs' claims hinge on

Medicaid requirements and funding mechanisms, and so we must begin by surveying Michigan's Medicaid framework.

### A.  Michigan's Medicaid Framework

The joint federal-state Medicaid program provides medical assistance to qualifying individuals who are unable to pay or do not have private insurance, pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Act").  In order to receive federal Medicaid funds, states must develop a plan to administer their program in compliance with federal statutory and regulatory requirements.  42 U.S.C. § 1396a(a); 42 C.F.R. § 430.10.  Once their plan is approved by the Centers for Medicare and Medicaid Services ("CMS"), states receive federal funds to supplement state spending on Medicaid-covered services.  *See* 42 U.S.C. § 1396b(a).

Michigan's Medicaid program is administered by Defendant Michigan Department of Health and Human Services ("the Department"), which is led by Defendant Robert Gordon, its director (collectively, "State Defendants").  42 U.S.C. § 1396a(a)(5) (requiring that each state "provide for the establishment or designation of a single State agency to administer or to supervise the administration of" their plan); 42 C.F.R. § 431.10(b)(1).  The Department then contracts with regional prepaid inpatient health plans ("PIHPs"), which are public managed care organizations that receive funding and arrange and pay for Medicaid services.  42 U.S.C. § 1396u-2(a)(1)(B); Mich. Comp. Laws § 400.109f.  Defendant Community Mental Health Partnership of Southeast Michigan ("CMHPSM") is the PIHP responsible for Washtenaw County, and is led by Defendant Jane Terwilliger, its executive officer (collectively, "PIHP Defendants").[1]  The Department has supervisory and policymaking authority over the PIHPs and must ensure that PIHPs retain oversight and accountability over any subcontractors.  PIHPs subcontract with community organizations that provide or arrange for mental health services for recipients, including Defendant Washtenaw County Community Mental Health ("WCCMH").  WCCMH is the public community mental health authority for Washtenaw County and is led by Defendant Trish Cortes, its director (collectively, "County Defendants").  The relationships

---

[1]According to Plaintiffs, Defendant Terwilliger left her position at CMHPSM in April 2019.  The parties do not further acknowledge this fact in their briefing; their posture has not apparently changed as a result.

between the Department, CMHPSM, and WCCMH are governed by federal and state law, in addition to specific contracts. *See, e.g.*, 42 U.S.C. § 1396u-2(a)(1)(B); Mich. Comp. Laws §§ 330.1100a(18), 400.109f.

## B. The Community Living Support Program Framework

Under this framework, Defendants work together to ensure CLS services are provided to qualifying recipients, including the individual Plaintiffs, pursuant to the terms of Michigan's Habilitation Supports Waiver. That waiver is financed through so-called "capitation procedures." This means that the federal government provides the relevant entity—here the PIHP, Defendant CMHPSM—with a fixed amount of funding for each person participating in the CLS program, regardless of how many services the entity ultimately provides to the recipient. The PIHP then determines how to allocate these funds to recipients. (Am. Compl., R. 146 at PageID #3718; Application for Habilitation Supports Waiver, MI.0167.R04.00, at 5–6 (Oct. 1, 2010) (hereinafter, "Waiver"), *available at* https://www.michigan.gov/documents/mdch/Habilation_Supports_Waiver_340749_7.pdf.) PIHPs can make or lose money depending on how the amount they receive in capitation funds compares to the amount of funding they provide recipients, but they must ensure that the services they provide comply with the terms of their contract with the State, which itself must ensure that it complies with the terms of the Medicaid Act, federal regulations, and the Waiver.

Once an individual has elected to receive CLS services, they go through what is known as a person-centered planning ("PCP") process, during which an individual plan of service ("IPOS") and corresponding budget for CLS services is developed. Mich. Dep't of Health & Human Servs., Medicaid Provider Manual at 328 (hereinafter "Mich. Medicaid Provider Manual"), *available at* http://www.mdch.state.mi.us/dch-medicaid/manuals/MedicaidProviderManual.pdf), *see* 42 C.F.R. § 441.301(b)(1)(i). The IPOS describes the services that have been deemed "medically necessary" for each recipient based on criteria defined in Michigan's Medicaid Provider Manual. (Am. Compl., R. 146 at PageID #3713; Mich. Medicaid Provider Manual at 337 ("The determination of a medically necessary support, service or treatment must be . . . [d]ocumented in the individual plan of service.").) Michigan's Waiver application, later approved by CMS, explained:

> An individual budget includes the expected or estimated costs of . . . obtaining the mental health services and supports included in the IPOS. . . . Once the IPOS is developed, the amount of funding needed to obtain the identified services and supports is determined collectively by the participant, the mental health agency (PIHP or designee), and others participating in the PCP process. This process involves costing out the services and supports using the rates for providers chosen by the participant and the number of hours authorized in the IPOS. . . . The individual budget is authorized in the amount of that total cost of all services and supports in the IPOS.

(Waiver at 134.) The individual then enters a "self-determination arrangement" with their local community mental health service program. (*Id.* at 135.) Under that arrangement, the individual determines how to use the funds in their budget to execute their IPOS. This includes hiring, scheduling, and paying staff, as well as selecting, arranging, and paying for services, supports, and treatments listed in the IPOS. A fiscal intermediary actually holds the funds and pays bills directed to them.

## C. WCCMH's Budget Methodology

This brings us to the change in budget methodology that prompted this case. Budgets for CLS services are calculated by multiplying how many hours of services a participant's IPOS calls for by a specific rate. Starting in at least April 2012, the CLS budget for recipients in Washtenaw County was developed by providing a rate for staff or providers and then allowing billing of other services and supports (*e.g.*, workers' compensation, staff training, and transportation) as separate line items. In 2015, the predecessor to WCCMH, Washtenaw Community Health Organization ("WCHO"), shifted to a budget methodology under which it provided a single, all-inclusive rate to cover both staff and services.[2] WCCMH now operates under this methodology.

---

[2]Defendant WCCMH explains that WCHO also used this methodology prior to 2012, and argues that the methodology implemented between 2012 and 2015 duplicated costs by providing for them in calculating the staff rate and then also paying for them separately as additional line items. Defendants previously argued that this billing methodology violated Medicaid regulations and their inter-entity contracts, and the district court denied a preliminary injunction in part because Plaintiffs were not "entitled to the reinstatement of a calculation method that violates Medicaid regulations and existing contracts between WCCMH and the State and PIHP." (Order Denying Pls. Mot. for Prelim. Inj., R. 55 at PageID #1168.) A court's determination of substantive issues at the preliminary injunction stage is "not dispositive of those substantive issues on the merits," *Wilcox v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989), and the district court did not rely on this issue or suggest that the prior methodology

As this Court explained in a previous opinion in this case,

> The budgeting change did not reduce the total number of service hours recipients were authorized to receive. The effect of utilizing an all-inclusive rate, however, was to reduce the total budget amount for each recipient. As a practical matter, service recipients had to reduce the hourly rate they paid service providers to maintain the level of hours authorized prior to the budget change. The notice to recipients acknowledged this reality, stating that "[w]hile this is not a reduction in your current level of services, it may reduce the amount you can pay your staff."

*Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254 (6th Cir. 2018). CLS recipients like the individual Plaintiffs now had to begin budgeting from the fixed all-inclusive rate (then $13.88 per hour) and subtract out the costs of non-staff services and supports in order to determine the amount they could pay staff. Plaintiffs Waskul, Schneider, and Wiesner challenged the resulting reductions in their budgets in Medicaid Fair Hearings through the Michigan Administrative Hearing System. An administrative law judge ruled in their favor, and their budgets were increased, but the budget methodology was not changed.

Plaintiffs allege that, due to this change in the budget methodology, the funding they receive no longer suffices to cover the services required by their IPOSs. In particular, they say that they cannot find sufficient CLS providers willing to work at the low rates they must pay under the new budgeting method and that, in order to pay providers more, they are now compelled to pay for supports and services themselves and hire family members at below-market rates. As a result of the reduction in support, they allege that they have not been able to receive all of the services identified in their IPOSs and their conditions have deteriorated.

**Procedural Background**

In 2016, Plaintiffs Waskul, Wiesner, Schneider and WACA filed the original complaint in this case ("*Waskul I*"), asserting five claims, including violations of constitutional and statutory due process, the Medicaid Act, and the Michigan Mental Health Code. Plaintiffs then

---

violated any contract or law in deciding Defendants' motions to dismiss. Defendants do not argue that the current methodology is the only permissible methodology, and whether the prior methodology is permissible goes to what relief Plaintiffs can be provided. Since Plaintiffs request a variety of forms of relief and the district court has broad discretion to fashion appropriate injunctive relief if or when it becomes necessary, *see, e.g.*, *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001), at this juncture, we need not consider whether the prior methodology complied with Medicaid law and regulations and with the Defendants' agreements.

moved for a preliminary injunction, which the district court denied, finding that WACA lacked standing, that the individual Plaintiffs could not show the required irreparable harm on their due process claims because they had received hearings following the change in budget methodology, and that they could not show a likelihood of success on their remaining claims because the prior budgeting method to which Plaintiffs sought to return violated Medicaid requirements. Plaintiffs only appealed the district court's decision as to WACA's standing, and on appeal sought only preliminary injunctive relief of "fresh notices and hearing rights" for the unnamed members of the organization. (*Waskul v. Washtenaw Cnty. Cmty. Mental Health*, No. 16-2742, Pls.' Br., Doc. No. 18 at 48.)

While that appeal was pending, Plaintiffs filed a new case in the district court (*Waskul II*, E.D. Mich. No. 17-cv-12355), adding Plaintiffs Trabue and Ernst and asserting five new claims. The new complaint also responded to the preliminary injunction ruling by attempting to show that the prior budgeting method did not violate Medicaid requirements. Plaintiffs moved to consolidate the two cases and for leave to file an amended complaint conforming the original complaint in *Waskul I* to that in *Waskul II*. The district court granted the motion to consolidate, but held the motion for leave to amend in abeyance pending the resolution of Plaintiffs' appeal to this Court. Defendants moved to dismiss the *Waskul II* complaint or for judgment on the pleadings. The district court stayed proceedings in full until resolution of the appeal. Following that stay, Plaintiff Schneider filed a motion for leave to file a second motion for a preliminary injunction.

On August 14, 2018, this Court issued its decision regarding Plaintiffs' appeal. *Waskul*, 900 F.3d at 250. It found that WACA lacked standing to seek the relief it requested on appeal—namely, "(1) 'fresh notices,' and (2) 'hearing rights with respect to the reduction in their CLS budgets'"—because its three named members had already received that relief prior to the complaint being filed and because Plaintiffs could not identify any other members that would benefit from that relief. *Id.* at 256–58. *But see id.* at 258–60 (Stranch, J., concurring in the judgment) (concluding that WACA had sufficiently shown standing, but concurring because "[o]n the record before us, we cannot conclude that either of the budget calculation methods at

issue is required or prohibited by the statute or regulation and, therefore, the district court did not abuse its discretion in determining there was 'not a high likelihood of success'").

After this Court's decision, the district court lifted the stay and requested supplemental briefing on the pending motions in *Waskul II*.  The parties agreed to withdraw pending motions and refile them with modified arguments as desired.  Plaintiffs responded to those motions, and Defendants replied.  Plaintiff Schneider then renewed his motion for a preliminary injunction. At the motion hearing, the district court granted Plaintiffs' longstanding request for leave to file the amended complaint and agreed to treat the pending motions as directed at the amended complaint.

On March 20, 2019, the district court issued an order construing Defendants' motions as motions to dismiss and dismissing Plaintiffs' claims in their entirety.  This timely appeal followed.

## DISCUSSION

### Standard of Review

We review the grant of a motion to dismiss *de novo*.  *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," thus raising "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  In our review, we construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in her favor.  *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 897 (6th Cir. 2019).

On appeal, the parties dispute what evidence the district court considered and what evidence we may consider.  Plaintiffs contend that, given the district court's extended delay in granting their motion to amend their complaint, we should consider other materials before the

district court that they relied on in opposing Defendants' dispositive motions, including the evidentiary records associated with Defendants' initial motions to dismiss and for summary judgment, Plaintiff Schneider's motion for a preliminary injunction, and supplemental briefing and arguments submitted to the district court following various status conferences and hearings. Defendants seek to rely on similar evidence, including testimony from the preliminary injunction hearing.

We decline to consider this evidence. As a general rule, a court considering a motion to dismiss "must focus only on the allegations in the pleadings." *Bates v. Green Farm Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). This does not include plaintiffs' responses to a motion to dismiss. *Id.* "If plaintiffs believe they need to supplement their complaint with additional facts to withstand [a motion to dismiss] . . . they have a readily available tool: a motion to amend the complaint under Rule 15." *Id.* They cannot "amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint." *Id.* Plaintiffs offer no explanation for why they did not seek a second amendment of their complaint, especially given the court's willingness to permit Defendants to update their motions to dismiss following this Court's disposition of Plaintiffs' appeal. Thus, we will consider the viability of Plaintiffs' claims without reference to evidence not included in Plaintiffs' complaint.

## Standing

Before turning to the merits of Plaintiffs' claims, we must address several threshold matters. First, PIHP Defendants assert on appeal that Plaintiff WACA "lack[s] standing to bring claims on behalf of unnamed individuals." (PIHP Defs.' Br. at 39–42.) As discussed, we previously found that Plaintiff WACA lacked standing to assert its due process claims because all named members of the association had received the relief then sought—fresh notices and hearing rights—prior to filing their complaint and Plaintiffs did not show that any unnamed member of the association had not received this relief. *Waskul*, 900 F.3d at 256–58. Plaintiffs have voluntarily dismissed their due process claims, and their remaining claims do not suffer from this deficiency.

"An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000). "Regarding the first element, it generally suffices for an association to demonstrate that 'at least one of [its] members would have standing to sue on his own.'" *Waskul*, 900 F.3d at 255 (alteration in original) (quoting *United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554–55 (1996)). Thus, if any of the individual Plaintiffs have standing, WACA may appropriately assert standing based upon their standing, because each is a member of WACA. A plaintiff has standing only if: (1) she has suffered an "injury in fact," *i.e.*, actual or imminent, concrete and particularized harm to a legally protected interest; (2) there is "a causal connection between the injury and the conduct complained of"; and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A plaintiff must demonstrate standing separately for each claim and each form of relief sought. *Waskul*, 900 F.3d at 255.

Regarding the first prong of the associational standing test, PIHP Defendants contend that the individual Plaintiffs lack standing because their "complaints were redressed through the state administrative process or are otherwise moot." (PIHP Defs.' Br. at 40–41.) They point out that Plaintiffs Waskul, Wiesner, and Schneider "are currently receiving the same or higher rates than they received prior to May 2015" and that the CLS rate has been raised multiple times since May 2015. (*Id.* at 12.) But even if this is true, as the district court concluded, "[t]his argument mistakenly assumes that the only form of relief sought is an adjustment to the hourly rate," when in fact Plaintiffs "have repeatedly made clear that they are challenging the budgeting method, not simply the amount budgeted for." (Dist. Ct. Op., R. 164 at PageID #4368.) The allegation underlying each of Plaintiffs' claims on appeal is that they are actually being harmed by Defendants' failure to use or ensure a budget method that allows their IPOSs to be fully implemented. This alleged harm is current and ongoing. And unlike Plaintiffs' previous due process claims, none of the relief Plaintiffs seek to remedy this harm has already been afforded

to any of the individual named Plaintiffs.[3]  Defendants do not contest any of the remaining standing elements as to any individual Plaintiff, and there are no apparent deficiencies in the individual Plaintiffs' standing as to each claim and form of relief sought.  Thus, Plaintiffs have shown that WACA's "members would otherwise have standing to sue in their own right." *Laidlaw*, 528 U.S. at 181.

Turning to the second prong of the associational standing test, Defendants do not contest that WACA's "interests at stake are germane to the organization's purpose."  *Id.*  And indeed, ensuring CLS recipients' IPOS budgets are correctly calculated and otherwise sufficient is clearly germane to WACA's "mission and purpose [of] advocating for persons with developmental disabilities and their families in order to help them obtain and maintain services." (Am. Compl., R. 146 at PageID #3774.)

PIHP Defendants do contest the remaining element of associational standing—that is, whether the claims asserted or relief requested require WACA's members' participation in this suit.  *See Laidlaw*, 528 U.S. at 181.  They contend that the relief Plaintiffs seek may not benefit other individual members of WACA.  While PIHP Defendants correctly point out that individuals' IPOS budgets are different and tailored based on their specific medical situation, the parties agree that the same methodology is applied to determine each CLS recipient's budget. The participation of individual members is not necessary to determining whether a methodology commonly applied to all members is valid.  Moreover, Plaintiffs allege that application of this methodology resulted in an "instant[] and drastic[]" reduction to CLS recipients' IPOS budgets, (Am. Compl., R. 146 at PageID #3731), suggesting that the declaratory and prospective injunctive relief sought by Plaintiffs will benefit all members.  *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("If in a proper case the association seeks a declaration, injunction, or some

---

[3]Specifically, Plaintiffs ask the court to declare unlawful the current budget methodology and corresponding rate reduction, as well as any denial of participants' rights to self-determination. They further request that the court enjoin Defendants from continuing to use the current budget methodology and depriving CLS recipients of services provided in the most integrated setting.  They request costs and attorneys' fees and "such other relief as is just and proper." (Am. Compl., R. 146 at PageID #3807.)  In their amended complaint, Plaintiffs also asked the court, as a remedy for alleged due process violations, to enjoin Defendants "from denying participants their right to procedural due process" and from refusing to reinstate pre-May 2015 funding until recipients are afforded IPOS meetings and provided notice and an opportunity to be heard regarding any proposed cuts.  (*Id.* at #3806.)  However, Plaintiffs no longer seek this relief after voluntarily dismissing their due process claims.

other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). Thus, Plaintiffs have made the showing necessary to demonstrate that WACA has associational standing.

### Eleventh Amendment Immunity

We must next address a second threshold matter. In their briefing, State and PIHP Defendants contend that they are entitled to Eleventh Amendment immunity against Plaintiffs' claims. Some of these arguments are specific to certain of Plaintiffs' claims and so we will address them in our analysis of those claims. But two of their arguments address Plaintiffs' claims more generally.

First, State Defendants argue that "[t]o the extent that [Plaintiffs] seek either some form of monetary compensation or retrospective injunctive relief," they are immune under the Eleventh Amendment. (State Defs.' Br. at 4.) But Plaintiffs request purely prospective declaratory and injunctive relief, and Plaintiffs' only claim against the Department directly is brought under § 504 of the Rehabilitation Act. Michigan waived its Eleventh Amendment immunity against § 504 claims by accepting federal Medicaid funding after enactment of 42 U.S.C. § 2000d-7. *See, e.g.*, *Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002); *see also* 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . .").

Because Plaintiffs seek prospective injunctive relief, Plaintiffs' claims against Defendant Gordon in his official capacity are permitted under *Ex parte Young*, 209 U.S. 123 (1908).[4] *Westside Mothers v. Haveman* ("*Westside Mothers I*"), 289 F.3d 852, 860–62 (6th Cir. 2002). This is true "notwithstanding" the fact that this relief will have "a direct and substantial impact on the state treasury." *Milliken v. Bradley*, 433 U.S. 267, 289 (1977). Still, "[a] court may enter a prospective injunction that costs the state money, but only if the monetary impact is ancillary, *i.e.*, not the primary purpose of the suit." *Barton v. Summers*, 293 F.3d 944, 950 (6th Cir. 2002).

---

[4]Plaintiffs' request for attorneys' fees is also permitted under *Ex parte Young*. *Hutto v. Finney*, 437 U.S. 678, 691–92 (1978).

In the present case, the primary purpose of the suit is to ensure that Plaintiffs receive the services required under their IPOSs. Moreover, since PIHPs control the allocation of funding to Plaintiffs, it is unclear whether any relief awarded will have *any* monetary impact on the State of Michigan.

PIHP Defendants, too, claim that they are entitled to Eleventh Amendment immunity. This argument also fails. "[T]he Eleventh Amendment does not extend its immunity to units of local government" or other political subdivisions, like CMHPSM. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 369 (2001). CMHPSM is thus entitled to Eleventh Amendment immunity only if it operates as an arm of the State. *Lowe v. Hamilton Cnty. Dep't of Job & Family Servs.*, 610 F.3d 321, 325 (6th Cir. 2010). CMHPSM bears the burden of showing that it operates in this capacity. *Id.* at 324. In assessing whether a public entity is an "arm of the State" entitled to Eleventh Amendment immunity or a "political subdivision" not entitled to that immunity, we consider four factors:

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (citations omitted). Of these, "[t]he state's potential legal liability for a judgment against the defendant 'is the foremost factor' to consider in our sovereign immunity analysis." *Lowe*, 610 F.3d at 325.

PIHP Defendants contend that CMHPSM "functions fiscally as an arm of the state (and, by virtue of the necessity of state approval of various operational aspects of each entity, administratively, as well)." (PIHP Defs.' Br. at 37.) Considering the first factor, it is true that Michigan financially supports CMHPSM pursuant to state law. *See* Mich. Comp. Laws § 330.1202(1). However, according to the current Department-CMHPSM contract, that financial support is provided through payment of a "fixed per person monthly rate . . . for each Medicaid eligible person," regardless of what payments CMHPSM makes to recipients. (Medicaid Managed Specialty Supports and Services Concurrent 1915(b)/(c) Waiver Program FY 19 at 9, 16,          https://www.nmre.org/wp-content/uploads/2018/09/FY19-NMRE-PIHP-Contract-and-

Attachments.pdf.)  The record does not suggest that Michigan would have any obligation or liability for judgments against CMHPSM.  To the contrary, the contract between the two entities establishes that liability as a result of claims or judgments "arising out of activities to be carried out pursuant to the obligation of the PIHP under this contract shall be the responsibility of the PIHP, and not the responsibility of the [Department], if . . . caused by, or aris[ing] out of, the actions or failure to act on the part of the PIHP."  (*Id.* at 14.)  Thus, this factor weighs against finding that CMHPSM is an arm of the State.

Turning to the other factors, Michigan law recognizes that PIHPs are regional entities governed by bylaws adopted by county officials.  Mich. Comp. Laws § 330.1204b; (*see also* CMHPSM Bylaws, R. 135-3 at PageID #3542.)  PIHPs do not serve the State, but only a region within it.  *See Lowe*, 610 F.3d at 332 ("[T]he fact that [an entity's] programs are designed to serve a specific local community weighs against characterizing it as an arm of the state, rather than a political subdivision.").  While the Department has some supervisory responsibilities over PIHPs, *see* Mich. Comp. Laws § 330.1232, they are controlled by county-level entities, including community mental health authorities like WCCMH.  (CMHPSM Bylaws, R. 135-3 at PageID #3542).  Likewise, PIHPs' board members are appointed by county-level entities.  (*Id.* at ##3545–46.)  Finally, while PIHPs do exercise some functions falling within the purview of state government, the simple fact than an entity "exercise[s] a slice of state power" does not by itself entitle that entity to Eleventh Amendment immunity.  *See Lowe*, 610 F.3d at 330 (quoting *N. Ins. Co. of N.Y. v. Chatham County*, 547 U.S. 189, 193–94 (2006)).  Altogether, the remaining factors also do not suggest that CMHPSM is an arm of the state.  Thus, CMHPSM cannot avoid liability by asserting Eleventh Amendment immunity.

PIHP Defendants also assert that Defendant Terwilliger is entitled to Eleventh Amendment immunity because Plaintiffs sue her in her official capacity.  However, "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."  *Kentucky v. Graham*, 473 U.S. 159, 167 (1985).  Because CMHPSM itself is not entitled to immunity, Terwilliger is also not entitled to immunity.

## Exhaustion

Having now ascertained that Plaintiffs have standing to bring this case and that Defendants are not entitled to Eleventh Amendment immunity, we must contend with one final threshold matter. PIHP Defendants assert that Plaintiffs were required to exhaust their administrative remedies provided by the State under the Medicaid Act, 42 U.S.C. § 1396a(a)(3), before they could bring their Medicaid claims in this suit. Three of the five Plaintiffs on appeal did so and received favorable remedies, and two did not. According to PIHP Defendants, both groups have somehow failed to exhaust their remedies and therefore cannot bring this suit. Defendants are incorrect. Exhaustion of state administrative remedies is not a prerequisite to suit under § 1983, *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 516 (1982), and "§ 1983 contains no exhaustion requirement beyond what Congress has provided," *Heck v. Humphrey*, 512 U.S. 477, 483 (1994). Our sister circuits have commonly concluded that the Medicaid Act does not require Plaintiffs to exhaust their state administrative remedies.[5] *See, e.g.*, *Romano v. Greenstein*, 721 F.3d 373, 376 (5th Cir. 2013); *Roach v. Morse*, 440 F.3d 53, 56–58 (2d Cir. 2006) (Sotomayor, J.); *Houghton ex rel. Houghton v. Reinertson*, 382 F.3d 1162, 1167 n.3 (10th Cir. 2004); *Alacare, Inc.-North v. Baggiano*, 785 F.2d 963, 967–69 (11th Cir. 1986). We agree.

We now turn to the content of Plaintiffs' claims.

---

[5] We note that we have previously held that a group of nursing homes suing the Secretary of the Department of Health and Human Services was required to exhaust their available remedy of review by the Secretary before bringing suit against her to challenge Medicare and Medicaid regulations. *Mich. Ass'n of Homes & Servs. for the Aging, Inc. v. Shalala*, 127 F.3d 496, 497 (6th Cir. 1997). However, we concluded so only because a provision of the Medicaid Act discussing remedies available to care facilities specifically incorporated provisions of the Social Security Act that required judicial review of the decision only after a hearing by the Secretary. *Id.* at 499 (noting 42 U.S.C. § 1396i(b)(2) incorporates 42 U.S.C. § 405(g)). There is no such provision limiting remedies to Medicaid beneficiaries like the individual Plaintiffs. As explained by the Fifth Circuit, the provisions at issue in *Michigan Association of Homes and Services for the Aging, Inc.* "involve review of decisions of the Secretary of Health and Human Services—a federal agency—regarding provider eligibility" and are inapplicable "where a Medicaid claimant seeks review of a state agency decision." *Romano v. Greenstein*, 721 F.3d 373, 376 n.11 (5th Cir. 2013).

## I.    The Medicaid Act's Reasonable-Promptness and Availability- and Comparability-of-Services Provisions, 42 U.S.C. §§ 1396a(a)(8), (10)(A), and (10)(B)

Plaintiffs argue that the individual Defendants have violated 42 U.S.C. §§ 1396a(a)(8) and (10)(A) because the budget method they are implementing or allowing to be implemented "makes it impossible for participants to obtain adequate medically necessary services with reasonable promptness." (Am. Compl., R. 146 at PageID #3785.) They argue that these Defendants have violated § 1396a(a)(10)(B) by denying them services "sufficient in scope to achieve the services' purpose." (*Id.* at #3783.) Defendants respond that these provisions do not allow for a private right of action under 42 U.S.C. § 1983, and even if they do, Plaintiffs' complaint does not adequately allege that they have been denied the opportunity to receive necessary medical services under these provisions. The district court found that these provisions allow for a private right of action, but concluded that Plaintiffs had not alleged facts sufficient to state such a claim because they had not identified medically necessary services they were being denied and because they had the option to use county-contracted providers or make additional requests through the PCP process in order to obtain these services.

The district court correctly concluded that §§ 1396a(a)(8) and (10) afford a private right of action. However, the district court erred in dismissing Plaintiffs' claims thereunder. We begin with Plaintiffs' right of action.

### A.  Private Right of Action Under § 1983

Section 1396a(a)(10)(A) requires that state Medicaid plans provide for making certain described categories of medical assistance available to qualified individuals. *See also* 42 U.S.C. § 1396n(c)(1) (providing that under a Habilitation Supports Waiver, this assistance includes "payment for part or all of the cost of home or community-based services" for qualified individuals). Section 1396a(a)(10)(B), meanwhile, requires that "the medical assistance made available to any individual described . . . shall not be less in amount, duration, or scope than the medical assistance made available" to others under Medicaid. Finally, § 1396a(a)(8) requires state plans to provide individuals with the opportunity to apply for this assistance "and that such assistance shall be furnished with reasonable promptness to all eligible individuals."

In *Westside Mothers v. Olszewski* ("*Westside Mothers II*"), 454 F.3d 532, 540–41 (6th Cir. 2006), this Court found that the plaintiffs had forfeited their claims that payments provided to them by the defendants "were insufficient to enlist an adequate number of providers, which effectively frustrates §§ 1396a(a)(8), 1396a(a)(10) by foreclosing the opportunity for eligible individuals to receive the covered medical services." But in dismissing those claims based on forfeiture, this Court specifically "modif[ied] the district court's order to reflect a dismissal without prejudice . . . because plaintiffs may be able to amend the complaint to allege that inadequate payments effectively deny the right to 'medical assistance.'" *Id.* at 541. This suggests that the *Westside Mothers II* panel implicitly concluded that Plaintiffs had a private right of action under these provisions.[6] We agree.

Despite this, Defendants argue that §§ 1396a(a)(8) and (10) do not establish individual rights enforceable under § 1983 because, in *Westside Mothers II*, this Court found that a different provision, § 1396a(a)(30)(A),[7] did not establish such rights. 454 F.3d at 542–43. The Supreme Court has since agreed. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328–29 (2015) ("In our view the Medicaid Act implicitly precludes private enforcement of § 30(A) . . . ."). Defendants point out that § 1396a(a)(30)(A) "explicitly addresse[s] provider reimbursement rates with regard to individuals' access to healthcare services" and reason that "if an individual cannot

---

[6]Notably, the same panel, considering a prior appeal in that case, applied the Supreme Court's analysis in *Blessing v. Freestone*, 520 U.S. 329 (1997), to determine whether provisions of § 1396a had created individual rights enforceable under § 1983. *See Westside Mothers I*, 289 F.3d at 862–63. It concluded they did. *Id.* That analysis refers to §§ 1396a(a)(8) and (a)(10)(A), suggesting it addressed those provisions. *See id.* at 863. However, upon hearing the appeal in *Westside Mothers II*, the same panel concluded that the district court was not wrong to address the issue again on remand because "the opinion in *Westside Mothers I* creates considerable ambiguity as to whether the prior panel applied the *Blessing* test to each of the statutory provisions identified in the plaintiffs' amended complaint," and so "the law of the case doctrine does not apply and . . . our earlier decision in this case did not foreclose the district court's consideration of whether plaintiffs have a right of action under § 1983 to enforce violations of §§ 1396a(a)(8) [and] 1396a(a)(10)." *Westside Mothers II*, 454 F.3d at 539. Thus, *Westside Mothers I* does not definitively decide whether §§ 1396a(a)(8) and (10) afford a private right of action under § 1983.

[7]That provision requires state plans to:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A).

enforce a Medicaid provision that speaks directly to provider reimbursement, that individual cannot enforce a provision that does so — at best — indirectly." (State Defs.' Br. at 19; *see also* PIHP Defs.' Br. at 26.)

This is not the proper analysis. In *Blessing v. Freestone*, 520 U.S. 329 (1997), the Supreme Court laid out three factors relevant to whether a statute confers rights enforceable under § 1983: (1) whether Congress "intended that the provision in question benefit the plaintiff"; (2) whether "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) whether the statute "unambiguously impose[s] a binding obligation on the States" by couching its right "in mandatory, rather than precatory, terms." *Id.* at 340–41 (quoting *Wright v. City of Roanoke Redev. and Hous. Auth.*, 479 U.S. 418, 431–32 (1987)). The Court "clarified the first of *Blessing*'s three requirements" in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), "making clear that only unambiguously conferred rights, as distinguished from mere benefits or interests, are enforceable under § 1983." *Westside Mothers II*, 454 F.3d at 541–42. Thus, we must inquire "whether or not Congress intended to confer individual rights upon a class of beneficiaries," in particular looking to "whether the pertinent statute contains 'rights-creating' language that reveals congressional intent to create an individually enforceable right." *Id.* at 542 (quoting *Gonzaga*, 536 U.S. at 285, 287). Finally, we must ask whether Congress "explicitly foreclose[d] recourse to § 1983" under the relevant statute, including by establishing a "remedial scheme sufficiently comprehensive to supplant § 1983." *Westside Mothers I*, 289 F.3d at 863. Applying this analysis demonstrates that §§ 1396a(a)(8) and (10) do allow for a private right of action. This conclusion is supported by the frequency with which other courts have held that these provisions create rights enforceable under § 1983, even post-*Gonzaga*.[8]

Considering the first *Blessing* factor in *Westside Mothers II*, this Court reasoned that "the text of § 1396a(a)(30)[(A)] does not focus on individual entitlements." 454 F.3d at 543. Indeed,

---

[8] *See, e.g.*, *Romano*, 721 F.3d at 377–79 (§ 1396a(a)(8)); *Doe v. Kidd*, 501 F.3d 348, 355–57 (4th Cir. 2007) (§ 1396a(a)(8)); *Watson v. Weeks*, 436 F.3d 1152, 1159–62 (9th Cir. 2006) (§ 1396a(a)(10)); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602–07 (5th Cir. 2004) (§ 1396a(a)(10)); *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 183 (3d Cir. 2004) (§§ 1396a(a)(8) and (10)); *Bryson v. Shumway*, 308 F.3d 79, 88–89 (1st Cir. 2002) (§ 1396a(a)(8)); *Doe ex rel. Doe v. Chiles*, 136 F.3d 709, 714–19 (11th Cir. 1998) (§ 1396a(a)(8)).

that provision never once references individuals. *See* 42 U.S.C. § 1396a(a)(30)(A). By contrast, §§ 1396a(a)(8) and (10) do focus on individual entitlements, requiring that "all individuals" have the opportunity to apply for medical assistance, that "all eligible individuals[']" assistance be furnished reasonably promptly, and that assistance "to any individual described" equal the assistance available to other Medicaid recipients. 42 U.S.C. §§ 1396a(a)(8), (a)(10). This is "the kind of 'individually focused terminology' that 'unambiguously confer[s]' an 'individual entitlement' under the law." *See Harris v. Olszewski*, 442 F.3d 456, 461 (6th Cir. 2006) (alteration in original) (quoting *Gonzaga*, 536 U.S. at 283, 287) (concluding that § 1396a(a)(23) creates rights enforceable under § 1983 in part because the provision explicitly refers to "any individual eligible for medical assistance").

Turning to the second *Blessing* factor, this Court found in *Westside Mothers II* that the "'broad and nonspecific' language" of § 1396a(a)(30)(A) was not amenable to judicial remedy. 454 F.3d at 543 (quoting *Gonzaga*, 536 U.S. at 292). We noted that the provision "sets forth general objectives, including 'efficiency, economy, and quality of care,' but does not identify what standards are required by such terms." *Id.*; *accord Armstrong*, 575 U.S. at 328 ("It is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'").

But unlike § 1396a(a)(30)(A), §§ 1396a(a)(8) and (10) are amenable to judicial remedy. Section 1396a(a)(8) requires simply that eligible individuals have the opportunity to apply for available medical assistance, and that this assistance "be furnished with reasonable promptness." Courts can easily determine whether individuals have been given the opportunity to apply for medical assistance by looking to the face of a state's Medicaid plan, records supplied by agencies and recipients, and witness testimony. And the regulations make clear that the standard for "reasonable promptness" is within at least forty-five or ninety days, depending on the basis for an individual's application. *See* 42 C.F.R. § 435.912(c)(3); *see also Romano*, 721 F.3d at 378–79; *Doe v. Kidd*, 501 F.3d 348, 356 (4th Cir. 2007); *Doe ex rel. Doe v. Chiles*, 136 F.3d 709, 716–17 (11th Cir. 1998). Similarly, § 1396a(a)(10) is not vague or amorphous, as it specifically defines what care and services must be made available to recipients by reference to § 1396d(a),

*see id.* § 1396a(a)(10)(A), and sets forth criteria for determining whether those services are equitably provided, *id.* § 1396a(a)(10)(B) (explaining that assistance made available "shall not be less in *amount*, *duration*, or *scope*" than that made available to other individuals) (emphasis added). *See also Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir. 2006); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 605 (5th Cir. 2004).

Regarding the third factor, as this Court explained in *Westside Mothers I*, these provisions "are couched in mandatory rather than precatory language, stating that Medicaid services, '*shall* be furnished' to eligible [individuals]" with reasonable promptness, 289 F.3d at 863 (quoting 42 U.S.C. § 1396a(a)(8)) (emphasis added), and that state plans "must" provide medical assistance, 42 U.S.C. § 1396a(a).  Finally, it is Defendants' burden to show that Congress foreclosed a remedy under § 1983.  *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989).  And while it is true that 42 U.S.C. § 1396c allows CMS to withhold Medicaid funds if states breach these requirements, this enforcement provision by itself does not necessarily foreclose relief.  *Armstrong*, 575 U.S. at 328.  Because the other factors point in favor of finding an enforceable right, and because Congress did not explicitly foreclose relief or provide a comprehensive remedial scheme, we conclude that Plaintiffs have a private right of action under both §§ 1396a(a)(8) and (a)(10).

## B.  Merits

Turning then to the merits, Plaintiffs assert two separate claims based on these provisions.  First, Count IV of Plaintiffs' amended complaint asserts that Defendants failed to ensure that the individual Plaintiffs were able to obtain medically necessary services with reasonable promptness, in violation of §§ 1396a(a)(8) and (10)(A).  As previously discussed, those provisions require states' Medicaid plans to provide "for making [specified] medical assistance available" to qualifying individuals, including the individual Plaintiffs, and "that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. §§ 1396a(a)(10)(A), (8).  The "medical assistance" to be provided under a state plan includes "payment of part or all of the cost of" "community supported living arrangements services" that "assist a developmentally disabled individual . . . in

activities of daily living necessary to permit such individual to live in the individual's own home," including "[p]ersonal assistance," "[t]raining and habilitation services (necessary to assist the individual in achieving increased integration, independence and productivity)," and "[s]upport services necessary to aid an individual to participate in community activities." 42 U.S.C. § 1396n(c)(1); *id.* § 1396d(a)(23) (defining "medical assistance"); *id.* §§ 1396u(a)(1), (2), (7) (defining "community supported living arrangements services"). Thus, the CLS services that Plaintiffs seek clearly fall within the "medical assistance" that must be paid for or provided by the State with relative promptness pursuant to §§ 1396a(a)(8) and (10)(A).

Second, in Count III of their amended complaint, Plaintiffs assert that Defendants have failed "to pay for services in the amount, scope, and duration needed to reasonably achieve their purpose," in violation of § 1396a(a)(10)(B). (Pls.' Br. at 16.) As previously discussed, § 1396a(a)(10)(B) requires state Medicaid plans to ensure that individuals are provided medical assistance "not . . . less in amount, duration, or scope than the medical assistance made available to any other such individual" under the provision. Plaintiffs do not assert that Defendants have failed to ensure that the individual Plaintiffs are provided services comparable to other relevant individuals, and in fact concede that they can make no such assertion because CMS waived Michigan's obligation to comply with those requirements.

Instead, Plaintiffs assert that Defendants violated § 1396a(a)(10)(B)'s "sufficiency requirements," which they say are set forth in 42 C.F.R. § 440.230(b) and were not waived. The parties do not dispute whether § 1396a(a)(10)(B) actually sets forth sufficiency requirements, whether 42 C.F.R. § 440.230(b) actually interprets 42 U.S.C. § 1396a(a)(10)(B) (as opposed to some other statutory provision, *e.g.*, §§ 1396a(a)(8) or (a)(10)(A)), or whether—if § 1396a(a)(10)(B) does indeed establish sufficiency requirements—CMS waived Michigan's obligation to comply with those requirements alongside its waiver of that statute's comparability requirements. These issues strike us as relevant to Plaintiffs' Count III. However, "[i]n our adversarial system of adjudication, we follow the principle of party presentation" and "rely on the parties to frame the issues for decision." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). Absent briefing or argument on any of these issues, we assume without deciding that § 1396a(a)(10)(B) does

establish sufficiency requirements embodied in 42 C.F.R. § 440.230(b). Under these provisions, then, "[e]ach service" provided to Plaintiffs under Michigan's Medicaid plan "must be sufficient in amount, duration, and scope to reasonably achieve [their] purpose[s]," 42 C.F.R. § 440.230(b), including "permit[ting] [the] individual to live in the individual's own home," "achieving increased integration, independence and productivity," and enabling the individual "to participate in community activities," 42 U.S.C. §§ 1396u(a)(1), (2), (7).

Turning then to the district court's stated reasons for dismissal and the parties' arguments on appeal, Plaintiffs dispute the district court's conclusion that they did not sufficiently state their § 1396a claims because their complaint failed to identify any "specific, *medically necessary* services which they are being denied under the existing budgeting scheme." (Dist. Ct. Op., R. 164 at PageID #4371.) We agree that the district court ignored Plaintiffs' well-pleaded allegations in reaching this conclusion. The heart of Plaintiffs' complaint is that the current budget methodology prevents them from promptly receiving sufficient medically necessary services, as detailed in their IPOSs and as required for them to live at home and participate in the community. In *Westside Mothers II*, this Court acknowledged that the plaintiffs' assertions that "the payments [they received] were insufficient to enlist an adequate number of providers" may suffice to state a claim that "inadequate payments effectively deny the right to 'medical assistance,'" that §§ 1396a(a)(8) and (10) protect. 454 F.3d at 540–41; *see also Health Care for All, Inc. v. Romney*, No. 00-10833, 2005 WL 1660677, at *10–11 (D. Mass. July 14, 2005); *Okla. Chapter of Am. Acad. of Pediatrics v. Fogarty*, 366 F. Supp. 2d 1050, 1109 (N.D. Okla. 2005); *Sobky v. Smoley*, 855 F. Supp. 1123, 1149 (E.D. Cal. 1994). Plaintiffs explained in their complaint that their IPOSs identified their medically necessary services and supports. They then alleged that the current budget methodology prevented each individual Plaintiff from receiving supports or care identified in their IPOS. (*See* Am. Compl., R. 146 at PageID #3753 (explaining that Plaintiff Waskul cannot find providers to fill all of the CLS hours required by his IPOS and has to stay home three days a week because of short staffing); *id.* at ##3758–59 (stating that Plaintiff Schneider can only employ providers for sixty-five of ninety-three CLS hours required by his IPOS and must pay for transportation and community activities himself); *id.* at #3766 (noting that Plaintiff Wiesner can only secure two of three providers, eighty of 120 total CLS hours, and a portion of the community hours called for in his IPOS); *id.* at ##3771–72

(explaining that Plaintiff Trabue can participate in activities called for by her IPOS only by paying for them herself); *id.* at #3773 (stating that Plaintiff Ernst must pay for transportation and community activities provided for in her IPOS out of pocket).)  This suffices to show that they are not receiving medically necessary services with relative promptness and in sufficient amounts to achieve their purpose.

The district court also concluded that Plaintiffs undisputedly had the option to use providers who contract with the County if they could not find their own providers to work at the pay they can offer under the current methodology.  Thus, even if Plaintiffs couldn't *hire* CLS providers, it said, they were not necessarily deprived of community-based services.  It is true that, were such services actually available, Plaintiffs could not show a violation of §§ 1396a(a)(8) and (10) simply because they did not get to choose their own providers, as nothing in these provisions evidently requires Plaintiffs to be provided services by the providers of their choice.  And in an April 2015 letter submitted with Plaintiffs' complaints, WCHO notes that one way individuals might fill their staffing needs following the budget change is by "us[ing] one of our contracted providers for CLS services."  (Am. Compl. Ex. 4, R. 146-5 at PageID #3834.)  But in finding that Plaintiffs could have fulfilled their staffing needs through the use of these agency-contracted providers, the court accepted the facts as presented by Defendants and made several inferences against Plaintiffs, contrary to its duty in considering motions to dismiss.  It inferred that these providers were actually available; it inferred that these providers would be able to fill Plaintiffs' staffing needs; and it inferred that if Plaintiffs had relied upon these providers, they would not still face a shortfall in other aspects of their CLS services.  In fact, the complaint alleged that agency providers were "not suitable" to fulfill Plaintiff Ernst's staffing needs, giving rise to the reasonable inference that these providers could not fill the gaps in staffing from which Plaintiffs suffered.  (Am. Compl., R. 146 at PageID ##3772–73.)  Thus, while this option, if available, may undermine Plaintiffs' claims at the summary judgment or trial stage, it does not defeat their claims at this stage.

The court also determined that Plaintiffs' claim failed because if they faced a shortfall in funding, they could simply request additional funding through the PCP process.  Again, if this option were actually available, it might undermine Plaintiffs' claims.  However, the complaint

explains that Plaintiffs' budget is now developed by multiplying "a specific rate times the number of [service] hours in the IPOS." (Am. Compl., R. 146 at PageID #3732.) Thus, without increasing the number of service hours called for by the IPOS, Plaintiffs cannot increase their budgets. Plaintiffs at no point allege that the hours identified in their IPOS are insufficient to meet their needs—instead, they allege that the budget they receive per hour is insufficient because it is improperly calculated. Nor do Plaintiffs apparently have any new medical needs that their IPOS can be updated to accommodate. As Plaintiffs explained at the hearing on Defendants' motions to dismiss, "[b]ecause the services that [they] are asking for are already in the IPOS, there is nothing to supplement" the IPOS with in order to receive more funds. (Mot. Hr'g Tr., R. 149 at PageID ##4021–22.) Moreover, the complaint suggests that at least some of the individual Plaintiffs have already requested and been denied additional funds to cover specific services already identified under their IPOSs. (*See, e.g.*, Am. Compl., R. 146 at PageID #3759 (stating that Plaintiff Schneider "requested $400 monthly for transportation and $200 monthly for community activities" and was told that "these costs are above what the current self-determination budget covers"); *id.* at #3769 (explaining that former Plaintiff Erlandson requested additional funds for a CLS staff supervisor and was rejected).)

Finally, throughout the course of their general argument, Defendants contend that CLS recipients are obligated to rely on natural or community supports, including family care, before they may use Medicaid funds. Accordingly, in their view, there is no problem with compelling individual Plaintiffs to pay out of pocket for certain supports or to enlist family members to provide care. However, the extent to which Plaintiffs can be required to do so is again a question of fact. Medicaid regulations call for individuals' IPOSs to include "natural supports," or "unpaid supports that are provided voluntarily to the individual in lieu of [Waiver] services and supports." 42 C.F.R. §§ 441.301(b)(1)(i), (c)(2)(v). Michigan's Medicaid Provider Manual states:

> [The Department] encourages the use of natural supports to assist in meeting an individual's needs to the extent that the family or friends who provide the natural supports are willing and able to provide this assistance. PIHPs may not require a beneficiary's natural support network to provide such assistance as a condition for receiving specialty mental health supports and services. The use of natural supports must be documented in the beneficiary's individual plan of service.

(Mich. Medicaid Provider Manual at 325.)  Plaintiffs' complaint suggests that the individual Plaintiffs' family members do not voluntarily provide care to them so much as they are compelled to do so by the current budget methodology, often at significant detriment to their health and finances.  (*See, e.g.*, Am. Compl., R. 146 at PageID #3753 (Plaintiff Waskul was "forced to hire" his father for care, although he is only available on weekends and in the evening); *id.* at #3760 (Plaintiff Schneider was "forced to hire" his 77-year-old ailing grandfather, and his grandparents are providing nearly 50% of his care because he is "short-staffed and cannot find CLS providers"); *id.* at #3765 (Plaintiff Wiesner's mother was compelled to pay for and provide his IPOS-required community activity and transportation, causing her to fall behind on her taxes and putting her at risk of foreclosure); *id.* at #3771 (Plaintiff Trabue's family is "forced to pay" for exercise activities called for by her IPOS).)  Thus, to the extent that Plaintiffs must depend on non-voluntary natural supports or supports not documented in their IPOS, this too does not defeat their claim.

To be sure, while the Supreme Court has explained that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage," the district court is correct that it is not "inconsistent with the objectives of the [Medicaid] Act for a State to refuse to fund unnecessary though perhaps desirable medical services."  *Beal v. Doe*, 432 U.S. 438, 444–45 (1977).  The potential availability of county providers, the potential that Plaintiffs could modify their budgets to ensure necessary medical coverage is available, and the potential that Plaintiffs' reliance on natural supports is within the scope of their IPOSs all suggest that Plaintiffs may not be able to succeed on this claim at later stages of their litigation.  This said, at this juncture, Plaintiffs' allegations suffice to state a plausible claim that they are being denied sufficient necessary medical services.  We therefore reverse the district court's dismissal of Counts III and IV of Plaintiff's amended complaint.

## II.    The Medicaid Act's Necessary-Safeguards and Free-Choice Provisions, 42 U.S.C. §§ 1396n(c)(2)(A) and (C)

Plaintiffs next claim that Defendant Gordon, Director of the Michigan Department of Health and Human Services, violated §§ 1396n(c)(2)(A) and (C), pertaining to assurances required for grant of Michigan's Medicaid Waiver, by permitting the implementation of the new

budget method.  Defendant Gordon responds that there is no private right of action to enforce those provisions.  Alternatively, he asserts that even if there was, Plaintiffs have not stated a claim because he properly exercised his review and oversight authority.  The district court found that there was a private right of action under these provisions, but that Plaintiffs did not state a claim because Defendant Gordon did not violate the Act by setting a limit on the budget and because Plaintiffs are not effectively homebound.  Because §§ 1396n(c)(2)(A) and (C) are properly enforceable under § 1983 and because Plaintiffs have plausibly stated a claim that Defendant Gordon violated these provisions, we also reverse the district court's decision as to these claims.

### A.  Private Right of Action Under § 1983

As with §§ 1396a(a)(8) and (10), the parties dispute whether §§ 1396n(c)(2)(A) and (C) are individually enforceable under § 1983.  Those provisions state that:

> [A habilitation supports] waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that—
>
> (A) necessary safeguards . . . have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services; [and] . . .
>
> (C) such individuals who are determined likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for [individuals with intellectual disabilities] are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facilities, or services in an intermediate care facility for [individuals with intellectual disabilities] . . . .

42 U.S.C. § 1396n(c)(2).  We have previously found that both §§ 1396n(c)(2)(A) and (C) are enforceable under § 1983.  *Wood v. Tompkins*, 33 F.3d 600, 611 (6th Cir. 1994).  However, since then, the Supreme Court has issued its decisions in *Blessing* and *Gonzaga* expanding upon when a statute creates rights enforceable under § 1983, and so that decision no longer binds us.  Nevertheless, upon reconsideration, we adhere to our conclusion that §§ 1396n(c)(2)(A) and (C) are enforceable under § 1983.  The analysis that this Court applied in *Wood* nearly parallels the analysis required under *Blessing* and *Gonzaga*.  *See id.* at 607–11.  And the great majority of

courts to consider the question of whether these provisions allow for a private right of action post-*Gonzaga* has found that they do.[9]

Our own application of the *Blessing-Gonzaga* analysis confirms that §§ 1396n(c)(2)(A) and (C) do indeed create rights enforceable under § 1983. As with the § 1396a provisions addressed in Part I, Defendant Gordon compares §§ 1396n(c)(2)(A) and (C) to § 1396a(a)(30)(A), which both this Court and the Supreme Court have held does not allow for individual enforcement under § 1983. (State Defs.' Br. at 39); *see Westside Mothers II*, 454 F.3d at 542–43; *Armstrong*, 575 U.S. at 328–29. Again, this comparison is inapt.

Considering the first prong of *Blessing*, it is clear that Congress intended both §§ 1396n(c)(2)(A) and (C) to confer individual rights enforceable under § 1983. Both provisions are "phrased in terms of the persons benefited," *Gonzaga*, 536 U.S. at 284, as they center around what shall be provided to "individuals" under the statute, 42 U.S.C. §§ 1396n(c)(2)(A), (C).[10] *See Harris*, 442 F.3d at 461 (holding that similar references to individuals were "the kind of 'individually focused terminology' that 'unambiguously confer[s]' an 'individual entitlement'

---

[9]*See, e.g.*, *Ball v. Rodgers*, 492 F.3d 1094, 1117 (9th Cir. 2007) (§ 1396n(c)(2)(C)); *Jackson v. Dep't of Human Servs. Div. of Developmental Disabilities*, No. 17-118, 2019 WL 669804, at *2–3 (D.N.J. Feb. 19, 2019) (§ 1396n(c)(2)(A)); *Ball v. Kasich*, 244 F. Supp. 3d 662, 684 (S.D. Ohio 2017) (§ 1396n(c)(2)(C)); *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1014–15 (D. Minn. 2016) (§ 1396n(c)(2)(C)); *Cohen v. Chester Cnty. Dep't of Mental Health/Intellectual Disabilities Servs.*, No. 15-2585, 2016 WL 3031719, at *8 (E.D. Pa. May 25, 2016) (§ 1396n(c)(2)(A)); *Steward v. Abbott*, 189 F. Supp. 3d 620, 635–37 (W.D. Tex. 2016) (§ 1396n(c)(2) generally); *Ill. League of Advocates for the Developmentally Disabled v. Quinn*, No. 13-1300, 2013 WL 5548929, at *9–10 (N.D. Ill. Oct. 8, 2013) (§ 1396n(c)(2)(C)); *Zatuchni v. Richman*, No. 07-4600, 2008 WL 3408554, at *8–11 (E.D. Pa. Aug. 12, 2008) (§ 1396n(c)(2)(C)); *Michelle P. ex rel. Deisenroth v. Holsinger*, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005) (§ 1396n(c)(2)(C)); *Masterman v. Goodno*, No. 03-2939, 2004 WL 51271, at *9–10 (D. Minn. Jan. 8, 2004) (§§ 1396n(c)(2)(A) and (C)). *But see M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (§ 1396n(c)(2)(C)); *Gaines v. Hadi*, No. 06-60129, 2006 WL 6035742, at *23–24 (S.D. Fla. Jan. 30, 2006) (§ 1396n(c)(2)(A)).

[10]The simple fact that § 1396n imposes requirements on states by stating that "[a] waiver shall not be granted . . . unless the State provides assurances satisfactory to the Secretary" regarding necessary safeguards and free choice does not preclude our conclusion that these provisions confer individual rights. 42 U.S.C. § 1396n(c)(2); *see Rodgers*, 492 F.3d at 1111 (rejecting the argument that this language shows that "the provisions' objective is not to benefit HCBS-eligible Medicaid recipients directly"). We see no functional difference between this language and § 1396a's statement that "[a] State plan for medical assistance must" make certain provisions. 42 U.S.C. § 1396a(a). And both Congress and this Court have concluded that such language can confer individual rights. 42 U.S.C. § 1320a-2 (explaining that a provision of the Medicaid Act "is not to be deemed unenforceable because of its inclusion in a section . . . specifying the required contents of a State plan"); *Harris*, 442 F.3d at 461 (explaining that "by saying that '[a] State plan . . . must . . . provide'" something, a statute "uses the kind of 'rights-creating,' 'mandatory language' that the Supreme Court and our court have held establishes a private right of action" (alterations in original) (citations omitted)).

under the law" (alteration in original) (quoting *Gonzaga*, 536 U.S. at 283, 287)).  And both expressly identify individual rights to be protected—namely, individuals' "health and welfare" and informed choice.  42 U.S.C. §§ 1396n(c)(2)(A), (C).  As the Ninth Circuit found when considering subsection (c)(2)(C) in *Ball v. Rodgers*, 492 F.3d 1094, 1107 (9th Cir. 2007), "[t]he statutory provisions are, in other words, 'concerned with "whether the needs of any particular person have been satisfied,"' not solely with an aggregate 'institutional policy and practice.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 288).  This is unlike § 1396a(a)(30)(A), which only references recipients of Medicaid services "in the aggregate" and "speaks not of any individual's right but of the State's obligation to develop 'methods and procedures for providing services generally.'" *Id.* at 1109 (quoting *Sanchez v. Johnson*, 416 F.3d 1051, 1059 (9th Cir. 2005)).

Turning to *Blessing*'s second prong, the rights "assertedly protected by the statute [are] not so 'vague and amorphous' that [their] enforcement would strain judicial competence."  520 U.S. at 340–41.  We have already concluded in *Wood* that "[t]he duties set forth [in §§ 1396n(c)(2)(A) and (C)] do not involve any fuzzy, undefined concepts like 'reasonable efforts.'  Rather, these duties involve unambiguous directives that are well within the ability of the judiciary to enforce."  33 F.3d at 608.  With regard to § 1396n(c)(2)(A), together, "the statute and regulations carefully detail the specific [assurances] to be provided" regarding safeguards for health and welfare.  *See Westside Mothers I*, 289 F.3d at 863 (discussing §§ 1396a(a)(8) and (10)).  As laid out in 42 C.F.R. § 441.302(a), § 1396n(c)(2)(A) requires assurances that states have set standards for service providers operating under the waiver, including state licensure and certification requirements; that facilities in which services are provided are in compliance with similar state standards; and that services are provided in home and community based settings. As for § 1396n(c)(2)(C), the statute simply requires that individuals have a right to choose among alternatives to institutionalized care and that they are informed of this choice.  *Rodgers*, 492 F.3d at 1115.  For both §§ 1396n(c)(2)(A) and (C), "[a] court can readily determine whether a state is fulfilling these statutory obligations by looking to sources such as a state's Medicaid plan, agency records and documents, and the testimony of Medicaid recipients and providers." *See id.*  And unlike § 1396a(a)(30)(A)'s requirement that payments be "'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services,'" *Armstrong*, 575 U.S. at 328, determining states'

compliance with these provisions does not require any sort of broad, policy-based balancing or "account[ing] for numerous, largely unquantifiable variables," *Rodgers*, 492 F.3d at 1115.

Under *Blessing*'s third prong, both provisions "impose a binding obligation on the States" by using "mandatory, rather than precatory" language. 520 U.S. at 341. Section 1396n(c)(2) states that "[a] waiver *shall not* be granted . . . unless the State provides [the] assurances" described. *Id.* (emphasis added). Finally, Congress has not foreclosed a remedy under § 1983 for either §§ 1396n(c)(2)(A) or (C). While §§ 1396n(c)(2)(A) and (C) are also explicitly enforceable through termination of a state's waiver, *see* 42 U.S.C. § 1396n(f)(1), again, this alone does not preclude the existence of an individual right under § 1983, *see Armstrong*, 575 U.S. at 328.[11] Section 1396a(a)(30)(A)'s similar enforcement provision precluded a finding of a right only in combination with the fact that it failed the second *Blessing* prong. *Id.* That is not the case with §§ 1396n(c)(2)(A) and (C). Neither did Congress explicitly foreclose relief or provide for a comprehensive remedial scheme. Thus, Defendants have a private right of action under both §§ 1396n(c)(2)(A) and (C).

### B. Merits

Considering Plaintiffs' claim under § 1396n(c)(2)(A), the federal regulation interpreting this provision requires states to provide "assurance that services are provided in home and community based settings, as specified in § 441.301(c)(4)." 42 C.F.R. § 441.302(a)(5). Section 441.301(c)(4), in turn, requires that home and community-based settings (1) "support[] full access of individuals receiving [services] to the greater community, including opportunities to . . . engage in community life, control personal resources, and receive services in the community, to the same degree of access as individuals not receiving [services]," *id.* § 441.301(c)(4)(i); (2) "[o]ptimize[], but . . . not regiment, individual initiative, autonomy, and independence in making life choices," *id.* § 441.301(c)(4)(iv); and (3) "[f]acilitate[] individual choice regarding services and supports, and who provides them," *id.* § 441.301(c)(4)(v). Plaintiffs' amended complaint

---

[11]The dissent's citation to *Nasello v. Eagleson*, --- F.3d ---, 2020 WL 5905070 (7th Cir. Oct. 6, 2020), is unconvincing, as that case addressed a different provision of the Medicaid Act. Further, its reasoning is inconsistent with our caselaw and that of our sister circuits' and appears to rule out a private right of action even in subsections of the Medicaid Act that the dissent agrees create a private right of action. *See id.* at *2 (suggesting that § 1396a(a)(8) does not imply a private right of action).

addressed each of these requirements and contended that, by permitting alteration of the budget methodology, Defendant Gordon failed to ensure that they were met.

The district court dismissed Plaintiffs' § 1396n(c)(2)(A) claim because Defendant Gordon has a "responsibility to set the appropriate budget." (Dist. Ct. Op., R. 164 at PageID ##4373–74.) But this does not provide grounds for dismissal. Indeed, Plaintiffs agree that Defendant Gordon has that responsibility. Their point is that he "is not exercising that responsibility and that the budgets set . . . are not, in fact, 'appropriate.'" (Pls.' Br. at 49.) It is readily apparent that, if Plaintiffs' claims are proven, allowing the implementation of a flawed budget methodology that results in underfunding of Plaintiffs' IPOSs might not allow Plaintiffs to receive the "same degree of access as individuals not receiving Medicaid HCBS," optimize their individual autonomy, or facilitate their individual choice. *See* 42 C.F.R. § 441.301(c)(4). If Plaintiffs are able to show that they are compelled to use agency providers in order to maintain their budgets, this may demonstrate that the budget methodology does not allow them sufficient choice among providers. *Id.* § 441.301(c)(4)(v). While Defendant Gordon may be able to show for the purposes of summary judgment or at trial that the current methodology achieves these goals as best possible, Plaintiffs' current allegations suffice to state a claim that he has not.

Turning to § 1396n(c)(2)(C), we agree with the Ninth Circuit that this provision confers "two explicitly identified rights—(a) the right to be informed of the alternatives to traditional, long-term institutional care, and (b) the right to choose among those alternatives." *Rodgers*, 492 F.3d at 1107. Regulations interpreting this provision also confirm that the State must ensure beneficiaries are "[g]iven the choice of either institutional or home and community-based services." 42 C.F.R. § 441.302(d)(2). Plaintiffs do not dispute that they were informed of their alternatives, but instead argue that they were not provided a meaningful right to choose because the current budget methodology means that if they opt for home-based services, they are "effectively homebound, unable to get out into the community and unable to receive necessary care, services, and support." (Am. Compl., R. 146 at PageID ##3795–96.) In essence, Plaintiffs argue that in order to receive their medically necessary supports, they are compelled to choose institutionalized care. And indeed, should Defendants' budget methodology preclude Plaintiffs from receiving necessary services, this would effectively destroy the choice Defendant Gordon

must ensure exists under § 1396n(c)(2)(C).  *See, e.g.*, *Cramer v. Chiles*, 33 F. Supp. 2d 1342, 1353 (S.D. Fla. 1999) ("Underfunding of the Home and Community-Based Waiver program compels institutionalization, thus negating a meaningful choice.").

The district court dismissed Plaintiffs' § 1396n(c)(2)(C) claim because they did not show that they are "effectively homebound," and because they purportedly could secure more funding to implement their IPOS through the PCP process.  (Dist. Ct. Op., R. 164 at PageID ##4374–75.)  Neither is an adequate reason to dismiss Plaintiffs' claims.  In finding that Plaintiffs did not sufficiently allege that they were "effectively homebound" and that they could increase their budgets for medically necessary services through the PCP process, the district court again disregarded well-pleaded allegations in Plaintiffs' complaint.  The complaint not only alleged that Plaintiff Waskul "goes three weekdays (Monday through Wednesday) without his normal community routine and is confined to his home on those days," but also that Plaintiff Wiesner has not been sufficiently able to "get into the community during the [service] hours that are currently provided" due to his inability to hire additional staff.  (Am. Compl., R. 146 at PageID ##3753, 3766.)  As previously discussed, Plaintiffs' pleadings also suggest that the PCP process cannot remedy this budget issue.

Defendant Gordon contends that this provision does not require the State to ensure that Plaintiffs have "meaningful" alternatives to institutionalized care.  (State Defs.' Br. at 39.)  We disagree.  An alternative in name only is no alternative, and if this provision has any purpose at all, it is to ensure that Plaintiffs have access to meaningful alternatives.  Accordingly, courts regularly interpret this provision to require "meaningful choice."  *See, e.g.*, *Ball v. Kasich*, 244 F. Supp. 3d 662, 685 (S.D. Ohio 2017); *Boulet v. Celluci*, 107 F. Supp. 2d 61, 77 (D. Mass. 2000); *see also Cramer*, 33 F. Supp. 2d at 1352–53 (stating that plaintiffs were provided "no real choice").  A "meaningful choice" is one that is actually available and that fulfills individuals' medical needs.  *See, e.g.*, *Kasich*, 244 F. Supp. 3d at 685 (finding that the plaintiffs had stated a claim that they were not afforded a meaningful choice when they had been on a waiting list for at-home services for decades); *Boulet*, 107 F. Supp. 2d at 77 (concluding that "an option which may not meet an individual's needs [does not] constitute[] a meaningful choice as contemplated by § 1396n(c)(2)"); *Cramer*, 33 F. Supp. 2d at 1352–53 (finding a violation of the statute where

individuals must choose between "(1) a Home and Community-Based Waiver option which gives no assurance that the supports and services will meet individuals['] needs, and (2) a hope for a future [institutionalized care facility] placement" because the system "effectively eliminat[es] a choice"). By alleging that the current budget methodology prevents them from receiving medically necessary services at home, then, Plaintiffs have plausibly alleged that they have been deprived of a choice between institutionalized and at-home care, in violation of § 1396n(c)(2)(C).

As a last point, § 1396n(c)(2)(C) only requires states to ensure that individuals are offered "feasible alternatives" available "under [the] waiver." But Plaintiffs' pleadings suggest that it may be feasible for them to receive additional services through a better funding methodology—specifically, they note that the CLS rate, as of April 2015, was "17.4% lower than the *lowest* average rate the State had told the federal government it expected to pay, and fully *31.3% lower* than the rate that the State had said it expected to pay in 2014, the then-most-recent year of the Habilitation Supports Waiver." (Am. Compl., R. 146 at PageID #3734.) This plausibly alleges that it was feasible for Defendants to enact a budget methodology that ensured a higher rate than was ultimately implemented. Of course, Defendant Gordon may later show that this alternative is not, in fact, feasible, for funding or other reasons. But at this point, Plaintiffs have sufficiently alleged that feasible alternatives that provide them a meaningful choice between institutionalized and at-home or community-based care exist and are not being ensured by Defendant Gordon, in violation of § 1396n(c)(2)(C). Accordingly, we reverse the district court's dismissal of Plaintiffs' claims under § 1396n.

## III.  Third-Party Beneficiary Claim

Plaintiffs next argue that Defendants Gordon, Terwilliger, and CMHPSM breached the terms of the Waiver and the Department-CMHPSM contract implementing the Waiver by failing to ensure that participants' budgets are "sufficient to implement the IPOS" and are developed "by costing out the services and supports using the rates for providers chosen by the participant and the number of hours authorized by the IPOS." (Am. Compl., R. 146 at PageID ##3801, 3803 (quoting Waiver at 125, 134).) Defendants argue that Plaintiffs cannot assert this claim as third-party beneficiaries because they do not have a private right of action under the statute

underlying the Waiver and contract, because "the relevant waiver language does not support Plaintiffs' claim," and because Plaintiffs did not show that Defendants' conduct led to them being denied any required services. The district court dismissed this claim, concluding that "Plaintiffs concede . . . that this claim is inseparable from their statutory claims" and that, because those claims failed, this one must also fail. (Dist. Ct. Op., R. 164 at PageID #4378 (citing Pls.' Oral Arg. Ps., R. 153-1 at PageID #4220).) That conclusion is unjustified; accordingly, we reverse the district court's decision.

The district court reasoned that Plaintiffs had conceded that their third-party beneficiary claim was inseparable from their statutory claims based on Plaintiffs' argument that the court should exercise supplemental jurisdiction over their third-party beneficiary claim because the Waiver and Department-CMHPSM contract "are central to every claim in this action" and would be impossible to separate into different suits in state and federal court. (Pls.' Oral Arg. Ps., R. 153-1 at PageID #4220.) But this argument does not concede that Plaintiffs' statutory and third-party beneficiary claims must necessarily rise and fall together. Instead, Plaintiffs simply assert that the third-party beneficiary claim is "so related to claims" over which the district court had original jurisdiction "that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). The simple fact that claims are part of the same case or controversy does not mean that they are dependent upon one another. Thus, the district court erred in dismissing these claims on that basis.

We could alternatively read the district court's decision as declining to exercise supplemental jurisdiction over these claims based on its dismissal of Plaintiffs' federal law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966). But if that was the basis for its dismissal, this decision is no longer justified, given that many of those federal law claims were improperly dismissed.

Notably, the district court did not reach the merits of this claim. "Absent 'exceptional circumstances,' we normally decline to rule on an issue not decided below." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 576 (6th Cir. 2013) (quoting *St. Marys Foundry, Inc. v. Emp'rs Ins. of Wausau*, 332 F.3d 989, 996 (6th Cir. 2003)). This case presents no exceptional circumstances in this regard and this claim would benefit from further briefing. We therefore

reverse and remand to allow the district court to consider the merits of Plaintiffs' claim in the first instance.

## IV.     ADA and Rehabilitation Act Claims

In Counts V and VI, Plaintiffs argue that Defendants Gordon, Terwilliger, Cortes, CMHPSM, and WCCMH have violated the "integration mandate" established under the ADA and that all Defendants have violated a mirroring provision of § 504 of the Rehabilitation Act. Defendants generally assert that they did not violate either provision because neither requires them to provide integration to the extent Plaintiffs desire.[12]  The district court dismissed these claims because Plaintiffs had not sufficiently shown that they were at risk of institutionalization or effectively institutionalized at home and because Plaintiffs' requested relief would require a "fundamental alteration" of Defendants' programs not available under either the ADA or § 504. (Dist. Ct. Op, R. 164 at PageID ##4376–78.)  Because Plaintiffs have plausibly stated a claim that they were at serious risk of institutionalization and were unduly isolated in their homes as a result of the change in budget methodology, we reverse the district court's decision.

Plaintiffs assert that Defendants Gordon, Terwilliger, Cortes, CMHPSM, and WCCMH have violated Title II of the ADA, 42 U.S.C. § 12132, which establishes that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999), the Supreme Court recognized that one form of discrimination prohibited thereunder is "unjustified institutional isolation of persons with disabilities." *See also* 42 U.S.C. § 12101(a)(2) (stating Congressional finding that "historically, society has tended to isolate and segregate individuals with disabilities, and . . . such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem").  Accordingly, to implement

---

[12]State Defendants also assert that they are entitled to immunity because Title II of the ADA only validly abrogates a state's Eleventh Amendment sovereign immunity insofar as the alleged ADA violation also violates the Fourteenth Amendment.  They therefore focus the majority of their ADA analysis on applying the test articulated in *United States v. Georgia*, 546 U.S. 151 (2006), to show that their conduct does not also violate the Fourteenth Amendment.  This strategy is misguided.  As addressed earlier, Plaintiffs do not state a claim against the Department under the ADA, and Plaintiffs' claim against Defendant Gordon is permitted under *Ex parte Young*.

§ 12132, the Attorney General promulgated a regulation known as the "integration mandate," which provides that public entities "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also Carpenter-Barker v. Ohio Dep't of Medicaid*, 752 F. App'x 215, 219 (6th Cir. 2018). The "most integrated setting" is one "that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Olmstead*, 527 U.S. at 592 (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)).

Alongside this, Plaintiffs also claim that all Defendants have violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794, which mirrors 42 U.S.C. § 12132 and is interpreted in parallel with it.[13] *See Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir. 2004). A regulation promulgated under § 504 similarly establishes that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). Plaintiffs' ADA and § 504 claims are "essentially one claim," and we thus consider them in tandem. *Carpenter-Barker*, 752 F. App'x at 220.

Plaintiffs argue that Defendants have violated the ADA and § 504 in two distinct manners.[14] First, they contend that implementation of the current budget methodology places all of the individual Plaintiffs at serious risk of institutionalization. Second, they assert that this methodology has caused Plaintiffs Waskul and Wiesner to be effectively institutionalized in their own homes. We address each theory in turn.

---

[13]State Defendants contend that their conduct did not violate § 504 because discrimination was not the sole motivation for their actions, because they had no discriminatory animus, and because Plaintiffs did not allege that they were denied services based on a distinction between them and other similarly situated individuals. But such showings are not required to state a claim for violation of the integration mandate, and so we are not persuaded by this argument. *See Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908–09 (6th Cir. 2004) (noting that the Supreme Court "indicated that Title II targets more than intentional discrimination" in *Olmstead* and that *Alexander v. Choate*, 469 U.S. 287, 296–97 (1985), suggested that the Rehabilitation Act should be construed to reach more than just conduct fueled by discriminatory intent).

[14]*Olmstead* clarified that states are only required to provide community-based treatment for individuals with disabilities when "the State's treatment professionals determine that such treatment is appropriate." 527 U.S. at 607. In this case, there is no dispute about whether such treatment is appropriate for the individual Plaintiffs.

Considering Plaintiffs' first theory, courts have widely accepted that plaintiffs can state a claim for violation of the integration mandate by showing that they have been placed at serious risk of institutionalization or segregation.  *See, e.g.*, *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 608, 615 (7th Cir. 2004) (finding that a plaintiff had stated a claim by showing that defendants' conduct "portend[ed]" future institutionalization); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181–82 (10th Cir. 2003) (rejecting district court's conclusion that the plaintiffs could not state a claim for violation of the integration mandate because they were not presently institutionalized and faced only the risk of institutionalization); *Townsend v. Quasim*, 328 F.3d 511, 515, 520 (9th Cir. 2003) (reversing summary judgment on a claim for violation of the integration mandate brought by a plaintiff currently living at home who had been informed that he would lose his benefits if he did not submit to institutionalization).  We have agreed that "cases applying *Olmstead* for the proposition that the risk of institutionalization can support a valid claim of discrimination under the ADA . . . provide reasonable applications of *Olmstead*'s holding." *Carpenter-Barker*, 752 F. App'x at 221–22.  Indeed, in *Olmstead*, the Supreme Court reasoned that unjustified institutionalization or segregation constitutes discrimination because:

> In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice.

527 U.S. at 601.   Under this reasoning, individuals with disabilities are subjected to discrimination when they are forced to choose between forgoing necessary medical services while remaining in the community or receiving necessary medical services while institutionalized—not just when they are actually institutionalized.

In accordance with this precedent, the Department of Justice put forward guidance in 2011 clarifying that "[i]ndividuals need not wait until the harm of institutionalization or segregation occurs or is imminent" in order to bring a claim for violation of the integration mandate.  U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (last updated Feb. 25, 2020) (hereinafter, "U.S. Dep't of Justice, Statement on *Olmstead*"), https://www.ada.gov/olmstead/q&a_olmstead.htm.  Instead, Plaintiffs may show a sufficient risk

of institutionalization "if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id.* Courts have also looked to this guidance in reviewing claims like Plaintiffs'. *See, e.g.*, *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 262–63 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013). Even if not authoritative, the DOJ's "views warrant respect" in this area. *Olmstead*, 527 U.S. at 598. And we need not decide whether the integration mandate is "genuinely ambiguous" as to whether it protects those at serious risk of institutionalization such that the Department of Justice's interpretation of that regulation is entitled to deference under *Auer v. Robbins*, 519 U.S. 452, 461–62 (1997), *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019), because in this case, Defendants do not dispute the DOJ's interpretation of *Olmstead* or that Plaintiffs can sustain a claim simply by showing that they are at serious risk of institutionalization. And we agree with the Tenth Circuit that a contrary interpretation is unreasonable because the integration mandate's "protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher*, 335 F.3d at 1181. Plaintiffs may thus state a claim by sufficiently alleging that they are at serious risk of institutionalization.

The district court properly recognized and accepted this possibility, but found that Plaintiffs had not sufficiently alleged that they were at serious risk of institutionalization because "this action was filed three years ago, but all of the individually named Plaintiffs still live at home." (Dist. Ct. Op., R. 164 at PageID #4376.) But while perhaps true, this fact says nothing about whether Plaintiffs have been compelled to forgo necessary medical services in order to remain in the community during that time. Nor does it reflect on the actual imminence of Plaintiffs' institutionalization—indeed, that could happen at any moment that Plaintiffs are unable to sustain their own care. *See* U.S. Dep't of Justice, Statement on *Olmstead*.

In fact, Plaintiffs did plausibly allege a serious risk of institutionalization. They explained in particular that the current budget methodology caused them to have to substantially rely on family members incapable of providing sustained, long-term care, thus placing them at risk of institutionalization. For instance, according to the complaint, Plaintiff Schneider must

rely on his grandparents for "around 75 hours of CLS services per week, nearly 50% of the CLS support required by [his] IPOS, because [he] . . . cannot find CLS providers to work at the current rate." (Am. Compl., R. 146 at PageID #3760.) Plaintiff Schneider's grandparents are aging and unwell. While not explicitly stated, the implication of this pleading is clear—should Plaintiff Schneider's grandparents no longer be able to care for him, he would be compelled to submit to institutionalization. Similarly, Plaintiffs allege that Plaintiff Wiesner has been forced to rely upon his guardian "to pay for the majority of [his] community activity and transportation needs out of pocket," causing her to "fall behind on her property taxes" and "putting her at risk of foreclosure." (*Id.* at #3765.) Plaintiff Wiesner's guardian is "unable to work during the time she has to stay home with [him]," purportedly at least forty hours a week, thus increasing her financial strain. (*Id.* at #3766.) This prompts the reasonable inference that he, too, is at serious risk of institutionalization if his guardian is unable to continue caring for him due to her dire financial situation. Plaintiff Waskul, for his part, has allegedly suffered "decline[s] in health, safety, or welfare" because he is unable to pay for his IPOS-required staff under the current methodology, including depression, worsening scoliosis, and anger management issues. *See* U.S. Dep't of Justice, Statement on *Olmstead*. For the purposes of a motion to dismiss, these facts suffice to show that Plaintiffs are at serious risk of institutionalization.

Turning to Plaintiffs' second theory, we have not yet addressed whether individuals' isolation at home may also violate the integration mandate. In considering Plaintiffs' claim, we find the Seventh Circuit's decision in *Steimel v. Wernert* persuasive. The *Steimel* court confronted a claim substantially similar to Plaintiffs' and concluded that the Supreme Court's rationale in *Olmstead* also applied when individuals were isolated at home. 823 F.3d at 910. It specifically noted that isolation at home would run counter to the "two evident judgments" the Supreme Court saw in the integration mandate:

> The first is that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." The second is that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."

*Id.* (citations omitted) (quoting *Olmstead*, 527 U.S. at 600–01).  We agree that these concerns are as present when individuals are confined in home settings because that situation "can just as 'severely diminish[] the everyday life activities' of people with disabilities."  *Id.* (alteration in original) (quoting *Olmstead*, 527 U.S. at 601).  Accordingly, we adopt *Steimel*'s analysis and recognize that the isolation of individuals with disabilities in a home environment can also violate the integration mandate.

Nevertheless, even accepting that home isolation might violate the integration mandate, the district court found that Plaintiffs' did not state a claim because they "have not alleged how the current budgeting method has rendered them effectively institutionalized at home."  (Dist. Ct. Op., R. 164 at PageID #4377.)  Again, this elides the well-pleaded allegations of Plaintiffs' complaint.  According to Plaintiffs, Plaintiff Wiesner is only receiving eighty of the 120 CLS hours his IPOS requires per week because he cannot afford to hire providers for the remaining time.  Because he must be accompanied by at least two CLS staff members in public, he must use at least two service hours for every hour that he wishes to leave his home.  This means that Plaintiff Wiesner can be outside his home a maximum of forty hours a week, rather than the sixty hours a week his IPOS would potentially allow.  As a practical matter, it stands to reason that Plaintiff Wiesner cannot use all forty hours outside the home if he needs to maximize the proportion of his time that he has care.  Moreover, Plaintiff Wiesner has allegedly been able to hire only two CLS providers, rather than his IPOS-required three, leading to increased difficulty scheduling out-of-home time.  As a result of being "stuck at home more," the complaint states, Plaintiff Wiesner's behavioral issues have worsened.  (Am. Compl., R. 146 at PageID #3766.)  This suggests that Plaintiff Wiesner is confined at home in a manner that does not enable him to engage with non-disabled persons "to the fullest extent possible," *Olmstead*, 527 U.S. at 592 (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)), which in turn causes "decline[s] in health, safety, or welfare" that could lead to institutionalization, U.S. Dep't of Justice, Statement on *Olmstead*.

Similarly, Plaintiffs allege that Plaintiff Waskul cannot hire sufficient staff under the current budget methodology, and as a result, he must "go[] three weekdays (Monday through Wednesday) without his normal community routine," during which time he "is confined to his

home." (Am. Compl., R. 146 at PageID #3753.) As previously discussed, Plaintiff Waskul has allegedly suffered from depression, worsened scoliosis, and anger management issues due to his reduced time in the community and with CLS providers.

In *Steimel*, the Seventh Circuit reversed the district court's grant of summary judgment to the state defendants based on the plaintiffs' evidence that the state defendants' policies resulted in them only being able to leave their home for twelve hours a week. 823 F.3d at 918. To be sure, Plaintiffs' allegations in this case, as they stand, suggest that they may receive considerably more time outside the home than the *Steimel* plaintiffs did. However, there is no numeric threshold that distinguishes the "most integrated setting" from a less integrated one. As the *Olmstead* Court clarified, the integration mandate does not impose a "standard of care" or require "a certain level of benefits to individuals with disabilities." *Olmstead*, 527 U.S. at 603 n.14 (quoting *id.* at 623–24 (Thomas, J., dissenting)). Instead, the question is whether Plaintiffs are provided services in the setting "that enables [them] to interact with non-disabled persons to the fullest extent possible." *Id.* at 592. The more hours one is provided outside the home, the less likely it is that one can show a violation of the integration mandate. But the simple fact that Plaintiffs have more than twelve hours outside the home per week does not foreclose their claim that they have been unjustifiably isolated within the home. As an initial matter, then, Plaintiffs' factual allegations suffice to state a claim for violation of the integration mandate.

However, our inquiry again does not end here. Under the integration mandate, public entities must "make reasonable modifications . . . necessary to avoid discrimination on the basis of disability," unless they "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The district court concluded that "the relief sought here," specifically "an overhaul of the budgeting method," would fundamentally alter Defendants' programs. (Dist. Ct. Op., R. 164 at PageID #4377.) But it did not justify that conclusion.

A plurality of the *Olmstead* Court opined that a state might show that a modification requires fundamental alteration of its programs if "in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental

disabilities." 527 U.S. at 604 (plurality opinion). Defendants have not carried their burden to make such a showing here. PIHP Defendants contend that the remedy Plaintiffs seek would be a fundamental alteration because the prior budget methodology caused them to operate on a deficit. But the facts alleged in Plaintiffs' complaint give rise to the inference that an alteration of the budget methodology is well within Defendants' capacity to provide, given that the amount they are spending under the current methodology is allegedly well below what the State had committed to spend under the Waiver. Moreover, while Plaintiffs undoubtedly would like to return to the previous budget method, that is not the only potential remedy here. The *Steimel* court rejected the state defendants' contention that it was not reasonable to require them to return to a previous method of determining individuals' eligibility for certain care because that method was error-filled. 823 F.3d at 916. The court pointed out that "[w]hile that may be one of the outcomes [the plaintiffs] will accept, it is not the only one." *Id.* So too here—to show that affording Plaintiffs relief would effect a fundamental alteration, Defendants must show that alteration of the budget methodology generally would be inequitable.

Altogether, the facts alleged in Plaintiffs' complaint suggest that they are at serious risk of institutionalization and that they are unreasonably confined at home. Defendants have not carried their burden to show that modifying their budget methodology would result in a fundamental alteration of their programs. Thus, Plaintiffs have stated a plausible claim for violation of the integration mandate under Title II of the ADA and § 504 of the Rehabilitation Act. Accordingly, we also reverse the district court's dismissal of these claims.

## V.     Michigan Mental Health Code, Mich. Comp. Laws §§ 330.1722(1) and (3)

In their final claim, Plaintiffs assert that Defendants WCCMH and CMHPSM violated Michigan Compiled Laws § 330.1722 by subjecting them to "neglect." Defendants respond that they are entitled to governmental immunity under Michigan law and that, even if Plaintiffs could overcome this immunity, they did not neglect Plaintiffs under that provision. The district court found that Defendants WCCMH and CMHPSM were entitled to immunity under Michigan law because Plaintiffs did not "allege[] that Defendants were grossly negligent with respect to adjusting the budget" and that, in the alternative, Plaintiffs had insufficiently alleged that they were subjected to non-accidental harm or not treated according to the standard of care. (Dist. Ct.

Op., R. 164 at PageID #4379.)  The district court erred in so concluding, and Plaintiffs have also stated a plausible claim for neglect under the Michigan Mental Health Code.  We therefore also reverse the district court's decision as to this claim.

### A.  Immunity

First, we contend with the district court's conclusion that Defendants were entitled to immunity under Michigan Compiled Laws § 691.1407.  It is true that Michigan Compiled Laws § 330.1722 "does not provide a statutory exception to governmental immunity for alleged abuse of mental health patients."  *de Sanchez v. Genoves-Andrews*, 446 N.W.2d 538, 542 (Mich. Ct. App. 1989).  However, where "instead of seeking compensation to remedy [a civil] harm, the plaintiff elects some other remedy," such as "ask[ing] a court to enforce his or her rights under the law" through declaratory or injunctive relief, governmental immunity is "inapplicable."  *In re Bradley Estate*, 835 N.W.2d 545, 557 n.54 (Mich. 2013).  Accordingly, Michigan courts have simply found that "a tort claim *for damages* does not constitute 'appropriate civil relief' under [§ 330.1722] . . . because [defendants] are entitled to the protection of governmental immunity and [§ 330.1722] is not an exception to such immunity."  *Dockweiler v. Wentzell*, 425 N.W.2d 468, 471 (Mich. Ct. App. 1988) (emphasis added).  Plaintiffs seek only declaratory and prospective injunctive relief in this suit, and so Defendants WCCMH and CMHPSM are not entitled to immunity.

### B.  Merits

Turning to the merits, the relevant provisions of the Michigan Mental Health Code provide that "[a] recipient of mental health services shall not be subjected to abuse or neglect," and that those who are abused or neglected have "a right to pursue injunctive and other appropriate civil relief."  Mich. Comp. Laws §§ 330.1722(1), (3).  "Neglect" under the statute means

> an act or failure to act committed by an employee or volunteer of the department, a community mental health services program, or a licensed hospital; a service provider under contract with the department, a community mental health services program, or a licensed hospital; or an employee or volunteer of a service provider under contract with the department, a community mental health services program,

or a licensed hospital, that denies a recipient the standard of care or treatment to which he or she is entitled under this act.

*Id.* § 330.1100b(21).

The "[s]tandard for mental health services" provision of the Michigan Mental Health Code provides that "[a] recipient shall receive mental health services suited to his or her condition," and that they "shall be offered in the least restrictive setting that is appropriate and available." *Id.* §§ 330.1708(1), (3). Thus, if Defendants' acts or failures to act denied Plaintiffs mental health services suitable to their condition in the least restrictive setting, they are liable. Michigan courts have interpreted § 330.1708 to cover an individual's "mental health treatment involv[ing] the implementation of [a] Behavior Treatment Plan . . . including [a] provision regarding [the individual's] movement in the community." *Estate Wrenn v. Spectrum Cmty. Servs.*, Nos. 339594, 342320, 2019 WL 845711, at *3 (Mich. Ct. App. Feb. 21, 2019) (per curiam). Plaintiffs alleged that Defendants WCCMH and CMHPSM fail to "provide CLS participants with actual budgets tied to the services and supports listed in the IPOS," and that because of this the individual Plaintiffs are denied transportation, staff, and recreation activities medically necessary to address their conditions. (Am. Compl., R. 146 at PageID ##3753, 3758–59, 3766, 3771–72, 3805.) This plausibly states a claim under the Michigan Mental Health Code.

County Defendants respond that Plaintiffs have not identified any employee, volunteer, or service provider associated with WCCMH who subjected the individual Plaintiffs to neglect, and so they have not stated a claim because the definition of neglect requires one of these parties to be the actor. PIHP Defendants rightly do not contest that CMHPSM is covered by this definition. Of course, Plaintiffs allege that Defendants Cortes and Terwilliger—current or former employees of WCCMH and CMHPSM, respectively—are responsible for the implementation of the flawed budget methodology. Indeed, this allegation underlies all of their claims against Defendants Terwilliger and Cortes. Accordingly, County Defendants' argument is unpersuasive.

Plaintiffs have sufficiently alleged that the action or inaction of Defendants WCCMH and CMHPSM have denied them mental health services meeting the standard of care established in Michigan's mental health code. The district court's dismissal of this claim was thus in error, and this Court must reverse.

## CONCLUSION

For these reasons, we **REVERSE** the district court's decision and **REMAND** for further proceedings consistent with this opinion.

_____

## CONCURRING IN PART AND DISSENTING IN PART

_____

CHAD A. READLER, Circuit Judge, concurring in part, and dissenting in part. Save for three instances where the majority opinion extends acts of Congress in an extra-legislative, atextual manner, I agree that the complaint may proceed beyond the pleading stage.

*Section 1396n(c)(2) of the Medicaid Act.* Section 1396n(c)(2) does not grant Appellants legal rights they can enforce via 42 U.S.C. § 1983. A statute creates individual rights only when Congress has expressed a clear intent to do so. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002). That intent will not be lurking in the shadows. For when Congress intends to create an individual right, it does so expressly, in the light of day. *See Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1013 (6th Cir. 2018) (noting that statutory rights are only created when Congress does so in "clear and unambiguous terms" (quoting *Gonzaga*, 536 U.S at 290)). So "unless Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." *Gonzaga*, 536 U.S. at 280 (cleaned up).

That one can identify beneficiaries from a statute's terms is not tantamount to a finding that the statute creates individual rights in those beneficiaries. More than simply establishing benefits, the statute must also include unambiguous, rights-creating language generating an enforceable individual right. *Harris v. Olszewski*, 442 F.3d 456, 460 (6th Cir. 2006) ("[A] claimant must demonstrate that the underlying statute creates enforceable rights because it is *rights* after all, not the broader or vaguer benefits or interests, that may be enforced under the statute." (quotations omitted)). And where a statute's focus is on a regulated entity, no individual rights exist. *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981))); *see also Gonzaga*, 536 U.S. at 284 (noting that statutes create an individual right when there is an "*unmistakable focus* on the benefited class" (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 691 (1979))).

Section 1396n(c)(2) fails to clear this high bar.  To start, the section's focus is on the regulated state, not the beneficiaries.  As a lead up to § 1396n(c)(2), § 1396n(c)(1) explains that "[t]he Secretary may by waiver provide that a State plan" include "medical assistance" to cover "the cost of home or community-based services . . . approved by the Secretary [of Health and Human Services]."  42 U.S.C. § 1396n(c)(1).  Section 1396n(c)(2) in turn instructs the Secretary how to regulate states seeking a waiver: "A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary . . . ."  42 U.S.C. § 1396n(c)(2).  The provisions that follow go on to list the duties placed upon a participating state.  It must implement safeguards to protect the health and welfare of the participants, demonstrate financial accountability, and inform individuals of their healthcare options.  *Id.*  In some respects, each of these state-owed duties may result in benefits to individuals participating in a state's Medicaid program.  But that is merely an ancillary result of a state's compliance with federal law, well short of the "unmistakable focus" required to demonstrate congressional intent to create individual rights.  *Gonzaga*, 536 U.S. at 284 (quoting *Cannon*, 441 U.S. at 691).

Confirming this reading of § 1396n(c)(2) is the remedy Congress employed for statutory violations.  Should a state breach its assurances to the Secretary, the Secretary can strip the state's federal funds.  *See* 42 U.S.C. § 1396n(f)(1); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015) ("[T]he sole remedy Congress provided for a State's failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services.").  By including this "express" remedy, Congress surely "intended to preclude others," including the enforcement of statutory requirements by individuals.  *Armstrong*, 575 U.S. at 328 (quoting *Sandoval*, 532 U.S. at 290); *see also Gonzaga*, 536 U.S. at 280 ("[T]he typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." (citation omitted)); *Nasello v. Eagleson*, --- F.3d ---, 2020 WL 5905070, at *2 (7th Cir. Oct. 6, 2020) (holding that a similar section of the Medicaid Act does not authorize suits by individuals, and noting that individuals dissatisfied with a state's program could "ask the responsible federal officials to disapprove a state's plan or withhold reimbursement").

In these ways, today's case tracks *Gonzaga*. There, the Supreme Court determined that the Family Educational Rights and Privacy Act (FERPA), which protects students from educational institutions mishandling their personal information, did not create individual rights enforceable via § 1983. *Gonzaga*, 536 U.S. at 276. That was so, the Supreme Court explained, because FERPA "speak[s] only in terms of institutional policy and practice, not individual instances of disclosure." *Id.* at 288. The statute thus "lack[s] the sort of rights-creating language critical to showing the requisite congressional intent to create new rights," and does not "confer the sort of *individual* entitlement that is enforceable under § 1983." *Id.* at 287 (citations and quotations omitted). FERPA's remedial provisions, which instruct that "the Secretary of Education . . . '*deal with violations*' of the Act," likewise cut against the creation of individual rights. *Id.* at 289 (citation omitted). And comparing FERPA to § 1396n(c)(2), the similarities ring out. Both statutes speak in terms of institutional policies (not individual rights), and both contain express remedies that do not involve individuals.

If all of this is not enough to show why § 1396n(c)(2) fails to create individual rights, consider further the fact that the statute is "judicially unadministrable." *Armstrong*, 575 U.S. at 328. In *Armstrong*, the Supreme Court held that a broad statutory directive for state "payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguarding against unnecessary utilization of care and services,'" undermines the suggestion that the Medicaid Act provisions at issue could be privately enforced. *Id.* (quoting 42 U.S.C. § 1396a(a)(30)(A)) (cleaned up). Having utilized such a "judgment-laden standard," Congress no doubt intended to make administrative remedies exclusive. *Id.* at 328–29; *see also Westside Mothers v. Olszewski*, 454 F.3d 532, 543 (6th Cir. 2006) (noting that "broad and nonspecific" language in the Medicaid Act "suggests that § 1396a(a)(30) is concerned with overall methodology rather than conferring individually enforceable rights on individual Medicaid recipients" (quotations and citations omitted)). Similar "judgment-laden" standards are at play here. Even more so, in fact. It is little exaggeration to say that § 1396n(c)(2)(A)'s references to "necessary safeguards," "adequate standards for provider participation," "health and welfare of individuals," and "financial accountability" are exceedingly difficult concepts for courts to administer. *See Westside Mothers*, 454 F.3d at 543 (noting a court has "little expertise" in the "interpretation and balancing of [the Medicaid statute's] general objectives" (citation omitted)).

Not so for the Secretary, who enjoys "significant expertise" in overseeing Medicaid's "complex and highly technical regulatory program." *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citation omitted). At day's end, all signs point to the absence of individual rights-creating language in § 1396n(c)(2).

*Section 12132 of the Americans with Disabilities Act.* Appellants' contention that they are "at risk" of institutionalization is an insufficient basis for pleading violations of the ADA (or by extension, the Rehabilitation Act). The ADA's text simply does not reach that far. And more than anything when it comes to statutory interpretation, we must respect the text Congress writes.

The ADA instructs that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To implement this provision of the ADA, the Attorney General, at Congress's instruction, promulgated a regulation known as the "integration mandate," a critical aspect of which states that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (2016).

Together with the text of the ADA, the Supreme Court has interpreted the integration mandate to prohibit the unwarranted institutionalization of disabled individuals. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999). In the two decades that followed *Olmstead*, however, some lower courts (as does the majority opinion today) have extended that holding to find an ADA violation when a state's Medicaid plan places disabled individuals "at risk" of institutionalization. *See, e.g.*, *M.R. v. Dreyfus*, 663 F.3d 1100, 1117–18 (9th Cir. 2011). Where, one might ask, have courts found that prohibition? Not in the text of the ADA nor the integration mandate. Instead, courts have seized upon a Department of Justice guidance document instructing that the "serious risk of institutionalization" is sufficient to establish an ADA claim. U.S. Dep't of Justice, *Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and* Olmstead v. L.C., http://www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020) [hereinafter "DOJ Guidance"]; *see, e.g.*, *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) ("Because Congress

instructed the DOJ to issue regulations regarding Title II, we are especially swayed by the DOJ's determination that the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings." (quotations omitted)).

Doing so violates numerous aspects of current-day administrative law. One, the DOJ guidance is explicitly non-binding. *See* DOJ Guidance (explaining that the "guidance document is not intended to be a final agency action [and] has no legally binding effect," and thus does "not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent"). That fact alone dramatically undercuts its use as an interpretive North Star. *See Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007) (noting that non-binding disclaimers are "relevant to the conclusion that a guidance document is non-binding"). Two, the DOJ has independently disavowed using guidance documents to create binding standards. *See* Prohibition on the Issuance of Improper Guidance Documents Within the Justice Department, 85 Fed. Reg. 50951 (Aug. 19, 2020) (to be codified at 28 C.F.R § 50) (instructing that guidance documents do not "create binding standards by which the [DOJ] will determine compliance with existing regulatory or statutory requirements"). That admission is understandable, as an agency's guidance document, unlike its formal rules and regulations, does not traverse the lengthy notice-and-comment period that tests an agency's proposal against the views of others. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[W]e confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, . . . lack the force of law . . . ."); *see also Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 680 (6th Cir. 2005) (noting that "the primary purpose of Congress in imposing notice and comment requirements for rulemaking [is] to get public input so as to get the wisest rules").

The DOJ Guidance, in other words, has little practical effect here, by the DOJ's own admission. Reference to agency guidance might be appropriate where, as the majority opinion notes in separately concluding that the ADA reaches claims brought by those purportedly

institutionalized at home, the guidance squarely supports what the agency rule already establishes. *Compare* 28 C.F.R. § 35.130(d) (explaining that individuals should receive care in the "most integrated setting"), *with* DOJ Guidance (defining what constitutes an "[i]ntegrated setting"); *accord Steimel v. Wernert*, 823 F.3d 902, 912 (7th Cir. 2016) (explaining that the "most integrated setting" requirement is not satisfied when individuals effectively are forced to remain in their homes due to their disabilities and reasoning that "[i]f [the text of the regulation] stick[s] a knife in the state's argument, the DOJ guidelines twist it"). But that is not the case for claims centered on the risk of institutionalization, when an "at risk" provision is nowhere to be found in the ADA or the accompanying regulation.

Nor, at all events, is there reason to defer to agency guidance when the text of the ADA and the integration mandate are unambiguous on the point. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (noting that "the possibility of deference can arise only if a regulation is genuinely ambiguous," and adding that "when we use that term, we mean it—genuinely ambiguous"). On that front, it bears noting that neither the ADA nor the mandate make any mention of institutionalization, let alone the risk of institutionalization. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d). With *Kisor* now the controlling standard on deference to agency interpretation, one would not expect the majority opinion to invoke *Auer v. Robbins*, 519 U.S. 452 (1997). *See Kisor*, 139 S. Ct. at 2426 (Gorsuch, J., concurring) (observing that *Kisor* "has transformed *Auer* into a paper tiger"). Nor, for this same reason, do the pre-*Kisor* cases relied upon in the majority opinion carry weight in a post-*Kisor* world. *See, e.g.*, *Steimel*, 823 F.3d at 911 (employing the pre-*Kisor* standard that "we defer to an agency's interpretation of its own regulation unless the agency's interpretation is plainly erroneous or inconsistent with the regulation or there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question" (quotations and citation omitted)); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016) (citing *Auer* for the proposition that "DOJ's interpretation . . . is controlling unless plainly erroneous or inconsistent with the regulation" (quotations and citation omitted)).

Embracing DOJ guidance to cover those "at risk" of institutionalization also creates a practical interpretive problem. What, after all, does it mean to say an individual is "at risk" of

institutionalization?  There is no articulable definition in the ADA, the mandate, or *Olmstead*. Nor does the majority opinion provide one.  One could theoretically define "at risk" with some temporal connection to actual institutionalization—for example, one is "at risk" of institutionalization if she is expected to be institutionalized in the next few months, perhaps even a year.  But setting aside the fact that such a standard has no textual mooring, even that generous articulation would not help Appellants.  After all, as revealed at oral argument, Appellants have been claiming a risk of institutionalization for over four years.   Yet none have been institutionalized.

Whether one is in fact institutionalized is a bright-line determination that can be fairly and uniformly applied by those who sit on the federal bench.  *See Daunt v. Benson*, 956 F.3d 396, 424–25 (6th Cir. 2020) (Readler, J., concurring) (discussing the advantages of bright-line rules).  But absent any textually articulated standards, how are we to decide when a benefits formula places individuals "at risk" of being institutionalized?  That hazy approach is a surefire recipe for unequal and unpredictable application of the law, an unattractive option for litigants and courts alike.  Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989) ("Even in simpler times uncertainty has been regarded as incompatible with the Rule of Law.").   And it is likely why Congress never intended for judges to make this determination to begin with.

Extending the ADA in this manner has yet one more unwelcome feature: It permits claims by individuals who are not seeking to remedy discriminatory conduct, but instead simply seek more Medicaid funding.  *Olmstead*, however, expressly "disavowed" reading the ADA to "impose[] on the States" a duty to "provide a particular level of benefits to disabled persons." *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 608 (7th Cir. 2004) (citing *Olmstead*, 527 U.S. at 603 n.14)).   Consider the allegation before us today: Appellants allege that Washtenaw County's funding methodology is insufficient to satisfy the needs set forth in Appellants' individual plans of service, placing them at a risk of institutionalization.  Absent actual segregation from the public or institutionalization, this sort of claim, at bottom, is simply a request for more Medicaid funding, something the ADA does not permit.

The majority opinion nonetheless believes its understanding of the ADA is necessary lest the landmark law risks losing its bite.  But the more customary practice is that a definitive harm, not just the "risk" of one, is needed before legal action is ripe.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–49 (2016).  At the very least, the risk of harm must be "certainly impending."  *See Huff v. TeleCheck Servs.*, 923 F.3d 458, 463 (6th Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  Rather than rewriting the ADA to cover premature claims, why not wait until institutionalization is at least "certainly impending" before allowing an ADA claim?  And to ensure the law maintains its force, why not rely on the settled practice of securing a preliminary injunction to "preserve the relative positions of the parties until a trial on the merits"?  *Tri-County Wholesale Distribs. v. Wine Grp., Inc.*, 565 F. App'x 477, 480 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)).

One can understand why a fair-minded judge might want to extend the ADA's reach to cover those at risk of institutionalization.  But as has long been true, our job remains to "say what the law is," no more, and no less.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  Expanding the ADA in this manner must come from Congress's drafting pen, in conjunction with supporting regulations enacted by the Attorney General.

*Section 1396a(a)(10)(B) of the Medicaid Act.*  Finally, as to Count III, the majority opinion assumes, without deciding, that § 1396a(a)(10)(B) applies to Appellants' sufficiency-of-funding claims.  In light of this "assumption," the majority opinion's application of § 1396a(a)(10)(B) has no controlling force beyond today.  Nor, I might add, does it have support in the statutory text.  As explained in § 1396a(a)(10)(B), a state's medical assistance "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual."  42 U.S.C. § 1396a(a)(10)(B).  By its terms, then, § 1396a(a)(10)(B) applies only to the comparison of medical services between disabled individuals.  *See Schott v. Olszewski*, 401 F.3d 682, 686 (6th Cir. 2005) ("Under the Act, states must provide comparable medical assistance to all Medicaid recipients . . . ." (citing § 1396a(a)(10)(B))); *Rodriguez v. City of New York*, 197 F.3d 611, 616 (2d Cir. 1999) ("Section 1396a(a)(10)(B)['s] . . . only proper application is in situations where the same benefit is funded for some recipients but not others.").

So for Appellants to state a claim under § 1396a(a)(10)(B), they must allege they are receiving fewer benefits as compared to others.

Appellants make no such allegation. They describe their claim as a "Medicaid statutory claim under 42 U.S.C. § 1396a(a)(10)(B) for Defendants' failure (caused by the May 2015 change in budgeting procedures) to pay for services in the amount, scope, and duration needed to reasonably achieve their purpose." No mention there of a comparison of benefits. Nor during oral argument, where Appellants conceded they are not making a comparability argument. Rather, Appellants take issue with the underlying method of calculating their respective Medicaid allotments. But the budgeting method at issue applies equally to all disabled individuals seeking benefits from Washtenaw County. It is thus difficult to see how a claim under § 1396a(a)(10)(B) is cognizable as a means for challenging an allegedly improper (yet uniform) benefits formula.

\*          \*          \*          \*          \*

One final point deserves mention. In Count IV, Plaintiffs tie together §§ 1396a(a)(8) and (a)(10)(A) of the Medicaid Act to allege a violation of their asserted right to receive medical support services with reasonable promptness. From the pleadings, however, it is not entirely clear whether Plaintiffs object to the promptness with which those services are provided or to the budgeting methodology employed by Washtenaw County to fund those services. The former may give rise to a cognizable claim. *See* 42 U.S.C. § 1396a(a)(8). But if Plaintiffs' "grievance concerns not the *time* at which these ongoing benefits are paid but the *amount* of those benefits," their claim is not cognizable under § 1396a(a)(8). *Nasello*, 2020 WL 5905070, at \*2 ("It would not be appropriate for a federal court to turn a statute about the timing of benefits into a statute about the level of benefits."). Forthcoming proceedings will likely reveal the precise nature of Plaintiffs' claim.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-1400

DEREK WASKUL, by his guardian, Cynthia Waskul; CORY
SCHNEIDER, by his guardians, Martha and Wendy Schneider;
KEVIN WIESNER, by his guardian, Kerry Kafafian;
WASHTENAW ASSOCIATION FOR COMMUNITY
ADVOCACY; LINDSAY TRABUE, by her guardian, Kristin Kill;
HANNAH ERNST, by her guardians, Susan and Robert Ernst,

    Plaintiffs-Appellants,

    v.

WASHTENAW COUNTY COMMUNITY MENTAL HEALTH;
TRISH CORTES, in her official capacity as Director of Washtenaw
County Community Mental Health; COMMUNITY MENTAL
HEALTH PARTNERSHIP OF SOUTHEAST MICHIGAN; JANE
TERWILLIGER, in her official capacity as director of Community
Mental Health Partnership of Southeast Michigan; MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES;
ROBERT GORDON, in his official capacity as Director of Michigan
Department of Health and Human Services,

    Defendants - Appellees.

> **FILED**
> Oct 29, 2020
> DEBORAH S. HUNT, Clerk

Before:  CLAY, WHITE, and READLER, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's dismissal of Plaintiffs' claims is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk