## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DEREK WASKUL, *et al.*,

                       Plaintiffs,

        v.

WASHTENAW COUNTY COMMUNITY
MENTAL HEALTH, *et al.*,

                     Defendants.

No. 2:16-cv-10936-AJT-EAS
Hon. Arthur J. Tarnow
Hon. Elizabeth A. Stafford

## PLAINTIFFS' MOTION TO COMPEL DISCOVERY BY DEFENDANT WCCMH AND NON-PARTIES WASHTENAW COUNTY AND HEALTH MANAGEMENT ASSOCIATES, AND BRIEF IN SUPPORT

Nicholas A. Gable (P79069)
LEGAL SERVICES OF SOUTH
CENTRAL MICHIGAN
Attorney for Plaintiffs
15 S. Washington Street
Ypsilanti, MI 48197
(734) 665-6181 ext. 127
ngable@lsscm.org

Kyle Williams (P77227)
Simon Zagata (P83162)
DISABILITY RIGHTS MICHIGAN
Attorney for Plaintiffs
4095 Legacy Pkwy Ste. 500
Lansing, MI 48911-4264
(517) 487-1755
kwilliams@drmich.org

Edward P. Krugman
Jordan Berger
    (both New York Bar;
    Admitted in E.D. Mich.)
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
Attorney for Plaintiffs
275 Seventh Avenue, Suite 1506
New York, NY 10001
(212) 633-6967
krugman@nclej.org

Lisa Ruby (P46322)
MICHIGAN POVERTY LAW PROGRAM
Attorney for Plaintiffs
15 S. Washington Street
Ypsilanti, MI 48197
(734) 998-6100 ext. 117
lruby@mplp.org

## MOTION

Plaintiffs, by their attorneys, move to Compel Discovery By Defendant WCCMH and Non-parties Washtenaw County and Health Management Associates (HMA) and state as follows:

1. Plaintiffs served their First Set of Interrogatories and First Request for Production of Documents on Defendant WCCMH on January 12, 2021.

2. The same day, Plaintiffs served a subpoena on HMA. Exhibit 1, pp. 9-14.

3. The HMA subpoena was narrow in scope, limited to three requests for production. Exhibit 1, p. 9.

4. All three requests for production in the HMA subpoena related to a Draft Report HMA authored for Washtenaw County in 2015. The report pertained to restructuring mental health services, including the cost of CLS services. ECF #146 ¶¶ 161-162; ECF #146-10).

5. HMA objected to all three requests for production on January 25, 2021, produced nothing, made boilerplate undue burden and privilege objections, and principally argued that its confidentiality agreement with Washtenaw County prevented any production. Exhibit 1, pp. 2-3.

6. Defendant WCCMH responded to Plaintiffs' First Set of Interrogatories on February 4, 2021, produced nothing, and objected to all Interrogatories and Requests for Production of Documents with boilerplate language. Exhibit 2.

M-1

7.     Plaintiffs' Counsel sent a letter regarding Defendant WCCMH's discovery responses on February 12, 2021, attempting to meet and confer to resolve any issues preventing disclosure of documentation, to obtain answers to their interrogatories, and to attempt to work out an acceptable schedule for production. Exhibit 3.

8.     Defendant's counsel eventually agreed to meet and confer on March 1, 2021, and agreed to limited production, subject to the results of the Scheduling Conference.

9.     At the Scheduling Conference on March 2, 2021, Judge Tarnow ordered discovery to commence, and held that the initial scope of discovery was: (1) costs to hire and maintain Community Living Support staff; (2) the amount of money in the public behavioral health system available for Plaintiffs' use; (3) the availability and suitability of agency providers; and (4) Community Living Supports budgeting methodologies and/or procedures.

10.    The Court expressly ruled in Plaintiffs' favor on the "timeframe" issue (*see* ECF #189, PageID##4987-4991), holding that, in light of the detailed allegations of Complaint relating to the 2012-2015 timeframe (*see* ¶¶ 76-117, 124-131 & Ex. E), the timeframe for discovery was January 1, 2012 to the present.

11.    Defendant WCCMH supplemented its interrogatory responses on March 11, 2021, but continued to completely object to some interrogatories, including contention interrogatories. Exhibit 4.

12.   On May 13, 2021 and June 3, 2021, Defendant WCCMH supplemented its responses to Plaintiffs' Requests for Production. For the majority of Plaintiffs' requests, Defendant WCCMH either claimed not to have responsive documents, continued to object on the basis of relevance and proportionality, or both. Exhibit 5.

13.   Defendant WCCMH also refused to produce information on self-determination CLS recipients who were supposedly able to hire staff after the budgeting change, even though its own employee testified that such individuals exist. Exhibit 6.

14.   Defendant WCCMH has expressly denied knowledge of any Washtenaw County Health Organization (WCHO) or Community Support and Treatment Services (CSTS) documents besides electronic medical records. Exhibit 4, Answer to Interrogatories 4, 5, and 6.

15.   WCHO and CSTS were predecessors to WCCMH. *Waskul v. WCCMH*, 979 F.3d 426, 435, 438 (6th Cir. 2020). Washtenaw County formed WCHO via an agreement with the University of Michigan Board of Regents. CSTS was a department within Washtenaw County. *See* ECF #146-3.

16.   On June 1, 2021, Plaintiffs served a subpoena on Washtenaw County, principally seeking documents from WCHO and CSTS in the timeframe of 2012-2015, documents that WCCMH says it does not have and/or cannot get. Exhibit 7.

M-3

17.   On June 14, 2021, Washtenaw County, through the same counsel as Defendant WCCMH, moved to quash the subpoena on the grounds of relevance, burden, and proportionality. ECF #196.

18.   On June 21, 2021, in hopes of avoiding or at least narrowing discovery disputes, Plaintiffs attempted to meet and confer with counsel for Defendant WCCMH to resolve the discovery issues and understand the scope of Defendant's searches and objections. Exhibit 8.

19.   Plaintiffs asked for Defendant to go request by request and identify the areas in which Defendant did not have responsive documents, as well as to identify what documents WCCMH withheld based on its objections. Exhibit 8.

20.   Plaintiffs questioned, in particular, the scope of Defendant WCCMH's search for documents. Exhibit 8.

21.   Defendant WCCMH offered to confer with its employees about those concerns and let Plaintiffs' counsel know whether they withheld documents or no responsive documents were found. Exhibit 8.

22.   Defendant WCCMH informed Plaintiffs' counsel that it did not have any files from WCHO or CSTS besides client files, and that it only withheld documents to or from Defendant WCCMH's counsel. Exhibit 8.

23.   On June 25, 2021, this Court issued an Order About Motion To Quash, directing the parties to meet and confer and go line by line through to try to resolve the issues raised in the Motion to Quash. ECF #199.

24.   After receiving that Order, on June 28, 2021, Plaintiffs' counsel contacted Defendant WCCMH's counsel to schedule the required meet and confer. Plaintiffs' counsel informed WCCMH's counsel that they planned on discussing potential motions to compel with respect to WCCMH and HMA as well as Motion to Quash, as all of the motions pertain to Plaintiffs' attempts to receive the same discovery. Exhibit 9.

25.   In that e-mail chain, counsel for WCCMH advised of a potential spoliation issue, as County e-mails are apparently on a 37-month retention cycle, and counsel did not say that a litigation hold had been issued on the filing of this action (or at any time thereafter). Exhibit 9.

26.   When counsel for Plaintiffs sought details about the retention/spoliation issue, counsel for WCCMH refused to respond further. Exhibit 9.

27.   Counsel for WCCMH refused to meet and confer regarding anything other than the Motion to Quash until Plaintiffs filed additional motions to compel, thus necessitating this Motion. Exhibit 9.

28.   Among the disputed discovery sought is information regarding the budgeting changes in 2012 and 2015, issues central to Plaintiffs' claims and defenses raised by multiple defendants.

29.   In fact, the Sixth Circuit held that "whether the prior methodology is permissible goes to what relief Plaintiffs can be provided," *Waskul v. Washtenaw County Community Mental Health*, 979 F.3d 426, 438 n. 2 (6th Cir. 2020).

30.   The Sixth Circuit also determined that pre-2015 practices are relevant to whether Plaintiffs' proposed budget methodology is "feasible" for purposes of 42 U.S.C. § 1396n(c)(2)(C). *see* 979 F.3d at 457.

31.   Despite these and Judge Tarnow's holding on the scope of discovery, Defendant WCCMH has refused to answer Interrogatories and provide a vast majority of the requested documentation.

32.   Defendant WCCMH has produced only three email chains, despite the fact that Affiant Richards claims to have "searched approximately 15,570 emails" ECF #196-1 PageID5059 ¶ 3.

33.   Defendant WCCMH's search for documents was clearly woefully inadequate, as evidenced by numerous documents produced by Defendant CMHPSM that are also in Defendant WCCMH's possession. Exhibits 10-21.

34.   Many of these documents are internal communications which WCCMH leadership and employees like Trish Cortes, Sally Amos O'Neal, Shane Ray, Nicole

Phelps and others sent or received. An appropriate search through the files of these key custodians would have turned up responsive documents. *See* Exhibits 10, 11, 13, 16, and 18.

35.   At no point in any objection does Defendant WCCMH, Washtenaw County, or HMA go through a proportionality analysis, comparing the burden of production with the importance of the issues and the importance of the requested discovery to the case.

36.   The claims in this case, all tied to the adequacy of CLS budgets for self-determination recipients, are of utmost importance. CLS services like those at issue, quite simply, allow Plaintiffs to survive and avoid institutionalization.

37.   Discovering the methodology and reasoning behind the CLS budgeting changes is essential. In December 2020, Defendant CMHPSM admitted that 81.3% of recipients in the region (1,270 people), do not receive the full amount of CLS services in their IPOSs. Ex. 22.

38.   The average annual shortfall is 686 hours; for individuals like Plaintiffs, operating under self-determination agreements, the average annual shortfall is 917 hours. Ex. 22. Determining the causes of those massive shortfalls, and then crafting an appropriate remedy, is essential.

39.   Plaintiffs' Motion to Compel Discovery By Defendant WCCMH and Non-parties Washtenaw County and Health Management Associates is based on

Fed. R. Civ. P. 26 and 37 and supported by the attached Brief in Support of Motion to Compel Discovery By Defendant WCCMH and Non-parties Washtenaw County and Health Management Associates.

WHEREFORE, Plaintiffs respectfully ask this Honorable Court to grant its Motion to Compel Discovery By Defendant WCCMH and Non-parties Washtenaw County and Health Management Associates and enter an order:

(a)  Compelling Defendant WCCMH to conduct and appropriate search for physical and electronic documents responsive to Plaintiffs Requests for Production, including conferring with Plaintiffs on search terms and search strategies;

(b)  Compelling WCCMH to answer Interrogatory 8;

(c)  Compelling Washtenaw County to produce the documents required by Plaintiffs' subpoena;

(d)  Compelling HMA to produce the documents required by Plaintiffs' subpoena;

(e)  Ordering that any subsequent objections to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents have been waived in accordance with Fed. R. Civ. P. 33(b)(4), 34(b)(2)(A), *e.g. Caldwell v. 9173-7999 Quebec, Inc*., 2020 WL 428356 (E.D. Mich. Jan. 28, 2020); and

(f)     Awarding Plaintiffs actual attorney fees and costs incurred in pre-

paring and arguing this Motion.

# BRIEF

## TABLE OF CONTENTS

*Page*

Motion ........................................................................................ M-1

Brief

Index of Authorities.................................................................... ii

Issues Presented......................................................................... iv

Controlling or Most Relevent Authority ................................... v

Background................................................................................. 1

I.   Documents Concerning the 2012-2015 Self-
     Determination Budget Process Are Indisputably Relevant.......... 5

II.  WCCMH's Search for Documents Was Wholly
     Inadequate, and It Should Be Compelled To Do the Job
     Right ......................................................................... 8

     A.   Legal Standards.................................................. 8

     B.   The Failure To Locate and Produce Documents That Are
          Known To Exist and Known to Be in WCCMH's
          Possession ......................................................... 10

III. WCCMH Should Be Directed To Cooperate in
     Determining Whether and Why It Failed To Preserve
     Documents It Knew Were Relevant............................... 18

IV.  The Subpoena to the County Was and Is an Appropriate
     Response to WCCMH's Repeated Disclaimers of
     Knowledge of Any Events Occurring Prior to Its
     Founding in October 2015 ........................................ 20

V.   The HMA Subpoena Is Specific and Tailored and Should
     Be Enforced Notwithstanding the Private Confidentiality
     Agreement Between HMA and the County .................. 22

*Page*

VI.   WCCMH Should Be Compelled To Produce Any Documents Supporting Its Testimony There Are Clients Who Are Managing Just Fine Under the Current CLS Regime ............................................................ 23

Conclusion........................................................... 25

### INDEX OF AUTHORITIES

**Cases**

*Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116 (E.D.Mich. 2019)...... 8

*Hancock v. Dodson*, 958 F.2d 1367 (6th Cir.1992)................................ 24

*Hayse v. City of Melvindale*, 2018 WL 11176493 (E.D.Mich. Apr. 10, 2018)............................................................... 24

*I.I.E. Int'l Elecs. & Eng'g, S.A. v. TK Holdings Inc.*, 2013 WL 12183637 (E.D. Mich. June 24, 2013) ................................. 23

*In re Subpoena of Autoliv ASP, Inc.*, 2016 WL 8201043 (E.D. Mich. Dec. 22, 2016),............................................ 21

*John B. v. Goetz,* 531 F.3d 448 (6th Cir. 2008)........................................ 18

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ........................ 2

*Sobel v. Imprimis Pharmaceuticals*, 2017 WL 5035837 (E.D.Mich. Oct. 26, 2017)......................................................... ii, 9, 24

*Waskul v. WCCMH*, 979 F.3d 426 (6th Cir. 2020)................................ ii, 1

*Weidman v. Ford Motor Co.*, 2021 WL 2349400 (E.D.Mich. June 9, 2021)............................................................... 8

*Zamorano v. Wayne State Univ.*, 2008 WL 2067005 (E.D.Mich. May 15, 2008) ...................................................... 24

*Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212 (S.D.N.Y.2003) ........ ii, 18

**Statutes**

42 U.S.C. § 1396a(a)(10) ........................................................ 2

42 U.S.C. § 1396n(c)(2)(A)...................................................... 2

42 U.S.C. § 1396n(c)(2)(C) ...................................................... 2

*Page*

42 U.S.C. § 1396a(a)(8) .......................................................... 2

Americans with Disabilities Act, Title II, 42 U.S.C. § 12131 *et seq*. .... 2, 6

Michigan Mental Health Code, MCL 330.1001 *et seq*. ........................ 2

MCL 330.1748(5)(a) .............................................................. 24

Rehabilitation Act, 29 U.S.C. § 794 ........................................... 2, 6

**Rules**

Fed.R.Civ.P. 34(b)(2)(C)........................................................ 9

Fed.R.Civ.P. 37(e) ............................................................. 19

Fed.R.Evid. 501 ................................................................ 24

*Issues Presented*

40.   Whether Defendant WCCMH has complied with its obligations to meet and confer regarding the discovery issues in this motion?

41.   Whether Defendant WCCMH (and, as necessary, Washtenaw County) should be compelled to perform a reasonable and adequate search for physical and electronic documents, including consultation with Plaintiffs concerning such matters as search terms, custodians, and physical locations to be searched?

42.   Whether Defendant WCCMH (and, as necessary, Washtenaw County) should be compelled to cooperate in the investigation of a potential spoliation of documents caused by their apparent failure to institute a routine "litigation hold" upon the filing of this action (or any time thereafter)?

43.   Whether non-party Washtenaw County should be compelled to provide discovery concerning documents and information as to which Defendant WCCMH has disclaimed possession, custody, or control?

44.   Whether Washtenaw County may prevent non-party Health Management Associates from complying with a narrow, tailored subpoena seeking information expressly referred to in the Complaint, solely on the basis of a private non-disclosure agreement?

45.   Whether WCCMH should be compelled to identify the individuals to which its witness had reference when she testified that Defendants' CLS budgeting system was in fact working for certain CLS recipients?

***Controlling or Most Relevent Authority***

> *Waskul v. WCCMH*, 979 F.3d 426 (6th Cir. 2020)
>
> *Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116 (E.D.Mich. 2019)
>
> *Sobel v. Imprimis Pharmaceuticals*, 2017 WL 5035837 (E.D.Mich. Oct. 26, 2017)
>
> *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)
>
> Fed. R. Civ. P. 26
>
> Fed. R. Civ. P. 37
>
> Fed. R. Civ. P. 37(e)(1), (e)(2)

Plaintiffs respectfully submit this brief in support of their motion to compel discovery against Defendant Washtenaw County Community Mental Health ("WCCMH") and non-parties Washtenaw County (the "County") and Health Management Associates ("HMA"). The exhibits in the exhibit volume filed herewith are cited "Ex. xx."

This brief also lays out certain background relevant to the County's pending motion to quash (ECF #196). That motion is set for hearing on August 26, with the joint issue summary to be filed on August 12 (*see* ECF #199). Simultaneously with the filing of this motion to compel, Plaintiffs are moving for an order referring the motion to Judge Stafford (as the County's motion to quash has been) and placing it on a schedule (including, in particular, a joint issues list on August 12) that will permit it to be heard together with the County's motion to quash. The motions relate to precisely the same subject matter, and all issues related to them should be heard together.

***Background***

Because this cluster of motions is the Magistrate Judge's first encounter with this case, the Sixth Circuit's most recent decision in this matter,[1] which sets forth the background of this case in detail, is attached to this brief as an Appendix. To

---

[1]    *Waskul v. WCCMH*, 979 F.3d 426 (6th Cir. 2020).

summarize, Plaintiffs are individuals with intellectual and developmental disabili-
ties[2] who receive Community Living Supports (CLS) on a self-determination basis
under Michigan's Habilitation Supports Waiver (HSW). The First Amended and
Supplemental Complaint (ECF #146), which was sustained by the Sixth Circuit, al-
leges that a 2015 change in budgeting procedure for self-determination CLS imple-
mented by the Washtenaw Community Health Organization, a predecessor to De-
fendant WCCMH,[3] caused Plaintiffs to be unable to pay for the staff and other CLS
services provided for in their Individual Plans of Service (IPOSs). The change and
its consequences—which have only gotten worse over time—are asserted to violate
the HSW (Count IX); several provisions of the Medicaid Act (42 U.S.C.
§§ 1396a(a)(8), (a)(10), 1396n(c)(2)(A), (C); Counts III, IV, VII, and VIII); the "In-
tegration Mandate"[4] under the Americans with Disabilities Act, 42 U.S.C. § 12131
*et seq*., and the Rehabilitation Act, 29 U.S.C. § 794; and the Michigan Mental Health
Code, MCL 330.1001 *et seq*.

At the Rule 16 Conference held on March 2, 2021, the Court held that the
initial scope of discovery was:

> (1) costs to hire and maintain Community Living Support staff; (2) the
> amount of money in the public behavioral health system available for
> Plaintiffs' use; (3) the availability and suitability of agency providers;

---

[2]     Plaintiff Washtenaw Association for Community Advocacy is an unincorpo-
rated association whose members include the individual Plaintiffs.

[3]     *See* 979 F.3d at 435, 438 (referring to WCHO as WCCMH's "predecessor").

[4]     *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

-2-

and (4) Community Living Supports budgeting methodologies and/or procedures.[5]

The Court further expressly ruled in Plaintiffs' favor on the "timeframe" issue (*see* ECF #189, PageID##4987-4991), holding that, in light of the detailed allegations of the Complaint relating to the 2012-2015 timeframe (*see* ¶¶ 76-117, 124-131 & Ex. E), the timeframe for discovery was January 1, 2012 to the present.[6]

The State and PIHP Defendants understood what was required of them, and they each produced thousands of pages of documents, including hundreds of e-mails. That is not to say, of course, that Plaintiffs will never have differences of opinion with these Defendants on discovery issues, but Plaintiffs acknowledge and respect that they took the process seriously.

WCCMH, however, is a different story. It produced a number of policy documents, and what appears to be a fairly complete set of Utilization Review Committee Minutes, but very little else of significance. It produced very few internal or external communications, discussions, or analyses on any of the subjects requested,

---

[5]   This description is taken from the State Defendants' Supplemental Responses to Plaintiffs' First Requests for Production of Documents addressed to those Defendants (Ex. 23). There was no court reporter at the Conference, and the parties have some differences of opinion as to precisely what was said, but there is no dispute that this scope description is generally accurate.

[6]   The Court also ruled for Plaintiffs on the "geography dispute," holding that Plaintiffs could obtain discovery about practices around the State, not merely in the four-county region covered by Defendant CMHPSM, but that ruling mostly relates to the other Defendants and has at most marginal effect on WCCMH, the County, and HMA.

and it frequently "bulked up" its production by producing the same document under multiple requests.[7] Even if, in fact, WCCMH's affiant "searched approximately 15,570 e-mails" (ECF #196-1, PageID#5059 ¶ 3), her search was remarkably ineffective, because **WCCMH's entire production contains only three e-mail chains**, and none on the overall substantive issues in the case.[8] Fully *sixty percent* of WCCMH's production (2094 pages out of a total of 3513) consists of a single, publicly available document, the Michigan Medicaid Provider Manual.

   Plaintiffs have repeatedly tried—and have repeatedly been rebuffed in their attempts—to have a face-to-face (*i.e.*, Zoom) meeting with counsel for WCCMH concerning the issues raised by these motions. The details are set forth in the motion, at ¶¶ 18-27 & Exs. 8, 9. Most recently, when Plaintiffs provided WCCMH's counsel a copy of Judge Stafford's individual practice guidelines, which require face-to-face meetings in conjunction with motions to compel and explicitly state that e-mail exchanges are *not* an adequate substitute, counsel responded:

> As I read the section that you have quoted, it refers to "motions for discovery that have been referred to the magistrate judge". I know of

---

[7]   For example, it produced three copies (Bates ##2229-39, 2248-58, 2259-69) of a document that was already Exhibit B to the Complaint (ECF#146-3)—a February 2015 memo to the County Board of Commissioners regarding the Behavioral Health Task Force Report—but it did *not* produce the Task Force Report itself. It produced two copies of a 2016 "Section 1009 Report" (Bates ##2767-2831, 2857-2921) and fully *six* copies of a 2019 Self-Determination Policy (Bates ##2509-14, 2761-66, 2922-27, 2928-33, 2934-39, 3184-89).

[8]   The three e-mail chains were produced in response to Requests 67 (relating to Plaintiff Kevin Wiesner) and 70 and 72 (relating to Plaintiff Cory Schneider).

no motion for discovery that you have filed. Nor do I know of any basis
for your threatened motion to compel, as we have responded to your
discovery requests. As a courtesy, I have provided a response to your
query about our Responses. If you have further or follow-up questions,
you are certainly able to file follow-up interrogatories. But I do not plan
to answer any further questions about our previous responses.

Because counsel for WCCMH has refused to talk prior to the filing of this motion,
Plaintiffs have no alternative but to file the motion and *then* have the meeting that
should already have been had. A number of specific issues on these motions will not
be ripe for resolution until WCCMH complies with its obligation to sit down and go
through the discovery requests line by line—a process that, per the scheduling mo-
tion filed concurrently herewith, Plaintiffs seek to have put on the same track (Joint
Statement on August 12, Hearing on August 26) as the County's motion to quash.
Certain overarching issues, however, can be addressed now.

## I.   Documents Concerning the 2012-2015 Self-Determination Budget Process Are Indisputably Relevant

The County asserts (and, so far as Plaintiffs can tell without the required dis-
cussion, WCCMH agrees) that budgeting procedures, and the reasons for them, in
the 2012-2015 timeframe are not relevant (ECF #196 at PageID#5053-54). This ob-
jection is completely untenable, if only because, as set forth above, Judge Tarnow
overruled it at the March 2 Conference. The objection also flies in the face of three
express rulings of the Court of Appeals:

- its holding that "whether the prior methodology is permissible goes to
  what relief Plaintiffs can be provided," 973 F.3d at 438 n.2;

-5-

- its determination that pre-2015 practices are relevant to whether Plaintiffs' proposed budget methodology is "feasible" for purposes of 42 U.S.C. § 1396n(c)(2)(C), *see* 973 F.3d at 457; and

- its parallel holding that the pre-2015 practices bear on whether Plaintiffs' proposal would effect a "fundamental alteration" of the HSW for purposes of the ADA and Rehabilitation Act claims, *see id*. at 463-64.

In all these instances, the Sixth Circuit held that what had happened under the pre-2015 regime—and why—was relevant to evaluating Plaintiffs' right to relief going forward. The County never so much as mentions "fundamental alteration," and it sneers at "feasibility" by placing the word in quotes, as though it were a concept Plaintiffs were making up out of whole cloth (ECF#196 at Page ID5049). The County's brief is nothing more or less than an effort to rewrite the decision of the Court of Appeals.

Indeed, WCCMH itself has repeatedly referred to pre-2015 events as justification for its current practices. At the 2016 preliminary injunction hearing in this matter, Sally Amos O'Neal, the Executive Director of WCCMH at the time of the budgeting change, testified that the 2012 addition of separate line items to the budget "essentially was then double paying for the CLS services" (ECF #48 PageID#1016; *see also id*. at 1017), and continued:

> THE COURT: But the provider as well as the beneficiary wouldn't be getting double for that trip to Red Robin but, rather, they would be able to go twice to Red Robin?
>
> THE WITNESS: No. We were paying for the service twice to the individuals.

THE COURT: For the same service?

THE WITNESS: Yes. So they were receiving more money.

THE COURT: I understand the more money part, but why isn't that fraud?

THE WITNESS: That's why we ended the practice, it was not appropriate. (*Id*. at 1017-18)

WCCMH told the Sixth Circuit that the 2012 budgeting change was made "for an unknown reason" (ECF #40 in No. 19-1400, at 10), which mirrored its prior description of the change to this Court as "inexplicabl[e]" (ECF #130, PageID#3294).

Well, the Amended Complaint expressly alleges that Ms. Amos O'Neal's testimony was not correct, that there was no double counting, and that the 2012 budgeting change was not inexplicable but rather a fully authorized and intentional benefit increase that Washtenaw County simply later came to regret (ECF #146 ¶¶ 124-131 & Ex. E). How and why the 2012 budget change was implemented, and how and why the 2015 reversal of that change was implemented, have always been core factual disputes in this case. They still are.[9] As Judge Tarnow ruled on March 2, Plaintiffs are entitled to the discovery needed to prove that it is their understanding, and not WCCMH's, that is correct.

---

[9]    As recently as this year, for example, in its Answers to Interrogatories, WCCMH stated that it was Ms. Amos O'Neal who "made the decision *to correct the budgeting error*" (Ex. 4 at 4; emphasis added)

## II.   WCCMH's Search for Documents Was Wholly Inadequate, and It Should Be Compelled To Do the Job Right

Using a combination of boilerplate burden and proportionality objections and a woefully inadequate search for physical and electronic documents, WCCMH has completely failed to satisfy its obligation to search for and produce responsive documents. As noted above, the entire production contains only three e-mail chains. Documents produced by the other Defendants make it clear that WCCMH has hundreds of responsive e-mails. WCCMH—and, to the extent necessary, the County—should be compelled to go back and do the job right.

### A.   Legal Standards

If a requesting party can reasonably question the responding party's effort to comply with discovery requests, courts may order "discovery about discovery" or grant a motion to compel. *See Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 125 (E.D.Mich. 2019). Credible evidence that the responding party withheld responsive documents is enough to succeed on a Motion to Compel. "Specifically, this might include presentation of responsive, but withheld, documents that the moving party obtained from another source or testimony demonstrating knowledge of the existence of responsive documents." *Weidman v. Ford Motor Co.*, 2021 WL 2349400 at *4 (E.D.Mich. June 9, 2021). Here, as set forth below, Plaintiffs have ample evidence that Defendant WCCMH has responsive documents in its possession but either failed to make a reasonable inquiry or simply refused to produce them.

It may be that WCCMH thinks it has done enough, but its repeated, boilerplate objection—made in response to virtually every request—that the request is "overly broad, not proportional to the needs of this case and . . . responding would be unduly and substantially burdensome" will not fly. Such boilerplate objections are "legally meaningless and amount to a waiver of an objection." *Sobel v. Imprimis Pharmaceuticals*, 2017 WL 5035837, at *4 (E.D.Mich. Oct. 26, 2017). They likewise violate the requirement of Fed.R.Civ.P. 34(b)(2)(C) that an objecting party state if it is withholding responsive materials based on that objection. *Id*. The affidavits submitted in connection with the County's motion to quash—which appear to relate to work undertaken on behalf of Defendant WCCMH, not on behalf of the County—are likewise insufficient because they do not specify what searches were done, or how. With a grand total of ***three*** e-mail chains having been produced, the most charitable thing one can say about Affiant Richards's assertion that she "searched approximately 15,570 emails" (ECF #196-1 PageID5059 ¶ 3) is that her search strategy must have been way off base. With WCCMH refusing to meet and confer on this (or any other) issue, Plaintiffs have had no choice but to proceed with this motion.

Moreover, WCCMH's "proportionality" and "burden" objections would not be well taken even if they had not been waived as meaningless boilerplate. This is significant litigation. It has been the subject of *two* published opinions of the Court of Appeals; the 2020 decision occupies 47 pages in the *Federal Reporter* and

addresses numerous cutting-edge issues in Medicaid and Disability Law. The need

for relief is great: Defendant CMHPSM admitted in December 2020 (Ex. 22) that

*81.3%* of CLS recipients in the four-county region (1270/1563) are not receiving the

full amount of CLS specified in their IPOSs, and that the average annual shortfall is

*686 hours*. For those (such as these Plaintiffs) operating under self-determination

arrangements, it is even worse: the "average number of CLS hours below amount

authorized in IPOS for those in self-determination structure" is *917 hours annually*.

This case matters, the relief sought matters, and WCCMH's choice to give the back

of its hand to its discovery obligations after wasting a couple of hundred hours on

misdirected searches should not be countenanced.

### B.   The Failure To Locate and Produce Documents That Are Known To Exist and Known to Be in WCCMH's Possession

As set forth above, WCCMH's production includes a grand total of *three* e-

mail chains, which is unbelievable on its face. Documents produced by the other

Defendants (principally Defendant CMHPSM) make it clear that WCCMH person-

nel—like everyone else in the world—regularly communicate by e-mail about all

sorts of subjects, including subjects that were and are responsive to document re-

quests in this action.

Of particular interest is a September 16, 2020 e-mail chain involving Trish

Cortes, the Executive Director of Defendant WCCMH, and James Colaianne, her

counterpart at Defendant CMHPSM (Ex. 10). This chain was produced by

CMHPSM under Bates Number C000107. It includes a discussion of a new State requirement that "the SD [self-determination] rate should be the same as our contracted CLS provider rate," and Ms. Cortes tells Mr. Colaianne, "This could be very bad!" The e-mails are responsive to a number of requests, including in particular Request 51, which asks for "All Documents reflecting or otherwise Concerning Communications with CMHPSM concerning budget procedures for CLS Recipients." Serendipitously, Request 51 is the only Request as to which counsel for WCCMH provided details as to their search efforts, stating:

> For example, with regard to Request # 51, we searched for to/from/cc contains "@cmhpsm.org + budget + CLS and returned 0 results.

Although the use of a Boolean "and" search is, in general, far too restrictive and will miss many responsive documents, even this crabbed search should have found the e-mail: It is to the Executive Director of CMHPSM (who has an "@cmhpsm" e-mail address), and it contains the words "budget" and "CLS." But the document was not located. Something is very seriously wrong.

Similarly, the agenda and Board Package for the February 13, 2019 meeting of the Board of Directors of Defendant CMHPSM, which has previously been filed as ECF #148-1, contains "Financial Narratives" relating to three of the four constituent Community Mental Health Service Providers (CMHSPs), including Defendant WCCMH. The WCCMH Narrative says, in part:

> Community Living Supports (CLS) services continue to be an area of concern and WCCMH continues its focus on utilization review. The CLS rate increases that were implemented as a region were necessary and still insufficient for the provider network to continue to meet the mandated and medically necessary CLS services in Washtenaw. (ECF #148-1 at PageID#3938)

Whether or not this was actually drafted by WCCMH, it is inconceivable that it was drafted without WCCMH's active involvement. Accordingly, Request No. 44 asked for:

> All Documents Concerning the "CMHSP Financial Narratives" prepared for or in conjunction with CMHPSM (see ECF#148-1, at page 7 of 59 for an example) for the 2016, 2017, 2018, 2019, 2020, and 2021 fiscal years insofar as such narrative relates to CLS services.

WCCMH's response, in its entirety, was:

> Defendants WCCMH and Cortes OBJECT to this Request because it is overly broad, not proportional to the needs of this case and because responding would be unduly and substantially burdensome. Without waiving that objection, Defendants are currently unaware of any documents which are responsive to this request.

Not possible.

The list of things WCCMH would have found with a reasonable search goes on and on. Nicole Phelps was on a CLS work group with James Colaianne tasked with revising fee schedules for CLS (Ex. 11). WCCMH produced none of her notes or work from that work group. Also informative are the minutes of the Regional Operations Committee (ROC), of which Trish Cortes is a member, produced by Defendant CMHPSM. On November 28, 2016, the ROC met and included "CLS

Emergency Planning" as an agenda item, with a bullet point stating that "Washtenaw will pilot a plan" (Ex. 12). These meeting minutes and any communications concerning the meeting are plainly responsive to Plaintiffs' requests for documents about setting the CLS rate and the CLS provider shortage (*e.g.*, Requests 10, 19, 20, 23), both essential parts of Plaintiffs' case.[10] The meeting occurred seven months *after* Plaintiff filed this suit, and Trish Cortes attended the meeting. WCCMH has no excuse for not retaining this document and communications relating to it and producing them in discovery.

WCCMH withheld responsive documents as to named Plaintiffs as well. Request 66 asks for "All Documents Concerning any Communication between WCCMH and CMHPSM relating in any way to *In the Matter of Kevin Wiesner*"; WCCMH recited its boilerplate burden and proportionality objections but stated it was unaware of any responsive documents. On January 9, 2020, however, Ms. Cortes sent Mr. Colaianne and others the decision and order in *In the Matter of Kevin Wiesner*, asking that they put the matter on the ROC agenda (Ex. 13). Defendant CMHPSM produced the e-mail, and WCCMH easily could have done the same with an e-mail search of a main stakeholder.

---

[10]   The CLS staffing crisis has been a standing ROC agenda item since November 2016.

Defendant CMHPSM produced many other documents and other communications that Defendant WCCMH employees like Trish Cortes, Katie Snay, Shane Ray, Sally Amos O'Neal, and Nicole Phelps sent or received. According to the Court's model ESI discovery order, absent a Court order Defendant WCCMH should have searched for responsive ESI from up to 10 key custodians for up to 160 hours. This case may well require more than that, given the number of years the case has been active and the seriousness of the issues involved, but even if WCCMH's affiants spent anything like the time they say they did on ESI searches,[11] their efforts were astonishingly ineffective. WCCMH has clearly not conducted a reasonable search of the physical or electronic files of any of the employees listed above. If it had, it would have found responsive documents like the examples above.

Nor are these isolated examples—as, indeed, they could not be with WCCMH having produced only three e-mail chains altogether. We describe here seven more examples of obviously responsive documents that were not produced by WCCMH, and Exhibit 14 collects another 23. The relevance "categories" in these descriptions are those agreed at the March 2 Conference.[12]

---

[11]    WCCMH's affiants do not break out the amount of time they spent searching for physical documents (not included within the presumptive 160-hour limit) from that spent searching for ESI, but the record is clear that *whatever* time WCCMH spent searching ESI was completely wasted.

[12]    These are (1) costs to hire and maintain Community Living Support staff; (2) the amount of money in the public behavioral health system available for

1.  **Document:** Deconstructing the Direct Care Service Crisis (Ex. 15)

     **Date:** February 2019

     **Produced by:** CMHPSM (Bates ##K2672-2685)

     **Brief Description:** The report analyzes why there is a direct care staffing shortage and makes recommendations for improving the situation. The analyses and recommendations include information on the wages needed to retain staff and what the increased wages would cost.

     **Evidence WCCMH has it:** The Acknowledgements section names five WCCMH employees as having contributed to or supported the report, including Heather Linky, Sally Amos O'Neal, Megan Taylor, Shane Ray, and Trish Cortes.

     Sally Amos O'Neal e-mailed it to Trish Cortes on April 15, 2019. Trish Cortes then e-mailed it to the Regional Operations Committee ("ROC"). (CMHPSM Bates #K2741)

     **Relevance:** Categories 1, 2, and 3; RFPs 10, 19, 20, 23, 25, 30, 39, 46, 47, 48, 51, 55, 56.

2.  **Document**: E-mail re "Talking Points from meeting with MDHHS and Milliman yesterday." (Ex. 16)

     **Date**: November 28 and 29, 2018

     **Produced by**: CMHPSM (Bates ##P1558-1573)

     **Brief Description**: E-mail chain among (principally) Cortes (WCCMH) and Terwilliger (CMHPSM) regarding, *inter alia*, funding, costs of providing CLS services, inability to provide services at current rates, and related topics.

     **Evidence WCCMH has it**: Cortes is a principal on the e-mails; Nicole Phelps is also copied. The date is less than 37 months ago; there should be no spoliation issue.

     **Relevance**: Categories 1, 2, and 3: RFPs 10, 19, 20, 23, 30, 39, 46-49, 51, 52, 56.

3.  **Document:** ROC Minutes (Ex. 17)

     **Date:** January 13, 2020

     **Produced by:** CMHPSM (Bates ##L1221-1222)

------

Plaintiffs' use; (3) the availability and suitability of agency providers; and (4) Community Living Supports budgeting methodologies and/or procedures.

**Brief Description:** Minutes of the meeting referred to in Cortes 1/9/2020 e-mail above.

**Evidence WCCMH has it:** Ms. Cortes attended the meeting

**Relevance:** Categories 1, 2, 3, and 4: RFPs 4, 51, 59, 60, 61, and 66.

4. **Document:** E-mail from Connie Conklin to Trish Cortes, et. al. RE: CLS Rate Increase (Ex. 18)

**Date:** May 19, 2016

**Produced by:** CMHPSM (Bates ##D2787-2789); a portion of the chain was also produced by the State Defendants (SOM_0002038-40)

**Brief Description:** An e-mail chain involving all three sets of Defendants discussing, *inter alia*, the procedures for setting self-determination CLS budgets and some of the language of the HSW relating thereto. In writing to, among others, Trish Cortes and Katie Snay of WCCMH, about a projected rate increase for agency providers that would *not* apply to self-determination CLS participants, Jeffrey Wieferich of MDHHS said (5/18/2016 7:32AM e-mail):

> When word gets out that there was a rate increase for CLS providers and that this does not apply to SD arrangements you should expect some pushback from the individuals involved in the current case and probably others.

The "current case" to which Mr. Wieferich had reference is this case, and the "individuals involved" are these Plaintiffs.

**Evidence WCCMH has it:** Ms. Snay and Ms. Cortes are on the Wieferich e-mail and the full chain thereafter.

Because this is a 2016 e-mail, WCCMH's copies may have been discarded if, as appears likely, WCCMH breached its duty to preserve documents. See Point III below. That this could happen to an e-mail such as this, which was written *after* this action was filed and expressly refers to it, merely underscores the seriousness of the potential spoliation issue.

**Relevance:** Categories 1, 2, 3, and 4: RFPs 10, 19, 20, 25, 30, 33, 38, 39, 48, 49, 51 and 52.

5. **Document:** Memorandum re "H0043 Unlicensed CLS Change" (Ex. 19)

**Date:** Based on the content, August 31, 2015.

**Produced by**: CMHPSM (Bates #N50-53)

**Brief Description**: Discussion of budgeting and reimbursement methods for CLS in light of proposed change in State reporting requirements. Includes detailed discussion of pros and cons of budgeting "based on an individual's CLS assessment," which "would be individually authorized by case managers"—a procedure sharing many characteristics with what Plaintiffs say the HSW requires and the relief Plaintiffs seek.

**Evidence WCCMH has it:** The workgroup creating the analysis (and which held four meetings to do so) included five Washtenaw representatives—Mike Harding, Britt Paxton, Kelly Bellus, Nicole Phelps, and Megan Petersen. By date, there may be a spoliation issue as to this document as well.

**Relevance:** Category 4: RFPs 10, 19, 39, and 52.

6. **Document:** CMHPSM Direct Care Wage Increase Workgroup Action Plan (Ex. 20)

> **Date:** October 20, 2017
>
> **Produced by:** CMHPSM (Bates ##D520-529)
>
> **Brief Description:** The workgroup estimated the financial impact of a wage increase for direct care staff and made recommendations for a fringe rate calculation.
>
> **Evidence WCCMH has it:** WCCMH employees Megan Taylor, Nicole Phelps, Sara Hungerford and Seth Dominique are listed as members of the workgroup.
>
> As to potential spoliation, the date of this document is less than 37 months before the Sixth Circuit's decision, which was handed down on October 29, 2020.
>
> **Relevance:** Categories 1, 2, 3, 4: RFPs 10, 19, 20, 23, 25, 30, 43 46, 47, 48, 51, 55, and 56.

7. **Document:** E-mail from James Colaianne RE: Potential Pilot Worksheet (Ex. 21)

> **Date:** Based on date of Pilot Worksheet, October 2016
>
> **Produced by**: CMHPSM (Bates #N95)
>
> **Brief Description**: The e-mail discusses and includes an attachment on costing out standard and per diem CLS service rates, including separate line items for transportation and activities. It also references the per diem system used at WCHO in 2014. As it is after April 2015, it

directly rebuts WCCMH's contention that separately accounting for transportation and activities constitutes illegal "double billing."

**Evidence WCCMH has it:** WCCMH director Trish Cortes received the e-mail, as well as employees Nicole Phelps and Britt Paxton. As to potential spoliation, the document is dated after commencement of this action.

**Relevance:** Categories 1 and 4: RFPs 10, 19, 24, 25, 26, 39, 49, and 51.

\* \* \*

WCCMH should be ordered to conduct a proper search for responsive documents and produce the documents it finds.

## III. WCCMH Should Be Directed To Cooperate in Determining Whether and Why It Failed To Preserve Documents It Knew Were Relevant

There appears to be an issue of spoliation by the County and/or WCCMH.

Counsel for WCCMH has advised:

> With regard to emails, Washtenaw County has only one email system archiver, known as Barracuda. Every email to or from a County email domain is loaded onto that system. The system has a 37 month records retention. (Ex. 9, 6/28/21 11:09AM)

As the Sixth Circuit has held, however, "As a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" *John B. v. Goetz,* 531 F.3d 448, 459 (6th Cir. 2008) (citing, *inter alia*, *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216-18 (S.D.N.Y.2003)). And *Zubulake* held (220 F.R.D. at 218):

-18-

> Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents.

This action was filed in March 2016, and a "litigation hold" should have been put in place at that time. It certainly was possible to have done so: "Barracuda" is a well-known suite of records retention systems that advertises its ability to comply with its clients' litigation obligations: Under Barracuda, "selected data can be placed on legal hold on a case-by-case basis for as long as needed, then exported as needed for analysis or disclosure." https://www.barracuda.com/products/messagearchiver (last visited July 8, 2021). Accordingly, on receipt of the Barracuda e-mail, Counsel for Plaintiffs wrote to counsel for WCCMH seeking documents and information as to Barracuda (and retention policies in general) and "what efforts, if any, were made to preserve documents and e-mails relating to the subject matter of this action upon the filing of this suit (or at any time thereafter)" (Ex. 9, 6/28/21 11:24:44 AM). Counsel for WCCMH replied:

> I have responded to your query about our Responses to your Requests for Production. If you feel that my response is inadequate, you are free to file whatever motion you deem appropriate. (*Id.* 6/28/21 5:46:07PM)

This is that motion.

It is not yet certain that there has been a spoliation, although it does appear that there has been. It is likewise far too early to evaluate what remedy, if any, may be appropriate under Fed.R.Civ.P. 37(e)(1), (2). But the subject is clearly on the

table, and WCCMH should be directed to respond to Plaintiffs' routine, reasonable document preservation questions and to cooperate in the investigation of the potential spoliation.

## IV. The Subpoena to the County Was and Is an Appropriate Response to WCCMH's Repeated Disclaimers of Knowledge of Any Events Occurring Prior to Its Founding in October 2015

As directed by the Court (ECF #199), Plaintiffs will meet and confer with counsel for the County about the pending motion to quash and will file a Joint Report on August 12. In this section, we provide an overview of why the subpoena was issued and what it seeks to accomplish.

Throughout this litigation, WCCMH has asserted that it did not come into existence until October 1, 2015 and that it knows quite literally nothing about any event taking place before that date. Thus, in its Answers to Interrogatories, WCCMH acknowledged the receipt of electronic medical records transferred over from WCHO (Answer to Interrogatory 3), but it expressly denied knowledge of *any* other WCHO or CSTS documents (Answer to Interrogatories 4, 5, and 6). Plaintiffs believed (and continue to believe) that this assertion was more than a little disingenuous—when WCHO/CSTS went away and WCCMH came in, the same people were doing the same jobs in the same locations—but they told the Court at the March 2 Conference that they would serve a subpoena on Washtenaw County. Virtually all of the Subpoena is a repetition of requests for documents previously made to

-20-

WCCMH, but with a timeframe limited to 2012-2015. These are the documents WCCMH says it does not have and cannot get.

It is indisputable that the documents sought were, prior to the formation of WCCMH, in the possession, custody, or control of Washtenaw County:

- WCHO was a partnership between the County and the University of Michigan (*see*, *e.g.*, ECF #146-3), so that, on the dissolution of WCHO, the County or the University (or both) succeeded to the assets (including the business records) of the partnership. The Behavioral Health Task Force, which recommended the restructure of WCHO into WCCMH, was a joint UofM/County project and submitted its report on County letterhead (*id*.).

- CSTS was not a separate entity at all but was "a county department" (*id*.).

- Both WCHO and CSTS used the County's internet domain, "ewashtenaw.org," for their e-mail (*see*, *e.g.*, Subpoena Ex. 5 (the subpoena is Ex. 7 hereto, and the referenced e-mail is the 64th page of the .pdf)).[13] All e-mails from that timeframe are *by definition* in the County's "possession, custody, or control."

WCCMH is denying possession of the documents, and the entity *with* possession is saying "Don't bother me." The situation here is directly analogous to *In re Subpoena of Autoliv ASP, Inc*., 2016 WL 8201043, at *4 (E.D.Mich. Dec. 22, 2016), in which

---

[13]   Sally Amos O'Neal is the Director of Customer Service for Defendant WCCMH (ECF #196-1, PageID#5058), a position effectively the same as the one she held at WCHO. Michael Harding is, according to his Linked-In page (https://www.linkedin.com/in/michael-harding-7b529b87), the Deputy Director of WCCMH and the former Chief Information Officer of WCHO. Eric Kurtz was the Director of WCHO but departed in the budget crisis described in the Complaint. James Colaianne headed finance and actuarial for WCHO and is now the Director of Defendant CMPHSM. In 2014, all of these individuals had "ewashtenaw.org" e-mail addresses (Subpoena Ex. 5).

this Court held that "[t]he fact that both Autoliv and Ford are disclaiming possession of the relevant documents" warranted hearing Autoliv's motion to quash where the underlying action was pending:

> Ford is a party to the underlying action, but not to Autoliv's motion. If Judge Hayes assumes jurisdiction over both the underlying action and the instant motion, she will be in a position to compel both companies to provide answers in one forum. She will be able to assure that, "one way or the other, either from Ford or from Autoliv or from both," the Tabers will obtain the existing relevant documents.

> Plaintiffs look forward to addressing these issues with counsel for WCCMH

at the meet-and-confer and, to the extent still necessary, with the Court.

## V.   The HMA Subpoena Is Specific and Tailored and Should Be Enforced Notwithstanding the Private Confidentiality Agreement Between HMA and the County

In 2015, non-party Health Management Associates (HMA) submitted a report to the County regarding the restructure of mental health services in the County including, among other things, the cost of CLS services (Cplt. ¶¶ 161, 162). Plaintiffs have issued a subpoena to HMA (Ex. 1) seeking the documents underlying the report's discussion of what is, after all, the central factual issue in this case. HMA objected (Ex. 1), principally on the grounds that the materials were covered by a confidentiality agreement with its client, Washtenaw County. A meet-and-confer did not resolve the issue, and Plaintiffs now seek to compel production under the subpoena.

-22-

HMA's confidentiality agreement with the County is not a bar to production. Confidentiality agreements between a defendant and a third party do not preclude the production of documents protected by that agreement, pursuant to a subpoena to the third party. *I.I.E. Int'l Elecs. & Eng'g, S.A. v. TK Holdings Inc.*, 2013 WL 12183637, at *1 (E.D. Mich. June 24, 2013) (citing authority).[14] Counsel for WCCMH (who is also counsel for the County) had notice of the subpoena before it was served and has not moved for a protective order.

Nor has HMA begun to demonstrate burden. The subpoena is narrow and specific, relating to a specific portion of a specific engagement. In the meet-and-confer process counsel for HMA was invited to spell out the burden issues but did not do so. Accordingly, HMA should be compelled to comply with the subpoena.

## VI.   WCCMH Should Be Compelled To Produce Any Documents Supporting Its Testimony There Are Clients Who Are Managing Just Fine Under the Current CLS Regime

In a December 2019 Fair Hearing brought by Plaintiff Wiesner, WCCMH's Krista DeWeese testified that there were, to her knowledge, individuals within Washtenaw County who *were* able to hire CLS staff under the budget methodology challenged in this action. She testified that she had "looked into different situations that I know where individuals do and are able to hire staff," and that "[t]here are a

---

[14]   To the extent that the confidentiality agreement is not with WCCMH but with the County, it stands on no better footing, for the reasons discussed in Point IV above.

-23-

couple . . . that are able to manage within their budget" (Ex. 6 (12/18/19 H'rg Tr. at 33-34)). Plaintiffs' Interrogatory 8 sought identification of the individuals to whom Ms. DeWeese had reference, and WCCMH declined to respond. Plaintiffs submit that it should be ordered to do so.

Aside from its boilerplate burden and proportionality objections—which, as discussed above, are equivalent to no objection at all, *Sobel*, *supra*; *Hayse v. City of Melvindale*, 2018 WL 11176493, at *6 (E.D.Mich. Apr. 10, 2018)—WCCMH asserts that the information is subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and is also protected by Michigan law. But a HIPAA-compliant protective order has been submitted to the Court (ECF ##192, 194), and state sealing statutes and other privilege laws do not apply when, as here, the plaintiffs assert federal claims; rather, the federal common law of privilege controls. Fed. R.Evid. 501; *e.g.*, *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir.1992); *Zamorano v. Wayne State Univ.*, 2008 WL 2067005 (E.D.Mich. May 15, 2008). In any event, the Michigan Mental Health Code explicitly permits disclosure of such information "[u]nder an order or a subpoena of a court of record." MCL 330.1748(5)(a), and WCCMH has offered no argument or authority suggesting that a Rule 34 discovery request such as this is not the equivalent of a "subpoena of a court of record" under the Mental Health Code.

Accordingly, WCCMH should be compelled to answer Interrogatory 8.

## CONCLUSION

The motion to compel should be granted, and WCCMH, the County, and HMA should be ordered to make discovery as set forth herein.

Respectfully submitted,

/s/ Nicholas A. Gable (P79069)          /s/ Edward P. Krugman

/s/ Kyle Williams (P77227)          /s/ Lisa Ruby (P46322)

July 13, 2021

**CERTIFICATE OF SERVICE**

This 13th day of July, 2021, I filed the foregoing in the Court's electronic filing system, which will effect service on all counsel of record in this action, including counsel for non-party Washtenaw County. I also e-mailed the document to counsel for non-party Health Management Associates, as follows:

**Kimberly J. Ruppel** Member

2600 W. Big Beaver Rd.    Phone  248-433-7291
Suite 300                Mobile 810-922-9830
Troy MI 48084            Fax    844-670-6009
[Profile] [V-Card]       Email  KRuppel@dickinsonwright.com

**DICKINSON WRIGHT** PLLC

ARIZONA  CALIFORNIA  FLORIDA  ILLINOIS  KENTUCKY  MICHIGAN  NEVADA
OHIO  TENNESSEE  TEXAS  WASHINGTON D.C.  TORONTO

*s/ Edward P. Krugman*

# APPENDIX

979 F.3d 426
United States Court of Appeals, Sixth Circuit.

Derek WASKUL, by his guardian, Cynthia
Waskul; Cory Schneider, by his guardians,
Martha and Wendy Schneider; Kevin Wiesner,
by his guardian, Kerry Kafafian; Washtenaw
Association for Community Advocacy;
Lindsay Trabue, by her guardian, Kristin
Kill; Hannah Ernst, by her guardians, Susan
and Robert Ernst, Plaintiffs-Appellants,
v.
WASHTENAW COUNTY COMMUNITY MENTAL
HEALTH; Trish Cortes, in her official capacity as
Director of Washtenaw County Community Mental
Health; Community Mental Health Partnership
of Southeast Michigan; Jane Terwilliger, in her
official capacity as director of Community Mental
Health Partnership of Southeast Michigan;
Michigan Department of Health and Human
Services; Robert Gordon, in his official capacity
as Director of Michigan Department of Health
and Human Services, Defendants-Appellees.

No. 19-1400
|
Argued: June 11, 2020
|
Decided and Filed: October 29, 2020

**Synopsis**
**Background:** Recipients of community living support services under Medicaid program and non-profit advocacy group for individuals with developmental disabilities brought action against Michigan Department of Health and Human Services, prepaid inpatient health plan (PIHP), county mental health authority, and various agency officials, challenging a change in budget methodology under which county authority provided recipients with single, all-inclusive rate to cover both staff and services. The United States District Court for the Eastern District of Michigan, Arthur J. Tarnow, Senior District Judge, 2019 WL 1281957, dismissed. Recipients and advocacy group appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held that:

[1] advocacy group had associational standing to pursue action;

[2] Department's director was not immune under the Eleventh Amendment from claims brought by recipients;

[3] PIHP was not an arm of the State, and thus was not entitled to Eleventh Amendment immunity;

[4] Medicaid Act's reasonable-promptness and comparability-of-services provisions afforded recipients a private right of action under § 1983;

[5] recipients were at serious risk of institutionalization as result of change in budget methodology, supporting recipients' claim for violations of the integration mandates under the Americans with Disabilities Act (ADA) and Rehabilitation Act; and

[6] as matter of apparent first impression, recipient was unduly isolated in his home as result of change in budget methodology, supporting recipient's claim for violations of the integration mandates under the ADA and Rehabilitation Act.

Reversed and remanded.

Readler, Circuit Judge, filed opinion concurring in part and dissenting in part.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (51)

**[1]** **Injunction** ⬥ Operation and effect
A court's determination of substantive issues at the preliminary injunction stage is not dispositive of those substantive issues on the merits.

**[2]** **Injunction** ⬥ Discretion as to scope of relief

Med & Med GD (CCH) P 306,888

A district court has broad discretion to fashion appropriate injunctive relief if or when it becomes necessary.


**[3]**     **Federal Courts**  🗝  Dismissal or nonsuit in general

The Court of Appeals reviews the grant of a motion to dismiss de novo.


**[4]**     **Federal Civil Procedure**  🗝  Insufficiency in general

**Federal Civil Procedure**  🗝  Matters deemed admitted; acceptance as true of allegations in complaint

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  🗝 Fed. R. Civ. P. 12(b)(6).


**[5]**     **Federal Civil Procedure**  🗝  Insufficiency in general

On a motion to dismiss for failure to state a claim, a claim is facially plausible only when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, thus raising more than a sheer possibility that a defendant has acted unlawfully.  🗝 Fed. R. Civ. P. 12(b)(6).

1 Cases that cite this headnote


**[6]**     **Federal Courts**  🗝  Dismissal for failure to state a claim

In reviewing the grant of a motion to dismiss for failure to state a claim, the Court of Appeals construes the complaint in the light most favorable to the plaintiff, accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in her favor.  🗝 Fed. R. Civ. P. 12(b)(6).

1 Cases that cite this headnote


**[7]**     **Federal Courts**  🗝  Pleading

Court of Appeals would not consider evidence not included in complaint when considering viability of Medicaid recipients' claims, challenging change in budget methodology through which county mental health authority allocated funding to individuals with disabilities receiving community living support services under Medicaid program, on motion to dismiss for failure to state a claim; although there was extended delay before District Court granted motion to amend complaint, recipients offered no explanation for why they did not seek second amendment of their complaint. Social Security Act § 1902,  🗝 42 U.S.C.A. § 1396a(a);  🗝 Fed. R. Civ. P. 12(b)(6); 42 C.F.R. § 441.301(b)(1)(i).


**[8]**     **Federal Civil Procedure**  🗝  Matters considered in general

As a general rule, a court considering a motion to dismiss must focus only on the allegations in the pleadings; this does not include plaintiffs' responses to a motion to dismiss.

2 Cases that cite this headnote


**[9]**     **Federal Civil Procedure**  🗝  Complaint

**Federal Civil Procedure**  🗝  Amendments by briefs or motion papers

If plaintiffs believe they need to supplement their complaint with additional facts to withstand a motion to dismiss, they have a readily available tool, a motion to amend the complaint; they cannot amend their complaint in an opposition brief or ask the court to consider new allegations or evidence not contained in the complaint. Fed. R. Civ. P. 15.


**[10]**    **Associations**  🗝  Suits on Behalf of Members; Associational or Representational Standing

An association has standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane

to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

**[11]** **Associations** 🖛 **Standing of members in general**

Regarding the first element, standing to sue in members' own right, for an association to have standing to bring suit on behalf of its members, it generally suffices for an association to demonstrate that at least one of its members would have standing to sue on his own.

**[12]** **Federal Civil Procedure** 🖛 **In general; injury or interest**

**Federal Civil Procedure** 🖛 **Causation; redressability**

A plaintiff has standing only if: (1) she has suffered an injury in fact, i.e., actual or imminent, concrete and particularized harm to a legally protected interest; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury is likely to be redressed by a favorable decision.

**[13]** **Federal Civil Procedure** 🖛 **In general; injury or interest**

A plaintiff must demonstrate standing separately for each claim and each form of relief sought.

**[14]** **Associations** 🖛 **Health and medical care**

**Health** 🖛 **Standing**

Members of advocacy group for individuals with developmental disabilities had standing to sue in their own right, as required for advocacy group to have associational standing to pursue action challenging change in budget methodology through which county mental health authority allocated funding to individuals with disabilities receiving community living support services under Medicaid program; Medicaid recipients, who were members of the group, alleged that

they were actually being harmed by county authority's failure to use budget method that allowed their individual plans of service to be fully implemented, the alleged harm was current and ongoing, and relief sought by recipients had not been afforded to them. Social Security Act § 1902, 📒 42 U.S.C.A. § 1396a(a); 42 C.F.R. § 441.301(b)(1)(i).

**[15]** **Associations** 🖛 **Health and medical care**

**Health** 🖛 **Standing**

Claims asserted and relief requested did not require participation of individual members of advocacy group for individuals with developmental disabilities, as required for advocacy group to have associational standing to pursue action challenging change in budget methodology through which county mental health authority allocated funding to individuals with disabilities receiving community living support services under Medicaid program; same methodology was applied to determine each recipient's budget, participation of individuals members was not necessary to determine whether methodology applied to all members was valid, and group alleged that methodology resulted in drastic reduction in recipients' budgets, suggesting that relief sought would benefit all members. Social Security Act § 1902, 📒 42 U.S.C.A. § 1396a(a); 42 C.F.R. § 441.301(b)(1)(i).

**[16]** **Federal Courts** 🖛 **Other particular entities and individuals**

Director of Michigan Department of Health and Human Services, in his official capacity, was not immune under the Eleventh Amendment from claims brought by recipients of community living support services under Medicaid program challenging modified budget methodology through which county mental health authority allocated funding to recipients; recipients sought prospective injunctive relief, and primary purpose of suit was to ensure that recipients received services required under their individual

Med & Med GD (CCH) P 306,888

plans of service. U.S. Const. Amend. 11; Social Security Act § 1902, 42 U.S.C.A. § 1396a(a); 42 C.F.R. § 441.301(b)(1)(i).

**[17]    Federal Courts** 🖼 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

A court may enter a prospective injunction that costs the state money without violating the Eleventh Amendment, but only if the monetary impact is ancillary, i.e., not the primary purpose of the suit. U.S. Const. Amend. 11.

**[18]    Federal Courts** 🖼 Political Subdivisions

The Eleventh Amendment does not extend its immunity to units of local government or other political subdivisions. U.S. Const. Amend. 11.

**[19]    Federal Courts** 🖼 Arms of the state in general

In assessing whether a public entity is an arm of the State entitled to Eleventh Amendment immunity or a political subdivision not entitled to that immunity, courts consider four factors: (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government. U.S. Const. Amend. 11.

**[20]    Federal Courts** 🖼 Arms of the state in general

The state's potential legal liability for a judgment against the defendant is the foremost factor to consider in assessing whether a public entity is an arm of the State entitled to Eleventh Amendment immunity or a political subdivision not entitled to that immunity. U.S. Const. Amend. 11.

**[21]    Federal Courts** 🖼 Other particular entities and individuals

Regional prepaid inpatient health plan (PIHP) that was responsible for paying for Medicaid services was not an arm of the State, and thus was not entitled to Eleventh Amendment immunity in action challenging change in budget methodology through which county mental health authority allocated funding to individuals with disabilities receiving community living support services under Medicaid program; contract between Michigan Department of Health and Human Services and PIHP established that liability for claims would be responsibility of PIHP, not Department, PIHP did not serve the State but only a region within it, and PIHP was controlled by county-level entities. U.S. Const. Amend. 11; Social Security Act § 1932, 42 U.S.C.A. § 1396u-2(a)(1)(B); Mich. Comp. Laws Ann. §§ 330.1202(1), 330.1204b, 400.109f.

**[22]    Federal Courts** 🖼 Arms of the state in general

The simple fact that an entity exercises a slice of state power does not by itself entitle that entity to Eleventh Amendment immunity. U.S. Const. Amend. 11.

**[23]    Federal Courts** 🖼 Suits Against States; Eleventh Amendment and Sovereign Immunity States 🖼 What are suits against state or state officers

The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment. U.S. Const. Amend. 11.

**[24]    Civil Rights** 🖼 Administrative remedies in general

Exhaustion of state administrative remedies is not a prerequisite to suit under § 1983, and § 1983

Med & Med GD (CCH) P 306,888

contains no exhaustion requirement beyond what Congress has provided. 42 U.S.C.A. § 1983.

**[25]** **Health** ⚖ Exhaustion of administrative remedies

Medicaid Act did not require recipients of community living support services under Medicaid program and non-profit advocacy group for individuals with developmental disabilities to exhaust state administrative remedies before pursuing action challenging change in budget methodology under which county mental health authority allocated funding to recipients; no Medicaid provision limited remedies to Medicare beneficiaries and required judicial review of decision only after hearing by agency. Social Security Act § 1902, 42 U.S.C.A. § 1396a(a)(3).

**[26]** **Civil Rights** ⚖ Public Services, Programs, and Benefits

**Civil Rights** ⚖ Private Right of Action

**Health** ⚖ Judicial Review; Actions

Medicaid Act's reasonable-promptness and comparability-of-services provisions afforded recipients of community living support services under Medicaid program a private right of action under § 1983 to challenge county mental health authority's methodology for allocating funding to recipients; Medicaid provisions focused on individual entitlements, courts could easily determine whether individuals were given opportunity to apply for medical assistance by looking to state's Medicaid plan, and provisions specifically defined what care and services had to be made available to recipients. Social Security Act § 1902, 42 U.S.C.A. § 1396a(a)(8), (10)(A), and (10)(B); 42 U.S.C.A. § 1983.

**[27]** **Civil Rights** ⚖ Rights Protected

In determining whether a statute confers rights enforceable under § 1983, courts must inquire whether or not Congress intended to confer individual rights upon a class of beneficiaries, in particular looking to whether the pertinent statute contains "rights-creating" language that reveals congressional intent to create an individually enforceable right. 42 U.S.C.A. § 1983.

**[28]** **Civil Rights** ⚖ Rights Protected

In determining whether a statute confers rights enforceable under § 1983, courts must ask whether Congress explicitly foreclosed recourse to § 1983 under the relevant statute, including by establishing a remedial scheme sufficiently comprehensive to supplant § 1983. 42 U.S.C.A. § 1983.

**[29]** **Civil Rights** ⚖ Public Services, Programs, and Benefits

**Civil Rights** ⚖ Private Right of Action

**Health** ⚖ Judicial Review; Actions

Medicaid Act's reasonable-promptness provision, requiring state plans to furnish assistance with reasonable promptness, and comparability-of-services provision, requiring medical assistance to not be less than assistance made available to others, allow for a private right of action under § 1983. 42 U.S.C.A. § 1983; Social Security Act § 1902, 42 U.S.C.A. § 1396a(a)(8, 10).

**[30]** **Health** ⚖ Benefits and Services Covered

Community living support services under the Medicaid program fall within the "medical assistance" that must be paid for or provided by the State with relative promptness pursuant to Medicaid's reasonable promptness provision. Social Security Act §§ 1902, 1915, 42 U.S.C.A. §§ 1396a(a)(8) and (10)(A), 1396a(a)(10)(A), (8), 1396n(c)(1).

**[31]** **Health** ⚖ Benefits and Services Covered

Med & Med GD (CCH) P 306,888

Recipients of community living support services under Medicaid program stated claim against county mental health authority for denial of sufficient necessary medical services in violation of Medicaid's comparability-of-services provision, where recipients alleged that county authority's current budget methodology prevented them from promptly receiving services identified in their individual plans of services by reducing the amount that recipients could pay individual providers. Social Security Act § 1902, 42 U.S.C.A. § 1396a(a)(10)(B); 42 C.F.R. § 440.230(b).

**[32]** **Federal Civil Procedure** Hearing, evidence, and presentation of arguments

In the adversarial system of adjudication, courts follow the principle of party presentation and rely on the parties to frame the issues for decision.

**[33]** **Civil Rights** Existence of other remedies; exclusivity

**Health** Judicial Review; Actions

Medicaid Act provisions precluding a habilitation support waiver from being granted unless State provides assurances that necessary safeguards have been taken to protect the health and welfare of individuals and that individuals are informed of feasible alternatives create rights enforceable under § 1983. Social Security Act § 1915, 42 U.S.C.A. § 1396n(c)(2)(A) and (C); 42 U.S.C.A. § 1983.

**[34]** **Civil Rights** Public Services, Programs, and Benefits

**Civil Rights** Private Right of Action

**Health** Judicial Review; Actions

Medicaid Act provisions requiring States to make various assurances to obtain habilitation support waiver afforded recipients of community living support services under Medicaid program a private right of action under § 1983 to challenge

county mental health authority's methodology for allocating funding to recipients; provisions were phrased in terms of the persons benefited, provisions involved unambiguous directions well within the ability of the judiciary to enforce, and provisions imposed binding obligation on States by using mandatory, rather than precatory, language. Social Security Act § 1915, 42 U.S.C.A. § 1396n(c)(2)(A) and (C); 42 U.S.C.A. § 1983.

**[35]** **Health** Benefits and Services Covered

Allegations of recipients of community living support services under Medicaid program were sufficient to state claim against director of Michigan Department of Health and Human Services for violating Medicaid Act provision requiring states to provide assurances that services were provided in home and community based settings in order to obtain habilitation support waiver, where recipients alleged that director allowed county mental health authority to implement budget methodology that resulted in underfunding of recipients' individual plans of service and that methodology compelled recipients to use agency providers in order to maintain their budgets. Social Security Act § 1915, 42 U.S.C.A. § 1396n(c)(2)(A); 42 C.F.R. §§ 441.301(c)(4), 441.302(a)(5).

**[36]** **Health** Benefits and Services Covered

Medicaid Act provision requiring states to provide assurances that individuals requiring hospital or nursing facility care are informed of feasible alternatives in order to obtain a habilitation support waiver confers two explicitly identified rights, the right to be informed of the alternatives to traditional, long-term institutional care, and the right to choose among those alternatives. Social Security Act § 1915, 42 U.S.C.A. § 1396n(c)(2)(C).

**[37]** **Health** Benefits and Services Covered

Allegations of recipients of community living support services under Medicaid program were sufficient to state claim against director of Michigan Department of Health and Human Services for violating Medicaid Act provision requiring States to provide assurances that individuals requiring hospital or nursing facility care are informed of meaningful alternatives to institutionalized care in order to obtain a habilitation support waiver, where recipients alleged that budget methodology used to allocate funding compelled them to choose institutionalized care and prevented them from receiving services at home, recipient alleged that they he was unable to get into the community due to his inability to hire additional staff, and recipients alleged that the community living support rate was lower than the lowest average rate the State had told the federal government it expected to pay. Social Security Act § 1915, 42 U.S.C.A. § 1396n(c)(2)(C); 42 C.F.R. § 441.302(d)(2).

**[38]** **Health** 👈 Benefits and Services Covered

A "meaningful choice," under Medicaid Act provision requiring states to provide assurances that individuals requiring hospital or nursing facility care are informed of meaningful alternatives to institutionalized care in order to obtain a habilitation support waiver, is one that is actually available and that fulfills individuals' medical needs. Social Security Act § 1915, 42 U.S.C.A. § 1396n(c)(2)(A); 42 C.F.R. § 441.302(a)(5).

**[39]** **Federal Courts** 👈 In general; necessity

Absent exceptional circumstances, the Court of Appeals normally declines to rule on an issue not decided below.

**[40]** **Civil Rights** 👈 Discrimination by reason of handicap, disability, or illness

Recipients of community living support services under Medicaid program were at serious risk of

institutionalization as result of change in budget methodology under which recipients were given all-inclusive rate to cover both staff and services, supporting recipients' claim against county mental health authority for violating integration mandates under the ADA and Rehabilitation Act; recipient relied on his aging and unwell grandparents for 75 hours of services per week, another recipient was forced to rely on his guardian who was unable to continue caring for him due to her dire financial situation, and other recipient suffered declines in his health and safety because he was unable to pay for staff. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132; 28 C.F.R. §§ 35.130(d), 41.51(d).

**[41]** **Civil Rights** 👈 Discrimination by reason of handicap, disability, or illness

Individuals with disabilities are subjected to discrimination in violation of the integration mandates under the ADA and the Rehabilitation Act when they are forced to choose between forgoing necessary medical services while remaining in the community or receiving necessary medical services while institutionalized—not just when they are actually institutionalized. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132; 28 C.F.R. §§ 35.130(d), 41.51(d).

**[42]** **Civil Rights** 👈 Discrimination by reason of handicap, disability, or illness

Plaintiffs may state a claim for violations of the integration mandates under the ADA and the Rehabilitation Act by sufficiently alleging that they are at serious risk of institutionalization. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132; 28 C.F.R. §§ 35.130(d), 41.51(d).

Med & Med GD (CCH) P 306,888

1 Cases that cite this headnote

**[43]    Civil Rights** 🔑 **Discrimination by reason of handicap, disability, or illness**

Isolation of individuals with disabilities in a home environment can violate the integration mandate under the ADA and the Rehabilitation Act. Rehabilitation Act of 1973 § 504, 🚩 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990 § 202, 🚩 42 U.S.C.A. § 12132; 🚩 28 C.F.R. §§ 35.130(d), 41.51(d).

1 Cases that cite this headnote

**[44]    Civil Rights** 🔑 **Discrimination by reason of handicap, disability, or illness**

Recipient of community living support services under Medicaid program was unduly isolated in his home as result of change in budget methodology under which recipient was given all-inclusive rate to cover both staff and services, supporting recipient's claim against county mental health authority for violating integration mandates under the ADA and Rehabilitation Act; recipient only received 80 of the 120 hours his individual plan of service required because he could not afford to hire providers for the remaining time and as result recipient could be outside his home maximum of 40 hours per week, rather than 60 hours per week, and recipient's behavioral issues had worsened. Rehabilitation Act of 1973 § 504, 🚩 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990 § 202, 🚩 42 U.S.C.A. § 12132; Social Security Act § 1900, 🚩 42 U.S.C.A. § 1396 et seq.; 🚩 28 C.F.R. §§ 35.130(d), 41.51(d).

**[45]    Civil Rights** 🔑 **Discrimination by reason of handicap, disability, or illness**

Recipient of community living support services under Medicaid program was unduly isolated in his home as result of change in budget methodology under which recipient was given all-inclusive rate to cover both staff and services,

supporting recipient's claim against county mental health authority for violating integration mandates under the ADA and Rehabilitation Act; recipient could not hire sufficient staff under the methodology and as result had to go three weekdays without his normal community routine, during which he was confined to his home, and recipient suffered from depression, worsened scoliosis, and anger management issues due to his reduced time in the community. Rehabilitation Act of 1973 § 504, 🚩 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990 § 202, 🚩 42 U.S.C.A. § 12132; 🚩 28 C.F.R. §§ 35.130(d), 41.51(d).

**[46]    Civil Rights** 🔑 **Discrimination by reason of handicap, disability, or illness**

The integration mandate under the ADA does not impose a standard of care or require a certain level of benefits to individuals with disabilities; instead, the question is whether plaintiffs are provided services in the setting that enables them to interact with non-disabled persons to the fullest extent possible. Americans with Disabilities Act of 1990 § 202, 🚩 42 U.S.C.A. § 12132; 🚩 28 C.F.R. § 35.130(d).

**[47]    Civil Rights** 🔑 **Discrimination by reason of handicap, disability, or illness**

The more hours of community living support service under the Medicaid program one is provided outside the home, the less likely it is that one can show a violation of the integration mandate under the ADA based on isolation of an individual with a disability. Americans with Disabilities Act of 1990 § 202, 🚩 42 U.S.C.A. § 12132; Social Security Act §§ 1902, 1932, 🚩 42 U.S.C.A. §§ 1396a(a), 1396u-2(a)(1)(B); 🚩 28 C.F.R. § 35.130(d); 42 C.F.R. § 441.301(b)(1)(i).

1 Cases that cite this headnote

Med & Med GD (CCH) P 306,888

**[48]    Civil Rights** 🔑 **Discrimination by reason of handicap, disability, or illness**

Prepaid inpatient health plan (PIHP) responsible for paying for Medicaid services did not show that modifying its budget methodology for allocating funding to individuals with disabilities receiving community living support services under Medicaid program would result in fundamental alteration of the programs, as would relieve PIHP of its obligation under ADA integration mandate to make reasonable modifications to avoid discrimination on the basis of disability; although prior methodology caused PIHP to operate at deficit, amount that PIHP was spending under modified methodology was well below what the State had committed to spending. Americans with Disabilities Act of 1990 § 202, 🚩 **42 U.S.C.A. § 12132;** Social Security Act § 1900, 🚩 **42 U.S.C.A. § 1396 et seq.;** 🚩 **28 C.F.R. §§ 35.130(b)(7), 35.130(d).**

**[49]    States** 🔑 **Declaratory judgment**

Prepaid inpatient health plan (PIHP) responsible for paying for Medicaid services and county mental health authority were not entitled to immunity in action brought by recipients of community living support services under Medicaid program for allegedly neglecting recipients in violation of Michigan's mental health code, since recipients sought only declaratory and prospective injunctive relief. Social Security Act § 1900, 🚩 **42 U.S.C.A. § 1396 et seq.;** **Mich. Comp. Laws Ann. § 330.1722.**

**[50]    Municipal Corporations** 🔑 **Health and education**

**Municipal Corporations** 🔑 **Capacity to sue or be sued in general**

**Municipal Corporations** 🔑 **Injunction**

Michigan's mental health code does not provide a statutory exception to governmental immunity for alleged abuse of mental health patients; however, where instead of seeking compensation to remedy a civil harm, the plaintiff elects some other remedy, such as asking a court to enforce his or her rights under the law through declaratory or injunctive relief, governmental immunity is inapplicable. **Mich. Comp. Laws Ann. § 330.1722.**

**[51]    Health** 🔑 **Benefits and Services Covered**

Allegations of recipients of community living support services under Medicaid program were sufficient to state claim against prepaid inpatient health plan (PIHP) responsible for paying for Medicaid services and county mental health authority for neglect in violation of Michigan's mental health code, where recipients alleged that PIHP and county authority failed to provide recipients with actual budgets tied to community living support services and that recipients were denied transportation, staff, and recreation activities medically necessary to address their conditions. Social Security Act § 1900, 🚩 **42 U.S.C.A. § 1396 et seq.;** **Mich. Comp. Laws Ann. § 330.1722(1).**

**\*434** Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 2:16-cv-10936—Arthur J. Tarnow, District Judge.

**Attorneys and Law Firms**

ARGUED: Edward P. Krugman, NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE, New York, New York, for Appellants. Stefani A. Carter, STEFANI A. CARTER, PLLC, Ypsilanti, Michigan, for Appellees Washtenaw County Community Mental Health and Trish Cortes. Marcelyn A. Stepanski, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees Community Mental Health Partnership of Southeast Michigan and Jane Terwilliger. Tracy E. Van den Bergh, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan for Appellees Michigan Department of Health and Human Services and Robert Gordon. ON BRIEF: Edward P. Krugman, NATIONAL

Med & Med GD (CCH) P 306,888

CENTER FOR LAW AND ECONOMIC JUSTICE, New York, New York, Nicholas A. Gable, LEGAL SERVICES OF SOUTH CENTRAL MICHIGAN, Ypsilanti, Michigan, Lisa Ruby, MICHIGAN POVERTY LAW PROGRAM, Ypsilanti, Michigan, for Appellants. Stefani A. Carter, STEFANI A. CARTER, PLLC, Ypsilanti, Michigan, for Appellees Washtenaw County Community Mental Health and Trish Cortes. Marcelyn A. Stepanski, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees Community Mental Health Partnership of Southeast Michigan and Jane Terwilliger. Kristin M. Heyse, William Morris, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan for Appellees Michigan Department of Health and Human Services and Robert Gordon.

Before: CLAY, WHITE, and READLER, Circuit Judges.

CLAY, J., delivered the opinion of the court in which WHITE, J., joined. READLER, J. (pp. 466–72), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

CLAY, Circuit Judge.

 **\*435** In 2015, a predecessor to Defendant Washtenaw County Community Mental Health modified the methodology through which it allocated funding to individuals with disabilities receiving community living support services pursuant to a Medicaid waiver received by the State of Michigan. Plaintiffs, five individuals receiving those services, together with the Washtenaw Association for Community Advocacy, challenge that methodology in this case against Defendants the Michigan Department of Health and Human Services, Community Mental Health Partnership of Southeast Michigan, Washtenaw County Community Mental Health, and the directors of these organizations. In particular, Plaintiffs assert that by implementing or allowing implementation of this new methodology, Defendants violated provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(8), (a)(10)(A), (a)(10)(B), 1396n(c)(2)(A) and (C); Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; § 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Michigan Mental Health Code, Mich. Comp. Laws § 330.1722; and the terms of Michigan's Medicaid Habilitation Supports Waiver and the contracts

implementing it. The district court dismissed Plaintiffs' claims in full.

For the reasons set forth in this opinion, we **REVERSE** the district court's decision and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

### Factual Background

The State of Michigan offers funding and support to qualifying individuals with disabilities to aid them in living independently in their own home communities, rather than in institutionalized care facilities, pursuant to a Medicaid waiver (the "Habilitation Supports Waiver" or the "Waiver") obtained from the federal government. **\*436** This Community Living Support ("CLS") program furthers those individuals' self-determination by allowing them to structure their own support services based on their medical needs.

Plaintiffs in this case are five individuals who participate in Michigan's CLS program and the Washtenaw Association for Community Advocacy ("WACA"), a non-profit organization of which the individual Plaintiffs are members that advocates for support services for individuals with developmental disabilities. Plaintiff Derek Waskul has severe cognitive impairment and autism and requires 24/7 supervision. Plaintiff Cory Schneider has autism, a developmental disability, and an undiagnosed behavior disorder that also require 24/7 care. Plaintiff Kevin Wiesner has severe developmental disabilities and suffers from seizures. Plaintiff Lindsay Trabue has Down syndrome and is non-verbal. She has only very basic functional skills and also requires 24/7 care. Finally, Plaintiff Hannah Ernst has been diagnosed with Angelman syndrome, a seizure disorder, and cognitive impairment.

At bottom, Plaintiffs allege that a change in the method through which their CLS budgets are calculated has prevented them from receiving required services and support, in violation of federal and state law and Defendants' contracts with one another. Plaintiffs' claims hinge on Medicaid requirements and funding mechanisms, and so we must begin by surveying Michigan's Medicaid framework.

### A. Michigan's Medicaid Framework

Med & Med GD (CCH) P 306,888

The joint federal-state Medicaid program provides medical assistance to qualifying individuals who are unable to pay or do not have private insurance, pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (the "Medicaid Act"). In order to receive federal Medicaid funds, states must develop a plan to administer their program in compliance with federal statutory and regulatory requirements. 42 U.S.C. § 1396a(a); 42 C.F.R. § 430.10. Once their plan is approved by the Centers for Medicare and Medicaid Services ("CMS"), states receive federal funds to supplement state spending on Medicaid-covered services. *See* 42 U.S.C. § 1396b(a).

Michigan's Medicaid program is administered by Defendant Michigan Department of Health and Human Services ("the Department"), which is led by Defendant Robert Gordon, its director (collectively, "State Defendants"). 42 U.S.C. § 1396a(a)(5) (requiring that each state "provide for the establishment or designation of a single State agency to administer or to supervise the administration of" their plan); 42 C.F.R. § 431.10(b)(1). The Department then contracts with regional prepaid inpatient health plans ("PIHPs"), which are public managed care organizations that receive funding and arrange and pay for Medicaid services. 42 U.S.C. § 1396u-2(a)(1)(B); Mich. Comp. Laws § 400.109f. Defendant Community Mental Health Partnership of Southeast Michigan ("CMHPSM") is the PIHP responsible for Washtenaw County, and is led by Defendant Jane Terwilliger, its executive officer (collectively, "PIHP Defendants"). [1] The Department has supervisory and policymaking authority over the PIHPs and must ensure that PIHPs retain oversight and accountability over any subcontractors. PIHPs subcontract with community organizations that provide or arrange for mental health services for recipients, including **437** Defendant Washtenaw County Community Mental Health ("WCCMH"). WCCMH is the public community mental health authority for Washtenaw County and is led by Defendant Trish Cortes, its director (collectively, "County Defendants"). The relationships between the Department, CMHPSM, and WCCMH are governed by federal and state law, in addition to specific contracts. *See, e.g.*, 42 U.S.C. § 1396u-2(a)(1)(B); Mich. Comp. Laws §§ 330.1100a(18), 400.109f.

### B. The Community Living Support Program Framework

Under this framework, Defendants work together to ensure CLS services are provided to qualifying recipients, including the individual Plaintiffs, pursuant to the terms of Michigan's Habilitation Supports Waiver. That waiver is financed through so-called "capitation procedures." This means that the federal government provides the relevant entity —here the PIHP, Defendant CMHPSM—with a fixed amount of funding for each person participating in the CLS program, regardless of how many services the entity ultimately provides to the recipient. The PIHP then determines how to allocate these funds to recipients. (Am. Compl., R. 146 at PageID #3718; Application for Habilitation Supports Waiver, MI.0167.R04.00, at 5–6 (Oct. 1, 2010) (hereinafter, "Waiver"), *available at* https://www.michigan.gov/documents/mdch/ Habilation_Supports_Waiver_340749_7.pdf.) PIHPs can make or lose money depending on how the amount they receive in capitation funds compares to the amount of funding they provide recipients, but they must ensure that the services they provide comply with the terms of their contract with the State, which itself must ensure that it complies with the terms of the Medicaid Act, federal regulations, and the Waiver.

Once an individual has elected to receive CLS services, they go through what is known as a person-centered planning ("PCP") process, during which an individual plan of service ("IPOS") and corresponding budget for CLS services is developed. Mich. Dep't of Health & Human Servs., Medicaid Provider Manual at 328 (hereinafter "Mich. Medicaid Provider Manual"), *available at* (http://www.mdch.state.mi.us/dch-medicaid/ manuals/MedicaidProviderManual.pdf), *see* 42 C.F.R. § 441.301(b)(1)(i). The IPOS describes the services that have been deemed "medically necessary" for each recipient based on criteria defined in Michigan's Medicaid Provider Manual. (Am. Compl., R. 146 at PageID #3713; Mich. Medicaid Provider Manual at 337 ("The determination of a medically necessary support, service or treatment must be ... [d]ocumented in the individual plan of service.").) Michigan's Waiver application, later approved by CMS, explained:

> An individual budget includes the expected or estimated costs of ... obtaining the mental health services and supports included in the IPOS....

Med & Med GD (CCH) P 306,888

Once the IPOS is developed, the amount of funding needed to obtain the identified services and supports is determined collectively by the participant, the mental health agency (PIHP or designee), and others participating in the PCP process. This process involves costing out the services and supports using the rates for providers chosen by the participant and the number of hours authorized in the IPOS.... The individual budget is authorized in the amount of that total cost of all services and supports in the IPOS.

(Waiver at 134.) The individual then enters a "self-determination arrangement" with their local community mental health service program. (*Id.* at 135.) Under that arrangement, the individual determines how to use the funds in their budget to **\*438** execute their IPOS. This includes hiring, scheduling, and paying staff, as well as selecting, arranging, and paying for services, supports, and treatments listed in the IPOS. A fiscal intermediary actually holds the funds and pays bills directed to them.

### C. WCCMH's Budget Methodology

 **[1]** **[2]** This brings us to the change in budget methodology that prompted this case. Budgets for CLS services are calculated by multiplying how many hours of services a participant's IPOS calls for by a specific rate. Starting in at least April 2012, the CLS budget for recipients in Washtenaw County was developed by providing a rate for staff or providers and then allowing billing of other services and supports (*e.g.*, workers' compensation, staff training, and transportation) as separate line items. In 2015, the predecessor to WCCMH, Washtenaw Community Health Organization ("WCHO"), shifted to a budget methodology under which it provided a single, all-inclusive rate to cover both staff and services. [2] WCCMH now operates under this methodology.

As this Court explained in a previous opinion in this case,

The budgeting change did not reduce the total number of service hours recipients were authorized to receive. The effect of utilizing an all-inclusive rate, however, was to reduce the total budget amount for each recipient. As a

practical matter, service recipients had to reduce the hourly rate they paid service providers to maintain the level of hours authorized prior to the budget change. The notice to recipients acknowledged this reality, stating that "[w]hile this is not a reduction in your current level of services, it may reduce the amount you can pay your staff."

*Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254 (6th Cir. 2018). CLS recipients like the individual Plaintiffs now had to begin budgeting from the fixed all-inclusive rate (then $13.88 per hour) and subtract out the costs of non-staff services and supports in order to determine the amount they could pay staff. Plaintiffs Waskul, Schneider, and Wiesner challenged the resulting reductions in their budgets in Medicaid Fair Hearings through the Michigan Administrative Hearing System. An administrative law judge ruled in their favor, and their budgets **\*439** were increased, but the budget methodology was not changed.

Plaintiffs allege that, due to this change in budget methodology, the funding they receive no longer suffices to cover the services required by their IPOSs. In particular, they say that they cannot find sufficient CLS providers willing to work at the low rates they must pay under the new budgeting method and that, in order to pay providers more, they are now compelled to pay for supports and services themselves and hire family members at below-market rates. As a result of the reduction in support, they allege that they have not been able to receive all of the services identified in their IPOSs and their conditions have deteriorated.

### Procedural Background

In 2016, Plaintiffs Waskul, Wiesner, Schneider and WACA filed the original complaint in this case (" *Waskul I*"), asserting five claims, including violations of constitutional and statutory due process, the Medicaid Act, and the Michigan Mental Health Code. Plaintiffs then moved for a preliminary injunction, which the district court denied, finding that WACA lacked standing, that the individual Plaintiffs could not show the required irreparable harm on their due process claims because they had received hearings following the change in budget methodology, and that they could not show a likelihood of success on their remaining claims because the prior budgeting method to which Plaintiffs sought to return violated Medicaid requirements. Plaintiffs only appealed the district court's decision as to WACA's

standing, and on appeal sought only preliminary injunctive relief of "fresh notices and hearing rights" for the unnamed members of the organization. (*Waskul v. Washtenaw Cnty. Cmty. Mental Health*, No. 16-2742, Pls.' Br., Doc. No. 18 at 48.)

While that appeal was pending, Plaintiffs filed a new case in the district court (*Waskul II*, E.D. Mich. No. 17-cv-12355), adding Plaintiffs Trabue and Ernst and asserting five new claims. The new complaint also responded to the preliminary injunction ruling by attempting to show that the prior budgeting method did not violate Medicaid requirements. Plaintiffs moved to consolidate the two cases and for leave to file an amended complaint conforming the original complaint in 📄 *Waskul I* to that in *Waskul II*. The district court granted the motion to consolidate, but held the motion for leave to amend in abeyance pending the resolution of Plaintiffs' appeal to this Court. Defendants moved to dismiss the *Waskul II* complaint or for judgment on the pleadings. The district court stayed proceedings in full until resolution of the appeal. Following that stay, Plaintiff Schneider filed a motion for leave to file a second motion for a preliminary injunction.

On August 14, 2018, this Court issued its decision regarding Plaintiffs' appeal. 📄 *Waskul*, 900 F.3d at 250. It found that WACA lacked standing to seek the relief it requested on appeal—namely, "(1) 'fresh notices,' and (2) 'hearing rights with respect to the reduction in their CLS budgets' "—because its three named members had already received that relief prior to the complaint being filed and because Plaintiffs could not identify any other members that would benefit from that relief. 📄 *Id.* at 256–58. *But see* 📄 *id.* at 258–60 (Stranch, J., concurring in the judgment) (concluding that WACA had sufficiently shown standing, but concurring because "[o]n the record before us, we cannot conclude that either of the budget calculation methods at issue is required or prohibited by the statute or regulation and, therefore, the district court did not abuse its discretion in determining there was 'not a high likelihood of success' ").

**\*440** After this Court's decision, the district court lifted the stay and requested supplemental briefing on the pending motions in *Waskul II*. The parties agreed to withdraw pending motions and refile them with modified arguments as desired. Plaintiffs responded to those motions, and Defendants replied. Plaintiff Schneider then renewed his motion for a preliminary injunction. At the motion hearing, the district court granted Plaintiffs' longstanding request for leave to file the amended

complaint and agreed to treat the pending motions as directed at the amended complaint.

On March 20, 2019, the district court issued an order construing Defendants' motions as motions to dismiss and dismissing Plaintiffs' claims in their entirety. This timely appeal followed.

## DISCUSSION

### Standard of Review

**[3]** **[4]** **[5]** **[6]** We review the grant of a motion to dismiss *de novo.* 📄 *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " 📄 *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting 📄 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is facially plausible only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," thus raising "more than a sheer possibility that a defendant has acted unlawfully." 📄 *Id.* In our review, we construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in her favor. *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 897 (6th Cir. 2019).

**[7]** On appeal, the parties dispute what evidence the district court considered and what evidence we may consider. Plaintiffs contend that, given the district court's extended delay in granting their motion to amend their complaint, we should consider other materials before the district court that they relied on in opposing Defendants' dispositive motions, including the evidentiary records associated with Defendants' initial motions to dismiss and for summary judgment, Plaintiff Schneider's motion for a preliminary injunction, and supplemental briefing and arguments submitted to the district court following various status conferences and hearings. Defendants seek to rely on similar evidence, including testimony from the preliminary injunction hearing.

**[8]** **[9]** We decline to consider this evidence. As a general rule, a court considering a motion to dismiss "must focus

Med & Med GD (CCH) P 306,888

only on the allegations in the pleadings." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). This does not include plaintiffs' responses to a motion to dismiss. *Id.* "If plaintiffs believe they need to supplement their complaint with additional facts to withstand [a motion to dismiss] ... they have a readily available tool: a motion to amend the complaint under Rule 15." *Id.* They cannot "amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint." *Id.* Plaintiffs offer no explanation for why they did not seek a second amendment of their complaint, especially given the court's willingness to permit Defendants to update their motions to dismiss following this Court's disposition of Plaintiffs' appeal. Thus, we will consider the viability of Plaintiffs' claims without reference to evidence not included in Plaintiffs' complaint.

**\*441 Standing**

Before turning to the merits of Plaintiffs' claims, we must address several threshold matters. First, PIHP Defendants assert on appeal that Plaintiff WACA "lack[s] standing to bring claims on behalf of unnamed individuals." (PIHP Defs.' Br. at 39–42.) As discussed, we previously found that Plaintiff WACA lacked standing to assert its due process claims because all named members of the association had received the relief they sought—fresh notices and hearing rights—prior to filing their complaint and Plaintiffs did not show that any unnamed member of the association had not received this relief. *Waskul*, 900 F.3d at 256–58. Plaintiffs have voluntarily dismissed their due process claims, and their remaining claims do not suffer from this deficiency.

**[10] [11] [12] [13]** "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). "Regarding the first element, it generally suffices for an association to demonstrate that 'at least one of [its] members would have standing to sue on his own.' " *Waskul*, 900 F.3d at 255 (alteration in original) (quoting *United Food & Comm. Workers Union Local 751 v. Brown*

*Grp., Inc.*, 517 U.S. 544, 554–55, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996)). Thus, if any of the individual Plaintiffs have standing, WACA may appropriately assert standing based upon their standing, because each is a member of WACA. A plaintiff has standing only if: (1) she has suffered an "injury in fact," *i.e.*, actual or imminent, concrete and particularized harm to a legally protected interest; (2) there is "a causal connection between the injury and the conduct complained of"; and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff must demonstrate standing separately for each claim and each form of relief sought. *Waskul*, 900 F.3d at 255.

**[14]** Regarding the first prong of the associational standing test, PIHP Defendants contend that the individual Plaintiffs lack standing because their "complaints were redressed through the state administrative process or are otherwise moot." (PIHP Defs.' Br. at 40–41.) They point out that Plaintiffs Waskul, Wiesner, and Schneider "are currently receiving the same or higher rates than they received prior to May 2015" and that the CLS rate has been raised multiple times since May 2015. (*Id.* at 12.) But even if this is true, as the district court concluded, "[t]his argument mistakenly assumes that the only form of relief sought is an adjustment to the hourly rate," when in fact Plaintiffs "have repeatedly made clear that they are challenging the budgeting method, not simply the amount budgeted for." (Dist. Ct. Op., R. 164 at PageID #4368.) The allegation underlying each of Plaintiffs' claims on appeal is that they are actually being harmed by Defendants' failure to use or ensure a budget method that allows their IPOSs to be fully implemented. This alleged harm is current and ongoing. And unlike Plaintiffs' previous due process claims, none of the relief Plaintiffs seek to remedy this harm has already been afforded to any of the individual named Plaintiffs. [3] Defendants do not contest any of the **\*442** remaining standing elements as to any individual Plaintiff, and there are no apparent deficiencies in the individual Plaintiffs' standing as to each claim and form of relief sought. Thus, Plaintiffs have shown that WACA's "members would otherwise have standing to sue in their own right." *Laidlaw*, 528 U.S. at 181, 120 S.Ct. 693.

Turning to the second prong of the associational standing test, Defendants do not contest that WACA's "interests at stake are germane to the organization's purpose." *Id.* And indeed, ensuring CLS recipients' IPOS budgets are correctly

Med & Med GD (CCH) P 306,888

calculated and otherwise sufficient is clearly germane to WACA's "mission and purpose [of] advocating for persons with developmental disabilities and their families in order to help them obtain and maintain services." (Am. Compl., R. 146 at PageID #3774.)

[15] PIHP Defendants do contest the remaining element of associational standing—that is, whether the claims asserted or relief requested require WACA's members' participation in this suit. *See Laidlaw*, 528 U.S. at 181, 120 S.Ct. 693. They contend that the relief Plaintiffs seek may not benefit other individual members of WACA. While PIHP Defendants correctly point out that individuals' IPOS budgets are different and tailored based on their specific medical situation, the parties agree that the same methodology is applied to determine each CLS recipient's budget. The participation of individual members is not necessary to determining whether a methodology commonly applied to all members is valid. Moreover, Plaintiffs allege that application of this methodology resulted in an "instant[ ] and drastic[ ]" reduction to CLS recipients' IPOS budgets, (Am. Compl., R. 146 at PageID #3731), suggesting that the declaratory and prospective injunctive relief sought by Plaintiffs will benefit all members. *See Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). Thus, Plaintiffs have made the showing necessary to demonstrate that WACA has GD associational standing.

### Eleventh Amendment Immunity

We must next address a second threshold matter. In their briefing, State and PIHP Defendants contend that they are entitled to Eleventh Amendment immunity against Plaintiffs' claims. Some of these arguments are specific to certain of Plaintiffs' claims and so we will address them in our analysis of those claims. But two of their arguments address Plaintiffs' claims more generally.

First, State Defendants argue that "[t]o the extent that [Plaintiffs] seek either some form of monetary compensation or **\*443** retrospective injunctive relief," they are immune under the Eleventh Amendment. (State Defs.' Br. at 4.) But Plaintiffs request purely prospective declaratory and injunctive relief, and Plaintiffs' only claim against the Department directly is brought under § 504 of the Rehabilitation Act. Michigan waived its Eleventh Amendment immunity against § 504 claims by accepting federal Medicaid funding after enactment of 42 U.S.C. § 2000d-7. *See, e.g.*, *Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002); *see also* 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment ... from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 ....").

[16] [17] Because Plaintiffs seek prospective injunctive relief, Plaintiffs' claims against Defendant Gordon in his official capacity are permitted under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). [4] *Westside Mothers v. Haveman* ("*Westside Mothers I*"), 289 F.3d 852, 860–62 (6th Cir. 2002). This is true "notwithstanding" the fact that this relief will have "a direct and substantial impact on the state treasury." *Milliken v. Bradley*, 433 U.S. 267, 289, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). Still, "[a] court may enter a prospective injunction that costs the state money, but only if the monetary impact is ancillary, *i.e.*, not the primary purpose of the suit." *Barton v. Summers*, 293 F.3d 944, 950 (6th Cir. 2002). In the present case, the primary purpose of the suit is to ensure that Plaintiffs receive the services required under their IPOSs. Moreover, since PIHPs control the allocation of funding to Plaintiffs, it is unclear whether any relief awarded will have *any* monetary impact on the State of Michigan.

[18] [19] [20] PIHP Defendants, too, claim that they are entitled to Eleventh Amendment immunity. This argument also fails. "[T]he Eleventh Amendment does not extend its immunity to units of local government" or other political subdivisions, like CMHPSM. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 369, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). CMHPSM is thus entitled to Eleventh Amendment immunity only if it operates as an arm of the State. *Lowe v. Hamilton Cnty. Dep't of Job & Family Servs.*, 610 F.3d 321, 325 (6th Cir. 2010). CMHPSM bears the burden of showing that it operates in this capacity. *Id.* at 324. In assessing whether a public entity is an "arm of the State" entitled to Eleventh Amendment immunity or a "political subdivision" not entitled to that immunity, we consider four factors:

Med & Med GD (CCH) P 306,888

(1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (citations omitted). Of these, "[t]he state's potential legal liability for a judgment against the defendant 'is the foremost factor' to consider in our sovereign immunity analysis." *Lowe*, 610 F.3d at 325.

[21] PIHP Defendants contend that CMHPSM "functions fiscally as an arm of the state (and, by virtue of the necessity of state approval of various operational aspects of each entity, administratively, as well)." (PIHP Defs.' Br. at 37.) Considering the first factor, it is true that Michigan financially supports CMHPSM pursuant to **444 state law. *See* Mich. Comp. Laws § 330.1202(1). However, according to the current Department-CMHPSM contract, that financial support is provided through payment of a "fixed per person monthly rate ... for each Medicaid eligible person," regardless of what payments CMHPSM makes to recipients. (Medicaid Managed Specialty Supports and Services Concurrent 1915(b)/(c) Waiver Program FY 19 at 9, 16, https://www.nmre.org/wp-content/uploads/2018/09/FY19-NMRE-PIHP-Contract-andAttachments.pdf .) The record does not suggest that Michigan would have any obligation or liability for judgments against CMHPSM. To the contrary, the contract between the two entities establishes that liability as a result of claims or judgments "arising out of activities to be carried out pursuant to the obligation of the PIHP under this contract shall be the responsibility of the PIHP, and not the responsibility of the [Department], if ... caused by, or aris[ing] out of, the actions or failure to act on the part of the PIHP." (*Id.* at 14.) Thus, this factor weighs against finding that CMHPSM is an arm of the State.

[22] Turning to the other factors, Michigan law recognizes that PIHPs are regional entities governed by bylaws adopted by county officials. Mich. Comp. Laws § 330.1204b; (*see also* CMHPSM Bylaws, R. 135-3 at PageID #3542.) PIHPs do not serve the State, but only a region within it. *See Lowe*, 610 F.3d at 332 ("[T]he fact that [an entity's] programs are designed to serve a specific local community weighs against characterizing it as an arm of the state, rather than a political subdivision."). While the Department has some supervisory responsibilities over PIHPs, *see* Mich. Comp. Laws § 330.1232, they are controlled by county-level entities, including community mental health authorities like WCCMH. (CMHPSM Bylaws, R. 135-3 at PageID #3542.) Likewise, PIHPs' board members are appointed by county-level entities. (*Id.* at ##3545–46.) Finally, while PIHPs do exercise some functions falling within the purview of state government, the simple fact than an entity "exercise[s] a slice of state power" does not by itself entitle that entity to Eleventh Amendment immunity. *See Lowe*, 610 F.3d at 330 (quoting *N. Ins. Co. of N.Y. v. Chatham County*, 547 U.S. 189, 193–94, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006)). Altogether, the remaining factors also do not suggest that CMHPSM is an arm of the state. Thus, CMHPSM cannot avoid liability by asserting Eleventh Amendment immunity.

[23] PIHP Defendants also assert that Defendant Terwilliger is entitled to Eleventh Amendment immunity because Plaintiffs sue her in her official capacity. However, "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Because CMHPSM itself is not entitled to immunity, Terwilliger is also not entitled to immunity.

## Exhaustion

[24] [25] Having now ascertained that Plaintiffs have standing to bring this case and that Defendants are not entitled to Eleventh Amendment immunity, we must contend with one final threshold matter. PIHP Defendants assert that Plaintiffs were required to exhaust their administrative remedies provided by the State under the Medicaid Act, 42 U.S.C. § 1396a(a)(3), before they could bring their Medicaid claims in this suit. Three of the five Plaintiffs on appeal did so and received favorable remedies, and two did not. According

Med & Med GD (CCH) P 306,888

to PIHP Defendants, both groups have **445** somehow failed to exhaust their remedies and therefore cannot bring this suit. Defendants are incorrect. Exhaustion of state administrative remedies is not a prerequisite to suit under § 1983, *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), and "§ 1983 contains no exhaustion requirement beyond what Congress has provided," *Heck v. Humphrey*, 512 U.S. 477, 483, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Our sister circuits have commonly concluded that the Medicaid Act does not require Plaintiffs to exhaust their state administrative remedies. [5] *See, e.g.,* *Romano v. Greenstein*, 721 F.3d 373, 376 (5th Cir. 2013); *Roach v. Morse*, 440 F.3d 53, 56–58 (2d Cir. 2006) (Sotomayor, J.); *Houghton ex rel. Houghton v. Reinertson*, 382 F.3d 1162, 1167 n.3 (10th Cir. 2004); *Alacare, Inc.-North v. Baggiano*, 785 F.2d 963, 967–69 (11th Cir. 1986). We agree.

We now turn to the content of Plaintiffs' claims.

## I. The Medicaid Act's Reasonable-Promptness and Availability- and Comparability-of-Services Provisions, 42 U.S.C. §§ 1396a(a)(8), (10)(A), and (10)(B)

Plaintiffs argue that the individual Defendants have violated 42 U.S.C. §§ 1396a(a)(8) and (10)(A) because the budget method they are implementing or allowing to be implemented "makes it impossible for participants to obtain adequate medically necessary services with reasonable promptness." (Am. Compl., R. 146 at PageID #3785.) They argue that these Defendants have violated § 1396a(a)(10)(B) by denying them services "sufficient in scope to achieve the services' purpose." (*Id.* at #3783.) Defendants respond that these provisions do not allow for a private right of action under 42 U.S.C. § 1983, and even if they do, Plaintiffs' complaint does not adequately allege that they have been denied the opportunity to receive necessary medical services under these provisions. The district court found that these provisions allow for a private right of action, but concluded that Plaintiffs had not alleged facts sufficient to state such a claim because they had not identified medically necessary services they were being denied and because they had the option to use county-contracted providers or make additional requests through the PCP process in order to obtain these services.

The district court correctly concluded that §§ 1396a(a)(8) and (10) afford a private right of action. However, the district court erred in dismissing Plaintiffs' claims thereunder. We begin with Plaintiffs' right of action.

### A. Private Right of Action Under § 1983

[26] Section 1396a(a)(10)(A) requires that state Medicaid plans provide for making **446** certain described categories of medical assistance available to qualified individuals. *See also* 42 U.S.C. § 1396n(c)(1) (providing that under a Habilitation Supports Waiver, this assistance includes "payment for part or all of the cost of home or community-based services" for qualified individuals). Section 1396a(a)(10)(B), meanwhile, requires that "the medical assistance made available to any individual described ... shall not be less in amount, duration, or scope than the medical assistance made available" to others under Medicaid. Finally, § 1396a(a)(8) requires state plans to provide individuals with the opportunity to apply for this assistance "and that such assistance shall be furnished with reasonable promptness to all eligible individuals."

In *Westside Mothers v. Olszewski* ("*Westside Mothers II*"), 454 F.3d 532, 540–41 (6th Cir. 2006), this Court found that the plaintiffs had forfeited their claims that payments provided to them by the defendants "were insufficient to enlist an adequate number of providers, which effectively frustrates §§ 1396a(a)(8), 1396a(a)(10) by foreclosing the opportunity for eligible individuals to receive the covered medical services." But in dismissing those claims based on forfeiture, this Court specifically "modif[ied] the district court's order to reflect a dismissal without prejudice ... because plaintiffs may be able to amend the complaint to allege that inadequate payments effectively deny the right to 'medical assistance.' " *Id.* at 541. This suggests that the *Westside Mothers II* panel implicitly concluded that Plaintiffs had a private right of action under these provisions. [6] We agree.

Despite this, Defendants argue that §§ 1396a(a)(8) and (10) do not establish individual rights enforceable under § 1983 because, in *Westside Mothers II*, this Court found that a different provision, § 1396a(a)(30)(A), [7]

Med & Med GD (CCH) P 306,888

did not establish such rights. 454 F.3d at 542–43. The Supreme Court has since agreed. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328–29, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015) ("In our view the Medicaid Act implicitly precludes private enforcement of § 30(A) ....").

Defendants point out that § 1396a(a)(30)(A) "explicitly address[es] **\*447** provider reimbursement rates with regard to individuals' access to healthcare services" and reason that "if an individual cannot enforce a Medicaid provision that speaks directly to provider reimbursement, that individual cannot enforce a provision that does so — at best — indirectly." (State Defs.' Br. at 19; *see also* PIHP Defs.' Br. at 26.)

**[27] [28] [29]** This is not the proper analysis. In *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the Supreme Court laid out three factors relevant to whether a statute confers rights enforceable under § 1983: (1) whether Congress "intended that the provision in question benefit the plaintiff"; (2) whether "the right asserted by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) whether the statute "unambiguously impose[s] a binding obligation on the States" by couching its right "in mandatory, rather than precatory, terms." *Id.* at 340–41, 117 S.Ct. 1353 (quoting *Wright v. City of Roanoke Redev. and Hous. Auth.*, 479 U.S. 418, 431–32, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). The Court "clarified the first of *Blessing*'s three requirements" in *Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), "making clear that only unambiguously conferred rights, as distinguished from mere benefits or interests, are enforceable under § 1983." *Westside Mothers II*, 454 F.3d at 541–42. Thus, we must inquire "whether or not Congress intended to confer individual rights upon a class of beneficiaries," in particular looking to "whether the pertinent statute contains 'rights-creating' language that reveals congressional intent to create an individually enforceable right." *Id.* at 542 (quoting *Gonzaga*, 536 U.S. at 285, 287, 122 S.Ct. 2268). Finally, we must ask whether Congress "explicitly foreclose[d] recourse to § 1983" under the relevant statute, including by establishing a "remedial scheme sufficiently comprehensive to supplant § 1983." *Westside Mothers I*, 289 F.3d at 863. Applying this analysis demonstrates that

§§ 1396a(a)(8) and (10) do allow for a private right of action. This conclusion is supported by the frequency with which other courts have held that these provisions create rights enforceable under § 1983, even post- *Gonzaga*.[8]

Considering the first *Blessing* factor in *Westside Mothers II*, this Court reasoned that "the text of § 1396a(a)(30)[ (A) ] does not focus on individual entitlements." 454 F.3d at 543. Indeed, that provision never once references individuals. *See* 42 U.S.C. § 1396a(a)(30)(A). By contrast, §§ 1396a(a)(8) and (10) do focus on individual entitlements, requiring that "all individuals" have the opportunity to apply for medical assistance, that "all eligible individuals['] assistance be furnished reasonably promptly, and that assistance "to any individual described" equal the assistance available to other Medicaid recipients. 42 U.S.C. §§ 1396a(a)(8), (a)(10). This is "the kind of 'individually focused terminology' that 'unambiguously confer[s]' an 'individual entitlement' under the law." *See Harris v. Olszewski*, 442 F.3d 456, 461 (6th Cir. 2006) (alteration in original) (quoting *Gonzaga*, 536 U.S. at 283, 287, 122 S.Ct. 2268) **\*448** (concluding that § 1396a(a)(23) creates rights enforceable under § 1983 in part because the provision explicitly refers to "any individual eligible for medical assistance").

Turning to the second *Blessing* factor, this Court found in *Westside Mothers II* that the " 'broad and nonspecific' language" of § 1396a(a)(30)(A) was not amenable to judicial remedy. 454 F.3d at 543 (quoting *Gonzaga*, 536 U.S. at 292, 122 S.Ct. 2268). We noted that the provision "sets forth general objectives, including 'efficiency, economy, and quality of care,' but does not identify what standards are required by such terms." *Id.*; *accord Armstrong*, 575 U.S. at 328, 135 S.Ct. 1378 ("It is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of ... care and services.' ").

But unlike § 1396a(a)(30)(A), §§ 1396a(a)(8) and (10) are amenable to judicial remedy. Section 1396a(a)(8) requires simply that eligible individuals have the opportunity to apply for available medical assistance, and that this assistance "be furnished with reasonable promptness." Courts can easily determine whether individuals have been given the opportunity to apply for medical assistance by looking to the face of a state's Medicaid plan, records supplied by agencies and recipients, and witness testimony. And the regulations make clear that the standard for "reasonable promptness" is within at least forty-five or ninety days, depending on the basis for an individual's application. *See* 42 C.F.R. § 435.912(c)(3); *see also Romano*, 721 F.3d at 378–79; *Doe v. Kidd*, 501 F.3d 348, 356 (4th Cir. 2007); *Doe ex rel. Doe v. Chiles*, 136 F.3d 709, 716–17 (11th Cir. 1998).

Similarly, § 1396a(a)(10) is not vague or amorphous, as it specifically defines what care and services must be made available to recipients by reference to § 1396d(a), *see id.* § 1396a(a)(10)(A), and sets forth criteria for determining whether those services are equitably provided, *id.* § 1396a(a)(10)(B) (explaining that assistance made available "shall not be less in *amount, duration,* or *scope*" than that made available to other individuals) (emphasis added). *See also Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir. 2006); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 605 (5th Cir. 2004).

Regarding the third factor, as this Court explained in *Westside Mothers I*, these provisions "are couched in mandatory rather than precatory language, stating that Medicaid services, '*shall* be furnished' to eligible [individuals]" with reasonable promptness, 289 F.3d at 863 (quoting 42 U.S.C. § 1396a(a)(8)) (emphasis added), and that state plans "must" provide medical assistance, 42 U.S.C. § 1396a(a). Finally, it is Defendants' burden to show that Congress foreclosed a remedy under § 1983. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). And while it is true that 42 U.S.C. § 1396c allows CMS to withhold Medicaid funds if states breach these requirements, this enforcement provision by itself does not necessarily foreclose relief. *Armstrong*, 575 U.S. at 328, 135 S.Ct.

1378. Because the other factors point in favor of finding an enforceable right, and because Congress did not explicitly foreclose relief or provide a comprehensive remedial scheme, we conclude that Plaintiffs have a private right of action under both §§ 1396a(a)(8) and (a)(10).

**B. Merits**

[30] Turning then to the merits, Plaintiffs assert two separate claims based on **\*449** these provisions. First, Count IV of Plaintiffs' amended complaint asserts that Defendants failed to ensure that the individual Plaintiffs were able to obtain medically necessary services with reasonable promptness, in violation of §§ 1396a(a)(8) and (10)(A). As previously discussed, those provisions require states' Medicaid plans to provide "for making [specified] medical assistance available" to qualifying individuals, including the individual Plaintiffs, and "that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. §§ 1396a(a)(10)(A), (8). The "medical assistance" to be provided under a state plan includes "payment of part or all of the cost of" "community supported living arrangements services" that "assist a developmentally disabled individual ... in activities of daily living necessary to permit such individual to live in the individual's own home," including "[p]ersonal assistance," "[t]raining and habilitation services (necessary to assist the individual in achieving increased integration, independence and productivity)," and "[s]upport services necessary to aid an individual to participate in community activities." 42 U.S.C. § 1396n(c)(1); *id.* § 1396d(a)(23) (defining "medical assistance"); *id.* §§ 1396u(a)(1), (2), (7) (defining "community supported living arrangements services"). Thus, the CLS services that Plaintiffs seek clearly fall within the "medical assistance" that must be paid for or provided by the State with relative promptness pursuant to §§ 1396a(a)(8) and (10)(A).

[31] Second, in Count III of their amended complaint, Plaintiffs assert that Defendants have failed "to pay for services in the amount, scope, and duration needed to reasonably achieve their purpose," in violation of § 1396a(a)(10)(B). (Pls.' Br. at 16.) As previously discussed, § 1396a(a)(10)(B) requires state Medicaid plans to ensure that individuals are provided medical assistance "not ... less in amount, duration, or scope than the medical assistance made

available to any other such individual" under the provision. Plaintiffs do not assert that Defendants have failed to ensure that the individual Plaintiffs are provided services comparable to other relevant individuals, and in fact concede that they can make no such assertion because CMS waived Michigan's obligation to comply with those requirements.

[32] Instead, Plaintiffs assert that Defendants violated § 1396a(a)(10)(B)'s "sufficiency requirements," which they say are set forth in 42 C.F.R. § 440.230(b) and were not waived. The parties do not dispute whether § 1396a(a)(10)(B) actually sets forth sufficiency requirements, whether 42 C.F.R. § 440.230(b) actually interprets 42 U.S.C. § 1396a(a)(10)(B) (as opposed to some other statutory provision, *e.g.*, §§ 1396a(a)(8) or (a)(10)(A)), or whether—if § 1396a(a)(10)(B) does indeed establish sufficiency requirements—CMS waived Michigan's obligation to comply with those requirements alongside its waiver of that statute's comparability requirements. These issues strike us as relevant to Plaintiffs' Count III. However, "[i]n our adversarial system of adjudication, we follow the principle of party presentation" and "rely on the parties to frame the issues for decision." *United States v. Sineneng-Smith*, ––– U.S. ––––, 140 S. Ct. 1575, 1579, 206 L.Ed.2d 866 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008)). Absent briefing or argument on any of these issues, we assume without deciding that § 1396a(a)(10)(B) does establish sufficiency requirements embodied in 42 C.F.R. § 440.230(b). Under these provisions, **\*450** then, "[e]ach service" provided to Plaintiffs under Michigan's Medicaid plan "must be sufficient in amount, duration, and scope to reasonably achieve [their] purpose[s]," 42 C.F.R. § 440.230(b), including "permit[ting] [the] individual to live in the individual's own home," "achieving increased integration, independence and productivity," and enabling the individual "to participate in community activities," 42 U.S.C. §§ 1396u(a)(1), (2), (7).

Turning then to the district court's stated reasons for dismissal and the parties' arguments on appeal, Plaintiffs dispute the district court's conclusion that they did not sufficiently state their § 1396a claims because their complaint failed to identify any "specific, *medically necessary* services

which they are being denied under the existing budgeting scheme." (Dist. Ct. Op., R. 164 at PageID #4371.) We agree that the district court ignored Plaintiffs' well-pleaded allegations in reaching this conclusion. The heart of Plaintiffs' complaint is that the current budget methodology prevents them from promptly receiving sufficient medically necessary services, as detailed in their IPOSs and as required for them to live at home and participate in the community. In *Westside Mothers II*, this Court acknowledged that the plaintiffs' assertions that "the payments [they received] were insufficient to enlist an adequate number of providers" may suffice to state a claim that "inadequate payments effectively deny the right to 'medical assistance,'" that §§ 1396a(a)(8) and (10) protect. 454 F.3d at 540–41; *see also Health Care for All, Inc. v. Romney*, No. 00-10833, 2005 WL 1660677, at \*10–11 (D. Mass. July 14, 2005); *Okla. Chapter of Am. Acad. of Pediatrics v. Fogarty*, 366 F. Supp. 2d 1050, 1109 (N.D. Okla. 2005); *Sobky v. Smoley*, 855 F. Supp. 1123, 1149 (E.D. Cal. 1994). Plaintiffs explained in their complaint that their IPOSs identified their medically necessary services and supports. They then alleged that the current budget methodology prevented each individual Plaintiff from receiving supports or care identified in their IPOS. (*See* Am. Compl., R. 146 at PageID #3753 (explaining that Plaintiff Waskul cannot find providers to fill all of the CLS hours required by his IPOS and has to stay home three days a week because of short staffing); *id.* at ##3758–59 (stating that Plaintiff Schneider can only employ providers for sixty-five of ninety-three CLS hours required by his IPOS and must pay for transportation and community activities himself); *id.* at #3766 (noting that Plaintiff Wiesner can only secure two of three providers, eighty of 120 total CLS hours, and a portion of the community hours called for in his IPOS); *id.* at ##3771–72 (explaining that Plaintiff Trabue can participate in activities called for by her IPOS only by paying for them herself); *id.* at #3773 (stating that Plaintiff Ernst must pay for transportation and community activities provided for in her IPOS out of pocket).) This suffices to show that they are not receiving medically necessary services with relative promptness and in sufficient amounts to achieve their purpose.

The district court also concluded that Plaintiffs undisputedly had the option to use providers who contract with the County if they could not find their own providers to work at the pay they can offer under the current methodology. Thus, even if Plaintiffs couldn't *hire* CLS providers, it said, they were not

necessarily deprived of community-based services. It is true that, were such services actually available, Plaintiffs could not show a violation of 🔖 §§ 1396a(a)(8) and (10) simply because they did not get to choose their own providers, as nothing in these provisions evidently requires Plaintiffs to be provided services by the providers of their choice. And in an April 2015 letter submitted with **\*451** Plaintiffs' complaints, WCHO notes that one way individuals might fill their staffing needs following the budget change is by "us[ing] one of our contracted providers for CLS services." (Am. Compl. Ex. 4, R. 146-5 at PageID #3834.) But in finding that Plaintiffs could have fulfilled their staffing needs through the use of these agency-contracted providers, the court accepted the facts as presented by Defendants and made several inferences against Plaintiffs, contrary to its duty in considering motions to dismiss. It inferred that these providers were actually available; it inferred that these providers would be able to fill Plaintiffs' staffing needs; and it inferred that if Plaintiffs had relied upon these providers, they would not still face a shortfall in other aspects of their CLS services. In fact, the complaint alleged that agency providers were "not suitable" to fulfill Plaintiff Ernst's staffing needs, giving rise to the reasonable inference that these providers could not fill the gaps in staffing from which Plaintiffs suffered. (Am. Compl., R. 146 at PageID ##3772–73.) Thus, while this option, if available, may undermine Plaintiffs' claims at the summary judgment or trial stage, it does not defeat their claims at this stage.

The court also determined that Plaintiffs' claim failed because if they faced a shortfall in funding, they could simply request additional funding through the PCP process. Again, if this option were actually available, it might undermine Plaintiffs' claims. However, the complaint explains that Plaintiffs' budget is now developed by multiplying "a specific rate times the number of [service] hours in the IPOS." (Am. Compl., R. 146 at PageID #3732.) Thus, without increasing the number of service hours called for by the IPOS, Plaintiffs cannot increase their budgets. Plaintiffs at no point allege that the hours identified in their IPOS are insufficient to meet their needs—instead, they allege that the budget they receive per hour is insufficient because it is improperly calculated. Nor do Plaintiffs apparently have any new medical needs that their IPOS can be updated to accommodate. As Plaintiffs explained at the hearing on Defendants' motions to dismiss, "[b]ecause the services that [they] are asking for are already in the IPOS, there is nothing to supplement" the IPOS with in order to receive more funds. (Mot. Hr'g Tr., R. 149 at PageID ##4021–22.) Moreover, the complaint suggests that at

least some of the individual Plaintiffs have already requested and been denied additional funds to cover specific services already identified under their IPOSs. (*See, e.g.*, Am. Compl., R. 146 at PageID #3759 (stating that Plaintiff Schneider "requested $400 monthly for transportation and $200 monthly for community activities" and was told that "these costs are above what the current self-determination budget covers"); *id.* at #3769 (explaining that former Plaintiff Erlandson requested additional funds for a CLS staff supervisor and was rejected).)

Finally, throughout the course of their general argument, Defendants contend that CLS recipients are obligated to rely on natural or community supports, including family care, before they may use Medicaid funds. Accordingly, in their view, there is no problem with compelling individual Plaintiffs to pay out of pocket for certain supports or to enlist family members to provide care. However, the extent to which Plaintiffs can be required to do so is again a question of fact. Medicaid regulations call for individuals' IPOSs to include "natural supports," or "unpaid supports that are provided voluntarily to the individual in lieu of [Waiver] services and supports." 42 C.F.R. §§ 441.301(b)(1)(i), (c)(2)(v). Michigan's Medicaid Provider Manual states:

> **\*452** [The Department] encourages the use of natural supports to assist in meeting an individual's needs to the extent that the family or friends who provide the natural supports are willing and able to provide this assistance. PIHPs may not require a beneficiary's natural support network to provide such assistance as a condition for receiving specialty mental health supports and services. The use of natural supports must be documented in the beneficiary's individual plan of service.

(Mich. Medicaid Provider Manual at 325.) Plaintiffs' complaint suggests that the individual Plaintiffs' family members do not voluntarily provide care to them so much as they are compelled to do so by the current budget methodology, often at significant detriment to their health and finances. (*See, e.g.*, Am. Compl., R. 146 at PageID #3753 (Plaintiff Waskul was "forced to hire" his father for care, although he is only available on weekends and

in the evening); *id.* at #3760 (Plaintiff Schneider was "forced to hire" his 77-year-old ailing grandfather, and his grandparents are providing nearly 50% of his care because he is "shortstaffed and cannot find CLS providers"); *id.* at #3765 (Plaintiff Wiesner's mother was compelled to pay for and provide his IPOS-required community activity and transportation, causing her to fall behind on her taxes and putting her at risk of foreclosure); *id.* at #3771 (Plaintiff Trabue's family is "forced to pay" for exercise activities called for by her IPOS).) Thus, to the extent that Plaintiffs must depend on non-voluntary natural supports or supports not documented in their IPOS, this too does not defeat their claim.

To be sure, while the Supreme Court has explained that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage," the district court is correct that it is not "inconsistent with the objectives of the [Medicaid] Act for a State to refuse to fund unnecessary though perhaps desirable medical services." 📖 *Beal v. Doe*, 432 U.S. 438, 444–45, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). The potential availability of county providers, the potential that Plaintiffs could modify their budgets to ensure necessary medical coverage is available, and the potential that Plaintiffs' reliance on natural supports is within the scope of their IPOSs all suggest that Plaintiffs may not be able to succeed on this claim at later stages of their litigation. This said, at this juncture, Plaintiffs' allegations suffice to state a plausible claim that they are being denied sufficient necessary medical services. We therefore reverse the district court's dismissal of Counts III and IV of Plaintiff's amended complaint.

## II. The Medicaid Act's Necessary-Safeguards and Free-Choice Provisions, 📖 42 U.S.C. §§ 1396n(c)(2)(A) and (C)

Plaintiffs next claim that Defendant Gordon, Director of the Michigan Department of Health and Human Services, violated 📖 §§ 1396n(c)(2)(A) and (C), pertaining to assurances required for grant of Michigan's Medicaid Waiver, by permitting the implementation of the new budget method. Defendant Gordon responds that there is no private right of action to enforce these provisions. Alternatively, he asserts that even if there was, Plaintiffs have not stated a claim because he properly exercised his review and oversight authority. The district court found that there was a private right of action under these provisions, but that Plaintiffs did not state a claim because Defendant Gordon did not violate

the Act by setting a limit on the budget and because Plaintiffs are not effectively homebound. Because 📖 §§ 1396n(c)(2)(A) and (C) are properly enforceable under 📖 § 1983 and because Plaintiffs have plausibly stated **\*453** a claim that Defendant Gordon violated these provisions, we also reverse the district court's decision as to these claims.

### A. Private Right of Action Under 📖 § 1983

As with 📖 §§ 1396a(a)(8) and (10), the parties dispute whether 📖 §§ 1396n(c)(2)(A) and (C) are individually enforceable under 📖 § 1983. Those provisions state that:

[A habilitation supports] waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that—

(A) necessary safeguards ... have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services; [and] ...

(C) such individuals who are determined likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for [individuals with intellectual disabilities] are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facilities, or services in an intermediate care facility for [individuals with intellectual disabilities] ....

📖 42 U.S.C. § 1396n(c)(2). We have previously found that both 📖 §§ 1396n(c)(2)(A) and (C) are enforceable under 📖 § 1983. 📖 *Wood v. Tompkins*, 33 F.3d 600, 611 (6th Cir. 1994). However, since then, the Supreme Court has issued its decisions in 📖 *Blessing* and 📖 *Gonzaga* expanding upon when a statute creates rights enforceable under 📖 § 1983, and so that decision no longer binds us. Nevertheless, upon reconsideration, we adhere to our conclusion that 📖 §§ 1396n(c)(2)(A) and (C) are enforceable under 📖 § 1983. The analysis that this Court applied in 📖 *Wood* nearly parallels the analysis required under 📖 *Blessing* and 📖 *Gonzaga*. *See* 📖 *id.* at 607–11. And the great majority of courts to consider

the question of whether these provisions allow for a private right of action post- *Gonzaga* has found that they do.[9]

[33] Our own application of the *Blessing-Gonzaga* analysis confirms that §§ 1396n(c)(2)(A) and (C) do indeed create rights enforceable under § 1983. As with the § 1396a provisions addressed in Part I, Defendant Gordon compares §§ 1396n(c)(2)(A) and (C) to § 1396a(a)(30)(A), which both this Court and the Supreme Court have held does not allow for individual enforcement under § 1983. (State Defs.' Br. at 39); *see Westside Mothers II*, 454 F.3d at 542–43; **\*454** *Armstrong*, 575 U.S. at 328–29, 135 S.Ct. 1378. Again, this comparison is inapt.

[34] Considering the first prong of *Blessing*, it is clear that Congress intended both §§ 1396n(c)(2)(A) and (C) to confer individual rights enforceable under § 1983. Both provisions are "phrased in terms of the persons benefited," *Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268, as they center around what shall be provided to "individuals" under the statute, 42 U.S.C. §§ 1396n(c)(2)(A), (C).[10] *See Harris*, 442 F.3d at 461 (holding that similar references to individuals were "the kind of 'individually focused terminology' that 'unambiguously confer[s]' an 'individual entitlement' under the law" (alteration in original) (quoting *Gonzaga*, 536 U.S. at 283, 287, 122 S.Ct. 2268)). And both expressly identify individual rights to be protected —namely, individuals' "health and welfare" and informed choice. 42 U.S.C. §§ 1396n(c)(2)(A), (C). As the Ninth Circuit found when considering subsection (c)(2)(C) in *Ball v. Rodgers*, 492 F.3d 1094, 1107 (9th Cir. 2007), "[t]he statutory provisions are, in other words, 'concerned with "whether the needs of any particular person have been satisfied," ' not solely with an aggregate 'institutional policy and practice.' " *Id.* (quoting *Gonzaga*, 536 U.S. at 288, 122 S.Ct. 2268). This is unlike § 1396a(a)(30)(A), which only references recipients of Medicaid services "in the aggregate" and "speaks not of any individual's right but of the State's obligation to develop 'methods and procedures

for providing services generally.' " *Id.* at 1109 (quoting *Sanchez v. Johnson*, 416 F.3d 1051, 1059 (9th Cir. 2005)).

Turning to *Blessing*'s second prong, the rights "assertedly protected by the statute [are] not so 'vague and amorphous' that [their] enforcement would strain judicial competence." 520 U.S. at 340–41, 117 S.Ct. 1353. We have already concluded in *Wood* that "[t]he duties set forth [in §§ 1396n(c)(2)(A) and (C)] do not involve any fuzzy, undefined concepts like 'reasonable efforts.' Rather, these duties involve unambiguous directives that are well within the ability of the judiciary to enforce." 33 F.3d at 608. With regard to § 1396n(c)(2)(A), together, "the statute and regulations carefully detail the specific [assurances] to be provided" regarding safeguards for health and welfare. *See Westside Mothers I*, 289 F.3d at 863 (discussing §§ 1396a(a)(8) and (10)). As laid out in 42 C.F.R. § 441.302(a), § 1396n(c)(2)(A) requires assurances that states have set standards for service providers operating under the waiver, including state licensure and certification requirements; that facilities in which services are provided are in compliance with similar state standards; **\*455** and that services are provided in home and community based settings. As for § 1396n(c)(2)(C), the statute simply requires that individuals have a right to choose among alternatives to institutionalized care and that they are informed of this choice. *Rodgers*, 492 F.3d at 1115. For both §§ 1396n(c)(2)(A) and (C), "[a] court can readily determine whether a state is fulfilling these statutory obligations by looking to sources such as a state's Medicaid plan, agency records and documents, and the testimony of Medicaid recipients and providers." *See id.* And unlike § 1396a(a)(30)(A)'s requirement that payments be " 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of ... care and services,' " *Armstrong*, 575 U.S. at 328, 135 S.Ct. 1378, determining states' compliance with these provisions does not require any sort of broad, policy-based balancing or "account[ing] for numerous, largely unquantifiable variables," *Rodgers*, 492 F.3d at 1115.

Under *Blessing*'s third prong, both provisions "impose a binding obligation on the States" by using "mandatory,

rather than precatory" language. 520 U.S. at 341, 117 S.Ct. 1353. Section 1396n(c)(2) states that "[a] waiver *shall not* be granted ... unless the State provides [the] assurances" described. *Id.* (emphasis added). Finally, Congress has not foreclosed a remedy under § 1983 for either §§ 1396n(c)(2)(A) or (C). While §§ 1396n(c)(2)(A) and (C) are also explicitly enforceable through termination of a state's waiver, *see* 42 U.S.C. § 1396n(f)(1), again, this alone does not preclude the existence of an individual right under § 1983, *see Armstrong, 575 U.S. at 328, 135 S.Ct. 1378.* [11] Section 1396a(a)(30)(A)'s similar enforcement provision precluded a finding of a right only in combination with the fact that it failed the second *Blessing* prong. *Id.* That is not the case with §§ 1396n(c)(2)(A) and (C). Neither did Congress explicitly foreclose relief or provide for a comprehensive remedial scheme. Thus, Defendants have a private right of action under both §§ 1396n(c)(2)(A) and (C).

### B. Merits

Considering Plaintiffs' claim under § 1396n(c)(2)(A), the federal regulation interpreting this provision requires states to provide "assurance that services are provided in home and community based settings, as specified in § 441.301(c)(4)." 42 C.F.R. § 441.302(a)(5). Section 441.301(c)(4), in turn, requires that home and community-based settings (1) "support[ ] full access of individuals receiving [services] to the greater community, including opportunities to ... engage in community life, control personal resources, and receive services in the community, to the same degree of access as individuals not receiving [services]," *id.* § 441.301(c)(4)(i); (2) "[o]ptimize[ ], but ... not regiment, individual initiative, autonomy, and independence in making life choices," *id.* § 441.301(c)(4)(iv); and (3) "[f]acilitate[ ] individual choice regarding services and supports, and who provides them," *id.* § 441.301(c)(4)(v). Plaintiffs' amended complaint addressed each of these requirements and contended that, by permitting alteration of the budget methodology, **\*456** Defendant Gordon failed to ensure that they were met.

[35] The district court dismissed Plaintiffs' § 1396n(c)(2)(A) claim because Defendant Gordon has a "responsibility to set the appropriate budget." (Dist. Ct. Op., R. 164 at

PageID ##4373–74.) But this does not provide grounds for dismissal. Indeed, Plaintiffs agree that Defendant Gordon has that responsibility. Their point is that he "is not exercising that responsibility and that the budgets set ... are not, in fact, 'appropriate.' " (Pls.' Br. at 49.) It is readily apparent that, if Plaintiffs' claims are proven, allowing the implementation of a flawed budget methodology that results in underfunding of Plaintiffs' IPOSs might not allow Plaintiffs to receive the "same degree of access as individuals not receiving Medicaid HCBS," optimize their individual autonomy, or facilitate their individual choice. *See* 42 C.F.R. § 441.301(c)(4). If Plaintiffs are able to show that they are compelled to use agency providers in order to maintain their budgets, this may demonstrate that the budget methodology does not allow them sufficient choice among providers. *Id.* § 441.301(c)(4)(v). While Defendant Gordon may be able to show for the purposes of summary judgment or at trial that the current methodology achieves these goals as best possible, Plaintiffs' current allegations suffice to state a claim that he has not.

[36] [37] Turning to § 1396n(c)(2)(C), we agree with the Ninth Circuit that this provision confers "two explicitly identified rights—(a) the right to be informed of the alternatives to traditional, long-term institutional care, and (b) the right to choose among those alternatives." *Rodgers, 492 F.3d at 1107.* Regulations interpreting this provision also confirm that the State must ensure beneficiaries are "[g]iven the choice of either institutional or home and community-based services." 42 C.F.R. § 441.302(d)(2). Plaintiffs do not dispute that they were informed of their alternatives, but instead argue that they were not provided a meaningful right to choose because the current budget methodology means that if they opt for home-based services, they are "effectively homebound, unable to get out into the community and unable to receive necessary care, services, and support." (Am. Compl., R. 146 at PageID ##3795–96.) In essence, Plaintiffs argue that in order to receive their medically necessary supports, they are compelled to choose institutionalized care. And indeed, should Defendants' budget methodology preclude Plaintiffs from receiving necessary services, this would effectively destroy the choice Defendant Gordon must ensure exists under § 1396n(c)(2)(C). *See, e.g., Cramer v. Chiles, 33 F. Supp. 2d 1342, 1353 (S.D. Fla. 1999)* ("Underfunding of the Home and Community-Based Waiver program compels institutionalization, thus negating a meaningful choice.").

The district court dismissed Plaintiffs' § 1396n(c)(2)(C) claim because they did not show that they are "effectively homebound," and because they purportedly could secure more funding to implement their IPOS through the PCP process. (Dist. Ct. Op., R. 164 at PageID ##4374–75.) Neither is an adequate reason to dismiss Plaintiffs' claims. In finding that Plaintiffs did not sufficiently allege that they were "effectively homebound" and that they could increase their budgets for medically necessary services through the PCP process, the district court again disregarded well-pleaded allegations in Plaintiffs' complaint. The complaint not only alleged that Plaintiff Waskul "goes three weekdays (Monday through Wednesday) without his normal community routine and is confined to his home on those days," but also that Plaintiff Wiesner has not been sufficiently able to "get into the community **\*457** during the [service] hours that are currently provided" due to his inability to hire additional staff. (Am. Compl., R. 146 at PageID ##3753, 3766.) As previously discussed, Plaintiffs' pleadings also suggest that the PCP process cannot remedy this budget issue.

[38]  Defendant Gordon contends that this provision does not require the State to ensure that Plaintiffs have "meaningful" alternatives to institutionalized care. (State Defs.' Br. at 39.) We disagree. An alternative in name only is no alternative, and if this provision has any purpose at all, it is to ensure that Plaintiffs have access to meaningful alternatives. Accordingly, courts regularly interpret this provision to require "meaningful choice." *See, e.g., Ball v. Kasich*, 244 F. Supp. 3d 662, 685 (S.D. Ohio 2017); *Boulet v. Cellucci*, 107 F. Supp. 2d 61, 77 (D. Mass. 2000); *see also Cramer*, 33 F. Supp. 2d at 1352–53 (stating that plaintiffs were provided "no real choice"). A "meaningful choice" is one that is actually available and that fulfills individuals' medical needs. *See, e.g., Kasich*, 244 F. Supp. 3d at 685 (finding that the plaintiffs had stated a claim that they were not afforded a meaningful choice when they had been on a waiting list for at-home services for decades); *Boulet*, 107 F. Supp. 2d at 77 (concluding that "an option which may not meet an individual's needs [does not] constitute[ ] a meaningful choice as contemplated by § 1396n(c)(2)"); *Cramer*, 33 F. Supp. 2d at 1352–53 (finding a violation of the statute where individuals must choose between "(1) a Home and Community-Based Waiver option which gives no assurance that the supports and services will meet individuals['] needs, and (2) a hope for a future [institutionalized care facility] placement" because the system "effectively eliminat[es] a

choice"). By alleging that the current budget methodology prevents them from receiving medically necessary services at home, then, Plaintiffs have plausibly alleged that they have been deprived of a choice between institutionalized and at-home care, in violation of § 1396n(c)(2)(C).

As a last point, § 1396n(c)(2)(C) only requires states to ensure that individuals are offered "feasible alternatives" available "under [the] waiver." But Plaintiffs' pleadings suggest that it may be feasible for them to receive additional services through a better funding methodology—specifically, they note that the CLS rate, as of April 2015, was "17.4% lower than the *lowest* average rate the State had told the federal government it expected to pay, and fully *31.3% lower* than the rate that the State had said it expected to pay in 2014, the then-most-recent year of the Habilitation Supports Waiver." (Am. Compl., R. 146 at PageID #3734.) This plausibly alleges that it was feasible for Defendants to enact a budget methodology that ensured a higher rate than was ultimately implemented. Of course, Defendant Gordon may later show that this alternative is not, in fact, feasible, for funding or other reasons. But at this point, Plaintiffs have sufficiently alleged that feasible alternatives that provide them a meaningful choice between institutionalized and at-home or community-based care exist and are not being ensured by Defendant Gordon, in violation of § 1396n(c)(2)(C). Accordingly, we reverse the district court's dismissal of Plaintiffs' claims under § 1396n.

## III. Third-Party Beneficiary Claim

Plaintiffs next argue that Defendants Gordon, Terwilliger, and CMHPSM breached the terms of the Waiver and the Department-CMHPSM contract implementing the Waiver by failing to ensure that participants' budgets are "sufficient to implement the IPOS" and are developed "by costing out the services and supports **\*458** using the rates for providers chosen by the participant and the number of hours authorized by the IPOS." (Am. Compl., R. 146 at PageID ##3801, 3803 (quoting Waiver at 125, 134).) Defendants argue that Plaintiffs cannot assert this claim as third-party beneficiaries because they do not have a private right of action under the statute underlying the Waiver and contract, because "the relevant waiver language does not support Plaintiffs' claim," and because Plaintiffs did not show that Defendants' conduct led to them being denied any required services. The district court dismissed this claim, concluding that "Plaintiffs concede ... that this claim is inseparable from their statutory

Med & Med GD (CCH) P 306,888

claims" and that, because those claims failed, this one must also fail. (Dist. Ct. Op., R. 164 at PageID #4378 (citing Pls.' Oral Arg. Ps., R. 153-1 at PageID #4220).) That conclusion is unjustified; accordingly, we reverse the district court's decision.

The district court reasoned that Plaintiffs had conceded that their third-party beneficiary claim was inseparable from their statutory claims based on Plaintiffs' argument that the court should exercise supplemental jurisdiction over their third-party beneficiary claim because the Waiver and Department-CMHPSM contract "are central to every claim in this action" and would be impossible to separate into different suits in state and federal court. (Pls.' Oral Arg. Ps., R. 153-1 at PageID #4220.) But this argument does not concede that Plaintiffs' statutory and third-party beneficiary claims must necessarily rise and fall together. Instead, Plaintiffs simply assert that the third-party beneficiary claim is "so related to claims" over which the district court had original jurisdiction "that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). The simple fact that claims are part of the same case or controversy does not mean that they are dependent upon one another. Thus, the district court erred in dismissing these claims on that basis.

We could alternatively read the district court's decision as declining to exercise supplemental jurisdiction over these claims based on its dismissal of Plaintiffs' federal law claims.

*See* United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). But if that was the basis for its dismissal, this decision is no longer justified, given that many of those federal law claims were improperly dismissed.

**[39]** Notably, the district court did not reach the merits of this claim. "Absent 'exceptional circumstances,' we normally decline to rule on an issue not decided below." Stoudemire v. Mich. Dep't of Corr., 705 F.3d 560, 576 (6th Cir. 2013) (quoting St. Marys Foundry, Inc. v. Emp'rs Ins. of Wausau, 332 F.3d 989, 996 (6th Cir. 2003)). This case presents no exceptional circumstances in this regard and this claim would benefit from further briefing. We therefore reverse and remand to allow the district court to consider the merits of Plaintiffs' claim in the first instance.

## IV. ADA and Rehabilitation Act Claims

In Counts V and VI, Plaintiffs argue that Defendants Gordon, Terwilliger, Cortes, CMHPSM, and WCCMH have violated the "integration mandate" established under the ADA and that all Defendants have violated a mirroring provision of § 504 of the Rehabilitation Act. Defendants generally assert that they did not violate either provision because neither requires them to provide integration to the **\*459** extent Plaintiffs desire. [12] The district court dismissed these claims because Plaintiffs had not sufficiently shown that they were at risk of institutionalization or effectively institutionalized at home and because Plaintiffs' requested relief would require a "fundamental alteration" of Defendants' programs not available under either the ADA or § 504. (Dist. Ct. Op, R. 164 at PageID ##4376–78.) Because Plaintiffs have plausibly stated a claim that they were at serious risk of institutionalization and were unduly isolated in their homes as a result of the change in budget methodology, we reverse the district court's decision.

Plaintiffs assert that Defendants Gordon, Terwilliger, Cortes, CMHPSM, and WCCMH have violated Title II of the ADA, 42 U.S.C. § 12132, which establishes that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." In Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 600, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court recognized that one form of discrimination prohibited thereunder is "unjustified institutional isolation of persons with disabilities." *See also* 42 U.S.C. § 12101(a)(2) (stating Congressional finding that "historically, society has tended to isolate and segregate individuals with disabilities, and ... such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"). Accordingly, to implement § 12132, the Attorney General promulgated a regulation known as the "integration mandate," which provides that public entities "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* Carpenter-Barker v. Ohio Dep't of Medicaid, 752 F. App'x 215, 219 (6th Cir. 2018). The "most integrated setting" is one "that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." Olmstead, 527 U.S. at 592, 119 S.Ct. 2176 (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)).

Med & Med GD (CCH) P 306,888

Alongside this, Plaintiffs also claim that all Defendants have violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794, which mirrors 42 U.S.C. § 12132 and is interpreted in parallel with it. [13] *See* **\*460** *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir. 2004). A regulation promulgated under § 504 similarly establishes that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). Plaintiffs' ADA and § 504 claims are "essentially one claim," and we thus consider them in tandem. *Carpenter-Barker*, 752 F. App'x at 220.

 **[40]** Plaintiffs argue that Defendants have violated the ADA and § 504 in two distinct manners. [14] First, they contend that implementation of the current budget methodology places all of the individual Plaintiffs at serious risk of institutionalization. Second, they assert that this methodology has caused Plaintiffs Waskul and Wiesner to be effectively institutionalized in their own homes. We address each theory in turn.

 **[41]** Considering Plaintiffs' first theory, courts have widely accepted that plaintiffs can state a claim for violation of the integration mandate by showing that they have been placed at serious risk of institutionalization or segregation. *See, e.g.*, *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 608, 615 (7th Cir. 2004) (finding that a plaintiff had stated a claim by showing that defendants' conduct "portend[ed]" future institutionalization); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181–82 (10th Cir. 2003) (rejecting district court's conclusion that the plaintiffs could not state a claim for violation of the integration mandate because they were not presently institutionalized and faced only the risk of institutionalization); *Townsend v. Quasim*, 328 F.3d 511, 515, 520 (9th Cir. 2003) (reversing summary judgment on a claim for violation of the integration mandate brought by a plaintiff currently living at home who had been informed that he would lose his benefits if he did not submit to institutionalization). We have agreed that "cases applying *Olmstead* for the proposition that the risk of institutionalization can support a valid claim of discrimination under the ADA ... provide reasonable applications of *Olmstead*'s holding." *Carpenter-Barker*, 752 F. App'x at

221–22. Indeed, in *Olmstead*, the Supreme Court reasoned that unjustified institutionalization or segregation constitutes discrimination because:

> In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice.

527 U.S. at 601, 119 S.Ct. 2176. Under this reasoning, individuals with disabilities are subjected to discrimination when they are forced to choose between forgoing necessary medical services while remaining in the community or receiving necessary medical services while institutionalized —not just when they are actually institutionalized.

 **[42]** In accordance with this precedent, the Department of Justice put forward guidance in 2011 clarifying that "[i]ndividuals need not wait until the harm of institutionalization or segregation occurs or is imminent" in order to bring a claim for violation of the integration mandate. U.S. Dep't of Justice, Statement of the Department **\*461** of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (last updated Feb. 25, 2020) (hereinafter, "U.S. Dep't of Justice, Statement on *Olmstead*"), https://www.ada.gov/ olmstead/q&a_olstead.htm. Instead, Plaintiffs may show a sufficient risk of institutionalization "if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id.* Courts have also looked to this guidance in reviewing claims like Plaintiffs'. *See, e.g.*, *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 262–63 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013). Even if not authoritative, the DOJ's "views warrant respect" in this area. *Olmstead*, 527 U.S. at 598, 119 S.Ct. 2176. And we need not decide whether the integration mandate is "genuinely ambiguous" as to whether it protects those at serious risk of institutionalization such that

Med & Med GD (CCH) P 306,888

the Department of Justice's interpretation of that regulation is entitled to deference under *Auer v. Robbins*, 519 U.S. 452, 461–62, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), *see Kisor v. Wilkie*, —— U.S. ——, 139 S. Ct. 2400, 2414, 204 L.Ed.2d 841 (2019), because in this case, Defendants do not dispute the DOJ's interpretation of *Olmstead* or that Plaintiffs can sustain a claim simply by showing that they are at serious risk of institutionalization. And we agree with the Tenth Circuit that a contrary interpretation is unreasonable because the integration mandate's "protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher*, 335 F.3d at 1181. Plaintiffs may thus state a claim by sufficiently alleging that they are at serious risk of institutionalization.

The district court properly recognized and accepted this possibility, but found that Plaintiffs had not sufficiently alleged that they were at serious risk of institutionalization because "this action was filed three years ago, but all of the individually named Plaintiffs still live at home." (Dist. Ct. Op., R. 164 at PageID #4376.) But while perhaps true, this fact says nothing about whether Plaintiffs have been compelled to forgo necessary medical services in order to remain in the community during that time. Nor does it reflect on the actual imminence of Plaintiffs' institutionalization—indeed, that could happen at any moment that Plaintiffs are unable to sustain their own care. *See* U.S. Dep't of Justice, Statement on *Olmstead*.

In fact, Plaintiffs did plausibly allege a serious risk of institutionalization. They explained in particular that the current budget methodology caused them to have to substantially rely on family members incapable of providing sustained, long-term care, thus placing them at risk of institutionalization. For instance, according to the complaint, Plaintiff Schneider must rely on his grandparents for "around 75 hours of CLS services per week, nearly 50% of the CLS support required by [his] IPOS, because [he] ... cannot find CLS providers to work at the current rate." (Am. Compl., R. 146 at PageID #3760.) Plaintiff Schneider's grandparents are aging and unwell. While not explicitly stated, the implication of this pleading is clear—should Plaintiff Schneider's grandparents no longer be able to care for him, he would be compelled to submit to institutionalization. Similarly, Plaintiffs allege that Plaintiff Wiesner has been

forced to rely upon his guardian "to pay for the majority of [his] community activity and transportation needs out of pocket," causing her to **\*462** "fall behind on her property taxes" and "putting her at risk of foreclosure." (*Id.* at #3765.) Plaintiff Wiesner's guardian is "unable to work during the time she has to stay home with [him]," purportedly at least forty hours a week, thus increasing her financial strain. (*Id.* at #3766.) This prompts the reasonable inference that he, too, is at serious risk of institutionalization if his guardian is unable to continue caring for him due to her dire financial situation. Plaintiff Waskul, for his part, has allegedly suffered "decline[s] in health, safety, or welfare" because he is unable to pay for his IPOS-required staff under the current methodology, including depression, worsening scoliosis, and anger management issues. *See* U.S. Dep't of Justice, Statement on *Olmstead*. For the purposes of a motion to dismiss, these facts suffice to show that Plaintiffs are at serious risk of institutionalization.

[43] Turning to Plaintiffs' second theory, we have not yet addressed whether individuals' isolation at home may also violate the integration mandate. In considering Plaintiffs' claim, we find the Seventh Circuit's decision in *Steimel v. Wernert* persuasive. The *Steimel* court confronted a claim substantially similar to Plaintiffs' and concluded that the Supreme Court's rationale in *Olmstead* also applied when individuals were isolated at home. 823 F.3d at 910. It specifically noted that isolation at home would run counter to the "two evident judgments" the Supreme Court saw in the integration mandate:

> The first is that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." The second is that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."

*Id.* (citations omitted) (quoting *Olmstead*, 527 U.S. at 600–01, 119 S.Ct. 2176). We agree that these concerns are as present when individuals are confined in home settings because that situation "can just as 'severely diminish[ ] the everyday life activities' of people with disabilities." *Id.* (alteration in original) (quoting *Olmstead*, 527 U.S. at 601,

Waskul v. Washtenaw County Community Mental Health, 979 F.3d 426 (2020)

Med & Med GD (CCH) P 306,888

119 S.Ct. 2176). Accordingly, we adopt *Steimel*'s analysis and recognize that the isolation of individuals with disabilities in a home environment can also violate the integration mandate.

[44] Nevertheless, even accepting that home isolation might violate the integration mandate, the district court found that Plaintiffs' did not state a claim because they "have not alleged how the current budgeting method has rendered them effectively institutionalized at home." (Dist. Ct. Op., R. 164 at PageID #4377.) Again, this elides the well-pleaded allegations of Plaintiffs' complaint. According to Plaintiffs, Plaintiff Wiesner is only receiving eighty of the 120 CLS hours his IPOS requires per week because he cannot afford to hire providers for the remaining time. Because he must be accompanied by at least two CLS staff members in public, he must use at least two service hours for every hour that he wishes to leave his home. This means that Plaintiff Wiesner can be outside his home a maximum of forty hours a week, rather than the sixty hours a week his IPOS would potentially allow. As a practical matter, it stands to reason that Plaintiff Wiesner cannot use all forty hours outside the home if he needs to maximize the proportion of his time that he has care. Moreover, Plaintiff Wiesner has allegedly been able to hire only two CLS providers, rather than his **\*463** IPOS-required three, leading to increased difficulty scheduling out-of-home time. As a result of being "stuck at home more," the complaint states, Plaintiff Wiesner's behavioral issues have worsened. (Am. Compl., R. 146 at PageID #3766.) This suggests that Plaintiff Wiesner is confined at home in a manner that does not enable him to engage with non-disabled persons "to the fullest extent possible," *Olmstead*, 527 U.S. at 592, 119 S.Ct. 2176 (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)), which in turn causes "decline[s] in health, safety, or welfare" that could lead to institutionalization, U.S. Dep't of Justice, Statement on *Olmstead*.

[45] Similarly, Plaintiffs allege that Plaintiff Waskul cannot hire sufficient staff under the current budget methodology, and as a result, he must "go[ ] three weekdays (Monday through Wednesday) without his normal community routine," during which time he "is confined to his home." (Am. Compl., R. 146 at PageID #3753.) As previously discussed, Plaintiff Waskul has allegedly suffered from depression, worsened scoliosis, and anger management issues due to his reduced time in the community and with CLS providers.

[46] [47] In *Steimel*, the Seventh Circuit reversed the district court's grant of summary judgment to the state defendants based on the plaintiffs' evidence that the state defendants' policies resulted in them only being able to leave their home for twelve hours a week. 823 F.3d at 918. To be sure, Plaintiffs' allegations in this case, as they stand, suggest that they may receive considerably more time outside the home than the *Steimel* plaintiffs did. However, there is no numeric threshold that distinguishes the "most integrated setting" from a less integrated one. As the *Olmstead* Court clarified, the integration mandate does not impose a "standard of care" or require "a certain level of benefits to individuals with disabilities." *Olmstead*, 527 U.S. at 603 n.14, 119 S.Ct. 2176 (quoting *id.* at 623–24, 119 S.Ct. 2176 (Thomas, J., dissenting)). Instead, the question is whether Plaintiffs are provided services in the setting "that enables [them] to interact with non-disabled persons to the fullest extent possible." *Id.* at 592, 119 S.Ct. 2176. The more hours one is provided outside the home, the less likely it is that one can show a violation of the integration mandate. But the simple fact that Plaintiffs have more than twelve hours outside the home per week does not foreclose their claim that they have been unjustifiably isolated within the home. As an initial matter, then, Plaintiffs' factual allegations suffice to state a claim for violation of the integration mandate.

[48] However, our inquiry again does not end here. Under the integration mandate, public entities must "make reasonable modifications ... necessary to avoid discrimination on the basis of disability," unless they "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b) (7). The district court concluded that "the relief sought here," specifically "an overhaul of the budgeting method," would fundamentally alter Defendants' programs. (Dist. Ct. Op., R. 164 at PageID #4377.) But it did not justify that conclusion.

A plurality of the *Olmstead* Court opined that a state might show that a modification requires fundamental alteration of its programs if "in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." 527 U.S. at 604, 119 S.Ct. 2176 (plurality opinion). Defendants have not carried

their burden to make such a **\*464** showing here. PIHP Defendants contend that the remedy Plaintiffs seek would be a fundamental alteration because the prior budget methodology caused them to operate on a deficit. But the facts alleged in Plaintiffs' complaint give rise to the inference that an alteration of the budget methodology is well within Defendants' capacity to provide, given that the amount they are spending under the current methodology is allegedly well below what the State had committed to spend under the Waiver. Moreover, while Plaintiffs undoubtedly would like to return to the previous budget method, that is not the only potential remedy here. The *Steimel* court rejected the state defendants' contention that it was not reasonable to require them to return to a previous method of determining individuals' eligibility for certain care because that method was error-filled. *823 F.3d at 916.* The court pointed out that "[w]hile that may be one of the outcomes [the plaintiffs] will accept, it is not the only one." *Id.* So too here—to show that affording Plaintiffs relief would effect a fundamental alteration, Defendants must show that alteration of the budget methodology generally would be inequitable.

Altogether, the facts alleged in Plaintiffs' complaint suggest that they are at serious risk of institutionalization and that they are unreasonably confined at home. Defendants have not carried their burden to show that modifying their budget methodology would result in a fundamental alteration of their programs. Thus, Plaintiffs have stated a plausible claim for violation of the integration mandate under Title II of the ADA and § 504 of the Rehabilitation Act. Accordingly, we also reverse the district court's dismissal of these claims.

**V. Michigan Mental Health Code, Mich. Comp. Laws §§ 330.1722(1) and (3)**

In their final claim, Plaintiffs assert that Defendants WCCMH and CMHPSM violated Michigan Compiled Laws § 330.1722 by subjecting them to "neglect." Defendants respond that they are entitled to governmental immunity under Michigan law and that, even if Plaintiffs could overcome this immunity, they did not neglect Plaintiffs under that provision. The district court found that Defendants WCCMH and CMHPSM were entitled to immunity under Michigan law because Plaintiffs did not "allege[ ] that Defendants were grossly negligent with respect to adjusting the budget" and that, in the alternative, Plaintiffs had insufficiently alleged that they were subjected to non-accidental harm or not treated according to the standard of care. (Dist. Ct. Op., R. 164 at PageID #4379.)

The district court erred in so concluding, and Plaintiffs have also stated a plausible claim for neglect under the Michigan Mental Health Code. We therefore also reverse the district court's decision as to this claim.

**A. Immunity**

**[49]** **[50]** First, we contend with the district court's conclusion that Defendants were entitled to immunity under Michigan Compiled Laws § 691.1407. It is true that Michigan Compiled Laws § 330.1722 "does not provide a statutory exception to governmental immunity for alleged abuse of mental health patients." *de Sanchez v. Genoves-Andrews,* 179 Mich.App. 661, 446 N.W.2d 538, 542 (1989). However, where "instead of seeking compensation to remedy [a civil] harm, the plaintiff elects some other remedy," such as "ask[ing] a court to enforce his or her rights under the law" through declaratory or injunctive relief, governmental immunity is "inapplicable." *In re Bradley Estate,* 494 Mich. 367, 835 N.W.2d 545, 557 n.54 (2013). Accordingly, Michigan courts have simply found that "a tort claim *for damages* does not constitute **\*465** 'appropriate civil relief' under [§ 330.1722] ... because [defendants] are entitled to the protection of governmental immunity and [§ 330.1722] is not an exception to such immunity." *Dockweiler v. Wentzell,* 169 Mich.App. 368, 425 N.W.2d 468, 471 (1988) (emphasis added). Plaintiffs seek only declaratory and prospective injunctive relief in this suit, and so Defendants WCCMH and CMHPSM are not entitled to immunity.

**B. Merits**

**[51]** Turning to the merits, the relevant provisions of the Michigan Mental Health Code provide that "[a] recipient of mental health services shall not be subjected to abuse or neglect," and that those who are abused or neglected have "a right to pursue injunctive and other appropriate civil relief." Mich. Comp. Laws §§ 330.1722(1), (3). "Neglect" under the statute means

> an act or failure to act committed by an employee or volunteer of the department, a community mental health services program, or a licensed hospital; a service provider under contract with the department, a community mental health services

program, or a licensed hospital; or an employee or volunteer of a service provider under contract with the department, a community mental health services program, or a licensed hospital, that denies a recipient the standard of care or treatment to which he or she is entitled under this act.

*Id.* § 330.1100b(21).

The "[s]tandard for mental health services" provision of the Michigan Mental Health Code provides that "[a] recipient shall receive mental health services suited to his or her condition," and that they "shall be offered in the least restrictive setting that is appropriate and available." *Id.* §§ 330.1708(1), (3). Thus, if Defendants' acts or failures to act denied Plaintiffs mental health services suitable to their condition in the least restrictive setting, they are liable. Michigan courts have interpreted § 330.1708 to cover an individual's "mental health treatment involv[ing] the implementation of [a] Behavior Treatment Plan ... including [a] provision regarding [the individual's] movement in the community." *Estate Wrenn v. Spectrum Cmty. Servs., Nos. 339594, 342320, 2019 WL 845711, at *3 (Mich. Ct. App. Feb. 21, 2019)* (per curiam). Plaintiffs alleged that Defendants WCCMH and CMHPSM fail to "provide CLS participants with actual budgets tied to the services and supports listed in the IPOS," and that because of this the individual Plaintiffs are denied transportation, staff, and recreation activities medically necessary to address their conditions. (Am. Compl., R. 146 at PageID ##3753, 3758–59, 3766, 3771–72, 3805.) This plausibly states a claim under the Michigan Mental Health Code.

County Defendants respond that Plaintiffs have not identified any employee, volunteer, or service provider associated with WCCMH who subjected the individual Plaintiffs to neglect, and so they have not stated a claim because the definition of neglect requires one of these parties to be the actor. PIHP Defendants rightly do not contest that CMHPSM is covered by this definition. Of course, Plaintiffs allege that Defendants Cortes and Terwilliger—current or former employees of WCCMH and CMHPSM, respectively—are responsible for the implementation of the flawed budget methodology. Indeed, this allegation underlies all of their claims against Defendants Terwilliger and Cortes. Accordingly, County Defendants' argument is unpersuasive.

Plaintiffs have sufficiently alleged that the action or inaction of Defendants WCCMH and CMHPSM have denied them **\*466** mental health services meeting the standard of care established in Michigan's mental health code. The district court's dismissal of this claim was thus in error, and this Court must reverse.

### CONCLUSION

For these reasons, we **REVERSE** the district court's decision and **REMAND** for further proceedings consistent with this opinion.

CHAD A. READLER, Circuit Judge, concurring in part, and dissenting in part.

### CONCURRING IN PART AND DISSENTING IN PART

Save for three instances where the majority opinion extends acts of Congress in an extra-legislative, atextual manner, I agree that the complaint may proceed beyond the pleading stage.

*Section 1396n(c)(2) of the Medicaid Act.* Section 1396n(c)(2) does not grant Appellants legal rights they can enforce via 42 U.S.C. § 1983. A statute creates individual rights only when Congress has expressed a clear intent to do so. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). That intent will not be lurking in the shadows. For when Congress intends to create an individual right, it does so expressly, in the light of day. *See Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1013 (6th Cir. 2018) (noting that statutory rights are only created when Congress does so in "clear and unambiguous terms" (quoting *Gonzaga*, 536 U.S. at 290, 122 S.Ct. 2268)). So "unless Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." *Gonzaga*, 536 U.S. at 280, 122 S.Ct. 2268 (cleaned up).

That one can identify beneficiaries from a statute's terms is not tantamount to a finding that the statute creates individual

rights in those beneficiaries. More than simply establishing benefits, the statute must also include unambiguous, rights-creating language generating an enforceable individual right.

*Harris v. Olszewski,* 442 F.3d 456, 460 (6th Cir. 2006) ("[A] claimant must demonstrate that the underlying statute creates enforceable rights because it is *rights* after all, not the broader or vaguer benefits or interests, that may be enforced under the statute." (quotations omitted)). And where a statute's focus is on a regulated entity, no individual rights exist. *Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.' " (quoting *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981))); *see also Gonzaga,* 536 U.S. at 284, 122 S.Ct. 2268 (noting that statutes create an individual right when there is an *unmistakable focus* on the benefited class" (quoting *Cannon v. Univ. of Chicago,* 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979))).

*Section 1396n(c)(2)* fails to clear this high bar. To start, the section's focus is on the regulated state, not the beneficiaries. As a lead up to § 1396n(c)(2), § 1396n(c)(1) explains that "[t]he Secretary may by waiver provide that a State plan include "medical assistance" to cover "the cost of home or community-based services ... approved by the Secretary [of Health and Human Services]." 42 U.S.C. § 1396n(c)(1). *Section 1396n(c)(2)* in turn instructs the Secretary how to regulate states seeking a waiver: "A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary ...." 42 U.S.C. § 1396n(c)(2). The **\*467** provisions that follow go on to list the duties placed upon a participating state. It must implement safeguards to protect the health and welfare of the participants, demonstrate financial accountability, and inform individuals of their healthcare options. *Id.* In some respects, each of these state-owed duties may result in benefits to individuals participating in a state's Medicaid program. But that is merely an ancillary result of a state's compliance with federal law, well short of the "unmistakable focus" required to demonstrate congressional intent to create individual rights. *Gonzaga,* 536 U.S. at 284, 122 S.Ct. 2268 (quoting *Cannon,* 441 U.S. at 691, 99 S.Ct. 1946).

Confirming this reading of § 1396n(c)(2) is the remedy Congress employed for statutory violations. Should a state breach its assurances to the Secretary, the Secretary can strip the state's federal funds. *See* 42 U.S.C. § 1396n(f)(1); *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 328, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015) ("[T]he sole remedy Congress provided for a State's failure to comply with Medicaid's requirements ... is the withholding of Medicaid funds by the Secretary of Health and Human Services."). By including this "express" remedy, Congress surely "intended to preclude others," including the enforcement of statutory requirements by individuals. *Armstrong,* 575 U.S. at 328, 135 S.Ct. 1378 (quoting *Sandoval,* 532 U.S. at 290, 121 S.Ct. 1511); *see also Gonzaga,* 536 U.S. at 280, 122 S.Ct. 2268 ("[T]he typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." (citation omitted)); *Nasello v. Eagleson,* 977 F.3d 599, 601–02 (7th Cir. Oct. 6, 2020) (holding that a similar section of the Medicaid Act does not authorize suits by individuals, and noting that individuals dissatisfied with a state's program could "ask the responsible federal officials to disapprove a state's plan or withhold reimbursement").

In these ways, today's case tracks *Gonzaga.* There, the Supreme Court determined that the Family Educational Rights and Privacy Act (FERPA), which protects students from educational institutions mishandling their personal information, did not create individual rights enforceable via § 1983. *Gonzaga,* 536 U.S. at 276, 122 S.Ct. 2268. That was so, the Supreme Court explained, because FERPA "speak[s] only in terms of institutional policy and practice, not individual instances of disclosure." *Id.* at 288, 122 S.Ct. 2268. The statute thus "lack[s] the sort of rights-creating language critical to showing the requisite congressional intent to create new rights," and does not "confer the sort of *individual* entitlement that is enforceable under § 1983." *Id.* at 287, 122 S.Ct. 2268 (citations and quotations omitted). FERPA's remedial provisions, which instruct that "the Secretary of Education ... '*deal with violations*' of the Act," likewise cut against the creation of individual rights. *Id.* at 289, 122 S.Ct. 2268 (citation omitted). And

Med & Med GD (CCH) P 306,888

comparing FERPA to § 1396n(c)(2), the similarities ring out. Both statutes speak in terms of institutional policies (not individual rights), and both contain express remedies that do not involve individuals.

If all of this is not enough to show why § 1396n(c)(2) fails to create individual rights, consider further the fact that the statute is "judicially unadministrable." *Armstrong,* 575 U.S. at 328, 135 S.Ct. 1378. In *Armstrong,* the Supreme Court held that a broad statutory directive for state "payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguarding against unnecessary utilization of care and services,' " undermines the suggestion that the Medicaid **\*468** Act provisions at issue could be privately enforced. *Id.* (quoting 42 U.S.C. § 1396a(a)(30)(A)) (cleaned up). Having utilized such a "judgment-laden standard," Congress no doubt intended to make administrative remedies exclusive. *Id.* at 328–29, 135 S.Ct. 1378; *see also Westside Mothers v. Olszewski,* 454 F.3d 532, 543 (6th Cir. 2006) (noting that "broad and nonspecific" language in the Medicaid Act "suggests that § 1396a(a)(30) is concerned with overall methodology rather than conferring individually enforceable rights on individual Medicaid recipients" (quotations and citations omitted)). Similar "judgment-laden" standards are at play here. Even more so, in fact. It is little exaggeration to say that § 1396n(c)(2)(A)'s references to "necessary safeguards," "adequate standards for provider participation," "health and welfare of individuals," and "financial accountability" are exceedingly difficult concepts for courts to administer. *See Westside Mothers II,* 454 F.3d at 543 (noting a court has "little expertise" in the "interpretation and balancing of [the Medicaid statute's] general objectives" (citation omitted)). Not so for the Secretary, who enjoys "significant expertise" in overseeing Medicaid's "complex and highly technical regulatory program." *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citation omitted). At day's end, all signs point to the absence of individual rights-creating language in § 1396n(c)(2).

*Section 12132 of the Americans with Disabilities Act.* Appellants' contention that they are "at risk" of institutionalization is an insufficient basis for pleading violations of the ADA (or by extension, the Rehabilitation Act). The ADA's text simply does not reach that far. And more than anything when it comes to statutory interpretation, we must respect the text Congress writes.

The ADA instructs that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To implement this provision of the ADA, the Attorney General, at Congress's instruction, promulgated a regulation known as the "integration mandate," a critical aspect of which states that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (2016).

Together with the text of the ADA, the Supreme Court has interpreted the integration mandate to prohibit the unwarranted institutionalization of disabled individuals. *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 600, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). In the two decades that followed *Olmstead,* however, some lower courts (as does the majority opinion today) have extended that holding to find an ADA violation when a state's Medicaid plan places disabled individuals "at risk" of institutionalization. *See, e.g., M.R. v. Dreyfus,* 663 F.3d 1100, 1117–18 (9th Cir. 2011). Where, one might ask, have courts found that prohibition? Not in the text of the ADA nor the integration mandate. Instead, courts have seized upon a Department of Justice guidance document instructing that the "serious risk of institutionalization" is sufficient to establish an ADA claim. U.S. Dep't of Justice, *Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and* Olmstead v. L.C., http://www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020) [hereinafter "DOJ Guidance"]; *see, e.g., Pashby v. Delia,* 709 F.3d 307, 322 (4th Cir. 2013) ("Because Congress instructed the DOJ to issue regulations regarding **\*469** Title II, we are especially swayed by the DOJ's determination that the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings." (quotations omitted)).

*Waskul v. Washtenaw County Community Mental Health, 979 F.3d 426 (2020)*

Med & Med GD (CCH) P 306,888

Doing so violates numerous aspects of current-day administrative law. One, the DOJ guidance is explicitly non-binding. *See* DOJ Guidance (explaining that the "guidance document is not intended to be a final agency action [and] has no legally binding effect," and thus does "not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent"). That fact alone dramatically undercuts its use as an interpretive North Star. *See Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007) (noting that non-binding disclaimers are "relevant to the conclusion that a guidance document is non-binding"). Two, the DOJ has independently disavowed using guidance documents to create binding standards. *See Prohibition on the Issuance of Improper Guidance Documents Within the Justice Department, 85 Fed. Reg. 50951 (Aug. 19, 2020)* (to be codified at 28 C.F.R § 50) (instructing that guidance documents do not "create binding standards by which the [DOJ] will determine compliance with existing regulatory or statutory requirements"). That admission is understandable, as an agency's guidance document, unlike its formal rules and regulations, does not traverse the lengthy notice-and-comment period that tests an agency's proposal against the views of others. *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("[W]e confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters —like interpretations contained in policy statements, agency manuals, and enforcement guidelines, ... lack the force of law ...."); *see also Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 680 (6th Cir. 2005) (noting that "the primary purpose of Congress in imposing notice and comment requirements for rulemaking [is] to get public input so as to get the wisest rules").

The DOJ Guidance, in other words, has little practical effect here, by the DOJ's own admission. Reference to agency guidance might be appropriate where, as the majority opinion notes in separately concluding that the ADA reaches claims brought by those purportedly institutionalized at home, the guidance squarely supports what the agency rule already establishes. *Compare* 28 C.F.R. § 35.130(d) (explaining that individuals should receive care in the "most integrated setting"), *with* DOJ Guidance (defining what constitutes an "[i]ntegrated setting"); *accord Steimel v. Wernert*, 823 F.3d 902, 912 (7th Cir. 2016) (explaining that the

"most integrated setting" requirement is not satisfied when individuals effectively are forced to remain in their homes due to their disabilities and reasoning that "[i]f [the text of the regulation] stick[s] a knife in the state's argument, the DOJ guidelines twist it"). But that is not the case for claims centered on the risk of institutionalization, when an "at risk" provision is nowhere to be found in the ADA or the accompanying regulation.

Nor, at all events, is there reason to defer to agency guidance when the text of the ADA and the integration mandate are unambiguous on the point. *See Kisor v. Wilkie*, ⸺ U.S. ⸺, 139 S. Ct. 2400, 2414, 204 L.Ed.2d 841 (2019) (noting that "the possibility of deference can arise only if a regulation is genuinely ambiguous," **\*470** and adding that "when we use that term, we mean it—genuinely ambiguous"). On that front, it bears noting that neither the ADA nor the mandate make any mention of institutionalization, let alone the risk of institutionalization. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d). With *Kisor* now the controlling standard on deference to agency interpretation, one would not expect the majority opinion to invoke *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). *See Kisor*, 139 S. Ct. at 2426 (Gorsuch, J., concurring) (observing that *Kisor* "has transformed" *Auer* into a paper tiger"). Nor, for this same reason, do the pre-*Kisor* cases relied upon in the majority opinion carry weight in a post-*Kisor* world. *See, e.g., Steimel*, 823 F.3d at 911 (employing the pre-*Kisor* standard that "we defer to an agency's interpretation of its own regulation unless the agency's interpretation is plainly erroneous or inconsistent with the regulation or there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question" (quotations and citation omitted)); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016) (citing *Auer* for the proposition that "DOJ's interpretation ... is controlling unless plainly erroneous or inconsistent with the regulation" (quotations and citation omitted)).

Embracing DOJ guidance to cover those "at risk" of institutionalization also creates a practical interpretive problem. What, after all, does it mean to say an individual is "at risk" of institutionalization? There is no articulable definition in the ADA, the mandate, or *Olmstead*.

Med & Med GD (CCH) P 306,888

Nor does the majority opinion provide one. One could theoretically define "at risk" with some temporal connection to actual institutionalization—for example, one is "at risk" of institutionalization if she is expected to be institutionalized in the next few months, perhaps even a year. But setting aside the fact that such a standard has no textual mooring, even that generous articulation would not help Appellants. After all, as revealed at oral argument, Appellants have been claiming a risk of institutionalization for over four years. Yet none have been institutionalized.

Whether one is in fact institutionalized is a bright-line determination that can be fairly and uniformly applied by those who sit on the federal bench. *See Daunt v. Benson, 956 F.3d 396, 424–25 (6th Cir. 2020)* (Readler, J., concurring) (discussing the advantages of bright-line rules). But absent any textually articulated standards, how are we to decide when a benefits formula places individuals "at risk" of being institutionalized? That hazy approach is a surefire recipe for unequal and unpredictable application of the law, an unattractive option for litigants and courts alike. Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989) ("Even in simpler times uncertainty has been regarded as incompatible with the Rule of Law."). And it is likely why Congress never intended for judges to make this determination to begin with.

Extending the ADA in this manner has yet one more unwelcome feature: It permits claims by individuals who are not seeking to remedy discriminatory conduct, but instead simply seek more Medicaid funding. *Olmstead*, however, expressly "disavowed" reading the ADA to "impose[ ] on the States" a duty to "provide a particular level of benefits to disabled persons." *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 608 (7th Cir. 2004) (citing *Olmstead*, 527 U.S. at 603 n.14, 119 S.Ct. 2176)). Consider the allegation before us today: Appellants allege that Washtenaw County's funding methodology is insufficient to satisfy the needs set forth in Appellants' individual plans of service, placing them at a risk of institutionalization. **\*471** Absent actual segregation from the public or institutionalization, this sort of claim, at bottom, is simply a request for more Medicaid funding, something the ADA does not permit.

The majority opinion nonetheless believes its understanding of the ADA is necessary lest the landmark law risks losing its bite. But the more customary practice is that a definitive harm,

not just the "risk" of one, is needed before legal action is ripe. *See Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S. Ct. 1540, 1547–49, 194 L.Ed.2d 635 (2016). At the very least, the risk of harm must be "certainly impending." *See Huff v. TeleCheck Servs.*, 923 F.3d 458, 463 (6th Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)). Rather than rewriting the ADA to cover premature claims, why not wait until institutionalization is at least "certainly impending" before allowing an ADA claim? And to ensure the law maintains its force, why not rely on the settled practice of securing a preliminary injunction to "preserve the relative positions of the parties until a trial on the merits"? *Tri-County Wholesale Distribs. v. Wine Grp., Inc.*, 565 F. App'x 477, 480 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)).

One can understand why a fair-minded judge might want to extend the ADA's reach to cover those at risk of institutionalization. But as has long been true, our job remains to "say what the law is," no more, and no less. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Expanding the ADA in this manner must come from Congress's drafting pen, in conjunction with supporting regulations enacted by the Attorney General.

*Section 1396a(a)(10)(B) of the Medicaid Act.* Finally, as to Count III, the majority opinion assumes, without deciding, that § 1396a(a)(10)(B) applies to Appellants' sufficiency-of-funding claims. In light of this "assumption," the majority opinion's application of § 1396a(a)(10)(B) has no controlling force beyond today. Nor, I might add, does it have support in the statutory text. As explained in § 1396a(a)(10)(B), a state's medical assistance "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B). By its terms, then, § 1396a(a)(10)(B) applies only to the comparison of medical services between disabled individuals. *See Schott v. Olszewski*, 401 F.3d 682, 686 (6th Cir. 2005) ("Under the Act, states must provide comparable medical assistance to all Medicaid recipients ...." (citing § 1396a(a)(10)(B))); *Rodriguez v. City of New York*, 197 F.3d 611, 616 (2d Cir. 1999) ("Section 1396a(a)(10)(B)['s] ... only proper application

is in situations where the same benefit is funded for some recipients but not others."). So for Appellants to state a claim under § 1396a(a)(10)(B), they must allege they are receiving fewer benefits as compared to others.

Appellants make no such allegation. They describe their claim as a "Medicaid statutory claim under 42 U.S.C. § 1396a(a) (10)(B) for Defendants' failure (caused by the May 2015 change in budgeting procedures) to pay for services in the amount, scope, and duration needed to reasonably achieve their purpose." No mention there of a comparison of benefits. Nor during oral argument, where Appellants conceded they are not making a comparability argument. Rather, Appellants take issue with the underlying method of calculating their respective Medicaid allotments. But the budgeting method at issue applies equally to all disabled individuals seeking benefits from Washtenaw County.  **\*472**  It is thus difficult to see how a claim under § 1396a(a)(10)(B) is cognizable as a means for challenging an allegedly improper (yet uniform) benefits formula.

\* \* \* \* \*

One final point deserves mention. In Count IV, Plaintiffs tie together §§ 1396a(a)(8) and (a)(10)(A) of the Medicaid Act to allege a violation of their asserted right to receive medical support services with reasonable promptness. From the pleadings, however, it is not entirely clear whether Plaintiffs object to the promptness with which those services are provided or to the budgeting methodology employed by Washtenaw County to fund those services. The former may give rise to a cognizable claim. *See* 42 U.S.C. § 1396a(a) (8). But if Plaintiffs' "grievance concerns not the *time* at which these ongoing benefits are paid but the *amount* of those benefits," their claim is not cognizable under § 1396a(a) (8). *Nasello*, 977 F.3d at 602 ("It would not be appropriate for a federal court to turn a statute about the timing of benefits into a statute about the level of benefits."). Forthcoming proceedings will likely reveal the precise nature of Plaintiffs' claim.

**All Citations**

979 F.3d 426, Med & Med GD (CCH) P 306,888

**Footnotes**

1   According to Plaintiffs, Defendant Terwilliger left her position at CMHPSM in April 2019. The parties do not further acknowledge this fact in their briefing; their posture has not apparently changed as a result.

2   Defendant WCCMH explains that WCHO also used this methodology prior to 2012, and argues that the methodology implemented between 2012 and 2015 duplicated costs by providing for them in calculating the staff rate and then also paying for them separately as additional line items. Defendants previously argued that this billing methodology violated Medicaid regulations and their inter-entity contracts, and the district court denied a preliminary injunction in part because Plaintiffs were not "entitled to the reinstatement of a calculation method that violates Medicaid regulations and existing contracts between WCCMH and the State and PIHP." (Order Denying Pls. Mot. for Prelim. Inj., R. 55 at PageID #1168.) A court's determination of substantive issues at the preliminary injunction stage is "not dispositive of those substantive issues on the merits," *Wilcox v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989), and the district court did not rely on this issue or suggest that the prior methodology violated any contract or law in deciding Defendants' motions to dismiss. Defendants do not argue that the current methodology is the only permissible methodology, and whether the prior methodology is permissible goes to what relief Plaintiffs can be provided. Since Plaintiffs request a variety of forms of relief and the district court has broad discretion to fashion appropriate injunctive relief if or when it becomes necessary, *see, e.g.,* *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001), at this juncture, we need not consider whether the prior methodology complied with Medicaid law and regulations and with the Defendants' agreements.

Med & Med GD (CCH) P 306,888

3  Specifically, Plaintiffs ask the court to declare unlawful the current budget methodology and corresponding rate reduction, as well as any denial of participants' rights to self-determination. They further request that the court enjoin Defendants from continuing to use the current budget methodology and depriving CLS recipients of services provided in the most integrated setting. They request costs and attorneys' fees and "such other relief as is just and proper." (Am. Compl., R. 146 at PageID #3807.) In their amended complaint, Plaintiffs also asked the court, as a remedy for alleged due process violations, to enjoin Defendants "from denying participants their right to procedural due process" and from refusing to reinstate pre-May 2015 funding until recipients are afforded IPOS meetings and provided notice and an opportunity to be heard regarding any proposed cuts. (*Id.* at #3806.) However, Plaintiffs no longer seek this relief after voluntarily dismissing their due process claims.

4  Plaintiffs' request for attorneys' fees is also permitted under *Ex parte Young.* *Hutto v. Finney*, 437 U.S. 678, 691–92, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

5  We note that we have previously held that a group of nursing homes suing the Secretary of the Department of Health and Human Services was required to exhaust their available remedy of review by the Secretary before bringing suit against her to challenge Medicare and Medicaid regulations. *Mich. Ass'n of Homes & Servs. for the Aging, Inc. v. Shalala*, 127 F.3d 496, 497 (6th Cir. 1997). However, we concluded so only because a provision of the Medicaid Act discussing remedies available to care facilities specifically incorporated provisions of the Social Security Act that required judicial review of the decision only after a hearing by the Secretary. *Id.* at 499 (noting 42 U.S.C. § 1396i(b)(2) incorporates 42 U.S.C. § 405(g)). There is no such provision limiting remedies to Medicaid beneficiaries like the individual Plaintiffs. As explained by the Fifth Circuit, the provisions at issue in *Michigan Association of Homes and Services for the Aging, Inc.* "involve review of decisions of the Secretary of Health and Human Services—a federal agency—regarding provider eligibility" and are inapplicable "where a Medicaid claimant seeks review of a state agency decision." *Romano v. Greenstein*, 721 F.3d 373, 376 n.11 (5th Cir. 2013).

6  Notably, the same panel, considering a prior appeal in that case, applied the Supreme Court's analysis in *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), to determine whether provisions of § 1396a had created individual rights enforceable under § 1983. *See Westside Mothers I*, 289 F.3d at 862–63. It concluded they did. *Id.* That analysis refers to §§ 1396a(a)(8) and (a)(10)(A), suggesting it addressed those provisions. *See id.* at 863. However, upon hearing the appeal in *Westside Mothers II*, the same panel concluded that the district court was not wrong to address the issue again on remand because "the opinion in *Westside Mothers I* creates considerable ambiguity as to whether the prior panel applied the *Blessing* test to each of the statutory provisions identified in the plaintiffs' amended complaint," and so "the law of the case doctrine does not apply and ... our earlier decision in this case did not foreclose the district court's consideration of whether plaintiffs have a right of action under § 1983 to enforce violations of §§ 1396a(a)(8) [and] 1396a(a)(10)." *Westside Mothers II*, 454 F.3d at 539. Thus, *Westside Mothers I* does not definitively decide whether §§ 1396a(a)(8) and (10) afford a private right of action under § 1983.

7  That provision requires state plans to:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

Med & Med GD (CCH) P 306,888

8    42 U.S.C. § 1396a(a)(30)(A).

     *See, e.g.*, Romano, 721 F.3d at 377–79 ( § 1396a(a)(8)); Doe v. Kidd, 501 F.3d 348, 355–57 (4th Cir. 2007) ( § 1396a(a)(8)); Watson v. Weeks, 436 F.3d 1152, 1159–62 (9th Cir. 2006) ( § 1396a(a)(10)); S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 602–07 (5th Cir. 2004) ( § 1396a(a)(10)); Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 183 (3d Cir. 2004) ( §§ 1396a(a)(8) and (10)); Bryson v. Shumway, 308 F.3d 79, 88–89 (1st Cir. 2002) ( § 1396a(a)(8)); Doe ex rel. Doe v. Chiles, 136 F.3d 709, 714–19 (11th Cir. 1998) ( § 1396a(a)(8)).

9    *See, e.g.*, Ball v. Rodgers, 492 F.3d 1094, 1117 (9th Cir. 2007) ( § 1396n(c)(2)(C)); Jackson v. Dep't of Human Servs. Div. of Developmental Disabilities, No. 17-118, 2019 WL 669804, at *2–3 (D.N.J. Feb. 19, 2019) ( § 1396n(c)(2)(A)); Ball v. Kasich, 244 F. Supp. 3d 662, 684 (S.D. Ohio 2017) ( § 1396n(c)(2)(C)); Guggenberger v. Minnesota, 198 F. Supp. 3d 973, 1014–15 (D. Minn. 2016) ( § 1396n(c)(2)(C)); Cohen v. Chester Cnty. Dep't of Mental Health/Intellectual Disabilities Servs., No. 15-2585, 2016 WL 3031719, at *8 (E.D. Pa. May 25, 2016) ( § 1396n(c)(2)(A)); Steward v. Abbott, 189 F. Supp. 3d 620, 635–37 (W.D. Tex. 2016) ( § 1396n(c)(2) generally); Ill. League of Advocates for the Developmentally Disabled v. Quinn, No. 13-1300, 2013 WL 5548929, at *9–10 (N.D. Ill. Oct. 8, 2013) ( § 1396n(c)(2)(C)); Zatuchni v. Richman, No. 07-4600, 2008 WL 3408554, at *8–11 (E.D. Pa. Aug. 12, 2008) ( § 1396n(c)(2)(C)); Michelle P. ex el. Deisenroth v. Holsinger, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005) ( § 1396n(c)(2)(C)); Masterman v. Goodno, No. 03-2939, 2004 WL 51271, at *9–10 (D. Minn. Jan. 8, 2004) ( §§ 1396n(c)(2)(A) and (C)). *But see* M.A.C. v. Betit, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) ( § 1396n(c)(2)(C)); Gaines v. Hadi, No. 06-60129, 2006 WL 6035742, at *23–24 (S.D. Fla. Jan. 30, 2006) ( § 1396n(c)(2)(A)).

10   The simple fact that § 1396n imposes requirements on states by stating that "[a] waiver shall not be granted ... unless the State provides assurances satisfactory to the Secretary" regarding necessary safeguards and free choice does not preclude our conclusion that these provisions confer individual rights. 42 U.S.C. § 1396n(c)(2); *see* Rodgers, 492 F.3d at 1111 (rejecting the argument that this language shows that "the provisions' objective is not to benefit HCBS-eligible Medicaid recipients directly"). We see no functional difference between this language and § 1396a's statement that "[a] State plan for medical assistance must" make certain provisions. 42 U.S.C. § 1396a(a). And both Congress and this Court have concluded that such language can confer individual rights. 42 U.S.C. § 1320a-2 (explaining that a provision of the Medicaid Act "is not to be deemed unenforceable because of its inclusion in a section ... specifying the required contents of a State plan"); Harris, 442 F.3d at 461 (explaining that "by saying that '[a] State plan ... must ... provide' " something, a statute "uses the kind of 'rights-creating,' 'mandatory language' that the Supreme Court and our court have held establishes a private right of action" (alterations in original) (citations omitted)).

11   The dissent's citation to Nasello v. Eagleson, 977 F.3d 599 (7th Cir. Oct. 6, 2020), is unconvincing, as that case addressed a different provision of the Medicaid Act. Further, its reasoning is inconsistent with our caselaw and that of our sister circuits' and appears to rule out a private right of action even in subsections of the Medicaid Act that the dissent agrees create a private right of action. *See* id. at 601–02 (suggesting that § 1396a(a)(8) does not imply a private right of action).

Med & Med GD (CCH) P 306,888

12    State Defendants also assert that they are entitled to immunity because Title II of the ADA only validly
      abrogates a state's Eleventh Amendment sovereign immunity insofar as the alleged ADA violation also
      violates the Fourteenth Amendment. They therefore focus the majority of their ADA analysis on applying the
      test articulated in 🟨 *United States v. Georgia*, 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), to show
      that their conduct does not also violate the Fourteenth Amendment. This strategy is misguided. As addressed
      earlier, Plaintiffs do not state a claim against the Department under the ADA, and Plaintiffs' claim against
      Defendant Gordon is permitted under 🟨 *Ex parte Young*.

13    State Defendants contend that their conduct did not violate § 504 because discrimination was not the sole
      motivation for their actions, because they had no discriminatory animus, and because Plaintiffs did not allege
      that they were denied services based on a distinction between them and other similarly situated individuals.
      But such showings are not required to state a claim for violation of the integration mandate, and so we are
      not persuaded by this argument. *See* 🟨 *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901,
      908–09 (6th Cir. 2004) (noting that the Supreme Court "indicated that Title II targets more than intentional
      discrimination" in 🟨 *Olmstead* and that 🟨 *Alexander v. Choate*, 469 U.S. 287, 296–97, 105 S.Ct. 712, 83
      L.Ed.2d 661 (1985), suggested that the Rehabilitation Act should be construed to reach more than just
      conduct fueled by discriminatory intent).

14    🟨 *Olmstead* clarified that states are only required to provide community-based treatment for individuals with
      disabilities when "the State's treatment professionals determine that such treatment is appropriate." 🟨 527
      U.S. at 607, 119 S.Ct. 2176. In this case, there is no dispute about whether such treatment is appropriate
      for the individual Plaintiffs.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.