UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEREK WASKUL, et al.

        Plaintiffs,

v.                                                                Case No. 16-cv-10936
                                                                  Honorable Linda V. Parker

WASHTENAW COUNTY
COMMUNITY MENTAL HEALTH, et al.

        Defendants.

_____/

**OPINION REGARDING PLAINTIFFS' AMENDED MOTION FOR
APPROVAL OF SETTLEMENT AGREEMENT AND FOR A
DECLARATORY JUDGMENT (ECF NO. 316)
AND
OPINION AND ORDER DENYING DEFENDANT WASHTENAW COUNTY
COMMUNITY MENTAL HEALTH'S MOTION TO STRIKE
DECLARATIONS (ECF NO. 383)**

This action was filed by several individuals who participate in Michigan's

Community Living Supports ("CLS") program and the Washtenaw Association for

Community Advocacy, a non-profit organization that advocates for support

services for individuals with intellectual and developmental disabilities and of

which the individual plaintiffs are members.  Plaintiffs claim that Defendants

violated federal and state law,[1] as well as Defendants' contracts with one another,

_____

[1] Specifically, Plaintiffs allege violations of the following: the Medicaid Act, 42
U.S.C. §§ 1396a(a)(8), (a)(10)(A), (a)(10)(B), 1396n(c)(2)(A) and (C); Title II of

by modifying the methodology through which the individual Plaintiffs' CLS budgets are calculated.  Defendants currently are the Michigan Department of Health and Human Services ("MDHHS") and its Director (collectively "State Defendants"), as well as Washtenaw County Community Mental Health ("WCCMH") and Community Mental Health Partnership of Southeastern Michigan ("CMHPSM") (collectively "Local Defendants").

In 2023, the parties engaged in lengthy mediation discussions before the Honorable Phillip Shefferly, resulting in a settlement agreement (hereafter "Settlement Agreement" or "Agreement") between Plaintiffs and the State Defendants.  Plaintiffs now ask the Court to approve the Settlement Agreement. Plaintiffs also seek a declaratory judgment binding the Local Defendants to the terms of the Agreement.  Plaintiffs submitted evidence in support of their motion, including numerous declarations.

The Local Defendants have filed briefs and submitted evidence, including numerous declarations, opposing Plaintiffs' requests.  WCCMH also has moved to strike two of the declarations submitted in support of Plaintiffs' motion: (a) the undated declaration of Patrick Wiesner, the guardian of Plaintiff Kevin Wiesner

---

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; § 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the Michigan Mental Health Code, Mich. Comp. Laws § 330.1722.

(*see* ECF No. 362); and (b) the July 14, 2024 supplemental declaration of Kerry Kafafian, Kevin's mother and one of his direct care workers.

After interested parties were provided notice of the Settlement Agreement, the scheduled hearing to address the fairness of the Agreement, and the opportunity to file objections to the Agreement, and after numerous "objections" were received and reviewed by the Court, a fairness hearing was held on December 3, 2024.  At the conclusion of that hearing, the Court issued an oral ruling finding the Settlement Agreement fair, adequate, reasonable, and in the public interest, and therefore approved.  (*See* ECF No. 396 at PageID. 15117-15118.)  This Opinion sets forth the reasons for the Court's ruling, as well as its rulings on Plaintiffs' remaining motion to issue a declaratory judgment that the Settlement Agreement is binding on the Local Defendants, and WCCMH's motion to strike Kevin Wiesner's and Kerry Kafafian's declarations.  For the reasons below, the Court is denying both of those motions.

## I.    Factual and Procedural Background

### A.    Medicaid and the States

The joint federal-state Medicaid program provides medical assistance to qualifying individuals who are unable to pay or do not have private insurance, pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (the "Medicaid Act").  To qualify for federal Medicaid funds, a State must develop a

plan to administer its program in compliance with federal statutory and regulatory requirements.  42 U.S.C. § 1396a(a); 42 C.F.R. § 430.10.  Once a State's plan is approved by the Centers for Medicare and Medicaid Services ("CMS"), the State receives federal funds to supplement its spending on Medicaid-covered services. *See* 42 U.S.C. § 1396b(a).

Each State must "provide for the establishment or designation of a single State agency to administer or to supervise the administration of" the State's plan. 42 U.S.C. § 1396a(a)(5); *see also* 42 C.F.R. § 431.10(b)(1).  MDHHS is the "single state agency" charged with administering Michigan's Medicaid program.  States may contract with managed care entities to provide or arrange for services to Medicaid beneficiaries.  *See* 42 U.S.C. § 1396u-2.  MDHHS contracts with regional prepaid inpatient health plans ("PIHPs"), which are public managed care organizations that receive funding and arrange and pay for Medicaid services.  *See id.* § 1396u-2(a)(1)(B); Mich. Comp. Laws § 400.109f.  PHIPs, in turn, subcontract with community organizations to directly manage and provide CLS services to beneficiaries.

Despite the authority to subcontract the management and delivery of Medicaid services, federal law vests the ultimate responsibility on the single-state agency to oversee the State's Medicaid program.  42 C.F.R. § 431.10(c)-(e).  For example, federal regulations provide that the single State agency "may not

4

delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." *Id.* § 431.10(e).  As the Sixth Circuit has described, MDHHS "has supervisory and policymaking authority over the PIHPs and must ensure that PIHPs retain oversight and accountability over any subcontractors. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 436 (2020).

Since 2014, there have been ten PIHPs serving various regions in Michigan. CMHPSM is the PIHP serving the region where the individual Plaintiffs receive services.  PIHPs in turn subcontract with Community Mental Health Service Providers ("CMHSPs").  CMHPSM has subcontracted with WCCMH.

"The relationships between [MDHHS], CMHPSM, and WCCMH are governed by federal and state law, in addition to specific contracts." *Id.* at 437 (citing 42 U.S.C. § 1396u-2(a)(1)(B); Mich. Comp. Laws §§ 330.1100a(18), 400.109f).  One of the conditions of those contracts is that "[c]ontractors must comply with all State and federal laws, statutes, regulations, and administrative procedures and implement any necessary changes in policies and procedures as required by the State." (*See, e.g.*, ECF No. 316-14 at PageID. 9605, § Q.1.a.)

## B.    The CLS Program

Through a Medicaid Habilitation Supports Waiver ("HSW" or "Waiver"), Michigan provides funding and support to qualifying individuals with disabilities

5

to assist them to live independently in their own home communities, rather than in institutionalized care facilities.  Once an individual elects to receive such CLS services, the individual goes through a person-centered planning ("PCP") process, where an Individual Plan of Service ("IPOS") and corresponding budget for CLS services is prepared.  The IPOS describes the services and supports deemed "medically necessary" for the beneficiary based on criteria defined in the State's Medicaid Provider Manual.  The beneficiary's budget includes the expected or estimated costs of obtaining those services and supports.

The amount of funding needed is determined collectively by the beneficiary, the PIHP or its designee, and others participating in the PCP process.  This involves costing out the services and supports in the IPOS using the rates for the providers chosen by the participant and the number of hours authorized by the IPOS.  The individual budget is authorized in the amount of the total cost of all services and supports in the IPOS.

The CLS program allows individuals to structure their own support services through self-determination ("SD") arrangements.  The individual plaintiffs (hereafter "Plaintiffs") receive CLS services under the HSW and through SD arrangements.  Under SD arrangements, once a beneficiary's budget is developed, the beneficiary decides how to use the funds to execute the IPOS.  The beneficiary retains the authority to employ his or her providers and/or manage the schedule and

budget for their services.  Services are provided generally by Direct Care Workers ("DCWs").

MDHHS has pursued a policy of encouraging self-determination arrangements for recipients.  The Local Defendants and agencies providing CLS services argue that such a policy puts them at risk of being unable to stay afloat and provide the critical services they offer.

### C.    The Budget Methodology Precipitating this Lawsuit

The HSW is financed through "capitation procedures."  As the Sixth Circuit previously explained in this case, "[t]his means that the federal government provides the relevant entity—here the PIHP, Defendant CMHPSM—with a fixed amount of funding for each person participating in the CLS program, regardless of how many services the entity ultimately provides to the recipient." *Waskul*, 979 F.3d at 473.  The decision of how to distribute those funds to recipients is left to the PIHP.  *Id*. (citation omitted).  The discretion conferred upon the PIHPs is circumscribed by the terms of their contract with the State, which must comply with the Medicaid Act, federal regulations, and the HSW.  *Id*.

CLS service budgets are calculated by multiplying the hours of services called for in an individual's IPOS.  Prior to 2015, the CLS budget for Washtenaw County recipients was calculated by providing a rate for staff or providers and then allowing billing of other services and supports, such as worker's compensation,

7

staff training, and transportation.  In 2015, WCCMH's predecessor changed the budget methodology, and a single, all-inclusive rate was provided.  As the Sixth Circuit found,

> The budgeting change did not reduce the total number of service hours recipients were authorized to receive.  The effect of utilizing an all-inclusive rate, however, was to reduce the total budget amount for each recipient.  As a practical matter, service recipients had to reduce the hourly rate they paid service providers to maintain the level of hours authorized prior to the budget change.  The notice to recipients acknowledged this reality, stating that "[w]hile this is not a reduction in your current level of services, it may reduce the amount you can pay your staff."

*Waskul*, 900 F.3d at 254.  In this lawsuit, Plaintiffs allege that this change led to their funding being insufficient to cover the services required in their IPOSs.

Due to this insufficiency, Plaintiffs have been forced to go without adequate staffing, pay for support and services themselves, and/or hire family members at below-market rates.  The reduction in support has meant that beneficiaries do not receive all the services required in their IPOSs and that their conditions have deteriorated.  The reduction in the hourly rate beneficiaries can offer service providers has exacerbated the already existing crisis for attracting and retaining those providers.

The briefing and declarations submitted in this matter reflect universal agreement among Plaintiffs, the Local Defendants, guardians of disabled individuals receiving CLS Medicaid services in the State, and the representatives

of organizations serving those recipients, that there is a long-standing crisis for DCWs locally and nationally.  It is difficult to attract and retain workers.  A significant factor contributing to this crisis is the lower hourly rate budgeted for DCWs.  Fast-food restaurants, grocery stores, and similar establishments compete for the same potential workers and can afford higher wages.  Aside from the rate of pay, other factors contribute to the DCW shortage.  For example, services may be needed in remote areas, requiring workers to have reliable transportation and the funds to pay for gas.  The crisis became more acute after the COVID-19 pandemic.

### D.    The Settlement Agreement

As indicated, after extensive, although not complete discovery, the parties engaged in court-ordered facilitation with Judge Shefferly.  At some point in the negotiations, the Local Defendants stopped participating.  In late 2023, Plaintiffs and the State Defendants reached a settlement, which was memorialized in the Settlement Agreement executed on December 1, 2023.  (*See* ECF No. 300-1.)  The Court will not describe the terms of the Settlement Agreement at length but focuses on those provisions most relevant in addressing the objections raised to it.

Subject to certain contingencies, which will be discussed further below, MDHHS agrees in the Settlement Agreement to Minimum Fee Provisions through September 2029, which will provide *all* SD CLS recipients under the HSW in the State, not only Plaintiffs, a $31 hourly rate for CLS services and a $21.70 hourly

9

rate for Overnight Health, Safety, and Support ("OHSS") services, subject to adjustments for inflation.  (*Id.*)  Plaintiffs are promised these increased rates for their services "as soon as practicable after execution of th[e] Settlement Agreement, but no later than 60 days after such execution . . ..[2]  (*Id.*)  The increased rates for Plaintiffs' services continue until the Minimum Fee Provisions take hold or, if the failure of the contingencies prevents the Minimum Fee Provisions from taking effect, then until sixty days after the "Drop Dead Date" (defined as June 1, 2025) or any extension of that date.

The Settlement Agreement strengthens the administrative process, such as what a CMHPS or PIHP must document when declining or rejecting services, and the administrative appeals process.  These provisions are intended to protect the due process rights of beneficiaries.  They also confer more authority and power on administrative law judges to enforce a beneficiary's IPOS when the PIHP and/or CMHP decline or reject services.

The contingencies set forth in the Settlement Agreement must be met by the June 1, 2025 Drop Dead Date, unless that date is extended.  One contingency is the execution of an amended contract between MDHHS and CMHPSM.  Another is the Michigan legislature's approval of appropriations to fund the Agreement.  Prior

---

[2] These payments constitute partial settlement of disputed claims, separate and apart from the terms of the agreement.

to the fairness hearing, the Court was informed that several PIHPs, including

CMHPSM, had refused to sign amended contracts with MDHHS.  (*See* ECF No.

381 at PageID. 14099.)  The legislature, on the other hand, had approved the

required funding.  (*See* ECF No.  387 at PageID. 14869.)  Nonetheless, the

Settlement Agreement provides for "non-contract" mechanisms for achieving

many of its terms if the contingencies are not satisfied by June 1 or any extended

date.

For example, MDHHS must amend Michigan's Medicaid Provider Manual

to enact some of the Agreement's provisions.  Further, while the Minimum Fee

Schedules are not required if the contingencies do not occur, MDHHS agrees in

that instance to amend the Medicaid Provider Manual to reflect the "costing out"

procedure outlined in "Attachment C" to the Agreement.  This procedure is

designed to ensure that each component of a recipient's CLS budget (such as staff

wages, community activities, transportation) is built up separately based on each

beneficiary's IPOS to create a total, individualized HSW SD CLS rate.  In other

words, it is designed to assure that sufficient funding is budgeted to implement

what is required in the IPOS.

11

II.   **Plaintiffs' Request to Approve the Consent Decree**

A.   **Applicable Standard**

Before entering a consent decree—which the parties agree the Settlement

Agreement is—the court must find that it is "fair, adequate, and reasonable, as well

as consistent with the public interest." *Pedreira v. Sunrise Children's Servs., Inc.*,

802 F.3d 865, 872 (6th Cir. 2015) (quoting *United States v. Lexington-Fayette*

*Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010)).  Several factors are relevant

to this inquiry: "(1) the risk of fraud or collusion; (2) the complexity, expense and

likely duration of the litigation; (3) the amount of discovery engaged in by the

parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel

and class representatives; (6) the reaction of absent class members; and (7) the

public interest."[3] *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir.

2013) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).

District courts are afforded " 'wide discretion in assessing the weight and

applicability' of  the relevant factors." *Id.* (quoting *Granada Invs., Inc. v. DWG*

*Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992)).  However, the Sixth Circuit has

held that it "cannot judge the fairness of a proposed compromise without weighing

---

[3] While these factors have been developed in the context of settlements in class
action lawsuits filed under Federal Rule of Civil Procedure 23, courts have adopted
them to evaluate non-class action settlement agreements.  *See, e.g., United States v.*
*Michigan*, 680 F. Supp. 928, 946 (W.D. Mich. 1987); *Dallas v. Alcatel-Lucent*
*USA, Inc.*, No. 09-14596, 2013 WL 2197624, at *7-8 (E.D. Mich. May 20, 2013).

the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Id.* at 754-55 (cleaned up).

Before approving a consent decree, a court must also "allow anyone affected by the decree to 'present evidence and have its objections heard." *Pedreira*, 802 F.3d at 872 (quoting *Tenn. Ass'n of Health Maint. Orgs. v. Grier*, 262 F.3d 559, 566-67 (6th Cir. 2001)) (brackets omitted).  Yet, "the Supreme Court also warned that 'it has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation . . . an intervenor does not have the power to block the decree merely by withholding its consent.'" *Grier*, 262 F.3d at 567 (quoting *Local 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 528-29 (1986)) (brackets omitted).  Interested parties or intervenors are not entitled to a quasi-trial but only the opportunity to present evidence and have their objections heard. *Id.* (citations omitted).

### B.    Analysis

#### i.    *Risk of Fraud and Collusion*

This factor focuses on whether the negotiations were conducted at arm's length without evidence of fraud or collusion. *See Clark Equip. Co. v. UAW*, 803 F.2d 878, 880 (6th Cir. 1986) (asking whether the agreement is "the product of fraud or overreaching by, or collusion between, the negotiating parties").  "Courts

presume the absence of fraud or collusion unless there is evidence to the contrary. *See In re Flint Water Cases*, 571 F. Supp. 3d 746, 780 (E.D. Mich. 2021) (quoting *UAW v. Gen. Motors Corp.*, No. 05-cv-73991, 2006 WL 891151, at *21 (E.D. Mich. Mar. 31, 2006)).  No party or objector has suggested that there was fraud or collusion here.

### ii.     Complexity, Expense, and Likely Duration of the Litigation

Absent the Settlement Agreement, this lawsuit likely would continue for years and require complex, resource-intensive litigation.  In the interim, Plaintiffs and the other recipients of HSW SD CLS services would continue being denied all the supports and services their IPOSs require.  Any additional relief that could be gained by Plaintiffs at trial is too little to justify further delay.  Moreover, "the prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery."  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) (citation omitted).

### iii.     Stage of the Proceedings and Discovery Completed

This lawsuit has been pending for almost nine years.  The parties collectively produced and reviewed over 2.5 million pages of documents, took approximately twenty depositions, and issued more than thirty third-party subpoenas.  The Court believes that, at this stage of the litigation and with this extensive discovery completed, Plaintiffs were able "to make an informed

evaluation of the merits of a possible settlement," and this Court is able "to intelligently approve or disapprove the settlement." *United States v. Michigan*, No. 16-cv-12146, 2021 WL 2253270, at \*5 (E.D. Mich. June 3, 2021) (quoting *UAW v. Ford Motor*, No. 07-14845, 2008 WL 4104329, at \*26-27 (E.D. Mich. Aug. 29, 2008)).

### iv.  *Likelihood of Success Balanced Against the Settlement's Afforded Relief*

When assessing this factor, a court need not decide "whether one side is right or even whether one side has the better . . . arguments . . . The question rather is whether the parties are using settlement to resolve a legitimate legal and factual dispute." *UAW*, 497 F.3d at 632.  This consideration undoubtedly weighs in favor of approving the Settlement Agreement.  Moreover, the Agreement grants Plaintiffs substantial if not complete success on their claims against the State Defendants.

### v.  *Experienced Trial Counsel's Judgment*

The Sixth Circuit has advised that, in evaluating the fairness, adequacy, and reasonableness of a settlement, "[t]he court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs[,]" although "the deference afforded should correspond to the amount of discovery completed and the character of the evidence uncovered." *Olden v. Gardner*, 294 F. App'x 210, 219 (6th Cir. 2008) (quoting *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)).

As addressed above, extensive discovery was conducted before Plaintiffs and the State Defendants reached an agreement.  Their attorneys are experienced. Thus, the Court gives considerable weight to their opinion as to the adequacy, fairness, and reasonableness of the settlement.

*vi.     Objections and the Public Interest*

As this is not a class action, there are no opinions of absent class members to consider.  The Court has considered, however, the objections of interested parties, which also raise some public interest concerns.  The Court addresses them below.

a.     <u>Harm to Agencies</u>

The argument is made that increasing the hourly rates for only HSW SD CLS recipients will have a "catastrophic" impact on agencies providing CLS services to recipients not using SD arrangements.  Representatives from many of these agencies submitted declarations in which they assert that their organizations will be unable to retain and hire Direct Care Workers, and in fact will lose managerial staff members who earn less than the $31 which will be available in the HSW SD setting.  They highlight the important role these agencies serve in the system, such as responding when behavioral-health recipients are hospitalized or are otherwise in crisis and need to receive treatment in the least restrictive environment available.

16

The Court acknowledges the vital role these agencies serve.  Nevertheless, it finds the anticipated impact of the Settlement Agreement on their ability to function and survive to be speculative and likely exaggerated for the reasons Plaintiffs and the State Defendants have articulated in their briefs and at the motion hearing.  Notably, the number of HSW slots is fixed, so it is unlikely that the number of individuals receiving HSW SD CLS services will expand as a result of the settlement.  As data offered by the State Defendants show, the number of individuals receiving HSW SD CLS services is far smaller than those receiving CLS services through agencies or without the waiver.  (*See* ECF No. 370-3.)  For those reasons, increasing the wages for DCWs serving those limited recipients will not significantly—much less "catastrophically"—alter the pool of workers available to agencies.  Moreover, even the agencies acknowledge that a $31 hourly wage—that is, the increased wage for HSW SD CLW workers—is not enough to move workers from retail, fast food, and convenience store jobs to serve as DCWs.  Any harm to agencies is due to factors beyond the Settlement Agreement.

Additionally, the Settlement Agreement does not impact the amount MDHHS currently allots to agencies.  The money used to fund the $31 hourly rate for HSW SD CLS services is new funding obtained from the Michigan legislature.  If the Court does not approve the Settlement Agreement, agencies will be in the same position they are in now—that is, being able to offer an hourly wage that

17

appears to be too low to attract the limited pool of workers from competing industries to remedy the DCW staffing shortage.  And if Plaintiffs' claims proceeded to trial and they prevailed, any award would not benefit agencies, either.

To benefit agencies, the Settlement Agreement would have to resemble the "all of nothing" approach the Local Defendants advocate—that being, increased funding to pay a higher hourly wage for direct care workers across the board. However, such an approach, which would involve additional expenditures of $207.8 million—nearly nine-and-a-half times greater than the $22.1 million in additional funds projected for the settlement—is "a non-starter" where the State has finite resources to distribute.  The Settlement Agreement need not resolve the DCW crisis for all interested parties to be deemed fair, reasonable, and adequate. As has been pointed out:  "If the State can only get off the starting line of system reform if it is able to immediately reach the finish line, the State would never leave the starting line."  (ECF No. 370 at PageID. 13725.)

The Settlement Agreement settles a lawsuit brought by HSW CLS SD recipients, asserting claims arising from a change in the methodology for calculating their budgets.  It attempts to resolve *those* claims.  There may be universal agreement that there is a direct care worker crisis impacting the delivery of CLS services generally.  However, Plaintiffs did not file this lawsuit to resolve

that crisis.  Extending the resources MDHHS obtained to resolve the claims presented here to *all* CLS recipients would not meaningfully impact anyone.

b.   <u>Disparate Impact</u>

The contention also is made that the Settlement Agreement results in MDHHS increasing funding for Caucasian and financially advantaged CLS recipients, creating an even greater staffing crisis for minority and financially disadvantaged recipients who tend to rely on agency providers.

This contention is based upon an analysis of data by Michael Harding, Jr., as summarized in his declaration.  (*See* ECF No. 336-18.)  As an initial matter, some objectors assert that individuals receiving CLS services through agencies are more financially disadvantaged than those receiving CLS services through self-determination arrangements.  However, Harding's data does not consider the economic status of the different groups of recipients, and no evidence is offered to demonstrate the economic status of the individuals who will benefit from the Settlement Agreement as opposed to those who will not.

With respect to race, Plaintiffs and the State Defendants demonstrate that Harding's analysis is not based on accurate and complete data and does not compare similarly-situated individuals.  Supreme Court and Sixth Circuit precedent require such a comparison when determining whether an action or policy disparately impacts a protected class of individuals.  *See Reform Am. v. City of*

19

*Detroit*, 37 F.4th 1138, 1152 (6th Cir. 2022) (citations omitted); *Nordlinger v.*

*Hahn*, 505 U.S. 1, 10 (1992).  Plaintiffs and the State Defendant show that, when

the correct comparison is made, as reflected in the declaration of Crystal Williams

(*see* ECF No. 370-3), the Agreement does not in fact have a disparate impact on

non-white beneficiaries.  This is because, as Williams explains:

> [O]n a statwide level, non-white beneficiaries comprise a higher
> percentage of the beneficiaries receiving HSW SD CLS than they do of
> the beneficiaries enrolled in the HSW as a whole, and non-white
> beneficiaries comprise a higher percentage of the beneficiaries receiving
> HSW SD CLS than they do of the beneficiaries receiving HSW agency
> CLS.

(*Id.* at PageID. 13808 ¶ 13; *see also id.* ¶ 14 (finding that Mr. Harding's data from

specific State regions "similarly shows that non-white beneficiaries comprise

nearly the same percentage of HSW SD CLS recipients in those regions as do non-

white HSW enrollees in those regions").

Despite Williams' declaration and the data on which she relies, WCCMH

continues to insist that the settlement agreement disproportionately harms

minorities and socioeconomically disadvantaged individuals.  (*See* ECF No. 379 at

PageID. 14043.)  However, WCCMH makes no attempt to address, much less

undermine, Williams' findings or the data she provides.[4]  (*See id.*)  The agency

---

[4] As observed earlier, there is no evidence in the record to support the claimed
impact based on economic status.

representatives who have submitted declarations opposing the settlement

agreement also offer no data to support their similar assertions.

Further, in addition to not analyzing similarly-situated comparators, the

Local Defendants make no attempt to address the other required element to support

a disparate-impact claim under the legal framework set forth in Supreme Court

precedent.  *See, e.g., Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys.

Project, Inc.*, 576 U.S. 519, 524 (2015) (citing *Ricci v. DeStefano*, 557 U.S. 557,

577 (2009)).  That is, the Local Defendants have not shown that the Settlement

Agreement is "otherwise unjustified by a legitimate rationale" or that an "equally

effective" alternative remedy is available.  *Id.*

c.   Federal Medicaid Law & State Law

The assertion also is made that the Settlement Agreement violates different

Medicaid provisions.  The first category is Medicaid's "network-adequacy

requirements" which ensure "a provider network that guarantees certain services

are accessible to its members within specified times or distances from their

homes."  *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*,

714 F.3d 424, 427 (6th Cir. 2013); *see also* 42 U.S.C. § 1396a(a)(30)(a).  The

second are provisions requiring that the State's budget methodology ensures that

"services are provided in home and community based settings" and "that

21

individuals have a right to choose among alternatives to institutionalized care[.]"
*Waskul*, 979 F.3d at 454-55 (citing 42 C.F.R. §§ 441.302(a), 1396n(c)(2)(A)).

These contentions are premised on the "catastrophic crisis" scenario
discussed above—that is, that the payment of higher wages for HSW SD CLS
services will diminish the capacity of agencies to hire and retain DCWs and thus
provide CLS services to the Medicaid populations they serve.  The same reasons
for why the crisis argument is unwarranted and too speculative therefore apply
here.

The Local Defendants also point to MDHHS' obligations to set and certify
"actuarially sound capitation rates" for *all* CLS services.  *See* 42 C.F.R. § 438.4.
The actuarial-soundness regulations require MDHHS to set capitation rates
covering "all reasonable, appropriate, and attainable costs" required by the State's
Medicaid recipients, and that are "appropriate for the populations to be covered
and the services to be furnished" and "adequate to meet the [provider-network]
requirements."  42 C.F.R. § 438.4(a), (b)(2), (b)(3).  The Local Defendants argue
that you cannot certify that a $20 per hour rate is actuarially sound for agency-
provided services when conceding a $31 rate is needed for the exact same services
for SD recipients.

MDHHS does not disagree that it has a statutory obligation to confirm that
its capitation rates are sound for *all* Medicaid recipients.  However, by agreeing to

22

settle Plaintiffs' claims by paying a higher rate for HSW SD CLS services,

MDHHS is not necessarily acknowledging or conceding that a lower rate is not

actuarially sound.  Moreover, the Settlement Agreement does not result in MDHHS

"robbing Peter to pay Paul."  If MDHHS' actuarial firm cannot certify its actuarial

soundness for the remaining population receiving CLS services going forward, the

State will be required to raise rates to comply with its statutory obligations.

Again, this case was brought on behalf of SD CLS HSW recipients.  This

Court's role is to address their claims, not problems with the entire Medicaid

system or even underfunding as to *all* CLS recipients.  The Settlement Agreement

must be fair, reasonable, and adequate vís-a-vís Plaintiffs, without otherwise

harming the public interest.  No such harm has been shown.

The Local Defendants argue that the Settlement Agreement violates

Michigan's rulemaking process.  However, the decision to settle Medicaid

litigation is committed solely to MDHHS as "the 'single-state agency' responsible

for administration of the [State's Medicaid] program."  *Grier*, 262 F.3d at 565.

Michigan law grants MDHHS "special authority" to establish Medicaid policy

which is binding on all participants in the system without the need to go through

either notice-and-comment rulemaking or some form of consultation procedure.

*See* Mich. Comp. Laws § 400.6(4).  Every policy provision of the Settlement

Agreement implements a Medicaid statute or regulation setting forth a condition of

receipt of federal funds.  Moreover, policies developed by MDHHS under Section

§ 400.6(4) are expressly excluded from the definition of a "rule."  *See id.*

§ 24.207(*o*).

### d.   Waste, Fraud & Abuse

The Local Defendants contend that there is greater waste, fraud, and abuse

when CLS services are provided through self-determination arrangements as

opposed to through agencies.  Thus, they argue, the Settlement Agreement, which

favors SD CLS services, is against the public interest.  The Local Defendants claim

there are more internal controls and oversight when services are provided through

agencies.

No data has been offered, however, to demonstrate systemic fraud, waste, or

abuse in the SD sphere.  Those opposing the Settlement Agreement offer the same,

single example to demonstrate that such fraud, waste, or abuse occurs:  a recipient

who took his or her staff on a vacation to Mexico, hired local individuals to

provide CLS services to the recipient at a low hourly rate, and then encouraged his

or her usual staff to claim that they provided services on the trip.  This single

instance does not convince the Court that the Settlement Agreement should be

rejected due to its encouragement of SD arrangements.

WCCMH contends that further "troubling" conduct is uncovered by the

deposition testimony of Patrick Wiesner and Kerry Kafafian, in the face of their

subsequent declarations, the latter of which WCCMH has moved to strike. Specifically, WCCMH maintains that this evidence reveals that Kerry, when acting as guardian for her developmentally disabled son, Plaintiff Kevin Wiesner, used money from Kevin's special needs trust to purchase a home, which she titled in her own name and then used to rent out rooms to Kevin's CLS workers.  Further, while Kerry stopped serving as Kevin's legal guardian so she could serve as one of his CLS workers, the evidence suggests that she still makes the decisions reserved for the legal guardian.  Thus, Patrick fills that position in name, only.  WCCMH also points to Patrick's "several instances of abuse" (one involving grabbing Kevin's hands too tightly during an outing and another where he used mace against his mother) and inappropriate sexual comments toward one of Kevin's CLS workers (he asked her out and made personal inquiries concerning her body).

However, these examples involving a single SD CLS recipient's family members do not demonstrate systemic fraud, waste, or abuse in the SD realm. And, according to Plaintiffs, the assertion that agencies are less likely to engage in fraud, waste, and abuse due to unidentified "internal controls and oversight" falls flat when confronted with contrary data.  (*See, e.g.*, ECF No. 365 at PageID. 12416 (providing that "[a] review of 138 Recipient Rights complaints in Washtenaw County concerning CLS reveals that agencies were the subject of all but six.  In fact, agencies are exclusively responsible for all (or possibly all but one)

25

substantiated complaints for neglect in Washtenaw County" (footnote and emphasis omitted).)  Moreover, Plaintiffs and the State Defendants describe various forms of oversight in place to monitor SD arrangements.  (*See id.*; *see also* ECF No. 370 at PageID. 13732-33.)  For example, PIHPs need only report suspicious behavior to MDHHS's Officer of Inspector General to initiate an investigation.  A fiscal intermediary is required in all SD arrangements, which provides additional oversight as this individual assists with the management and distribution of funds contained in the Medicaid recipient's individual budget and understands billing and documentation requirements.

> ### vii.    Conclusion

As reflected in the analysis above, the relevant factors weigh in favor of finding the Settlement Agreement fair, adequate, reasonable, and consistent with the public interest.  It is for this reason that the Court approved the Agreement.

## III.    Plaintiffs' Request for a Declaratory Judgment

Plaintiffs moved for a declaratory judgment under 28 U.S.C. § 2201, declaring the Settlement Agreement binding on the Local Defendants.

### A.    Applicable Law

It is well-settled that federal courts may only adjudicate actual cases or controversies.  U.S. Const., Art. III, Section 2.  That principle is reiterated in the Declaratory Judgment Act, which states:

26

> *In a case of actual controversy* within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a) (emphasis added).  It also is well settled that jurisdiction to grant relief under the Declaratory Judgment Act is discretionary.  *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494, 499 (1942) ("The Declaratory Judgment Act was an authorization, not a command.  It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so."); *see also Aetna Cas. & Sur. Co. v. Sunshine Corp.*, 74 F.3d 685, 687 (6th Cir. 1996) (citing *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 325 (6th Cir.1984)).  In exercising this discretion, a federal court must pass judgment only upon real, not uncertain or hypothetical, disputes.  *See Golden v. Zwickler*, 394 U.S. 103, 108 (1969) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

The Sixth Circuit has provided several factors for courts to consider when exercising that discretion:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory

action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 F.4th 792, 796-97 (6th Cir. 2022) (quoting *Grand Trunk W. R.R.*, 746 F.2d at 326).  The Sixth Circuit "has 'never assigned weights to the *Grand Trunk* factors when considered in the abstract' and the factors are not always considered equally."  *Id.* at 797 (quoting *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014)).

## B.    Analysis

In this matter, the third and fourth factors are inapplicable.  The parties have not engaged in procedural fencing or a race to the courthouse.  Issuing a declaratory judgment will neither increase friction between federal and state courts nor encroach improperly on state jurisdiction.  The remaining factors, however, dictate that a judgment will not "serve a useful purpose in clarifying and settling the legal relations in issue" or "terminate and afford relief from [any] uncertainty, insecurity, [or] controversy[.]"  *Grand Trunk*, 746 F.2d at 326.

This is because there is no actual dispute that, if CMHPSM and WCCMH are contractually obligated to provide Medicaid services on behalf of MDHHS, they are "bound by any 'policies, rules, and regulations' that MDHHS issues in compliance with federal and state law to fulfill its obligations under the settlement agreement[.]"  (*See* ECF No. 341 at PageID. 10700; *see also* ECF No. 348 at

28

PageID. 10780-81.)  As discussed already, MDHHS is the single-state agency with final responsibility to administer and supervise Michigan's Medicaid program. Entities contracting with MDHHS to fulfill the State's obligations are required under the terms of their contracts and state and federal Medicaid law to follow MDHHS' policies, rules, and regulations and adhere to its obligations.

As WCCMH acknowledges "those affected entities are *always* bound to comply with federal and state law and MDHHS's authority over the [Michigan]'s Medicaid system." (*Id.*)  In fact, "*every* PIHP, community mental health services program, and Medicaid provider in Michigan would be bound by them."  (*Id.* (citing Mich. Comp. Laws § 330.1232b).)  CMHPSM "fully concurs and adopts by reference" WCCMH's assertions and arguments.  (*See* ECF No. 348 at PageID. 10780.)

Caselaw cited by Plaintiffs confirms these assertions and arguments.  *See, e.g., K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 112-13 (4th Cir. 2013) (describing the relationship between the North Carolina's single state agency and its subcontractors); *Grier*, 262 F.3d at 565 (describing the same relationship between Tennessee's single state agency and its subcontractors).  Based on the relationship between the single state agency and its subcontractors, the circuit courts in those cases concluded that the subcontractors were bound by a preliminary injunction against the state agency in *Shipman* and consent decree with

29

the state agency in *Grier*.  *Shipman*, 716 F.3d at 113 (concluding that the state

agency's "decision to comply [with the preliminary injunction] means that the

injunction is binding not only on the [state agency] itself, but also on the [agency]'s

'agents' and any who are in 'active concert or participation' with it"); *Grier*, 262

F.3d at 565 (holding that "the intervenors [the state agency's subcontractors] are

subject to the control of the State insofar as they are contractually bound to follow

whatever appeals and grievance procedures the State deems appropriate" and "are

acting on behalf of the State[.] . . . Accordingly, the intervenors are agents of the

State and are bound by the consent decree to which the [S]tate was a party").

Plaintiffs maintain that these decisions support the entry of a declaratory judgment

here.  (*See* ECF No. 316 at PageID. 9413.)  This Court finds that they do the

opposite.

*Grier* and *Shipman* confirm that the law already requires MDHHS'

subcontractors to abide by the terms of the Settlement Agreement by following

whatever rules, regulations, and policies MDHHS enacts to satisfy those terms.  As

such, they also confirm that a declaratory judgment is not necessary to resolve any

actual controversy.[5]  In other words, there are no legal relations at issue that require

clarification or settlement.

---

[5] Notably, neither the Sixth Circuit in *Grier* nor the Fourth Circuit in *Shipman* addressed whether a declaratory judgment should issue, binding the subcontractors.

There is no uncertainty, insecurity, or controversy to resolve.  If CMHPSM and WCCMH choose to continue contracting with MDHHS to provide Medicaid services, they acknowledge that they are bound by federal and state Medicaid laws, MDHHS' existing rules, regulations, and policies, and any rules, regulations, and policies MDHHS adopts to comply with the Settlement Agreement.  This renders the entry of a declaratory judgment improper.  As the Sixth Circuit explained in *Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404 (2016), "[i]njunctions that seek no more than obedience to the law as written are deserving of scrutiny under Rule 65(d) [of the Federal Rules of Civil Procedure]."  *Id.* at 411 (collecting cases from sister circuits ruling against injunctions that compel nothing more than obedience to existing law).

For these reasons, the Court denies Plaintiffs' motion to the extent it seeks a declaratory judgment binding the Local Defendants to the Settlement Agreement.

## IV.   WCCMH's Motion to Strike

As mentioned, WCCMH filed a motion to strike Kerry Kafafian's July 14, 2024 declaration and Patrick Wiesner's undated declaration.  According to WCCMH, Kerry and Patrick attempt to materially change their deposition

---

However, the reasoning in both decisions suggests that, if faced with that issue, the courts would find declaratory relief unnecessary.

testimony in the declarations.  WCCMH cites Federal Rule of Civil Procedure

30(e) and Sixth Circuit caselaw in support of its request.

Rule 30(e) provides a mechanism for deponents to review and make

"changes in form or substance" to their deposition testimony.  *See* Fed. R. Civ. P.

30(e).  The rule does not provide a mechanism for striking a deponent's signed

statement listing any changes, referred to as an "errata sheet."  *See id.*

Nevertheless, the Sixth Circuit has held that a court may strike or disregard an

errata sheet when it is used to alter what the deponent said under oath to create a

factual issue.  *See, e.g., Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560,

565-66 (2009).  While WCCMH is seeking to strike a declaration, not an errata

sheet, the Sixth Circuit has similarly held that a declaration or affidavit may be

stricken under the "sham affidavit doctrine."  *See, e.g., Johnson v. Ford Motor Co.*,

13 F.4th 493, 501 (6th Cir. 2021) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d

453, 460 (6th Cir. 1986)).

The sham affidavit doctrine precludes a party from "create[ing] a factual

issue by filing an affidavit, after a motion for summary judgment has been made,

which contradicts [his or] her earlier deposition testimony."  *Id*. (quoting *Reid*, 790

F.3d at 460).  "The purpose of this rule is to prevent a party from 'raising an issue

of fact simply by submitting an affidavit contradicting his own prior testimony,'

which would greatly diminish the utility of summary judgment as a procedure for

screening out sham issues of fact." *Id*. (quoting *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016)) (brackets omitted).  The Court finds the "sham affidavit doctrine" inapplicable here, however.

First, no party has moved for summary judgment.  To decide Plaintiffs' motion, the Court is not tasked with deciding whether there are genuine issues of material fact.  In any event, the statements in the declarations that WCCMH claims contradict Kerry's and Kevin's earlier testimony do not involve material facts.  Instead, WCCMH argues, they evince the waste, fraud, and abuse that occurs when CLS services are provided through self-determination arrangements, as opposed to through agencies.  As discussed earlier, however, even if Kerry's and/or Kevin's declarations in the face of their earlier deposition statements uncover an instance of waste, fraud, or abuse, this fails to demonstrate systemic defects in SD arrangements.

For these reasons, the Court denies WCCMH's motion (ECF No. 383) to strike Kerry Kafafian's or Kevin Wiesner's declarations.

## V.    Conclusion

In summary, the Court finds the Settlement Agreement between Plaintiffs and the State Defendants to be adequate, fair, reasonable, and consistent with the public interest.  The Court, therefore, has granted Plaintiffs' request to approve the Agreement.  The Court sees no reason to strike Kerry Kafafian's and Kevin

Wiesner's declarations submitted in support of Plaintiffs' request.  The Court, however, denies Plaintiffs' request to enter a judgment declaring the Settlement Agreement binding on the Local Defendants.

A separate Order will issue.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: January 27, 2025