UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEREK WASKUL, et al.,

        Plaintiffs,

                                      Case No. 16-cv-10936
v.                                  Honorable Linda V. Parker

WASHTENAW COUNTY
COMMUNITY MENTAL HEALTH, et al.,

        Defendants.
_____/

## OPINION AND ORDER DENYING MOTION
## FOR ORDER TO SHOW CAUSE OR FOR THE WRIT OF MANDAMUS

This matter is before the Court on Plaintiff Washtenaw Association for Community Advocacy's motion for an order requiring Defendant Washtenaw County Community Mental Health ("WCCMH") to show cause as to why it should not be held in civil contempt.  (ECF No. 423.)  Alternatively, Washtenaw Association for Community Advocacy ("WACA") moves for the writ of mandamus.  The motion is fully briefed (ECF Nos. 424, 431), and the Court held a motion hearing on February 23, 2026 (*see* 438).  Since that time, WACA and WCCMH have filed notices providing updated relevant information.  (ECF Nos. 439-441.)

**Background**

This action was filed by several individuals who participate in Michigan's Community Living Supports ("CLS") program and WACA, a non-profit organization that advocates for support services for individuals with intellectual and developmental disabilities. The individual plaintiffs are members of WACA. Plaintiffs claimed that Defendants violated federal and state law, as well as Defendants' contracts with one another, by modifying the methodology through which the individual Plaintiffs' CLS budgets are calculated. Defendants are the Michigan Department of Health and Human Services ("MDHHS") and its Director (collectively "State Defendants"), and WCCMH and Community Mental Health Partnership of Southeastern Michigan ("CMHPSM") (collectively "Local Defendants").

**The Relevant Entities**

MDHSS is the single state agency responsible for administering and supervising Michigan's Medicaid program. It has contracted with managed care entities to provide or arrange for services to Medicaid beneficiaries. MDHSS contracts with regional prepaid inpatient health plans ("PIHPS"), which are public managed care organizations that receive funding and arrange and pay for Medicaid services. CMHPSM is a PIHP. PIHPS, in turn, subcontract with community

2

organizations, like WCCMH, to directly manage and provide CLS services to beneficiaries.

Despite the authority to subcontract the management and delivery of Medicaid services, federal law vests the ultimate responsibility on the single-state agency to oversee the State's Medicaid program.  The relationships between these three levels of providers are governed by federal and state law, in addition to specific contracts.  One of the conditions of those contracts is that contractors must comply with all state and federal laws, statutes, regulations, and administrative procedures and implement any necessary changes in policies and procedures as required by the State.

### The CLS Program

Through a Medicaid Habilitation Supports Waiver ("HSW" or "Waiver"), Michigan provides funding and support to qualifying individuals with disabilities to assist them to live independently in their own home communities, rather than in institutionalized care facilities.  Once an individual elects to receive such CLS services, the individual goes through a person-centered planning ("PCP") process, where an Individual Plan of Service ("IPOS") and corresponding budget for CLS services is prepared.  The IPOS describes the services and supports deemed "medically necessary" for the beneficiary based on criteria defined in the State's

3

Medicaid Provider Manual.  The beneficiary's budget includes the expected or estimated costs of obtaining those services and supports.

The amount of funding needed is determined collectively by the beneficiary, the PIHP or its designee, and others participating in the PCP process.  This involves costing out the services and supports in the IPOS using the rates for the providers chosen by the participant and the number of hours authorized by the IPOS.  The individual budget is authorized in the amount of the total cost of all services and supports in the IPOS.

The CLS program allows individuals to structure their own support services through self-determination ("SD") arrangements.  The individual plaintiffs (hereafter "Plaintiffs") receive CLS services under the HSW and through SD arrangements.  Under SD arrangements, once a beneficiary's budget is developed, the beneficiary decides how to use the funds to execute the IPOS.  The beneficiary retains the authority to employ his or her providers and/or manage the schedule and budget for their services.  Services are provided generally by Direct Care Workers ("DCWs").

**The Budget Methodology Precipitating this Lawsuit**

The HSW is financed through "capitation procedures."  As the Sixth Circuit previously explained in this case, "[t]his means that the federal government provides the relevant entity—here the PIHP, Defendant CMHPSM—with a fixed

amount of funding for each person participating in the CLS program, regardless of how many services the entity ultimately provides to the recipient." The decision of how to distribute those funds to recipients is left to the PIHP. The discretion conferred upon the PIHPs is circumscribed by the terms of their contract with the State, which must comply with the Medicaid Act, federal regulations, and the HSW.

CLS service budgets are calculated by multiplying the hours of services called for in an individual's IPOS. Prior to 2015, the CLS budget for Washtenaw County recipients was calculated by providing a rate for staff or providers and then allowing billing of other services and supports, such as worker's compensation, staff training, and transportation. In 2015, WCCMH's predecessor changed the budget methodology, and a single, all-inclusive rate was provided. As the Sixth Circuit found,

> The budgeting change did not reduce the total number of service hours recipients were authorized to receive. The effect of utilizing an all-inclusive rate, however, was to reduce the total budget amount for each recipient. As a practical matter, service recipients had to reduce the hourly rate they paid service providers to maintain the level of hours authorized prior to the budget change. The notice to recipients acknowledged this reality, stating that "[w]hile this is not a reduction in your current level of services, it may reduce the amount you can pay your staff."

In this lawsuit, Plaintiffs alleged that this change led to their funding being insufficient to cover the services required in each Plaintiff's IPOS.

Due to this insufficiency, Plaintiffs were forced to go without adequate staffing, pay for support and services themselves, and/or hire family members at below-market rates.  The reduction in support meant that beneficiaries did not receive all the services required in their IPOS and, as a result, their conditions deteriorated.  The reduction in the hourly rate beneficiaries could offer service providers has exacerbated the already existing crisis for attracting and retaining those providers.

### Settlement Agreement

In 2023, Plaintiffs reached a settlement ("Settlement Agreement" or "Agreement") with the State Defendants in this action.  While the Local Defendants initially participated in the facilitation which led to the Settlement Agreement, they had stopped participating by the time the Agreement was reached.

Pursuant to the Settlement Agreement, which was executed on December 1, 2023, MDHSS agreed to certain provisions through September 2029 *if* identified contingencies were met by June 1, 2025—i.e., the "Drop Dead Date," unless the date was extended.  If the contingencies were not met by the Drop Dead Date— which in fact ended up being the case—MDHHS agreed to amend Michigan's Medicaid Provider Manual to enact some of the Agreement's provisions.  Most

significantly, MDHSS agreed to amend the Medicaid Provider Manual to reflect the "costing out" procedure outlined in "Attachment C" to the Agreement. This procedure was designed to ensure that each component of a recipient's CLS budget (such as staff wages, community activities, transportation) is built up separately based on each beneficiary's IPO to create a total, individualized HSW SD CLS rate. In other words, it is designed to ensure that sufficient funding is budgeted to implement what is required in the IPOS.

The Settlement Agreement is a consent decree, over which the Court retained enforcement jurisdiction. As a consent decree, the Court had to find it "fair, adequate, and reasonable, as well as consistent with the public interest." After a hearing on December 11, 2024, the Court held that the Settlement Agreement satisfied this criteria and approved the agreement.

### Request for a Declaratory Judgment & The Dismissal of Plaintiffs' Claims Against the Local Defendants

In addition to seeking the Court's approval of the Settlement Agreement, Plaintiffs moved for a declaratory judgment under 28 U.S.C. § 2201, declaring the Settlement Agreement binding on the Local Defendants. The Court declined to exercise its discretion to issue such declaratory relief, concluding that a judgment would not serve a useful purpose in clarifying and settling the legal relations at issue or terminate and afford relief from any uncertainty, insecurity, or controversy.

This was because there was no actual dispute that, if CMHPSM and WCCMH are contractually obligated to provide Medicaid services on behalf of MDHHS, they are "bound by any 'policies, rules, and regulations' that MDHHS issues in compliance with federal and state law to fulfill its obligations under the Settlement Agreement."  MDHHS is the single-state agency with final responsibility to administer and supervise Michigan's Medicaid program.  Entities contracting with MDHHS to fulfill the State's obligations are required under the terms of their contracts and state and federal Medicaid law to follow MDHHS' policies, rules, and regulations and adhere to its obligations.

For the same reasons, the Court later granted the Local Defendants' motion to dismiss Plaintiffs' claims against them on mootness grounds.  The Court reasoned that Plaintiffs had obtained the relief sought in this litigation through their Settlement Agreement with the State Defendants, and there was no additional relief obtainable through their unresolved claims against the Local Defendants.  The Court noted, however, that while the claims may now be moot, this did not mean that a live controversy did not remain as to whether the Settlement Agreement is enforceable against the Local Defendants.  This observation was made specifically because WACA had filed its pending motion for an order to show cause as to why WCCMH should not be found in contempt of the Settlement Agreement.

8

**Motion for Order to Show Cause**

In the motion, WACA asks the Court to find WCCMH in civil contempt for failing to adhere to two requirements of the Settlement Agreement.  Alternatively, WACA seeks a writ of mandamus requiring WCCMH's performance.  Specifically, WACA maintains that WCCMH has: (1) refused to abide by the "costing out" policies issued by MDHHS by failing to "cost out" the CLS budgets of all WACA members, and (2) failed to come into compliance with the Michigan Earned Sick Time Act ("ESTA").

WCCMH argues in response that it has acted as quickly as it can based on the guidance MDHHS has provided.  WCCMH points out that WACA demanded action and accused it of contempt before the Settlement Agreement's deadline for MDHHS to issue its guidance for implementing the costing out provisions and before the guidance issued.  WCCMH maintains that it needed this guidance before preparing and finalizing its clients' budgets.  WCCMH also maintains that the Court cannot hold it in contempt of a consent decree to which it is not a party, particularly when WCCMH is requesting that MDHHS comply with the State's obligations under that decree.

9

## Applicable Standard

### *Civil Contempt*

A consent decree is both a judgment of the court and a contract between the parties. *Loc. No. 93, Int'l Assoc. of Firefighters v. Cleveland*, 478 U.S. 501, 519 (1986).  As indicated, this Court retained jurisdiction over the Settlement Agreement, which the parties agree is a consent judgment.  The Federal Rules of Civil Procedure also expressly authorize a court to order a specific act or adjudge in civil contempt a party that fails to act within the time specified in a judgment of the court.  Fed. R. Civ. P. 70(a), (e).

Although "[r]ecognizing that the power 'to punish for contempts' should not be used lightly,' the Supreme Court has stated that this power 'is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law.'" *Elec. Workers Pension Tr. Fund of Loc. Union No. 58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911)).  The court retains the discretion to decide whether to use its contempt power.  *Id.* at 378 (citing *Peppers v. Barry*, 873 F.2d 967, 968 (6th Cir. 1989)).  This discretion "includes the power to frame a sanction to fit the violation."  *Id.* at 385 (quoting 11A Charles Alan Wright, Fed. Practice & Proc. § 2960 (2d ed. 1995)). "With respect to civil contempt proceedings, 'judicial sanctions may, in a proper case, be

10

employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" *Id.* at 379 (brackets and ellipsis omitted) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)).

"A party that seeks civil contempt sanctions must demonstrate by clear and convincing evidence that the opposing party knowingly 'violated a definite and specific order of the court.'" *NLRB v. Bannum, Inc.*, 93 F.4th 973, 979 (6th Cir. 2024) (quoting *Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 800 (6th Cir. 2017)) (internal quotation marks and citation omitted). This is "not a light burden" and is more stringent than proof by a preponderance of the evidence. *Gary's Elec.*, 340 F.3d at 379 (citation omitted). If the party satisfies this burden, "the burden shifts to the contemnor who may defend by coming forward with evidence showing that [the contemnor] is *presently* unable to comply with the court's order." *Bannum*, 93 F.4th at 980 (quoting *Gary's Elec.*, 340 F.3d at 379). The court may "also consider whether the [contemnor] 'took all reasonable steps within [its] power to comply with the court's order.'" *Gary's Elec.*, 340 F.3d at 379 (quoting *Peppers v. Barry*, 873 F.3d 967, 969 (6th Cir. 1989)).

*Mandamus*

"Mandamus is a 'drastic and extraordinary remedy reserved for really extraordinary causes.'" *In re King's Daughters Health Sys., Inc.*, 31 F.4th 520, 525

11

(6th Cir. 2022) (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004)).  "Because the writ of mandamus 'is one of the most potent weapons in the judicial arsenal, three conditions must be satisfied before it may issue.'"  *Id.* (quoting *Cheney*, 542 U.S. at 380).  Those conditions are: (1) the "petitioner must 'have no other adequate means to attain the relief it desires'"; (2) the "petitioner must show a 'clear and indisputable' right to the relief sought"; and (3) the "petitioner must show that issuing the writ is otherwise 'appropriate under the circumstances.'"  *Id.* at 525-26 (quoting *Cheney*, 542 U.S. at 380-81).

## Background

As previously described, the contingencies in the Settlement Agreement were not satisfied by the Drop Dead Date.  Therefore, thirty days before that date, MDHHS had to begin the process to adopt the costing-out provisions in Attachment C to the Agreement.  (ECF No. 401 at PageID.15297.)  MDHHS was required to amend its Medicaid Provider Manual within 120 days from the Drop Dead Date, or by October 1, 2025.  (*Id.*)  The Agreement required MDHHS, 90 days after Attachment C took effect—that is, by December 30, 2025—to provide non-binding guidance "illustrating the operation of the contract and Policy amendments" and "the operation of Attachment C of the Agreement[.]"  (*Id.* at 15295.)

As part of the process of implementing the costing out provisions in Attachment C, MDHHS issued two policy bulletins, which were effective October 1, 2025.  (ECF No. 423-2 at PageID.16857; ECF No. 423-3 at PageID.16864.)  According to WCCMH, the bulletins did not set forth detailed instructions for costing out CLS services but offered broad, general directives.[1]  Seeking more specific guidance, WCCMH reached out to MDHHS with a list of questions on October 1, 6, 8, 21, 28 and November 5, 2025.  (ECF No. 423-13 at PageID.16885.)  On November 12, 2025, WCCMH's Director of Recipient Rights and Compliance compiled a list of 15 unanswered questions and emailed them to MDHHS, proposing meeting dates to discuss them.  (ECF No. 424-1 at PageID.16975-76.)

A week later, on November 19, MDHHS responded only to state that the questions were being reviewed and further direction would follow.  (*Id*. at PageID.16975.)  WCCMH inquired again on November 25 and December 3.  (*Id*. at PageID.16974.)  WCCMH elevated its December 3 inquiry to the MDHHS Director of the Bureau of Specialty Behavioral Health Services, Kristen Morningstar.  On December 3, Ms. Morningstar responded, indicating MDHHS was working on answers to WCCMH's questions and would provide them soon.

---

[1] Although WACA disputes the lack of detail in the bulletins' instructions (*see* ECF No. 431 at PageID.17033-34), this does not negate WCCMH's assertion that the instructions left multiple questions unanswered for MDHHS' contractors.

(*Id*. at PageID.16975.)  When no answers were received by December 11, WCCMH sent another email to MDHHS.  (ECF No. 424-3.)

On December 8, 2025, WACA filed the pending motion to hold WCCMH in civil contempt or to issue the writ of mandamus.  (ECF No. 423.)  Four days later, on December 12, in an email to WCCMH and other providers, MDHHS answered one of WCCMH's questions.  (*See* ECF No. 424-4.)  According to WCCMH, "MDHHS's direction on this point provided a critical missing piece for WCCMH and the other CMHSs: how to determine the 'income' side for a given participant's budget equation."  (ECF No. 424 at PageID.1694.)  On December 17, MDHHS issued the non-binding guidance required under the Settlement Agreement.  (ECF No. 424-2.)

In the meantime, on September 17, 2025, Plaintiffs' counsel sent a letter to the Local Defendants' attorneys providing "notice of noncompliance" with the Consent Decree's provisions.  (ECF No. 423-4.)  Plaintiffs' counsel wrote, in part, that a letter from one of WCCMH's contractors, advising SD CLS beneficiaries of certain required modifications to their SD budgets as of October 1, 2025, violated Attachment C's requirement that benefits, such as PTO, be costed out as part of the staff wage component of the budget.  (*Id*.)  Stated differently, Plaintiffs' counsel asserted that reducing wages to account for the cost of ESTA violated the costing-out requirement.  (*Id*.)

14

WCCMH's counsel responded on September 24, pointing out that the violated provision Plaintiffs' counsel cited was not presently in the Medicaid Provider Manual and did not take effect until October 1.  (ECF No. 423-5.) WCCMH's counsel indicated, however, that WCCMH reached out to MDHHS regarding anticipated Medicaid Provider Manual language as it relates to ESTA. (*Id.*)  Counsel expressed that WCCMH would share the guidance received from MDHHS with its contractors.  (*Id.*)  On October 3, MDHHS issued a memorandum addressing ESTA and SD arrangements.  (ECF No. 423-7.)  The memo acknowledged that an "individual's budget may need to be increased to be able to cover ESTA."  (*Id.* at PageID.16873.)

Also in the months preceding MDHHS' issuance of its nonbinding guidance, but after the costing out policies were in effect, SD CLS recipients, who are WACA members, sought to develop their annual CLS budgets.  (*See generally* ECF No. 423.)  Each recipient's Support Coordinator indicated that a new IPO and budget could not be implemented or approved until MDHHS issued further guidance. (*See id.*)

## Discussion

### *Whether WCCMH, as a Non-Party to the Settlement Agreement, Can Be Held in Contempt for Non-Compliance with its Terms*

"[C]ourts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them."  *United States v. Bd. of Cnty.*

15

*Comm'rs of Hamilton Cnty.*, 937 F.3d 679, 688 (6th Cir. 2019).  As foretold in this Court's previous decision addressing Plaintiffs' request for a declaratory judgment, WCCMH, through its contract with MDHHS, is bound by the Settlement Agreement and can be held in contempt for failing to comply with its terms.  The Sixth Circuit Court of Appeals' decision in *Tennessee Association of Health Maintenance Organizations, Inc. v. Grier*, 262 F.3d 559 (2001), dictates this result. The Fourth Circuit Court of Appeals' decision in *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107 (2013), supports it too.

<u>*Whether WCCMH Should Be Held in Civil Contempt and*</u>
<u>*Whether the Writ of Mandamus Should Issue*</u>

The Court does not find clear and convincing evidence that WCCMH violated "a definite and specific" provision of the Settlement Agreement.  WACA, understandably, has advocated for immediate action to prepare and finalize its members' annual CLS budgets, incorporating the relief obtained through the Agreement.  Plaintiffs and WACA certainly waited a long time to obtain the relief they secured through the Settlement Agreement with the State Defendants. Nevertheless, the Court cannot agree with WACA that WCCMH was in a position to comply with its obligations as soon as it was clear that Attachment C of the Settlement Agreement (i.e., costing out) would be at play.

The Settlement Agreement set specific deadlines only for MDHHS. Moreover, it expressly contemplated that MDHHS would issue guidance for its

16

contractors, like WCCMH, with respect to the costing out provisions.  The Agreement gave MDHHS until December 30, 2025 to provide that guidance.  The motion for contempt was filed several weeks before that deadline.

As WACA's counsel argued at the motion hearing, the process must be individualized, focusing on the specific needs of the recipient.  Nevertheless, MDHHS and the entities with which it subcontracts must distribute state funds prudently.  Therefore, the process cannot be untethered to any State guidelines. WCCMH reasonably could not finalize and approve budgets for recipients, which included consideration of ESTA's requirements, prior to receiving that guidance. The evidence reflects that WCCMH took all reasonable steps within its power to demand further guidance from MDHHS sooner than the December 30 deadline.

Supplemental materials filed by WACA prior to the contempt hearing suggested that WCCMH still was not finalizing annual CLS budgets, even though it received some of the guidance it claimed it needed and answers to its "technical assistance" questions from MDHHS on December 17 and 22, respectively.  (ECF No. 432.)  However, evidence also supports WCCMH's assertion that it still needed more answers from the State to do so.  By the time of the hearing, WCCMH was taking steps to comply with its obligations.  Since the hearing, it has done even more, and individual budgets are being completed or are in the process of being completed.

17

Thus, the Court does not find WCCMH in civil contempt.  As the discussion above suggests, the Court also does not find "really extraordinary causes" warranting the writ of mandamus.

### *Conclusion*

Implementation of the Settlement Agreement undoubtedly has been disappointingly slow, but the Court cannot conclude that WCCMH violated any of its clear and specific terms.  WCCMH is reasonably relying on—and was reasonably waiting for—MDHHS guidance to cost out recipient budgets.  It seems that it is the State that has failed to move with deliberate speed to provide that guidance and otherwise work with PIHPs and communication organizations like WCCMH to ensure the Agreement's terms are met.  However, WACA did not move to hold MDHHS in civil contempt.[2]  Without notice that relief is being sought against it and an opportunity to be heard, the Court finds it inappropriate, presently, to order MDHHS to do anything.

While the Court declines, at this juncture, to hold WCCMH in civil contempt and finds the writ of mandamus unwarranted, it does conclude that the

---

[2] The Settlement Agreement circumscribes Plaintiffs' rights to seek enforcement against MDHHS.  (*See* ECF No. 300-1 at PageID.-7142-44, § A(4)(c)-(f).) Considering those limitations, and because negotiation may be more productive than filing motions, the Court welcomes a request, made through its Case Manager, to meet with the parties to discuss, or to refer to mediation, any alleged noncompliance in the future, and before a motion is filed.

Settlement Agreement is enforceable against the Local Defendants.  If the progress that appears to be happening stops or slows, WACA and/or Plaintiffs may return to the Court for relief.  The threatened "hammer" of civil contempt—which WACA's counsel surmised was the reason for any progress since the filing of its contempt motion—remains.

Accordingly,

**IT IS ORDERED** that the motion for order to show cause or for the writ of mandamus (ECF No. 423) is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: April 7, 2026

19